1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

David L. Cummin, M.D.,       :
et al.,
                             :
        Plaintiffs,
                             : Case No. 2:15-cv-1043
        vs.                    Judge Sargus
                             : Magistrate Judge King
Lanny North, et al.,
                             :
        Defendants.
                             :


- - - - -

DEPOSITION OF JEREMY DYE

- - - - -


Taken at Brunner Quinn
35 North Fourth Street, Ste. 200
Columbus, OH 43215
November 9, 2015, 11:19 a.m.


- - - - -


Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFFS:
3
        Brunner Quinn
4       35 North Fourth Street, Ste. 200
        Columbus, OH 43215
5       By Rick L. Brunner, Esq.

6

   ON BEHALF OF DEFENDANTS:
7
        Lambert Law Office, LLC
8       215 South 4th Street
        Ironton, OH 45638
9       By Randall L. Lambert, Esq.

10

   ON BEHALF OF DEFENDANT VALKINBURG:
11
        Isaac Wiles Burkholder & Teetor, LLC
12      2 Miranova Place, Ste. 700
        Columbus, OH 43215
13      By J. Stephen Teetor, Esq.

14

   ON BEHALF OF THE WITNESS:
15
        Timothy P. Gleeson, Esq.
16      47 North Market Street, Suite 204
        P.O. Box 148
17      Logan, OH 43138

18

19

   ALSO PRESENT:
20
        Lanny North
21      David Valkinburg
        Edwin Downs
22

23

24

3

1                    Monday Morning Session

2                     November 9, 2015, 11:19 a.m.

3                        - - - - -

4                S T I P U L A T I O N S

5                        - - - - -

6        It is stipulated by counsel in attendance that

7     the deposition of Jeremy Dye, a witness herein,

8     called by the Plaintiffs for cross-examination,

9     may be taken at this time by the notary pursuant

10    to notice and subsequent agreement of counsel that

11    said deposition may be reduced to writing in

12    stenotypy by the notary, whose notes may

13    thereafter be transcribed out of the presence of

14    the witness; that proof of the official character

15    and qualification of the notary is waived.

16                        - - - - -

17

18

19

20

21

22

23

24

4

1                              I N D E X

2    Examination By                                      Page

3    Mr. Brunner - Cross                                    6
     Mr. Lambert - Cross                                   40
4    Mr. Teetor - Cross                                   110
     Mr. Lambert - Further Cross                          188

5

6    Exhibits                                            Page

7    Exhibit 1 - Subpoena, 8-14-15                         10

8    Exhibit 1.1 - Plaintiffs' Notice of Service of       11
                   Subpoena
9
     Exhibit 1.2 - USPS Document                           11
10
     Exhibit 2.0 - Subpoena to Attend and Give            13
11                 Testimony at a deposition

12   Exhibit 3.0 - McKnight's card                         13

13   Exhibit 4.00 - Document                               15

14   Exhibit 5 - Complaint                                 20

15   Exhibit 6 - Letter to Dye from Brunner, 1-9-15        27

16   Exhibit 7 - Photos                                    31

17

18

19

20

21

22

23   (Exhibits returned to Mr. Lambert.)

24

5

```
 1                        JEREMY DYE

 2   being first duly sworn, testifies and says as

 3   follows:

 4              MR. TEETOR:  Rick, before you start --

 5              MR. BRUNNER:  Okay.

 6              MR. TEETOR:  -- I would like just to

 7   make a record that I think in federal court

 8   depositions if you're going to video, you need to

 9   do it in accordance with the rules that the

10   federal court requires.  I object to this.  I'm

11   not going to attempt to stop the deposition unless

12   Mr. Dye and his attorney object to it, but I do

13   want to make my record for that.  And I want it

14   known that there won't be any videotaping in this

15   manner of my witnesses without court approval

16   first.

17              MR. LAMBERT:  And, Randall Lambert, I

18   will join in for my clients also.

19              MR. GLEESON:  This is Tim Gleeson.  We

20   offer no objection, no position either way.

21              MR. BRUNNER:  Steve, have you filed a

22   notice of appearance yet?

23              MR. TEETOR:  Nope.  I'm about to.

24              MR. BRUNNER:  Okay.
```

6

```
 1                        - - - - -

 2                    CROSS-EXAMINATION

 3    BY MR. BRUNNER:

 4    Q.          Please state your name for the record.

 5    A.          My name is Jeremy Dye.

 6    Q.          Mr. Dye, hi, my name is Rick Brunner.

 7    I'm one of the attorneys for the plaintiff in this

 8    lawsuit.  Have you ever had your deposition taken

 9    before?

10    A.          No, sir.

11    Q.          A deposition is a procedure whereby I

12    attempt to get to the truth of matters involved in

13    this matter of litigation.  And to that end, it

14    makes no sense for me to get a wrong answer or to

15    confuse the witness or at any time, to say

16    anything that -- that gets -- elicits the wrong

17    information from you.  To that end, I tend from

18    time to time to adapt the speech patterns of our

19    former president George W. Bush and mix-up syntax

20    and words and so forth.  If I do that, will you

21    please just say I don't understand the question?

22    A.          Absolutely.

23    Q.          Okay.  If at any time you need a break

24    to confer with your counsel or anything or, pardon
```

1    me, I don't know if you are a smoker and you need

2    to have a cigarette or you just need to get up and

3    stretch your legs, will you just say we need a

4    convenience break?

5    A.        Yes, sir.

6    Q.        Okay.  Do you have any physical

7    difficulties or are you taking any medications

8    that we need to be aware of here today?

9    A.        No, sir.

10   Q.        Okay.  Well, the first part of the

11   deposition is for me to ask a little bit about you

12   so I understand the person answering questions

13   here today.  To that end, I'm going to ask a

14   little bit about your background.  Now, I assume

15   you graduated from high school?

16   A.        Yes, sir.

17   Q.        Where did you graduate from high

18   school?

19   A.        Lancaster High School, 1995.

20   Q.        Okay.  And after high school did you

21   pursue any education?

22   A.        I've got a degree, associates degree,

23   from DeVry University.

24   Q.        And what did you study at DeVry

8

```
 1    University?

 2    A.          Graphic -- computer graphic design.

 3    Q.          After you left DeVry University, what

 4    kind of work did you take up?

 5    A.          I'm currently employed at Geico as an

 6    outside senior investigator.

 7    Q.          Okay.

 8                MR. LAMBERT:  I'm sorry.  Would you

 9    care to speak up a little bit?  I'm having a hard

10    time hearing.

11    A.          I'm sorry.  Senior outside investigator

12    for fraud.  I work for Geico Insurance.

13    Q.          Well, prior to that, where did you

14    work?

15    A.          I worked at the Hocking County

16    Sheriff's Office.

17    Q.          And prior to the Hocking County

18    Sheriff's Office, where did you work?

19    A.          I worked at Ricart Automotive Security.

20    Q.          Okay.  And was that while you were in

21    school?

22    A.          No.  Actually, when I went to school, I

23    was working and employed at the Hocking County

24    Sheriff's Office.
```

9

```
 1    Q.          Okay.

 2    A.          And after I got out of college.

 3    Q.          Okay.  And how long were you with the

 4    Hocking County Sheriff's Office?

 5    A.          Including my auxiliary time, I would

 6    say 16 years, since 1998.

 7    Q.          Okay.  Was there a time that you worked

 8    there full-time?

 9    A.          From '99 to 2014.

10    Q.          Okay.  And when did you leave in 2014?

11    A.          Would have been September 12th, 2014

12    when I --

13    Q.          After you left the Hocking County

14    Sheriff's Office, did you have any further

15    involvement with them?

16    A.          I kept a commission there, yes.

17    Q.          And what does that mean to keep a

18    commission there?

19    A.          Just keep up on your training and that

20    your OPOTA certificate would remain valid.

21    Q.          Is that OPOTA certificate?

22    A.          Yes.  Police Officer Training Academy.

23    Q.          When you say OPOTA, it means Ohio

24    Police Officers?
```

```
1    A.          Yes.

2    Q.          Okay.  And you're currently employed

3    for Geico Insurance?

4    A.          Correct.  I'm also currently enrolled

5    at Columbus State University.

6    Q.          What did you do at Geico?

7    A.          Senior outside field investigator.  I

8    investigate insurance fraud.

9    Q.          And how long have you had that

10   position?

11   A.          A little over about 14 months, roughly.

12   Q.          Are you married?

13   A.          Yes, sir.

14   Q.          How long have you been married?

15   A.          Going on 11 years, 12 years.

16   Q.          Okay.  Do you live in Hocking County?

17   A.          Yes, sir.

18                         - - - - -

19          Thereupon, Dye Exhibit 1 is marked for

20   purposes of identification.

21                         - - - - -

22   Q.          Okay.  I'm handing you what's been

23   marked as Dye Deposition Exhibit 1.  Would you

24   take a moment, review it and identify it for the
```

1    record?

2    A.          This appears to be the subpoena that I

3    received certified mail requesting documents or

4    objects that I had in my possession to you.

5                    - - - - -

6            Thereupon, Dye Exhibit 1.2 is marked for

7    purposes of identification.

8                    - - - - -

9    Q.          Okay.  I'm handing you what's been

10   marked as Dye Deposition Exhibit 1.2.  What's

11   this?

12   A.          This is where I received the -- it

13   looks like the tracking and the -- the receipt

14   where I signed for the documents for the subpoena.

15   I'm sorry.

16                    - - - - -

17           Thereupon, Dye Exhibit 1.1 is marked for

18   purposes of identification.

19                    - - - - -

20   Q.          Okay.  A little bit out of order, but

21   I'm handing to you what's been marked as Dye

22   Deposition Exhibit 1.1.  What's this document?

23   A.          This is a notice of a subpoena.

24   Q.          Okay.  You have not seen this document

1    before today?

2    A.        This one?

3    Q.        Yes.

4    A.        I don't think so.

5    Q.        Okay.  Now, we've looked at Exhibit 1

6    through 1.2 and 1.3.  And those are in early

7    August; is that correct?

8    A.        Correct.

9    Q.        When you received those documents --

10             MR. LAMBERT:  We don't have 1.3 I

11   think.

12             MR. BRUNNER:  You have 1.1 through 1 --

13             MR. LAMBERT:  Oh, you said 1.0 --

14             MR. BRUNNER:  I apologize.  I'll strike

15   that question.  Thank you for the clarification.

16   Q.        When you received Exhibits 1 through

17   1.2, and this will be in August, at that time in

18   early August did anyone contact you from

19   Mr. Lambert's office and tell you that you were

20   represented by counsel?

21   A.        No, sir.

22   Q.        In that early first two months [sic] of

23   August, did anyone contact you and tell you that

24   you were represented by counsel at that point?

13

```
 1    A.          No.

 2                        - - - - -

 3                Thereupon, Dye Exhibit 2.0 is marked for

 4    purposes of identification.

 5                        - - - - -

 6    Q.          Did you comply with the subpoena?

 7    A.          I had to.

 8    Q.          Okay.  I've handed you what's been

 9    marked as Deposition Exhibit 2.  Take you moment

10    and review it for the record.  Is Exhibit 2 the

11    document by which you're here today?

12    A.          Yes.

13    Q.          Okay.  And what -- and did you get an

14    Exhibit 2 towards the end of August?

15    A.          I believe so.

16    Q.          Okay.  I'm handing you what's been

17    marked as Deposition -- Dye Deposition Exhibit 3.

18    Do you recognize this document?

19                        - - - - -

20                Thereupon, Dye Exhibit 3.0 is marked for

21    purposes of identification.

22                        - - - - -

23    A.          Yep.

24    Q.          What is this document?
```

14

```
1     A.            That was the picture I took of a

2     business card that I had found on my front door

3     while I was opening it for my kids and I to watch

4     a storm.  The card fell on the floor and all I saw

5     was Tom McKnight, Felony Investigator, Athens

6     County Prosecutor's Office.  Excuse me.

7                   MR. TEETOR:  I'm sorry.  I couldn't

8     hear.

9                   MR. LAMBERT:  I couldn't hear you.

10                  MR. TEETOR:  If you wouldn't mind, try

11    to keep your voice up just little bit.

12    A.            It's a business card for the Athens

13    County Prosecutor's office.  After work I opened

14    the front door to my residence and this card fell

15    on my floor that was stuck -- somebody had -- I'm

16    assuming it would be Mr. McKnight -- had stuck it

17    in my door to my residence, a felony investigator.

18    Q.            And you received Exhibit 3 around the

19    time that you got Exhibit 2?

20    A.            It was after I received all the

21    subpoenas.

22    Q.            Okay.  Did you ever talk to him?

23    A.            Mr. McKnight?

24    Q.            Yes.
```

15

1    A.        No.

2    Q.        Okay.

3              MR. LAMBERT:  Was that a no?

4    A.        No.  Correct.  No.

5                        - - - - -

6         Thereupon, Dye Exhibit 4.00 is marked for

7    purposes of identification.

8                        - - - - -

9    Q.        I'm handing you what's been marked as

10   Dye Deposition Exhibit 4.  Is this a text message

11   that you received on or about September 10th?

12   A.        Yes.

13   Q.        And do you know what this was about?

14   A.        This was a series of contacts I had

15   that day.

16   Q.        Okay.

17   A.        The first one I received a phone call

18   from Dave Valkinburg wanting me to come into his

19   office to meet with Mr. Lambert.  I was highly

20   upset because I received that I was being

21   investigated for OHLEG violations.  He actually

22   woke me up and I told him I would be in there.

23   And I called him back after thinking it, I'm not

24   going in there, I called him and told him.  That's

1  when he told me if I didn't talk to Mr. Lambert

2  that Lanny North would withdraw my commission.

3  Q.       You said you were told that you were

4  being investigated for OHLEG in --

5  A.       I received -- I was told from sources,

6  friends of mine along with Dr. Cummin that they

7  were at -- looking into disseminating OHLEG

8  information.

9  Q.       All right.  So you were electing to

10  meet with Mr. Lambert at that point?

11  A.       Absolutely.

12  Q.       Had you ever received other texts over

13  the summer from the Sheriff North?

14  A.       I believe I received one back in July.

15  It wasn't from Sheriff North, though.

16  Q.       Who was it from?

17  A.       Dave Valkinburg.

18  Q.       And what did that text say?

19  A.       It said that he heard I was talking bad

20  about the office, that he received information

21  that I was talking bad about the office.

22  Q.       Did you have a conversation with the

23  Sheriff's Office at that time?

24  A.       I did stop in to the office and he just

1    told me that he doesn't think of a reason why his

2    source that told him this would lie.

3    Q.        Okay.  Did he tell you what -- that you

4    had allegedly said about the office?

5    A.        He had told me that he heard I was

6    saying that I -- I'm glad I got out of there

7    before the backstabbing started.

8    Q.        Okay.  Anything else was said?

9    A.        That was about it.

10   Q.        Now, you said a moment ago that you

11   chose not to meet with Mr. Lambert at that point;

12   is that correct?

13   A.        Correct.

14   Q.        Okay.  Did you receive further contacts

15   from the Sheriff's Office?

16   A.        Well, first when I -- my initial

17   contact with Dave Valkinburg, I told him that they

18   -- the reason was because they were sending

19   investigators to my house --

20   Q.        Okay.

21   A.        -- involving this.  And he said that

22   they -- the Sheriff's Office did not send

23   investigators.  So I raised my voice to him.

24   Upset that they're even trying to do something

```
 1    like this with the OHLEG.  And I told him they

 2    could take my commission, that I resign it, and

 3    that was the end of that conversation.

 4    Q.        Okay.  Did you receive further contact

 5    from the investigators?

 6    A.        Well, that day -- I also told

 7    Mr. Valkinburg that I was going to seek counsel,

 8    too --

 9    Q.        Okay.

10    A.        -- before we ended the phone call.

11    Then later that day I actually turned all my stuff

12    in to the office, then I received the text that's

13    in front of me here from Lanny.  I just didn't

14    respond to that.

15    Q.        Okay.

16    A.        And then I went to one of the

17    restaurants on my lunch break and ate.  And

18    Mr. Lambert called me and wanted me to come in and

19    talk to him.  And I told him what had happened and

20    I'm getting counsel.

21    Q.        Okay.  And after you told Mr. Lambert

22    you were getting counsel, did you get further

23    contact from investigators?

24    A.        Yes, sir.
```

```
 1   Q.          Who was the next investigator that

 2   called you?

 3   A.          I believe it was Doug Edgington.

 4   Q.          Okay.  Who's Mr. Edgington?

 5   A.          At the time I was unaware of who he

 6   was.  I -- I looked up some information and he was

 7   actually an auxiliary with the Sheriff's Office.

 8   Q.          Okay.  Did he tell you what he wanted?

 9   A.          Yeah.  He wanted to meet with me to

10   talking about some OHLEG information,

11   disseminating OHLEG.  I was actually on vacation.

12   Q.          Okay.  And do you recall when about

13   that occurred?

14   A.          That happened I think it was the 17th

15   of September because I was on vacation -- 17th or

16   18th.  I was in Daytona Beach.

17   Q.          Okay.  And what did you tell

18   Mr. Edgington?

19   A.          I asked Mr. Edgington what agency he

20   was from.  And he just kept saying he was hired by

21   Hocking County to do an internal affairs

22   investigation.

23   Q.          Okay.

24   A.          Again, I asked him what agency he was
```

1    representing.  And he just repeated that he was

2    with Hocking County Sheriff's Office conducting an

3    internal affairs investigation.  And that's when I

4    told him he just needed to talk to my attorney.

5    Q.        Okay.  Did you speak to him again after

6    that point?

7    A.        No, sir.

8                    - - - - -

9            Thereupon, Dye Exhibit 5 is marked for

10   purposes of identification.

11                   - - - - -

12   Q.        I'm handing you what I'm going to mark

13   as Dye Deposition Exhibit 5.  Take a moment,

14   review it and identify it for the record if you

15   can.

16   A.        This appears to be the lawsuit filed in

17   the Eastern District of Ohio Federal Court on

18   behalf of Mr. Cummin to the defendants.

19   Q.        I'd like you to turn to page 15,

20   paragraph 63.

21   A.        Did you say you wanted me to read that?

22   Q.        No.  Just turn to paragraph 63.

23   A.        Okay.

24   Q.        Read it to yourself and then I'm going

1    to ask you some questions.

2    A.          Okay.

3    Q.          Okay.  Now let's take a look at -- it's

4    marked with the bowtie there, Exhibit 4.  And turn

5    the page.  Do you recognize those charges?

6    A.          Yes.  These ones, yes.

7    Q.          Have you seen them before today?

8    A.          Not this one, that looks like the

9    service.  This one, yes.

10            MR. LAMBERT:  I can't hear you.

11            MR. TEETOR:  I can't hear you.

12    A.          Yes.  Every other one, yeah, I

13    recognize.

14            MR. TEETOR:  I couldn't hear what we're

15    referring to, Rick, can you --

16            MR. BRUNNER:  It's Exhibit 4 of the

17    complaint.

18    Q.          Every other one.  You don't recognize

19    the summons is what you're saying?

20    A.          Right.  Right.  Just I never saw the

21    summons, just a copy of the serve right here.

22    Q.          Okay.

23    A.          Not the return.  The one that's filed

24    -- actually, the ones that just have my name on it

1    or the ones that have my signatures on it are the

2    ones I recognize.

3    Q.          Okay.  You said they had your signature

4    on them.  Where do they have your signature on

5    them?

6    A.          On the bottom, Peace Officer Authorized

7    to Administer Oaths --

8    Q.          Okay.  So you actually --

9    A.          Notarized them.

10    Q.          -- notarized them?

11    A.          Uh-huh.

12    Q.          Okay.  Where did that take place?

13    A.          It was at my desk.

14    Q.          Okay.  And where was your desk at that

15    point?

16    A.          It sat next to Ed Downs' desk.

17    Q.          And what was the -- a postal address of

18    that?

19    A.          48 -- it's the prosecutor's office.

20    Q.          Okay.

21    A.          Never really -- it was always 25 East

22    Second Street.  So it's Market Street 89 or

23    something of that nature on 89th --

24    Q.          So your desk was actually located in

1   the prosecutor's office?

2   A.          Correct.

3   Q.          Okay.  Do you recall the day that these

4   were sworn out?

5   A.          The day?

6   Q.          Yeah.

7   A.          I recall the day, yeah.  I don't if you

8   are asking me for the date and time now.

9   Q.          All right.

10  A.          But the day, yes.

11  Q.          And this took place in the prosecutor's

12  office?

13  A.          Yes.

14  Q.          Okay.  And is a that relatively small

15  building?

16  A.          It's an old Victorian style house

17  converted to the prosecutor's office.  Myself and

18  Ed Downs shared an office, so it was pretty

19  decent-sized, enough for two desks in there.

20  Q.          Okay.  And where was your office

21  located?  Was it on the first floor or second?

22  A.          First floor, the last when you walk in.

23  Q.          How far away are you from the

24  prosecutor's -- prosector's employees?

```
 1    A.          There's employees on the first floor.

 2    You have the receptionist, then you have a

 3    victim's advocate, plus you had the conference

 4    room which was right across from our office.  The

 5    prosecuting attorney's offices are actually

 6    upstairs along with their -- one of their clerks.

 7    Q.          Okay.  What was the atmosphere in the

 8    office when these particular charges were sworn

 9    out?

10    A.          Jubilant.

11    Q.          Okay.  What do you mean by "jubilant"?

12    A.          It was pretty cheerful.

13    Q.          Okay.  Did -- were people making a lot

14    of noise about this?

15    A.          Yeah.  They were pretty much

16    high-fiving each other, very excited.

17    Q.          You said they were high-fiving each

18    other.  Who was high-fiving?

19    A.          All I can remember, Laina and Ed -- I

20    tried to keep to myself on -- on that stuff.  It

21    was --

22    Q.          Okay.  Did they make any statements

23    about what they were going to do?

24    A.          I just remember Laina claiming that if
```

25

1    you mess with the bull, you're going to get the

2    horns.

3    Q.          Okay.

4                MR. LAMBERT:  What was that again?

5    I --

6    A.          If you mess with the bull, you're going

7    to get the horns.  And they were laughing and

8    proud of doing this is what it seemed from my

9    perspective.

10   Q.          Okay.  Were there comments made about

11   arresting the coroner?

12   A.          I don't recall anything being -- well,

13   I did hear Mr. Downs make several statements prior

14   to all this that he wanted to arrest him

15   personally and all that.

16   Q.          Okay.  But not that particular day?

17   A.          It was not that day that I recall.

18   Q.          Okay.  Was this a result of a -- was

19   this a spur-of-the-moment thing or was this

20   something that was a long time coming?

21   A.          It was -- I think it was a long time

22   coming.  I can remember just the tension between

23   the coroner and the Sheriff's Office since Chief

24   Speckman was in there.

26

1    Q.          Okay.

2    A.          It's been going on and it just started

3    getting worse and worse and worse and -- and it

4    affects everybody in that office.

5    Q.          Okay.  Was there an investigation

6    leading up to these particular charges being

7    filed?

8    A.          I -- I believe there was.  To my

9    knowledge, that the State declined to file any

10   charges.  The Sheriff's Office was upset.  I do

11   recall Ed Downs making the comment that she better

12   do something this time.

13   Q.          And the comment "she better do

14   something this time," who were they talking about?

15   A.          I'm assuming they're referring to

16   Laina.

17   Q.          Okay.  And that's the prosecutor?

18   A.          Yes.  My signature's on there.  I don't

19   know if you wanted to get back to that.

20   Q.          Yeah.

21   A.          Okay.

22   Q.          Your signature's on there, and I

23   recognize that you -- that you just took those --

24   was anything said at the time you took your --

```
 1    A.          Yeah.  He put it down that they were

 2    looking for someone to notarize the charges and I

 3    guess they chose me.

 4    Q.          Okay.

 5    A.          And he put it down in front of me and

 6    actually told me, here, we'll have you notarize it

 7    and get you involved in the lawsuit, too.

 8    Q.          Okay.  They expect -- in other words,

 9    you take that as they were expecting a lawsuit to

10    be filed over this?

11    A.          I --

12                MR. TEETOR:  Objection.

13    A.          It was a joke.  That's my opinion.

14    That's what was told to me.

15    Q.          Okay.

16                          - - - - -

17                Thereupon, Dye Exhibit 6 is marked for

18    purposes of identification.

19                          - - - - -

20    Q.          I've just handed you what's been marked

21    as Dye Deposition Exhibit 6.  Have you seen this

22    document before today?

23    A.          Yes.

24    Q.          Okay.  Were you at the Sheriff's Office
```

1    back in January of 2015?

2    A.          As an auxiliary deputy.

3    Q.          Okay.  At that time did you know that

4    you received that letter?

5    A.          At the time of January?

6    Q.          Yes.

7    A.          That I received this?

8    Q.          Yeah.

9    A.          Yeah, I believe I received it in

10   January.

11   Q.          Okay.  And did you read the letter at

12   that time?

13   A.          Yes.

14   Q.          Okay.  In carrying out the

15   investigation of the coroner, was there a file

16   created in the Sheriff's Office?

17   A.          There was a file on the server, I

18   believe it was labeled Coroner, that had been in

19   there quite some time, so, yes.

20   Q.          Do you have an idea of how big the file

21   was?

22   A.          As far as megabytes, no, I couldn't.

23               MR. LAMBERT:  I couldn't hear you.

24   A.          As far as megabytes, no, I do not.

1   Q.       Do you have an impression on how big it

2   was?

3   A.       There was some documents in there, yes,

4   along with audio recordings.

5   Q.       Okay.

6           MR. LAMBERT:  You trailed off again.

7   The last part of it?

8   A.       There was documents along with audio

9   recordings.

10   Q.       Did you do anything to preserve

11   documents on the Sheriff department's computer at

12   the time this letter was received?

13   A.       Did I try to do anything?

14   Q.       Yes.

15   A.       No, I wasn't even in the office.

16           MR. LAMBERT:  I couldn't hear you.

17   A.       No, I wasn't working at the office.

18   Q.       Do you have any idea what was done to

19   preserve documents when that letter was received?

20   A.       I don't know what was done to preserve

21   any documents.

22   Q.       When you left the Sheriff's Office, was

23   that file intact?

24   A.       To my knowledge, yes, it was still on

1    there.

2    Q.          And you said it was labeled Coroner?

3    A.          Yes, I believe it was labeled Coroner.

4    Q.          And was that document put together over

5    -- right before the criminal charges were filed or

6    is that something that was gathered over time?

7    A.          Yeah.  It's just been on there as far

8    as I know.  The origin of it, I couldn't answer

9    that.

10   Q.          Okay.  Do you have any impression of

11   what kind of time was spent putting that file

12   together?

13              MR. TEETOR:  Objection.

14   A.          Again, I -- there was stuff on there.

15   I --

16   Q.          Okay.

17   A.          -- couldn't --

18   Q.          What kind of effort did the Sheriff's

19   Office put in to bringing charges against the

20   coroner?

21   A.          I -- I believe there was one document

22   on there that Ed Downs had written to Laina.  I

23   believe it was prior to the writ of mandamus that

24   was against him outlining why he should be charged

1    with several charges, and he even quoted the ORC

2    in those on that document.  Then there was also a

3    recording where he was interviewing Alex Pavluck.

4    And I don't know if you have that recording.  It

5    speaks for itself.

6    Q.          Do you recall that recording and what

7    was on it?

8    A.          What I recall is they were asking Alex

9    if he knew of anything -- I should -- in his

10   financials that they could charge him with and if

11   his wife would be willing to talk to them so they

12   could find something to charge him with.  When I

13   say "they," it was Dave Valkinburg, Ed Downs

14   present.

15   Q.          And do you have any idea why they would

16   be interviewing Alex Pavluck?

17   A.          They wanted to charge the coroner with

18   something.

19                      - - - - -

20            Thereupon, Dye Exhibit 7 is marked for

21   purposes of identification.

22                      - - - - -

23   Q.          A little bit ago I had showed you a

24   copy of the subpoena that we had asked you to -- a

1    subpoena to bring documents to this office.  I'm

2    handing you what's been marked as Exhibit 7.  Can

3    you identify this?

4    A.          Yeah.  This is the OHLEG that I found

5    in Ed Downs' drawer.

6    Q.          Okay.  And it's -- it's a photograph of

7    it?

8    A.          Yes.

9    Q.          And it's under some documents, right?

10   A.          It was clearly visible from the -- when

11   you pulled the drawer out.

12               MR. LAMBERT:  I can't hear you.

13   A.          It was clearly visible when you pulled

14   the drawer out.

15   Q.          Let's turn to the next page of this

16   exhibit.  What is this?

17   A.          Let me see -- oh, the next page.

18   Q.          Yeah.

19   A.          We may be on different pages here.

20               This is his desk in his office showing

21   where it was found, where it was at.

22   Q.          Okay.  And what's the next page you

23   have?

24   A.          The next page is showing exactly what

1    it was.

2    Q.        Okay.  And what's the last page?

3    A.        The last page there, we have them out

4    of order.  I don't know if they're out of order or

5    not, but it's the second one that was behind.

6    Q.        Okay.

7              MR. LAMBERT:  Yeah, first of all, I

8    didn't hear you.  Second of all, that's -- that's

9    not the order I have.  Do we need to get them in

10   order?

11             MR. BRUNNER:  All right.

12             MR. TEETOR:  And I apologize, too, but

13   I'm having a really hard time hearing you.

14             THE WITNESS:  That's all right.  I'm a

15   soft talker.

16             MR. LAMBERT:  The first word is okay,

17   then you tail off.  The last word you can't hear

18   at all.

19             MR. BRUNNER:  I'm going to put in the

20   lower right-hand corner Arabic numerals -- or

21   lower left-hand corner because I'm a lefty, 1, 2,

22   3 and 4.  And I will put mine in the same order

23   and we will go through and do the same thing.

24             MR. LAMBERT:  Tell us what each one of

1    them are and we'll see --

2              THE WITNESS:  It was pictures.

3              MR. LAMBERT:  What number?

4              MR. BRUNNER:  Yeah.  You should have

5    the same order.  I think it was me that got them

6    out of order because mine aren't stapled.

7    Q.       Well, it's -- page 1 is marked

8    Exhibit 7.  It's the sideways photo.  Same order.

9              Page 2 is a picture of a gentleman held

10   -- and it has a hand in it.  Is that the same 2

11   that you all have?

12             MR. LAMBERT:  Yes.

13             MR. BRUNNER:  Page 3 is picture of

14   lady.

15             MR. LAMBERT:  Okay.

16             MR. BRUNNER:  A larger page.

17             And page 4 is also a picture of the

18   lady but also includes a picture of the desk.

19             MR. LAMBERT:  Okay.

20   Q.       All right.  We are in the same order

21   then.

22   A.       Okay.

23   Q.       And these were the pictures that you

24   produced in response to the subpoena that was

1    served upon you; is that correct?

2    A.          I didn't -- I had the pictures.

3    Q.          Okay.

4    A.          I'm sorry.  I had turned those over.

5    Q.          Turned those over in response to the

6    subpoena?

7    A.          Correct.

8    Q.          Did you give them to anybody else?

9    A.          No.

10   Q.          Okay.

11   A.          Well, yes, when I found it, I sent them

12   to Captain Alford when I reported it to him.

13   Q.          Okay.  And that was when -- when did

14   you report it to Captain Alford?

15   A.          I'm thinking it was in late spring,

16   early spring.

17   Q.          All right.

18   A.          When I found it -- what happened, if

19   you want to hear the story --

20   Q.          Okay.

21   A.          -- of where I found it.  Was I conduct

22   interviews on people.  And when I -- I don't take

23   notes, I record them.

24   Q.          All right.

36

1    A.          And when I would record them, I would

2    transcribe them back onto a statement.  When I

3    would do this, I would use headphones so I didn't

4    disturb everybody in the office.  I've always done

5    it; it's a practice that I've always done.  Those

6    headphones were kept in Ed Downs' drawer, bottom

7    left.  So I went over there and I opened the

8    drawer to get the headphones out and all I see is

9    what you see in this picture right here.

10   Q.        Okay.

11   A.          I know that Will Kernen was

12   Dr. Cummin's present attorney representing him for

13   the writ of mandamus.

14   Q.        Okay.

15   A.          That's illegal, as I understand -- if

16   there was an investigation that they had on him,

17   the last person on the planet that should be doing

18   it would be Ed Downs.  It should be an outside

19   source doing that.  Also aware that they just

20   discharged Kevin Groves with the same thing,

21   running attorneys or judges in that county.  And

22   he was presently awaiting trial.  I felt that was

23   illegal for them to be doing that.  I took

24   pictures of it.  That way if somebody did find out

1    about it, they couldn't say Jeremy did it.  And I

2    reported it to the only person I thought I could

3    report it to that would -- something would get

4    done about it would be Captain Alford.

5    Q.        Okay.  And what did Captain Alford tell

6    you at that time?

7    A.        He agreed with me that it was illegal.

8    Q.        You said it was in the spring.  Was

9    this the spring of 2014?

10   A.        '14, correct.

11   Q.        When you were still working there

12   full-time?

13   A.        Yes.

14   Q.        Okay.  Do you know what Captain Alford

15   did about it?

16   A.        You'd have to ask Captain Alford.

17   Q.        Okay.

18             MR. TEETOR:  I can't hear you.

19             THE WITNESS:  You'd have to ask Captain

20   Alford.

21             MR. TEETOR:  Thank you.

22   Q.        You said Captain Alford agreed he

23   thought it was a problem?

24   A.        Yes.

```
1    Q.          A minute ago you said you thought Ed

2    Downs was the last person that ought to be running

3    a check on Will Kernen.  Why is that?

4    A.          Because Will Kernen was representing

5    the coroner.

6    Q.          Do you know who Scott Blazer is?

7    A.          I'm familiar with Scott Blazer.

8    Q.          Okay.

9    A.          Not personally, I just know the name.

10   Q.          Has Mr. Blazer been in the office?

11   A.          Yeah, he's been in both offices.

12   Q.          Okay.  When you were still working

13   there, was he -- did he come into the office?

14   A.          Yes.

15   Q.          Did you ever see Scott Blazer reviewing

16   phone records of the coroner?

17   A.          I recall them having phone records.

18   Q.          Do you recall where they came from?

19   A.          I don't know where they came from.

20   Again, I tried to keep to myself --

21   Q.          Okay.

22   A.          What I recall is they were going over

23   each number on -- on the list and trying to

24   identify who it was.  And I do remember Scott
```

1    Blazer calling some of the numbers they didn't

2    recognize and pretty much pranking it saying, hey,

3    is John there.  They would just find out who would

4    answer; I'm sorry, I got the wrong number and hang

5    up.

6    Q.        Okay.

7    A.        So where they --

8    Q.        Do you understand where they were

9    calling numbers from the coroner's phone records?

10   A.        I -- I don't know.

11   Q.        How often was Scott Blazer there doing

12   that type of thing?

13   A.        It's -- he was in and out.  Again, I

14   didn't try to -- you know, I didn't track anybody

15   coming in and out.  I just tried to keep to myself

16   on this stuff.

17   Q.        Take a break for about five minutes.

18             (A short recess is taken.)

19             MR. BRUNNER:  I'll pass the witness to

20   you, Mr. Lambert.

21             MR. LAMBERT:  It may be better if I

22   come over there.

23             MR. BRUNNER:  Do you want to sit next

24   to the court reporter?

```
 1                MR. LAMBERT:  No.  Right here is fine.

 2                      - - - - -

 3                 CROSS-EXAMINATION

 4   BY MR. LAMBERT:

 5   Q.           Mr. Dye, my name is Randall Lambert and

 6   I'm representing Sheriff North and Detective Downs

 7   in this proceeding.  I'm here to ask you some

 8   questions concerning what you've stated today and

 9   anything that you know about this litigation.

10   Just instructions I'll follow are about the same.

11   Let me finish my questions before you start

12   answering and please keep your voice up.

13   A.           Certainly.

14   Q.           And when you answer, please give

15   audible answers, yes, no or an answer, okay?

16   A.           Yes, sir.

17   Q.           If you don't understand a question,

18   please let me know and I'll rephrase it or restate

19   it.  Because if I read your deposition later, I

20   want to know that the answer you give was to a

21   question you understood.

22   A.           Absolutely.

23   Q.           Fair enough?

24                You talked a little bit about your
```

```
 1   background.  I didn't get it all.  I missed part
 2   of it.
 3   A.        Okay.
 4   Q.        You worked at the Sheriff's Office for
 5   -- you were at the Sheriff's Office for 16 years?
 6   A.        Approximately, yeah.  From 1998 till
 7   2014.
 8   Q.        And from '99 to '14 you were full-time?
 9   A.        Correct.
10   Q.        What was your position?
11   A.        I was a road deputy up until 2012.  And
12   I was Detective Bureau from 2012 to 2014.
13   Q.        When you were a road deputy, who was
14   your immediate supervisor?
15   A.        On the road, I -- we had a couple
16   sergeants and Sergeant Matheny.  We've had a few
17   of them.
18   Q.        Well, let's look at 2012, 2014 when you
19   were in the Detective Bureau.  Who was your
20   immediate supervisor?
21   A.        Would have been Sergeant Downs.
22   Q.        The whole time you were in the
23   Detective Bureau he was your supervisor?
24   A.        Well, besides that, before he was
```

42

1    sergeant it would have been I imagine the chief.

2    Q.        Was that Chief Valkinburg at the time?

3    A.        Correct.

4    Q.        So from 2012 to 2014, Alford was not

5    your supervisor?

6    A.        He was the supervisor.  He was captain,

7    so he was above the sergeants, correct.  He was in

8    the administration.

9    Q.        Did you consider Alford at that time as

10   a supervisor of the sergeant of the detectives?

11   A.        I considered him part of the

12   administration.  He was a supervisor of everybody.

13             MR. TEETOR:  Keep your voice up, sir,

14   please.  I'm having a hard time hearing.

15   A.        It's okay.

16   Q.        What was your understanding who

17   Sergeant Downs reported to?

18   A.        I understood he reported to Sergeant --

19   or Chief Valkinburg.

20   Q.        If you -- when you were in the

21   Detective Bureau, if you needed to contact the

22   supervisor and Sergeant Downs was not available,

23   who would you contact?

24   A.        Chief Valkinburg.

1  Q.         In September of 2014, you -- strike

2  that.

3             When did you -- when in 2014 did you

4  stop working full-time?

5  A.         September.

6  Q.         You voluntarily left in September to

7  other employment?

8  A.         Yes.

9  Q.         After September 2014 when you kept your

10 commission with the Sheriff's Office, were you

11 required to spend any time at the Sheriff's Office

12 doing any ride-alongs or anything like that?

13 A.         Yeah.  Eight hours I believe.

14 Q.         A month?

15 A.         Yeah.

16 Q.         And what would you generally do for

17 those eight hours?

18 A.         I never did any.

19 Q.         You never did the eight hours a month?

20 A.         Nope.

21 Q.         Did someone tell you that was okay or

22 relieve you of that?

23 A.         No.

24 Q.         You just didn't --

1  A.        No one told me that --

2  Q.        Let me finish.  No one told you you had

3  to or told you you didn't have to?

4  A.        No one, no.

5  Q.        Okay.  Did you ever talk to anyone at

6  the Sheriff's Office about that?

7  A.        I believe captain -- Captain Alford may

8  have said hours put in, but --

9  Q.        Said what?

10  A.        He may have said putting some hours in,

11  those eight hours.

12  Q.        May have said you needed to do that?

13  A.        Yeah.  I can't recall them actually

14  saying anything about putting in hours in at all.

15  Q.        You just kind of ignored it and no one

16  else said anything?

17  A.        Correct.

18  Q.        So after September 2014, were you in

19  the Sheriff's Office any?

20  A.        Yeah, I stopped in there.

21  Q.        Since you weren't putting any hours in,

22  just stopped in?

23  A.        Stopped to check.

24  Q.        To check?

45

```
 1    A.           Yeah.  Check, chat with people.

 2    Q.           So after September of 2014, you never

 3    acted in any official capacity for the Sheriff's

 4    Office?

 5    A.           As far as working, is that --

 6    Q.           As far as any capacity for the

 7    Sheriff's Office?

 8    A.           No.

 9    Q.           When you received -- let me see which

10    one is first -- the January 9th, 2015 letter

11    regarding preserving records, did you discuss that

12    with anyone at the Sheriff's Office?

13    A.           About receiving the request -- can you

14    rephrase that one, please.

15    Q.           Sure.  Exhibit 6.

16    A.           Right.  The document to retain

17    information?

18    Q.           Yes.

19    A.           Yes.

20    Q.           Who did you talk to?

21    A.           I believe I notified Captain Alford to

22    see if he received one as well.

23                 MR. TEETOR:  Sorry.  Again.

24    A.           I believe I notified Captain Alford
```

1    just to see if he received one of those as well.

2              MR. TEETOR:   Thank you.

3    Q.         What did he tell you?

4    A.         I believe he stated he did.

5    Q.         And did he tell you what, if anything,

6    you needed to do?

7    A.         I asked.  He didn't say anything, no.

8    Q.         Did you contact the chief or --

9    A.         No.

10   Q.         Now, at that time, January 9th, 2015,

11   you were no longer an active part of the Sheriff's

12   Office?

13   A.         I was an auxiliary deputy.

14   Q.         You were no longer an active part of

15   the Sheriff's Office?

16   A.         I wasn't full-time.

17   Q.         Well, I thought you said since

18   September 14th you had never taken any official

19   action as a deputy in the Sheriff's Office?

20   A.         I never worked, but I was still a

21   commissioned officer.

22   Q.         Okay.  So I understand you were a

23   commissioned Officer on January 9th, 2015, but you

24   had never served as an officer performing any

47

1    duties as an officer or acted in any official

2    capacity as an officer for the Sheriff's Office

3    since September 2014?

4    A.         You could say correct on that, yes.

5    Q.         Okay.  As of January 9th, 2015, did you

6    have any records of the Sheriff's Office in your

7    possession?

8    A.         Yes.

9    Q.         What records did you have on --

10   A.         They weren't the records --

11   Q.         You have to let me -- let me finish.

12   A.         Okay.

13   Q.         What records did you have on January

14   9th, 2014 of the Sheriff's Office?

15   A.         I just had some of the pictures here

16   that were turned over and some audio recordings

17   that I took.

18   Q.         And what audio recordings did you take?

19   A.         They were pretty good racist remarks

20   made by Ed Downs.

21   Q.         Is this something you taped Mr. Downs

22   on?

23   A.         Yes.

24   Q.         Was this during a conversation you were

1    having with him?

2    A.        Yes.   I was present.

3    Q.        Was it a conversation you were having?

4    A.        Yes.

5    Q.        When were those conversations made?

6    A.        Right after the Trayvon Martin case and

7    early last year, 2014.

8    Q.        Last year being '14?

9    A.        2014, correct.

10   Q.        Now, was this some type of official

11   Sheriff's Office business or just a casual

12   conversation --

13   A.        Casual conversation.

14   Q.        You have to let me finish.

15             Or a casual conversation you taped?

16   A.        Yes, it was a casual conversation I

17   taped.

18   Q.        And who was part of that conversation?

19   A.        Me and him.  And the other one was

20   myself, Pat Allison and Ed Downs.

21   Q.        So two conversations you taped also one

22   with you, Allison and Downs?

23   A.        Right.

24   Q.        Now, those conversations were not

1  actually Sheriff's Office records, correct?

2  A.          No.  None of the records I have are

3  Sheriff's Office records.

4  Q.          They were just private conversations

5  you taped?

6  A.          Right.

7  Q.          And why did you tape those

8  conversations?

9  A.          Because I made a complaint again to

10  Captain Alford about the language, the "N" word

11  being thrown around in that office, and nothing

12  was done about it.

13  Q.          Now, if your -- if you were going to

14  complain about Sergeant Downs, would not the

15  appropriate person to have complained to would

16  have been his supervisor or your next immediate

17  supervisor, the chief?

18  A.          Yeah, you would think.

19  Q.          But you didn't?

20          MR. TEETOR:  I'm sorry.

21  A.          You would think, yes.

22  Q.          You didn't do that?

23  A.          No, because he was just as bad.

24  Q.          Well, the chief would be Captain

50

```
 1    Alford's supervisor, correct?

 2    A.          Yes.

 3    Q.          As far as your line of command if you

 4    go from Sergeant Downs then to the chief, the next

 5    would be the sheriff, correct?

 6    A.          Correct.

 7    Q.          And did you report any of this to the

 8    sheriff?

 9    A.          No.  No.

10    Q.          Pardon?

11    A.          No.

12    Q.          You were personal friends with Captain

13    Alford at the time?

14    A.          I was friends with a lot of people in

15    the office, yes.

16    Q.          Were you personal friends with Captain

17    Alford at the time?

18    A.          You'd have to define "personal."

19    Q.          Well, were you friends with him?

20    A.          Yeah.

21    Q.          Do you understand what "friends" means?

22    A.          Right.  Yeah, I was friends with most

23    of the officers.

24    Q.          All right.  And how were you -- were
```

1    you in your opinion a personal friend of Captain

2    Alford, more than just casual friends?

3    A.          We were friends.  I --

4    Q.          Well, did you do anything socially with

5    Captain Alford outside of the Sheriff's Office?

6    A.          No.

7    Q.          Other than working with him, then you

8    did not --

9    A.          Worked with him, we talked on the phone

10   maybe once a month, if that, just --

11   Q.          What did you talk on the phone about?

12   A.          Just stuff.

13   Q.          Sheriff's Office stuff?

14   A.          We'd talked about the office, we'd

15   talked about a little bit of everything.

16   Q.          So you indicated the records of the

17   Sheriff's Office that you had in your possession

18   as of January 9th, 2015 were audio recordings and

19   pictures.  But I think we've resolved the fact

20   that the audio recordings were personal and not

21   Sheriff's Office records, correct?

22   A.          The audio --

23              MR. BRUNNER:  Objection.  They would --

24   A.          I got recordings of that, then I got

1    some recordings where he's talking about the

2    coroner.

3    Q.        Okay.  So you've told me about two of

4    them.

5    A.        Right.

6    Q.        I thought that was it.

7    A.        No.  There's more.

8    Q.        You have to let me finish.

9    A.        Okay.

10   Q.        There was more than two?

11   A.        Yes.

12   Q.        Okay.  What other recordings were

13   there?

14   A.        One he was talking on the phone about

15   the coroner.

16   Q.        Okay.  And who was he talking to?

17   A.        I don't know who he was talking to.

18   Q.        And you were a party to that

19   conversation?

20   A.        That was at my desk.

21   Q.        Were you a party to the conversation?

22   A.        No.

23   Q.        And why did you record the

24   conversation?

1    A.          Because I was sick of hearing about the

2    coroner.

3    Q.          So you were sick of hearing about the

4    coroner; you felt recording a conversation would

5    help resolve that?

6    A.          Yeah.

7    Q.          And how is that?  What did you intend

8    to do with that when you recorded it?

9    A.          There was no intentions behind it.

10   Q.          Well, other than being sick --

11   A.          It was --

12   Q.          -- of hearing about the coroner, why

13   would you record someone's conversation?

14   A.          It was not intended appear -- there was

15   no ill intentions on that recording.

16   Q.          What did you do with that?

17   A.          I just hung on to it.

18   Q.          For what purpose?

19   A.          Because it was mine, hang on to it.

20   Q.          All right.  So now we know about the

21   three conversations that you recorded.  Any others

22   that you recorded that you had at that time?

23   A.          Let's see.  The fourth one was when Ed

24   Downs was on this tirade about Judge Wallace.

54

1    Q.       And so this was not -- was this a

2    conversation he was having with someone?

3    A.       Yeah.  It was with Sheriff North and

4    Gretchen Gregory from the newspaper.

5    Q.       And you were in the room?

6    A.       Yep.

7    Q.       And why did you record that?

8    A.       Because I thought it was highly

9    inappropriate.

10    Q.       So you felt making a record of it would

11    rectify that?

12    A.       Well, yeah, actually, it could.

13    Q.       Pardon?

14    A.       Yes.

15    Q.       In what way?  What did you intend to do

16    with it?

17    A.       I had no intentions at the time.  Most

18    of it was personal protection.

19    Q.       And you'll have to explain to me what

20    you mean by "personal protection."

21    A.       They got -- they've got a history of

22    going after people.

23    Q.       So you were going to use that against

24    them if they went after you?

55

1    A.        It -- it could have been used, yes.

2    Q.        Well, how would you have used it?

3    A.        I would get -- cross that bridge when I

4    got there.

5    Q.        Okay.  So we've got four conversations

6    that you recorded.  Any other audio recordings

7    that you referred to that you had at the time?

8    A.        Not that I can recall.

9    Q.        And, again, all four of these audio

10   recordings were personal recordings you made and

11   not part of the Sheriff's Office?

12   A.        Correct.  They were all mine.

13   Q.        Now, did you turn these recordings over

14   to Mr. Brunner?

15   A.        Per -- per the subpoena, yes.

16   Q.        And what part of the subpoena did you

17   think covered recordings of personal conversations

18   that were not related to the Sheriff's Office?

19   A.        It was all documents, everything I had.

20   I received the order not to destroy anything, then

21   I received a subpoena to turn everything in my

22   possession over to them.

23   Q.        You felt that was a Sheriff's Office

24   record?

```
 1    A.          No, it was my personal record.

 2    Q.          Okay.  Why did you fail -- feel that

 3    that had to be turned over as part of answering

 4    the subpoena?

 5    A.          Because I -- it shows atmosphere of the

 6    Sheriff's Office.

 7    Q.          Well, prior to receiving the subpoena,

 8    did you tell anyone you had those recordings?

 9    A.          I believe -- a lot of people actually

10    knew I think.  I knew I told Alford, but no one

11    ever heard them.  I think Bach knew.

12    Q.          Alford and Bach?

13    A.          Right.

14    Q.          Did you talk to Bach about these things

15    before?

16    A.          I just told him I had those did.

17                MR. TEETOR:  Sorry.  You've got to

18    speak up.

19    A.          I just told him I had the recordings.

20    Q.          Okay.  Who else did you tell?

21    A.          And that they -- and that they were

22    racists.

23                Let's see.  Pat knew about it.

24    Q.          Who was Pat?
```

1    A.         Allison.  Who else knew?  That's all I

2    can think of offhand.

3    Q.         Did you ever tell Dr. Cummin?

4    A.         Yes.

5    Q.         When did you tell Dr. Cummin?

6    A.         Actually, when I initially told him I

7    -- the patient/doctor privilege on that, but, yes,

8    I told him.

9    Q.         I'm sorry.  About --

10   A.         I did tell him, but it's doctor/patient

11   privilege on that one.

12   Q.         About telling him about recordings you

13   made of someone?

14   A.         Right.

15   Q.         And how do you claim that that is

16   doctor/patient privilege?

17   A.         I was at his doctor's office when I did

18   that.

19   Q.         Okay.  But it had nothing to do with

20   your necessary treatment?

21   A.         Right.  But I told him.  Yeah, he knew

22   about it.

23   Q.         You wasn't --

24   A.         It was basically -- go ahead.

58

1    Q.        You wasn't seeking treatment for having

2    a disorder of recording people or something like

3    that, were you?

4    A.        No. Do you want to know why I was at

5    the office or --

6           MR. GLEESON: No.

7    Q.        I don't want to know your medical

8    history.

9    A.        Okay.

10   Q.        So you would agree then that's not part

11   of your doctor/patient privilege?

12   A.        No. But that was also just

13   conversation with him when I was at the office.

14   Q.        Okay. And was that before you received

15   a subpoena?

16   A.        Yes.

17   Q.        And when was that?

18   A.        I can't think of the date offhand.

19   Q.        Well, September 14th was the last time

20   you received --

21   A.        It was before September 14th.

22   Q.        So before --

23   A.        Wait.

24   Q.        So before you left the Sheriff's

1   Office?

2   A.          No, it was after I think.  I can't

3   recall the exact date.

4   Q.          Well, was it --

5   A.          I think it was after -- I think it was

6   I already left because he contacted me.  So --

7   Q.          When you say after you had already

8   left, from working full-time but you were still --

9   A.          Yeah.  I was still auxiliary there,

10  correct.

11  Q.          See, you're going to have to let me

12  finish because your answers may not make sense if

13  you don't let me finish my question.

14  A.          Okay.

15  Q.          After you had left your full-time

16  position but you were still a commissioned

17  officer, you told Dr. Cummin about these

18  recordings?

19  A.          I believe so.  It was afterwards.

20  Q.          Afterwards meaning?

21  A.          After I left in September.

22  Q.          Okay.  But before you received this

23  January 9th letter?

24  A.          Yes.  Yes.

1  Q.          Any particular reason you told

2  Dr. Cummin?

3  A.          I was telling him about my frustration

4  about the atmosphere in the office.

5  Q.          Did you give him a copy of them?

6  A.          Nope.

7  Q.          And why were you telling your doctor

8  about frustrations in the -- of your -- of the

9  atmosphere in the Sheriff's Office?

10  A.          It was someone to talk to.

11  Q.          Pardon?

12  A.          He was someone to talk to.

13  Q.          He's not your therapist, was he?

14  A.          No.

15  Q.          Okay.  Did he give you any treatment

16  for that part of your conversation with him?

17  A.          No.

18  Q.          And at that time did you also tell him

19  you had a photograph that you had taken in

20  Sergeant Downs' desk?

21  A.          Not at that time, no.

22  Q.          When did you tell him?

23  A.          That was after I left and he asked me

24  what I thought of the whole thing, asked me if I

1    thought this was personal.  It was over the phone.

2    And I told him absolutely it was personal.  And

3    that's when I told him.

4    Q.        That you had taken a picture of a --

5    A.        That I had found evidence showing that

6    they were investigating his attorney as well or

7    saying they were investigating him.

8    Q.        So that was between September of 2014

9    and your receipt of this letter?

10   A.        Correct.

11   Q.        Okay.  Did you give him a copy of the

12   picture or show him the picture?

13   A.        Nope.  Nope.

14   Q.        When you was in his office talking

15   about the recordings, did you show him the

16   picture?

17   A.        No.

18   Q.        It was --

19   A.        I told him those were mine.  He wanted

20   them and I told him no.  Because I knew they would

21   do exactly what I tried to do, was come after me

22   for something.  So, no, I did not give them to

23   him.

24   Q.        Did you show it to him?

62

```
 1    A.          No.

 2    Q.          But you told him you had them on your

 3    phone?

 4    A.          No, I had them on a drive.

 5    Q.          How did you take them?  Take them with

 6    your phone?

 7    A.          With my phone, correct.

 8    Q.          Okay.  And then you transferred them

 9    to --

10    A.          To my e-mail and then I put it on and

11    erased them.

12    Q.          Erased them off your phone?

13    A.          Yes.

14    Q.          Well, who did you show the pictures on

15    -- when they were on your phone, who did you show

16    them to?

17    A.          I did not show them to anybody on my

18    phone.

19    Q.          You --

20    A.          I sent them to Captain Alford when I

21    reported it.

22    Q.          And you -- you didn't show Captain

23    Alford the pictures on your phone?

24    A.          I sent him the pictures.
```

63

1    Q.          My question is:  Did you show --

2    A.          Did I personally --

3    Q.          Let me finish.

4                Did you show Captain Alford the

5    photographs while they were on your phone?

6    A.          No.

7    Q.          Did you tell him you had them on your

8    phone --

9    A.          Yes.

10   Q.          -- at any time?

11   A.          Yes, I --

12   Q.          You have to let me finish.  At any time

13   before you sent them to him?

14   A.          I believe if I recall correctly, I sent

15   him the pictures and asked his opinion if those

16   were illegal.

17   Q.          When did you do that?

18   A.          The day I found them, right after I

19   found them.

20   Q.          Okay.  And when was that?

21   A.          It was early spring, late spring 2014.

22   Q.          So you had pictures of an OHLEG report

23   that you transmitted to Captain Alford?

24   A.          Yes.  Reported to him, correct.

1    Q.          Pardon?

2    A.          I reported it to him.

3    Q.          Well, you transmitted the pictures to

4    him?

5    A.          Right.

6    Q.          Was that before you put them on the --

7    erased them from your phone?

8    A.          Yes.

9    Q.          You sent him a copy by using your

10   phone --

11   A.          Correct.

12   Q.          -- a copy to him?

13               And I may have asked you this, I'm not

14   sure.  Did you show anyone the pictures while they

15   were on your phone?

16   A.          No.

17   Q.          Okay.  Now, so I'm clear, when you told

18   Dr. Cummin about the -- you were aware of the

19   OHLEG run, that was between -- was that after you

20   had left the Sheriff's Office full-time --

21   A.          Yes.

22   Q.          -- or --

23   A.          It was afterwards.

24   Q.          Okay.  That was before you received the

65

1      January 9th --

2      A.          Yes.

3      Q.          -- 2015 letter?

4                  At what point did you provide a copy to

5      Dr. Cummin?

6      A.          I never provided a copy to Dr. Cummin.

7      Q.          Other than sending the photographs to

8      Alford, did you show them to anyone else or

9      provide them to anyone else before sending them to

10     Mr. Brunner?

11     A.          No.

12     Q.          What other conversations about the

13     Sheriff's Office did you have with Dr. Cummin?

14     A.          Oh, I just told him as far as the OHLEG

15     stuff just BCI would need to be notified about it

16     and they were notified about it.

17     Q.          Who notified them?

18     A.          I was told that Dr. Cummin notified

19     them.

20     Q.          That was before --

21     A.          Yeah, it was last year.

22     Q.          -- you provided them to Attorney

23     Brunner?

24     A.          Correct.

66

1    Q.        Okay.  Now, the day that you say you

2    took these pictures, what -- lead me through that.

3    What -- when was that?  As close as you can get to

4    the date.

5    A.        Like I said, it was early spring, late

6    spring 2014.

7    Q.        Well --

8    A.        I can't give you an exact date.

9    Q.        And how long were they on your phone

10   before you sent them to your e-mail?

11   A.        I sent them that same day and deleted

12   them off my phone.

13   Q.        Are they still in your e-mail?

14   A.        Nope.

15   Q.        So that day you sent them to Captain

16   Alford, you sent them to your e-mail and deleted

17   them off your phone?

18   A.        Correct.

19   Q.        Do you have a record in your e-mail as

20   to when it was you sent the e-mail?

21   A.        No, I do not.

22   Q.        Do you still have the same computer?

23   A.        No, I do not -- or phone, it was sent

24   to my phone.

1    Q.          I couldn't understand.

2    A.          It was through my phone.

3    Q.          Well, you sent them to your computer?

4    A.          I sent to my e-mail, yes, but I don't

5    have that computer anymore.

6    Q.          Sent?

7    A.          From my phone to my e-mail.

8    Q.          Well, you sent it by e-mail to

9    somewhere.  You had to send it --

10   A.          Yeah, from my phone to my e-mail

11   address.

12   Q.          And then you recorded them on a drive?

13   A.          Yeah.  Put them on a drive.

14   Q.          And how did you put them on a drive?

15   A.          Transferred them over.

16   Q.          Well, you can't do it from your phone,

17   right?

18   A.          Right.  I did it on my computer at

19   home.

20   Q.          So you sent them -- you pulled up your

21   e-mail on your computer?

22   A.          Yes.

23   Q.          Was there anything else on this drive

24   other than these photographs?

68

```
 1    A.          Just the recordings.

 2    Q.          You made the recordings with your phone

 3    also?

 4    A.          Yes.

 5    Q.          And you say you don't have the same

 6    computer you --

 7    A.          No.  That computer blew up.

 8    Q.          Now, when you sent those, come to as

 9    close as you can what Captain Alford said?

10    A.          He agreed with me that they were

11    illegal.

12    Q.          So you told him you thought they were

13    illegal?

14    A.          Yeah.  I said somebody should notify

15    BCI.

16                MR. TEETOR:  I'm sorry.  You've got to

17    speak up.

18    A.          Somebody should notify BCI.

19    Q.          Tell me everything you said to Alford

20    the day you sent them.

21    A.          I'm sorry?

22    Q.          Tell me everything you said to Alford

23    the day you sent them.

24    A.          What I can remember is I asked him if
```

1    he thought this was illegal.

2    Q.        What?

3    A.        As far as I can remember, I asked him

4    if he thought those were illegal, and he said yes.

5    And I said somebody should notify BCI.

6    Q.        Did he say he was going to?

7    A.        He didn't say.

8    Q.        Now, just sending him the photographs

9    along -- alone, did you think he could determine

10   whether or not they were illegal by these

11   photographs?

12   A.        Yeah, I would think.

13   Q.        Have you ever run OHLEGs before?

14   A.        Yes.

15   Q.        And tell me the process you followed in

16   running the OHLEGs.

17   A.        It's for investigation reasons.

18   Q.        When you ran OHLEGS, did you have to

19   obtain authority or approval from anyone before

20   running them?

21   A.        No.

22   Q.        Is there anything on the document that

23   helps you determine whether or not it was legal or

24   illegal to run an OHLEG?

1    A.        No.

2    Q.        So you have to know the background as

3    to why the person that ran an OHLEG initiated that

4    in order to know whether or not it was legal or

5    illegal, correct?

6    A.        Correct.

7    Q.        All right.  And did Alford know

8    anything about the background about this one that

9    you sent him a picture of?

10    A.        No, sir.  Not that I know of.

11    Q.        Did you know about the background as to

12    why it was run?

13    A.        All I knew is that he was Cummin's

14    attorney and they -- they were at odds with the

15    coroner's office.

16             MR. TEETOR:  They were -- I'm sorry?

17    A.        They were at odds with the coroner.

18    Q.        Before any criminal charges were filed

19    against Dr. Cummin, though, correct?

20    A.        It was -- they -- it was after they

21    tried to -- Laina wrote that letter asking for

22    charges to be pressed on the coroner.  But then --

23    Q.        And were you provided a copy of that

24    letter, the letter --

71

1    A.        No.  I found -- it was found on the

2    server.

3    Q.        You have to let me finish my question

4    before you answer, okay?

5    A.        Okay.

6    Q.        So you went on the server and looked at

7    the file?

8    A.        Yes.

9    Q.        And was that part of your -- is that

10   your case, part of your investigation?

11   A.        It was -- it was under the detective's

12   server.

13   Q.        Was it part of your case?

14   A.        No.

15   Q.        Were you involved in the investigation?

16   A.        No.

17   Q.        So you went on Sergeant Downs' -- into

18   Sergeant Downs' file to look at it?

19   A.        It was a shared drive.

20   Q.        But you had nothing to do with the case

21   or the investigation?

22   A.        No.

23   Q.        So why would you go on and look at it

24   then?

1      A.            Curiosity.

2      Q.            So what information did you find out

3      about why the OHLEG that's Exhibit 7 here was run?

4      A.            I never heard an explanation.

5      Q.            But yet you determined it was -- you

6      made a decision it was illegal, even though you

7      did not know the basis of what was run?

8      A.            Oh, I -- no, I've had conversations

9      with Ed Downs in the office, and he has told me

10     that it's -- and actually it wasn't just me.  He

11     told everybody in the prosecutor's office that

12     with Dr. Cummin it was personal, that it was

13     personal and he -- he just didn't want to get him

14     out of office but he wanted him to to lose his

15     medical license.  This was all before I found

16     that.

17              On top of that, he also said that he

18     was willing to wait outside of a bar in a marked

19     cruiser so he could pull him over for DUI,

20     personally arrest him and put the handcuffs on him

21     himself.  Then also I had a discussion -- I was

22     getting something off the printer.  The printer

23     sat behind his desk.  And I was taking something

24     off the printer and I was going back to my desk

73

```
 1    and he turned his chair to me and told me at that
 2    time that he was using the chief's credentials for
 3    OHLEG, logging in there and using it.  I sat down
 4    and I asked him -- one thing is I was wondering
 5    why he even told me.  Two, I told him why don't
 6    you call OHLEG and they can get you back on.  And
 7    he just brushed me off and was continuing doing
 8    what he was doing.
 9    Q.        Okay.
10    A.        So I had every right to think that was
11    illegal.
12    Q.        I appreciate that information.  That
13    doesn't have anything to do with my question.
14    A.        That was your --
15    Q.        My question was:  What information did
16    you gather as to the basis or the reason for the
17    running of the OHLEG in Exhibit 7 before you made
18    a determination --
19    A.        I --
20    Q.        -- as to whether or not it was illegal?
21    A.        I had no information.
22    Q.        Okay.  And what information to your
23    knowledge did Captain Alford have regarding the
24    basis of the running of the OHLEG that's Exhibit 7
```

1     before you say he told you he agreed it was

2     illegal?

3     A.          None that I know of.

4     Q.          Okay.

5                 MR. TEETOR:  I'm sorry.  I couldn't

6     hear.

7     A.          None that I know of.

8                 MR. TEETOR:  Thank you.

9     Q.          So in these -- you're saying in the

10    spring of 2014, you were in Sergeant Downs' desk?

11    A.          I was getting headphones.

12    Q.          In his desk?

13    A.          Yes.

14    Q.          And Sergeant Downs was not present?

15    A.          Correct.

16    Q.          So tell me what you did.

17    A.          By finding the OHLEG, is that what you

18    mean?

19    Q.          Yes.

20    A.          I was going the type up a report that I

21    had conducted an interview with.  The headphones

22    were kept in the bottom left drawer.  I opened the

23    drawer.  I didn't see the headphones, but I saw

24    the OHLEGS.  And my first thought was it was

1    illegal.

2    Q.          Now, in what position in the drawer was

3    the OHLEG that you're saying you saw?

4    A.          It was right there where you see the

5    top picture, it was sitting exactly like that.

6    Q.          Page 1 of Exhibit 7?

7    A.          Yes.

8    Q.          And the headphones that you were

9    looking for, are those page 4 --

10   A.          They were --

11   Q.          -- of Exhibit 7?

12   A.          Yeah, I believe those are the

13   headphones.

14   Q.          On the desk?

15   A.          Yes.

16   Q.          And is that where you found them?

17   A.          No.  They were actually in the cabinet

18   behind me.  I grabbed the headphones and then came

19   back and took the pictures.

20             MR. TEETOR:  You've got to speak up.

21   A.          I found the headphones and then come

22   back and took the pictures.

23   Q.          So you'd already found the headphones

24   before you took the pictures?

```
 1    A.            No.  Yes.  Yes.  Before I took it, I
 2    thought about it and realized that it was illegal
 3    and I should probably report it.
 4    Q.            So you're saying that the OHLEG was
 5    laying flat in the drawer?
 6    A.            It was laying on it's side like that.
 7    That's a coffee cup to the right sitting there.
 8    I'm not sure what the other stuff is there, but
 9    it's sitting on its side like this.
10    Q.            Leaning against the --
11    A.            Yeah.
12    Q.            -- side of the drawer?
13    A.            It would be sitting like this.
14    Q.            Are you sure when you first saw it it
15    wasn't turned with the writings toward the side of
16    the drawer?
17    A.            No, I'm sure.  That's how I found it
18    right there.
19    Q.            So you took it out --
20    A.            Yes.
21    Q.            -- of the drawer?
22    A.            Yes.  I photographed it and then I took
23    it out.
24                  MR. TEETOR:  I'm sorry.  Photographed
```

1    it --

2    A.          Photographed it and then took it out to

3    show what it was.

4    Q.          So you photographed page 1?

5    A.          Yes.

6    Q.          And then you took it out of the drawer?

7    A.          Yes.

8    Q.          And what is page 4?

9    A.          4 is just showing another picture of

10   what it was in the -- where it was in his desk.

11   Q.          So when you opened the drawer, it was

12   obvious the headphones were not in there, correct?

13   A.          Right.

14   Q.          Now, before you told anyone other than

15   Captain Alford what you had seen, did you ask

16   Sergeant Downs what the basis was for running the

17   OHLEG before you told people about it?

18   A.          No.  I wouldn't ask him why he did

19   something that was in my mind illegal.

20               MR. TEETOR:  You've got to talk out

21   loud.

22   A.          No, I did not ask him anything.

23   Q.          He did something that in your mind was

24   illegal?

```
 1    A.          Yeah.  I believed that to be illegal,

 2    so to ask the person that I believed did it --

 3    Q.          Now, what's your understanding of the

 4    -- of the confidentiality of OHLEG or disclosing

 5    the existence of an OHLEG report?

 6    A.          Can you repeat the question?

 7    Q.          Yeah.  What's your understanding of

 8    whether or not you as a law enforcement officer

 9    can disclose the existence of an OHLEG report?

10    A.          Disclose it to -- I'm not getting what

11    you're saying.  Give it out?

12    Q.          Sure.

13    A.          As far as -- to report it, yeah.  I

14    reported it to my supervisor.

15    Q.          Okay.  But you also told someone about

16    it.  You told Dr. Cummin about it?

17    A.          Correct.

18    Q.          What's your understanding of whether or

19    not you can disclose the existence of an OHLEG

20    to --

21    A.          There's nothing illegal about it.

22    Q.          So you could go out and tell anyone

23    about OHLEGS that are run in the office at any

24    time?
```

```
 1    A.           If you believe that they're illegal,

 2    yes.  If it's --

 3    Q.           That isn't what I asked you.  I just

 4    asked you whether or not you believed you could go

 5    out and tell some member of the public that the

 6    Sheriff's Office had run an OHLEG?

 7    A.           No.

 8    Q.           And before you told Dr. Cummin about

 9    the OHLEG, what did you do to make a determination

10    as to whether or not there was a basis to run the

11    OHLEG?

12    A.           I don't think there was a basis to run

13    it.

14    Q.           That wasn't what I asked you.  I asked

15    you what did you do to make an independent

16    determination as to whether or not there was a

17    basis for the OHLEG to be run --

18    A.           I --

19    Q.           -- before you disclosed it to a third

20    party?

21    A.           I saw an OHLEG paper in there.

22    Q.           Uh-huh.

23    A.           Which was the attorneys for the

24    coroner.  I know they do not like each other.  I
```

1    know Ed Downs does not like the coroner.

2    Q.        Okay.

3    A.        There was no reason that Ed Downs

4    should be investigating or looking at anything to

5    do with the coroner.

6    Q.        Well, this was not an OHLEG concerning

7    the coroner, correct?

8    A.        This was his attorney that was

9    representing him at that time.

10   Q.        And what was he representing him in at

11   the time?

12   A.        I believe it was the writ of mandamus

13   with his attorney.

14   Q.        Well, that's a civil procedure, writ of

15   mandamus?

16   A.        Right.

17   Q.        Okay.  What -- I don't think you

18   answered this.  What did you do to make a

19   determination as to whether or not there was a

20   basis to run the OHLEG that you found in Sergeant

21   Downs' desk before you disclosed --

22   A.        Oh.

23   Q.        -- it to a third party?

24   A.        Right.  I was trying to dig up stuff on

1    Will Kernen to charge Will Kernen with something.

2    Q.          So what did you do to determine whether

3    or not there was a basis to run the OHLEG before

4    you disclosed it to a third party?

5    A.          I notified my supervisor.

6    Q.          Besides that, what did you do to

7    determine there was a basis?

8    A.          That's what I did, I notified my

9    supervisor.

10   Q.          And he didn't tell you whether or not

11   he knew if there was a basis, correct?

12   A.          No, he did not say.

13   Q.          Okay.  So when you disclosed that to a

14   third party, you didn't know if there was a reason

15   for that to have been run or not, correct?

16   A.          I disclosed that to a third party to

17   report it to BCI because he knew someone at BCI

18   that he reported it to.

19   Q.          How did you know he knew someone at BCI

20   to report it to?

21              MR. TEETOR:  One at a time.

22   Q.          How did you know he knew someone at BCI

23   to report it to?

24   A.          He told me.

82

1    Q.          Well, he told you before you told him

2    you knew about an OHLEG that he knew someone to

3    report it to?

4    A.          Right.  We'll go back when I told him

5    that -- I told him it was personal and --

6    Q.          I'm sorry.  Told him it was personal?

7    A.          Right.

8    Q.          What are you talking about?

9    A.          The investigation, the charges against

10   him were personal and that they were trying to

11   find something to charge an attorney with.  He

12   asked me how I knew, and I said they were

13   investigating him because they ran an illegal

14   OHLEG there.

15   Q.          So at that point he hadn't told you he

16   knew someone at BCI he could contact if you knew

17   something --

18   A.          No.

19   Q.          It was --

20   A.          It was after that.  He asked me for the

21   copy of it and I told him no.

22   Q.          Okay.  But I asked you why you told a

23   third party before determining -- knowing whether

24   or not there was a basis to run it.  And you said

83

1    it was because he knew someone to report it to at

2    BCI?

3    A.          Right.

4    Q.          But now you're telling me -- him

5    telling you that he knew someone at BCI was after

6    you had already told him?

7    A.          No.  It was after I told him and he

8    told me he knew someone from BCI.

9    Q.          Okay.  So that wasn't a reason why you

10   told him, him knowing someone to report it to

11   because you didn't find that out --

12   A.          Okay.  I see what you're getting at.  I

13   told him when he asked me if it was personal, then

14   I told him --

15   Q.          If it was personal?

16   A.          He asked me about what I knew about

17   this stuff.

18   Q.          Now, what's "this stuff"?

19   A.          It would be the investigation and the

20   charges.

21   Q.          So when you were -- went to see your

22   doctor for a medical reason, he asked you about

23   the Sheriff's Office or what they were doing?

24   A.          We'd have conversations, yes.

1    Q.          So he initiated the conversations?

2    A.          I believe I did.  We both did.  We

3    talked about it.  But I didn't see the doctor --

4    Q.          So what conversation did you initiate

5    with your doctor while you were seeing him for a

6    medical issue concerning an investigation at the

7    Sheriff's Office?

8    A.          I can't recall every conversation.

9    Q.          Tell me as best you can.

10   A.          All I know is when this stuff was

11   released it was after I had already left.

12   Q.          I'm sorry?

13   A.          It was after I already left the

14   Sheriff's Office.

15   Q.          It was already after?

16   A.          Yeah.

17   Q.          What are you talking about?

18   A.          When I talked to him about this stuff.

19   Because I did not give his stuff to him when I

20   worked there or talked to him about it or divulged

21   information about this when I was there.

22   Q.          Okay.  So you're saying it was between

23   September and January, September '14 and January

24   '15 that you talked to him?

1    A.        Yes.

2    Q.        You were still a commissioned officer

3    with the Sheriff's Office?

4    A.        Yes.

5    Q.        So you went to see Dr. Cummin for a

6    medical reason when you had these discussions?

7    A.        It started out he already knew somewhat

8    and he had told me of the OHLEG stuff, though.  He

9    had knowledge of it or something that was going on

10   with the use of it, he knew something about it.

11   Q.        Okay.  And that's different than what

12   you told me earlier.

13   A.        That's what he told me.

14   Q.        Earlier you told me that you told him

15   the investigation concerning him was personal and

16   they were even trying to get something on his

17   attorney and they had run an OHLEG on his

18   attorney.

19   A.        Right.

20   Q.        But now you're telling me he knew about

21   the OHLEG before you brought that up?

22   A.        No.  He told me that he heard something

23   about that, but I told him --

24   Q.        Well, okay, let's back up.

1   A.          I did not know he already knew, if he

2   did.

3   Q.          When did he tell you he knew something

4   about the OHLEG?

5   A.          After I told him.

6   Q.          Pardon?

7   A.          After I told him.

8   Q.          So he didn't initiate the OHLEG thing,

9   you did?

10  A.          No, I did.  Right.

11  Q.          So when you told him -- disclosed to

12  him about this OHLEG in Exhibit 7, you had no idea

13  he already knew something about it?

14  A.          Yeah, I didn't know he knew.

15  Q.          And what did he say to you that caused

16  you to believe he already knew about it?

17  A.          I believe he just told me that he's

18  heard about it before or knew something about it.

19  That's all I know.

20  Q.          So he told you he had already heard

21  about the OHLEG?

22  A.          He caught wind of something about it

23  but he wasn't for sure, something to that nature.

24  Q.          Did he tell you where he caught wind

1    about it at?

2    A.          No.  No, he didn't say.

3    Q.          You didn't ask him, well, how did you

4    know about it?

5    A.          No.

6                MR. TEETOR:  Let's go off the record

7    for a second.

8                (A short recess is taken.)

9    Q.          So you told him about the OHLEG and he

10   said he had already heard about it somewhere?

11   A.          He said he caught wind of it, but I did

12   not know he knew.

13   Q.          Did he tell you what he knew or what he

14   caught wind of?

15   A.          No.

16   Q.          You didn't ask him?

17   A.          No.

18   Q.          Did you talk to anyone else at the

19   Sheriff's Office about receiving Exhibit 6, the

20   January 9th letter, other than Captain Alford?

21   A.          I can't recall if I talked -- who I all

22   I talked to.  Maybe Pat.  I can't -- I can't

23   recall who I talk to.

24   Q.          Pat, was he a supervisor?

```
 1    A.          No.

 2    Q.          At the time you received the subpoena

 3    to produce documents -- I don't -- I'll see what

 4    number that is.  What number is that?

 5    A.          It would be -- it looks like 1.

 6    Q.          Did you talk with anyone at the

 7    Sheriff's Office about receiving such a subpoena?

 8    A.          Yeah, again maybe Alford.

 9    Q.          Do you recall if you actually did or

10    not?

11    A.          I -- I believe I asked him if he

12    received one as well and he said yes.

13    Q.          Did you talk to anyone else about what

14    documents, if any, you needed to produce in

15    response to that?

16    A.          No.

17    Q.          Did you talk to Mr. Brunner?

18    A.          Yes.

19    Q.          What was your conversation with

20    Mr. Brunner?

21    A.          Not when I received this one, I do not

22    believe I -- I don't think I talked.  I think it

23    was after I received the subpoena to produce the

24    documents I talked to Mr. Brunner.
```

```
1    Q.          Before you supplied the documents?

2    A.          Right.

3    Q.          And what was that conversation?

4    A.          This one I think I may have called him

5    I'm thinking and talked to him on the phone and

6    told him what I had -- I'm thinking.  And then I

7    didn't produce any documents until these subpoenas

8    were received.

9                MR. TEETOR:  Sorry.  I couldn't hear

10   you.

11   A.          I did not produce any documents until

12   subpoenas were received to produce them.

13   Q.          So you called him when you received the

14   January letter and told him what documents you

15   had?

16   A.          I believe so, but --

17   Q.          So after the January letter, you

18   believe you told Attorney Brunner that you had a

19   copy of an OHLEG?

20   A.          I believe so.

21   Q.          And you believe you talked to Alford

22   before calling Attorney Brunner, but --

23   A.          Yeah.  And then I talked to him after I

24   received it.
```

```
 1    Q.          After you received it?

 2    A.          After I received, yeah, the letter.

 3                MR. TEETOR:  Let him finish, please.

 4    Q.          You keep talking over me.

 5    A.          Sorry.

 6    Q.          Who, if anyone, did you talk to about

 7    whether or not you should provide a copy of the

 8    OHLEG to a third party?

 9    A.          I did not discuss that with anybody.

10    Q.          You made that determination on your own

11    then?

12    A.          I had a subpoena to produce documents.

13    Q.          You made that determination --

14    A.          Yes.

15    Q.          Let me --

16    A.          I want --

17    Q.          You have to let me finish.

18                MR. GLEESON:  Let him finish.

19    Q.          You made that determination on your own

20    then?

21    A.          Yes.

22    Q.          Did you talk to Attorney Brunner about

23    whether or not that was something that you could

24    disclose to him?
```

91

1    A.        Yes.

2    Q.        And what did he tell you?

3    A.        He said that was fine.

4    Q.        Did you express to him you had concerns

5    over providing the copy of an OHLEG to a third

6    party?

7    A.        Yes.

8    Q.        What concerns did you have?

9    A.        I figure they would try to come after

10   me for disseminating OHLEG.

11   Q.        Which you believe is illegal to

12   disseminate OHLEG?

13   A.        Yeah.

14   Q.        Before you provided a copy of that or

15   disseminated, did you talk with anyone at the

16   Sheriff's Office?

17   A.        About that?

18   Q.        About whether or not you should produce

19   it in response to the subpoena?

20   A.        No.

21   Q.        Just Attorney Brunner?

22   A.        Correct.

23   Q.        He told you it was okay?

24   A.        I asked him -- told him about it and he

1    said that would be fine.

2    Q.        That would be fine to --

3    A.        To produce, to give the document, yes.

4    Q.        The office you're talking about in the

5    -- it's located in the same building as the

6    prosecutor's office is located in, correct?

7    A.        Yes.

8    Q.        Actually, there was another

9    governmental agency besides the Sheriff's Office

10   in that room before the Sheriff's Office moved in

11   there?

12   A.        Yes.

13   Q.        You thought it was appropriate to take

14   something out of Sergeant Downs' desk and

15   photograph it?

16   A.        Something I believed to be illegal,

17   yes.

18   Q.        What were the reasons why you ran some

19   OHLEGS while you were a detective at the Sheriff's

20   Office?

21   A.        It was to conduct investigations on

22   them and get information to do reports on them.

23   Q.        When you would conduct investigations,

24   were there times you ran OHLEGS and then there was

93

1    nothing produced from it that was useful or

2    beneficial and you did not use it in such a part

3    of your investigation?

4    A.          Yes, I believe so.

5    Q.          You were entitled to run OHLEGS without

6    obtaining anyone's authority to do so as a

7    detective?

8    A.          Yes.

9    Q.          Some of the OHLEGS that you've run,

10   unless someone had asked you why, a third party or

11   an outside party may not know the reason why you

12   ran it, correct?

13   A.          Correct.

14   Q.          So in order for you to make any

15   determination as to whether or not there was a

16   basis for an OHLEG to be run, you would have to

17   communicate with the officer that run it to see

18   what the basis was before you would know if it was

19   proper or not, correct?

20   A.          Yes.

21   Q.          You said the Sheriff's Office had been

22   frustrated with Dr. Cummin for some time before

23   these criminal charges were filed?

24   A.          Yeah, to my knowledge.

94

1     Q.        Were you ever involved in any death

2     investigations that Dr. Cummin was involved in?

3     A.        Yes.

4     Q.        Were you involved in any investigations

5     in 2014 when Dr. Cummin did not have anyone

6     available to go to the scene where there was --

7     A.        Not that I can recall.

8     Q.        -- a body?

9             So you did not have any of those

10    experiences?

11    A.        No. No, not that I can recall. I

12    don't remember any problems with that from -- from

13    me.

14    Q.        I didn't ask you if it was any

15    problems. Let's back up. Let me finish.

16             Were you involved in any of the

17    investigations in 2014 when there was a death that

18    Dr. Cummin nor his staff had anyone available to

19    cover or to be there when they're to do the

20    coroner's investigation?

21    A.        No.

22    Q.        You were aware that that was part of

23    the frustration the Sheriff's Office had with

24    Dr. Cummin?

1    A.          That was part of it.

2    Q.          As a detective if you had been doing

3    the investigation with a dead body and a coroner's

4    office who was not available to come, would that

5    have frustrated you?

6    A.          That's personal opinion.  I don't --

7    Q.          Well --

8    A.          I mean, I -- no.  Do you want my

9    personal opinion on that?

10   Q.          Uh-huh.

11   A.          No.

12              MR. BRUNNER:  Objection.

13   Q.          What was the procedure you would

14   normally go through if you went to a scene and

15   there was a dead body as a detective?

16   A.          We'd have them, obviously the EMT --

17   Q.          Now, wait a minute.  The thems, I've

18   got -- you've got to be more specific.  You can't

19   say we had them.

20   A.          Okay.  I'm sorry.  At the scene we

21   would generally do a scene investigation and they

22   would notify either the ambulance or the coroner,

23   and the coroner would say, yes, release the body

24   or he would come out there and investigate it.

1    Q.        Okay.  What would you do until the

2    coroner released the body?

3    A.        Hold the scene.

4    Q.        Okay.  How long would you hold the

5    scene waiting on the coroner?

6    A.        Depending on the -- his arrival time.

7    Q.        Until he got there?

8    A.        Correct.

9    Q.        Okay.  As a detective, what would you

10   have done if they didn't show up?

11              MR. BRUNNER:  Objection.

12   A.        I never had that problem.

13   Q.        Do you know what you could have done as

14   a detective if they hadn't shown up?

15   A.        Again, I never had that problem.

16   Q.        I understand you didn't.  But do you

17   know what you could have --

18              MR. BRUNNER:  Objection.  This is not

19   relevant and you are badgering the witness.

20   Q.        Do you know what as a detective you --

21   the next step you would take if the coroner's

22   office didn't show up?

23   A.        What I would do, is that what you're

24   asking?

```
 1    Q.          Yes.

 2    A.          A hypothetical question, right?

 3    Q.          Yes.

 4    A.          I'd probably notify the supervisor.

 5    Q.          Okay.  But it was your understanding

 6    you needed to hold the scene as a detective --

 7    when there was a dead body, you need to hold the

 8    scene until the coroner's office released the

 9    body?

10    A.          Correct.

11    Q.          You said at the time the charges were

12    filed, you were asked to give your opinion about

13    the atmosphere in the office; is that correct?

14    A.          Correct.

15    Q.          Had you ever told anyone that before

16    today?

17    A.          Yes.

18    Q.          Who did you tell that to?

19    A.          Bach and Alford.

20    Q.          What did you tell them?

21    A.          Just that there was -- they were

22    celebrating.

23    Q.          Who is "they"?

24    A.          All I can remember is Ed and Laina.
```

98

1    Q.         And when you say "celebrating," what do
2    you mean?

3    A.         Like they were jubilant, happy that
4    they filed charges against him.

5    Q.         What, if anything, did they say?

6    A.         That was when they were kind of almost
7    high-fiving each other.

8    Q.         Okay.

9    A.         And she said, you know, you grab the
10   bull by the horns, you're going to get the horns.
11   And that's -- I believe after all that Ed had told
12   her that he was my doctor, and she said that's
13   fine as long as I don't say anything.

14   Q.         "My doctor" meaning you?

15   A.         My doctor, correct.

16   Q.         Now, you said high-fiving.  Someone
17   literally high-fived --

18   A.         It was that -- like I said, I was
19   sitting at my desk.  They were just happy, we're
20   going to get him, stuff like that --

21   Q.         Okay.

22   A.         -- is --

23   Q.         But you used the term "high five."  No
24   one literally --

99

```
 1    A.          I don't recall if they're high-fiving

 2    or just -- that's what it seemed like.

 3    Q.          Okay.  Do you recall anyone said now

 4    we're going to get him to do his job?

 5    A.          I do not -- well, I don't recall that.

 6    I can't rule that out if it was said.  I just

 7    don't recall.

 8    Q.          Okay.  So when you say someone said now

 9    we're going to get him, it could have been in

10    reference to get him to do his job?

11    A.          Well, it very well could have, yeah.

12    Q.          Now, you said there was a coroner's

13    file on the computer.  Did you go into that file

14    also?

15    A.          Did I -- yeah.  I went --

16    Q.          What were you doing in that file?

17    A.          Curiosity.

18    Q.          And what did you see in that file?

19    A.          The only thing I can remember is the

20    interview with Alex and the letter he had wrote to

21    Laina trying to get her to charge him with --

22    before the last charges.

23    Q.          When you say try and get her to charge

24    him, would it have been a letter explaining what
```

1    possible charges there were and the basis for

2    them?

3    A.          Yes.

4    Q.          Okay.  So trying to get her to charge

5    him is your characterization of what you felt it

6    was?

7    A.          Right.

8    Q.          Is it a similar type letter you would

9    have provided the prosecutor at times regarding an

10   investigation you were doing which you felt

11   charges should be filed against someone?

12   A.          No.  I wouldn't have sent a letter like

13   that, no.

14              MR. TEETOR:  Can't you hear.

15   A.          No.

16   Q.          So you would not inform the prosecutor

17   of factual background, possible charges regarding

18   an investigation you were doing as a detective?

19   A.          Not in that form.  I don't -- that was

20   a letter before I think the -- the writ was filed.

21   But it appeared to me when I read it that it was

22   her -- him trying to get her to charge him with

23   something.

24   Q.          After you provided this -- these

1    photographs to Attorney Brunner, you had shown

2    anyone else?

3    A.        No.  I got rid of them.

4    Q.        You no longer have the --

5    A.        No.

6    Q.        What did you say they were on, a --

7    A.        SanDisk.

8    Q.        So you destroyed the disk?

9    A.        Yes.  I no longer have anything.

10             MR. TEETOR:  Can't you hear.

11   A.        No.  I no longer have the SanDisk or

12   any pictures.

13   Q.        Did you have the disk at the time you

14   provided these pictures to Attorney Brunner?

15   A.        Yes.

16   Q.        So how long after that did you destroy

17   them?

18   A.        It was -- I destroyed it I believe when

19   I lost my commission.  I'm no longer authorized to

20   have anything like that.

21   Q.        So you felt you were authorized to have

22   that after September 2014, meaning Exhibit 7?

23   A.        Yes.

24   Q.        Even though you had not run it, you

```
1     were not part of any -- of that investigation?

2     A.          Actually right around the first of the

3     year, chief told me to go on OHLEGS and take a

4     refresher course and that would have been in

5     January and I couldn't get on.

6     Q.          January of?

7     A.          2015.

8     Q.          Okay.  That wasn't -- my question was:

9     You felt you were entitled to maintain and have a

10    copy of Exhibit 7 even though you were not

11    involved in that investigation?

12    A.          Yes.

13    Q.          Okay.  And you were no longer an active

14    member of the Sheriff's Office?

15    A.          Yes.

16    Q.          And you're saying, though you told the

17    coroner about these photographs, you never --

18    never provided copies to him?

19    A.          No.  I never gave him copies.

20    Q.          Take a short break and --

21                MR. BRUNNER:  Sure.

22                (A short recess is taken.)

23    Q.          A follow-up question.  I'd asked you if

24    you showed Captain Alford the pictures on your
```

1    phone of the OHLEG and you indicated you had not?

2    A.         Right.  I --

3    Q.         Did you show anyone else?

4    A.         No.

5    Q.         Officer Bach?

6    A.         No.

7    Q.         Pat Allison?

8    A.         No.

9    Q.         Did you tell Officer Bach you had taken

10   the pictures?

11   A.         I don't believe so.  I may have.  I

12   don't recall if I told him that specifically.

13   Q.         Okay.  I don't have any further

14   questions.

15              MR. LAMBERT:  Do you want to switch?

16   Are you okay there?

17              MR. TEETOR:  No, I'm okay.

18              MR. BRUNNER:  I'm not going to allow

19   two attorneys for the same people to question the

20   witness.

21              MR. TEETOR:  I'm sorry.  I'm

22   representing Mr. Valkinburg in his individual

23   capacity.

24              MR. BRUNNER:  You've not entered an

1    appearance.  You just said on the record he

2    represents him.

3              MR. LAMBERT:  I said --

4              MR. TEETOR:  He said --

5              MR. BRUNNER:  I'm not going to let two

6    attorneys for the same --

7              MR. LAMBERT:  For the record, I said

8    represent Chief North and --

9              MR. BRUNNER:  It's not even on the

10   record.

11             MR. LAMBERT:  -- Downs.

12             MR. TEETOR:  Well, I'll either get --

13             MR. GLEESON:  We're going to go.

14             MR. BRUNNER:  We didn't tell him it was

15   going to be this long either.

16             MR. TEETOR:  I'm sorry.  I can't hear

17   you, Rick.

18             MR. BRUNNER:  We didn't tell him it was

19   going to be this long either or there were going

20   to be other attorneys who have not yet entered an

21   appearance in this case to --

22             MR. TEETOR:  Well, Rick, you know that

23   I entered an appearance at the last deposition and

24   I appeared --

1              MR. BRUNNER:  You said you were going

2    to and you never did.

3              MR. TEETOR:  I told you I was here

4    representing Mr. Valkinburg in his individual

5    capacity.  If --

6              MR. BRUNNER:  I understood --

7              MR. TEETOR:  If you have an issue,

8    we'll have one filed in five minutes.

9              MR. BRUNNER:  But the issue is counsel

10   can't stay.

11             MR. TEETOR:  I can't hear you.

12             MR. BRUNNER:  Counsel said he can't

13   stay.

14             MR. TEETOR:  Well, why can't you stay?

15             MR. GLEESON:  I have other obligations

16   I'm already late for and I had an expectation that

17   this would take a couple hours.

18             MR. TEETOR:  Well, I -- did you tell

19   him that I had entered an appearance at the last

20   deposition?

21             MR. BRUNNER:  No.  No.  I was waiting

22   for you actually to file a notice of appearance on

23   the record.

24             MR. TEETOR:  Well, the deposition limit

1    and time period in federal court is seven hours

2    unless the parties agree to the contrary, so you

3    have to show up expecting that you may be required

4    to be here for seven hours.  I'm not certain that

5    you're going to go seven hours, but I have a right

6    to do this.  And I really don't want to bother the

7    court with motions and having to bring him back.

8    He's already here.  My suggestion is we conclude

9    it now or we're all going to be down in front of

10   the magistrate or federal judge about whether or

11   not I get a chance to ask questions on behalf of

12   my client.

13              MR. GLEESON:  How long are you going to

14   be?

15              MR. TEETOR:  Pardon?

16              MR. GLEESON:  How long will it take?

17              MR. TEETOR:  It depends on if he will

18   not interrupt me and just answer the questions.

19   It won't be that long.

20              MR. GLEESON:  How long will it be?

21              MR. TEETOR:  I don't know yet.

22              MR. BRUNNER:  If you can't do it and we

23   have to come back, we have to come back.  That's

24   all I can tell you.

1          MR. TEETOR:  Well, I'm here.  He's

2     here.  I've already told you that I represent

3     Mr. Valkinburg in his individual capacity.  I told

4     you that before.  If -- are you going to let me

5     ask questions or not?

6          MR. GLEESON:  I don't know how long --

7     I'm already a half hour late for a court

8     obligation that I have to be to.  I would suggest

9     that it would be a couple hours, so I planned

10    accordingly.

11         MR. TEETOR:  Well, the other thing is I

12    could feed these questions for the next five hours

13    because we have a seven-hour limit to Mr. Lambert

14    and let him ask him.  And that's kind of silly,

15    isn't it?

16         MR. BRUNNER:  We can all come back.

17    We've got time.

18         MR. TEETOR:  I want to do it now.

19    You've got a motion pending on OHLEG against my

20    client.  I want to have the information to deal

21    with that.

22         MR. BRUNNER:  I --

23         MR. TEETOR:  We can do one of two

24    things, I guess.  If you are not going to allow

1    me, we can get Magistrate King on the phone or I

2    can go have somebody file a formal notice of

3    appearance.  But I think the easier thing would be

4    and the thing that's going to get you out of here

5    quicker is --

6                MR. GLEESON:  I just need to have an

7    idea how long this is going to take so I can make

8    arrangements, if I can make those arrangements.

9    You are not telling me how long it's going to take

10   so --

11               MR. TEETOR:  I can't tell you exactly.

12   It's probably going to take an hour but no more

13   than two.

14               MR. GLEESON:  I can't do that today.

15   I'm sorry.

16               MR. TEETOR:  Why not?

17               MR. GLEESON:  Because I have a court

18   obligation I have to be present at.  I actually

19   have two that I have to be present for and I have

20   to be there.

21               MR. TEETOR:  What time's your court

22   appearance?

23               MR. GLEESON:  2:00 -- 2:15 and 2:30.

24               MR. TEETOR:  Jeez.  Where it is?

```
1              MR. GLEESON:  Logan.

2              MR. TEETOR:  Well, you wouldn't make

3      that now, would you?

4              MR. GLEESON:  I know that.  That's why

5      I said I was late.

6              MR. TEETOR:  Why don't you make a phone

7      call, see if you could get those --

8              MR. GLEESON:  I can't get them

9      continued.  I can get them pushed back a half hour

10     or so, but I can't get them continued.

11             MR. TEETOR:  Well, if you are going to

12     leave, we're going to have to get the

13     magistrate/judge on the phone.  That's all there

14     is to it.  We're all here, prepared, the witness

15     is sworn in.  The deposition is not concluded

16     unless you want to come back --

17             MR. GLEESON:  Do what you need to do.

18             MR. TEETOR:  What?  Thursday?

19             MR. GLEESON:  I don't --

20             MR. TEETOR:  Pardon?

21             MR. GLEESON:  I don't think Thursday --

22     I'm not available Thursday.

23             MR. TEETOR:  Okay.  We're going to have

24     to call the judge.  Let's -- Rick, you got a phone
```

1    to call?

2              THE REPORTER:  Do you want to go off

3    the record?

4              MR. BRUNNER:  Yeah.

5              (A short recess is taken.)

6                 - - - - -

7                 CROSS-EXAMINATION

8    BY MR. TEETOR:

9    Q.        Back on the record, please.

10             Mr. Dye, my name is Steve Teetor and

11   I'm here today representing Mr. Valkinburg in his

12   individual capacity.  And I'd like to ask you some

13   questions also if I may?

14   A.        Yes, sir.

15   Q.        What's your home address?

16   A.        It's 200 Midland Place, Logan, Ohio.

17   Q.        And what's your work address?

18   A.        It's the same.

19   Q.        You work out of your home?

20   A.        Yes, sir.

21   Q.        And who's your supervisor now at Geico?

22   A.        David Davich.

23   Q.        Last name?

24   A.        D-A-V-I-C-H.

1   Q.          And so where is he located?

2   A.          Dublin, Ohio.

3   Q.          Did you bring any documents with you

4   today?

5   A.          No, sir.

6   Q.          Did you review any documents in

7   preparation for your testimony?

8   A.          No, sir.

9   Q.          When's the last time you reviewed any

10  documents or audio tapes or any other items with

11  respect to the issues that are in this lawsuit?

12  A.          It's been awhile.

13  Q.          How long?

14  A.          I -- probably when I turned them over.

15  Q.          Turned what over?

16  A.          The documents requested.

17  Q.          Okay.  You turned those over to whom?

18  A.          Mr. Brunner.

19  Q.          When?

20  A.          Would have been back in August.

21  Whenever I received the subpoena.

22  Q.          August of 2015?

23  A.          '15, correct.

24  Q.          Tell me exactly what you turned over to

112

1    Mr. Brunner.

2    A.          The recordings, the four recordings I

3    believe I mentioned, and the pictures that you

4    guys have them in your possession.

5    Q.          The pictures that we saw here today?

6    A.          Yes.

7    Q.          And the four recordings?

8    A.          Right.

9    Q.          And those four recordings you turned

10   over on what kind of --

11   A.          It was on a disk drive.

12   Q.          Disk drive?

13   A.          Yes.

14   Q.          And did you keep copies of those?

15   A.          The recordings, yes.

16   Q.          Okay.  And did you keep copies of the

17   photos?

18   A.          No, I do not have copies of the photos.

19   Q.          And the photos were on the same disk

20   drive or something different?

21   A.          They were on a different disk drive.

22   Q.          And why did you not keep copies of

23   them?

24   A.          Because I'm no longer at the office

1    anymore.  I can't -- I'm not supposed to possess

2    that stuff.

3    Q.        Was there anything else on that disk

4    drive?

5    A.        No.

6    Q.        And what did you do with that disk

7    drive?

8    A.        I got rid of the one with the OHLEG

9    pictures and I still have the one of the audio

10   recordings.

11   Q.        You say you got rid of it.  You threw

12   it away?

13   A.        Yes.

14   Q.        Why would you throw away that disk in

15   light of the letter you received earlier about

16   preserving evidence and knowing that this lawsuit

17   was out there involving allegations of criminal

18   charges?

19   A.        Because he already has the pictures.

20   Q.        Well, but you had a disk that they were

21   on, correct?

22   A.        Yes.

23   Q.        And you don't have that disk anymore?

24   A.        He's got the pictures now.

1    Q.       He's got the pictures but he doesn't

2    have the disk?

3    A.       Correct.

4    Q.       And you threw away the disk?

5    A.       Right.

6    Q.       When did you throw that away?

7    A.       After I received it back from

8    Mr. Brunner.

9    Q.       All right.  So originally you had

10    photos on your phone and those were deleted?

11    A.       Yes.

12    Q.       And you had a disk with photos and

13    you've thrown that away?

14    A.       Yes.

15    Q.       Is there anything that you've deleted

16    or thrown away --

17    A.       No.

18    Q.       -- at any time?

19    A.       No, sir.

20    Q.       And when you left the Sheriff's Office,

21    you -- what, if anything, did you take with you?

22    A.       Nothing.  I didn't take anything.

23    Q.       Well, when you made these audio

24    recordings, you made those at the office?

1    A.         Yes.

2    Q.         You made them on your cell phone?

3    A.         Yes.

4    Q.         And then you transferred them to a

5    disk?

6    A.         No.  I e-mailed them to myself and I

7    put them on a SanDisk.

8    Q.         And you e-mailed them to your home

9    computer?

10   A.         To my server via hotmail.

11   Q.         What is that account?

12   A.         That's jeremydye@hotmail.com.

13   Q.         Okay.  And you e-mailed those photos

14   and those audio recordings to your account?

15   A.         Yes.

16   Q.         And then you deleted them from your

17   phone?

18   A.         Yes.

19   Q.         Why did you delete them from your

20   phone?

21   A.         I didn't want them on my phone if

22   someone got a hold of them.

23   Q.         Well, you deleted them from your phone

24   in spite of receiving an evidence from -- a letter

1    from Mr. Brunner saying not to destroy anything?

2    A.          I deleted them off my phone long before

3    that.

4    Q.          And then you kept those on your

5    computer at home?

6    A.          I put them on a SanDisk drive.

7    Q.          Well, you sent them to your computer at

8    home?

9    A.          Right.

10   Q.          And you put them on a disk drive?

11   A.          Correct.

12   Q.          And did you delete them from your

13   computer?

14   A.          Yes.

15   Q.          Why?

16   A.          I didn't need them on my computer.

17   I've got them on a SanDisk drive.

18   Q.          And then how many disk drives did you

19   have?

20   A.          Just the one.  I had one with the

21   pictures and the audio on it, and then after I got

22   it back, I transferred the audio over to another

23   SanDisk drive and I got rid of it.

24   Q.          And the ones you didn't get rid of, are

1    those the ones you sent to Mr. Brunner or did you

2    make copies for him?

3    A.          He -- I didn't make any copies for him.

4    I gave him the disk drive.

5    Q.          You gave him the disk drive?

6    A.          Yeah.

7    Q.          You didn't keep any copies of that?

8    A.          Not the pictures, no.  I got audio, I

9    still have the audio.

10    Q.          Okay.  How did you get it then to

11    Mr. Brunner then?  Did you e-mail --

12    A.          E-mailed -- I met with Mr. Brunner and

13    gave them to him in person.

14    Q.          Okay.  Where did you meet him?

15    A.          Here.

16    Q.          When?

17    A.          That would have been back in August.

18    Q.          Okay.  We'll get to that later.

19              Right now, let me just ask you this:

20    How many times have you met with Mr. Brunner?

21    A.          Once.

22    Q.          Once?

23    A.          Yes.

24    Q.          When was that?

118

1   A.        Back in August.

2   Q.        Okay.  You met with him today during a

3   break?

4   A.        Well, okay, twice.  I talked to him

5   over the phone maybe twice as well.

6   Q.        Okay.  And have you exchanged any

7   e-mails with Mr. Brunner?

8   A.        No.

9   Q.        Any phone conversations?

10  A.        I talked to him on the phone.

11  Q.        How many times?

12  A.        No more than three.

13  Q.        From what phone?

14  A.        It would be my cell phone?

15  Q.        What's your cell phone number?

16  A.        740-216-6247.

17  Q.        Who is your cell phone provider?

18  A.        It would be Sprint.

19  Q.        Have you exchanged any text messages

20  with Mr. Brunner?

21  A.        Yes.

22  Q.        How many?

23  A.        I would say no more than 10.

24  Q.        Did you save them?

1    A.        No.

2    Q.        Did you delete them?

3    A.        Yep.

4    Q.        Why?

5    A.        Because it's my phone.

6    Q.        When did you delete them?

7    A.        I deleted them when I get them.

8    Q.        So he would be -- Mr. Brunner texted

9    you and you texted him?

10   A.        Right.

11   Q.        Back and forth?

12   A.        Yes.

13   Q.        And you didn't save any of those?

14   A.        No.  Most of the time -- go ahead.

15   Q.        You didn't save them?

16   A.        No.

17   Q.        You deleted them all?

18   A.        Correct.

19   Q.        Including the ones he sent you?

20   A.        Correct.

21   Q.        What else have you deleted or

22   destroyed?

23   A.        I haven't -- it's personal property.  I

24   -- I don't usually keep text messages on my phone.

```
 1   Q.          Relating to this case, what kind of
 2   communications, letters, text, e-mails, so forth
 3   have you deleted other than what you've told me
 4   about?
 5   A.          One from Mr. Brunner.
 6   Q.          Yeah.
 7   A.          I've talked to the coroner, and I've
 8   talked to -- talked to Bach and I've talked to
 9   Alford.
10   Q.          When you talked to the coroner, was
11   that -- would that be from your cell phone?
12   A.          Yes.
13   Q.          Okay.  And what number would you call
14   for him?
15   A.          I don't know.  It's stored on my phone.
16   Q.          Do you still have that phone?
17   A.          Yes.
18   Q.          Still have your computer?
19   A.          The -- no.
20   Q.          What happened to your computer?
21   A.          The computer went -- it blew up.  It
22   was an old computer.
23   Q.          It blew up?
24   A.          Yes.  It was an old computer.
```

121

1    Q.          Tell me what you mean when you say "it

2    blew up."  Was there smoke and fire or --

3    A.          No, it just quit working.

4    Q.          What did you do with it?

5    A.          I got rid of it.

6    Q.          How did you get rid of it?

7    A.          Put it in the dump or I threw it in the

8    trash.

9    Q.          When?

10   A.          It was probably over the summer.

11   Q.          Summer of 2015?

12   A.          Yes.

13   Q.          At any time in the 30 days before you

14   left the Sheriff's Office, did you e-mail any

15   documents from the Sheriff's Office to your home

16   computer?

17   A.          No.  It would be from my cell phone.

18   Q.          Pardon?

19   A.          No.

20   Q.          You said something about a cell phone?

21   A.          It would be my cell phone.  But, no, I

22   never -- nothing 30 days before I left.

23   Q.          Would you e-mail from your cell phone?

24   A.          It would be what I just told you that I

1    e-mailed myself.

2    Q.         What did you e-mail -- I can't hear you

3    very well.

4    A.         The audio.

5    Q.         The audio?

6    A.         And the pictures.  And that was awhile

7    back, so nothing 30 days before.

8    Q.         Okay.  So you took no documents from

9    the Sheriff's Office and you e-mailed or texted no

10   documents or items from the Sheriff's Office other

11   than the four audio recordings and the

12   photographs?

13   A.         Correct.

14   Q.         At any point in time?

15   A.         Any point in time?

16   Q.         Yeah.  Did you send any information

17   relating to Dr. Cummin or any of the issues in

18   this case to your home computer at any point in

19   time?

20   A.         No.

21   Q.         I want to cover in as a much detail as

22   I can, sir, all of your communications with

23   Mr. Brunner and the attorneys in his office, okay?

24   How many times would you say you've met with

1    Mr. Brunner?

2    A.        Once.

3    Q.        Today?

4    A.        Yeah.  Well, today and then once

5    before.

6    Q.        Okay.  And the once before was?

7    A.        Back in August.

8    Q.        August.

9              And how was that arranged?

10   A.        I believe we spoke over the phone.

11   Q.        Who called who?

12   A.        I can't recall if he called me or I

13   called him.

14   Q.        That would be on your cell phone?

15   A.        I'd imagine.

16   Q.        All right.  How would you have gotten

17   his phone number?

18   A.        I believe Dr. Cummin gave it to me.

19   Q.        Did Dr. Cummin ask you to talk to his

20   lawyers?

21   A.        He asked me if I would.

22   Q.        Okay.  When did he ask you to do that?

23   A.        That was probably -- probably in the

24   spring.

124

1    Q.        Of?

2    A.        Of this year, of 2015.

3    Q.        Okay.  So sometime in the spring of

4    2015 Dr. Cummin said, hey, would you call

5    Mr. Brunner, my lawyer, and talk to him?

6    A.        Correct.

7    Q.        And where was -- where were you and he

8    when he asked that?

9    A.        It was over the phone.

10   Q.        Pardon?

11   A.        I talked to him over the phone.

12   Q.        Okay.  Did he call you and ask you to

13   do that?

14   A.        I can't recall who -- again, I can't

15   recall who called who.

16   Q.        Did he give you the phone number to

17   call?

18   A.        Yes.

19   Q.        And you called Mr. Brunner?

20   A.        Yes.

21   Q.        Tell me everything you remember about

22   that conversation.

23   A.        Just basically what I talked about

24   here.

1    Q.          Well, tell me what you told him.

2    A.          I told him about all the conversations

3    as far as between the office, about them doing the

4    charges, being told that -- Mr. Downs saying that

5    I was going to be involved in the civil suit when

6    I notarized it, along with the OHLEG stuff.

7    Q.          Tell me specifically what you told him

8    about the OHLEG stuff.

9    A.          That I found the illegal OHLEGS in the

10   desk drawer and I reported it to my supervisor.

11   Q.          And what else did you tell him about

12   the OHLEG stuff?

13   A.          That was what I can recall.  I mean

14   that's it.

15   Q.          Did you read any of it to him over the

16   phone?

17   A.          No.

18   Q.          Is that the conversation where you

19   asked him if you were allowed to provide it and he

20   told you go ahead?

21   A.          No.  That was when I was up here.  I

22   had it and I told him my concerns about giving it

23   to him.

24   Q.          Okay.  What else did you and

1    Mr. Brunner talk about in that very first

2    conversation?

3    A.          I told him that I believed it was

4    personal, a personal vendetta against the coroner.

5    Q.          Anything else?

6    A.          Not that I can recall -- think of.

7    Q.          How long was that conversation?

8    A.          I don't know.

9    Q.          Ballpark?

10   A.          15 minutes.

11   Q.          Did you tape-record that one?

12   A.          No.

13   Q.          Did you let Dr. Cummin know that you

14   called his lawyer to talk to him?

15   A.          Yes.

16   Q.          Did you let anybody at the office know

17   that?

18   A.          I believe after I received the

19   documents I talked to Jerrod and saw if he was

20   going to talk to Brunner or not.  I told him I

21   did.

22   Q.          Who did you talk to?

23   A.          Jerrod Alford, I think I told him.

24   Q.          So you went to Jerrod after you talked

1    to Mr. Brunner and said, hey, I called

2    Dr. Cummin's lawyer, do you want to call him, too?

3              MR. BRUNNER:  Objection.

4    Q.        Is that what happened?

5    A.        I didn't ask him if he wanted to call

6    him too.  I asked him if he did call him.  I told

7    him I received a subpoena and it said if I have

8    any questions call him, so I called.

9    Q.        Okay.  Do you know if he called him?

10   A.        I don't know if he called him or not.

11   Q.        Did he ask you for a number?

12   A.        No.

13   Q.        So originally you got a letter saying

14   to basically -- a letter from Mr. Brunner saying

15   basically to preserve a bunch of evidence?

16   A.        Correct.

17   Q.        Did you talk to anybody at the office

18   about that?

19   A.        I talked to Jerrod.

20   Q.        Anybody else?

21   A.        I may have told Derrick that I received

22   a -- he wasn't in it, so I -- the reason I talked

23   to Jerrod is because his name was on there as

24   well.

1    Q.          Anybody else?

2    A.          Not that I can think of, no.

3    Q.          Okay.  And then when you got that

4    letter, did you talk to Mr. Brunner?

5    A.          I don't recall if I called him and

6    talked to him, I -- maybe.  I don't know.  I can't

7    recall.

8    Q.          And tell me all the steps you took to

9    preserve any evidence.

10   A.          I just kept the disk drive or the flash

11   drive that had stuff on it.

12   Q.          The four tape-recordings and the

13   photographs?

14   A.          Yes.

15   Q.          That's all you had?

16   A.          Yes.

17   Q.          And did you take any steps to preserve

18   anything else?

19   A.          No.

20   Q.          Okay.

21   A.          All I had was that -- that's all I had

22   in my possession.

23   Q.          Did you ever talk to Mr. Lambert or the

24   sheriff about the fact that you got this letter,

1    what should you do?

2    A.          No.

3    Q.          Did you consult with any legal counsel?

4    A.          After -- after I got phone calls, yes.

5    Q.          After you got phone calls from whom?

6    A.          The Sheriff's Office.

7    Q.          Okay.  Tell me what -- what time period

8    are we talking about here?

9    A.          That would have been in September.

10   Q.          Okay.  I'm back in this early 2015 when

11   you got the --

12   A.          Okay.

13   Q.          -- letter to save evidence.  You didn't

14   talk to anybody --

15   A.          No.

16   Q.          -- the Sheriff's Office or Mr. Lambert

17   other than what you've told me?

18   A.          Correct.

19   Q.          And you don't remember if you called

20   Mr. Brunner?

21   A.          I can't recall after I received that if

22   I called him or not.

23   Q.          Okay.  And where would have been the

24   next time you talked to Mr. Brunner?

```
 1    A.          I think it was right before I -- maybe

 2    it was the subpoena, when I got the subpoena to

 3    produce the documents.

 4    Q.          And that subpoena asked you to produce

 5    stuff in August of 2015, correct?

 6    A.          Correct.

 7    Q.          And you read that over?

 8    A.          Yes.

 9    Q.          And then you called Mr. Brunner?

10    A.          Yes.

11    Q.          Tell me what you and he talked about.

12    A.          I just told him I had the documents and

13    we set up a time to meet him up here.

14    Q.          You told him you had the documents.

15    You didn't really have documents other than the

16    photographs?

17    A.          Photographs and the recordings.

18    Q.          Yeah.  Did he ask you to come up and

19    talk to him?

20    A.          I can't -- again, I can't recall if he

21    said, hey, come up here and talk to me or if it

22    was, hey, I got these, I got a subpoena, I want to

23    comply with the subpoena so --

24    Q.          Is there a reason you just didn't mail
```

1    them to him?

2    A.          I think it would be easier to come up

3    here and give them to him.

4    Q.          So you voluntarily made a trip from

5    Hocking County up to Columbus to deliver these?

6    A.          Yes.  I work up here.  I come up here

7    to work sometimes, so it's not a big issue.

8    Q.          And do you remember when that was?

9    A.          That would have been in August after I

10   received the subpoena.

11   Q.          And did you have any written

12   communications with Mr. Brunner about getting

13   together in Columbus at his office?

14   A.          Not that I can recall.  I think it was

15   over a phone call.

16   Q.          When you got up here to meet with

17   Mr. Brunner, who else was present at that meeting,

18   anyone?

19   A.          No, it was just he and I.

20   Q.          Tell me everything that happened.

21   A.          We just went over the stuff we had, the

22   -- I told him about the -- basically what they

23   were saying about the coroner in the office and

24   with Mr. Downs saying that it was personal and he

1    wanted to have him arrested and he wanted to put

2    the handcuffs on him himself, he would -- he would

3    be willing to wait outside of a bar for a DUI.  I

4    told him about the OHLEG, that I believe that it

5    was ran by Ed Downs using the chief's OHLEG

6    account because he told me he was using it.

7    Q.        What else did you tell him about the

8    OHLEG account, anything?

9    A.        No.

10   Q.        He didn't ask to see it?

11   A.        No.

12   Q.        Did he ask you to sign any statements?

13   A.        No.

14   Q.        Did he tape-record it?

15   A.        I don't know if he recorded us or not.

16   Q.        Did you?

17   A.        No.

18   Q.        Okay.  How long did that meeting last,

19   approximately?

20   A.        45 minutes.

21   Q.        Okay.  Did he ask you all kinds of

22   questions about the Sheriff's Office and the

23   people who work there as well as Dr. Cummin?

24   A.        I wouldn't -- yeah.  I mean it was just

1    a conversation of what I witnessed when I was

2    there involving Dr. Cummin.

3    Q.          What other conversations have you had

4    with Mr. Brunner?

5    A.          We had -- after I received the

6    subpoenas, as far as any phone calls for the

7    investigation on me, I called him up to let him

8    know that -- what was going on.

9    Q.          You say the investigation on you.  What

10   investigation are you talking about?

11   A.          Submitting OHLEG information.

12   Q.          Well, why did you assume they were

13   investigating you?

14   A.          I was told that they were.

15   Q.          By whom?

16   A.          I had both Jerrod and Eric tell me

17   after the first one when Mr. McKnight came to my

18   door.

19   Q.          He told you you were the subject of the

20   investigation?

21   A.          Disseminating, yes.

22   Q.          Mr. Edgington told you that?

23   A.          No, I never talk -- I never talked to

24   Mr. Edgington.  I'm talking about the first one

1    being Mr. McKnight.

2    Q.          McKnight?

3    A.          McKnight, yeah, Tom McKnight was the

4    first one to initiate the OHLEG.

5    Q.          And you talked to him on the phone?

6    A.          No.  He left a card at my door.  So I

7    called -- first I called Dr. Cummin and said,

8    yeah, they stopped out here, too, and they wanted

9    to know who told him about the OHLEG stuff.  And

10   so that's when I contacted Derrick and -- or I

11   contacted Jerrod because Derrick was talked to.

12   And that's when he told me that they were trying

13   to say that I was passing stuff out or whatnot.

14   Q.          I thought you just said Mr. McKnight

15   told you you were the subject of the

16   investigation?

17   A.          No.  I told you that I heard it from

18   Jerrod and I heard it from Dr. Cummin.

19   Q.          You never talked to Mr. McKnight?

20   A.          No.

21   Q.          Mr. McKnight never told you you were

22   the subject of the investigation?

23   A.          No.

24   Q.          He just said he wanted to talk to you?

1    A.          Right.

2    Q.          Same thing with Mr. Edgington, as far

3    as you know he wanted to talk to you?

4    A.          He wanted to discuss the -- passing out

5    the OHLEG stuff.

6    Q.          Okay.  And at that point in time, do

7    you know who was passing it out?

8    A.          Yeah.

9    Q.          Who?

10   A.          Who was passing it out?  They wanted to

11   know who was telling the coroner, so, yeah, they

12   knew that I told the coroner.

13   Q.          Did you know of anybody other than you

14   who had been passing around information on the

15   OHLEG account?

16   A.          I don't think anybody was passing out

17   stuff.

18   Q.          Well, you were telling -- you told Mr.

19   -- you told people in the office about it?

20   A.          Correct.

21   Q.          You told Dr. Cummin about it?

22   A.          Correct.

23   Q.          You told Mr. Brunner about it?

24   A.          Correct.

136

1    Q.          Do you know anybody else who told

2    anybody about the OHLEG report?

3    A.          No.  I don't know anybody else that

4    would say that.

5    Q.          You're the only one?

6    A.          Yes.

7    Q.          And nobody that was conducting that

8    investigation ever told you you were the subject

9    of it, they just told you they wanted to talk to

10   you, correct?

11   A.          They just said they wanted to talk

12   about the disseminating of OHLEG information.

13   Q.          But they never said you're the object

14   or the subject of the investigation?

15   A.          No.

16   Q.          Correct?

17   A.          Correct.

18   Q.          You said I think if I recall correctly,

19   sir, that you had maybe 10 phone conversations

20   with Mr. Brunner?

21   A.          It would have been less than 10.  Most

22   of them were with regards to the investigation

23   when they were contacting me.

24   Q.          Okay.  Tell me what you remember about

1    those.

2    A.          I just told him what was going on and

3    it was -- I felt like they were harassing me on

4    it.

5    Q.          Well, don't say "going on."  Tell me

6    exactly what you recall --

7    A.          Okay.

8    Q.          -- as close as you can.

9    A.          Right.  The first one I told about Tom

10   McKnight coming to my door, wanting to -- you

11   know, what I've heard what he was doing and he

12   that he said he would take care of it.

13   Q.          Who said he'd take care of it?

14   A.          Mr. Brunner.

15   Q.          Ah.  Did you tell Mr. Brunner that

16   Mr. McKnight was investigating you?

17   A.          Well, I was told he was investigating

18   me, yes.

19   Q.          Okay.  And Mr. Brunner said I'll take

20   care of that?

21   A.          He said he'll look into it and do what

22   he's got to do.

23   Q.          What else did you and he talk about?

24   A.          I think that was it.

138

1     Q.        Did he take care of it?

2     A.        He -- as far as I know he wrote a

3    letter or something to Athens County.

4     Q.        Did he copy you on that?

5     A.        Yes.

6     Q.        What else has he said to you besides

7    that letter and the subpoena and the exploitation

8    letter?

9     A.        Just the criminal -- not the criminal

10   but the civil complaint.

11    Q.        He sent that to you about the time he

12   filed it?

13    A.        No.  No.  It was after.

14    Q.        Why would he be sending that to you, do

15   you know?

16    A.        I don't know.  You'll have to ask him.

17    Q.        Did you ask for it?

18    A.        No.

19    Q.        Did it come to your home address?

20    A.        Yes.

21    Q.        You gave him your home address to send

22   you documents?

23    A.        Yes.

24    Q.        What kind of documents were you

1    expecting him to send you?

2    A.          Just stuff that -- it was basically I

3    gave him my home address for the subpoenas.

4    Q.          What other phone conversations do you

5    recall having with Mr. Brunner?

6    A.          The second one -- let's see.  I can't

7    -- I really didn't talk to him that much over the

8    phone.  I don't even think I talked to him when

9    Edgington got a hold of me.

10   Q.          Say that again.

11   A.          I didn't talk to him when Edgington got

12   a hold of me.  I really didn't talk to him much

13   over the phone.

14   Q.          You said you exchanged text messages?

15   A.          Yes.

16   Q.          What were the text messages about?

17   A.          I just told him what was going on and

18   he asked me if -- you know, to send a picture of

19   the card.  So I sent him a picture of the card,

20   and he asked me who it was and, you know, what

21   they said and that was about it.

22   Q.          Did Mr. Brunner ever tell you not to

23   talk to anyone else?

24   A.          No.  I told the chief that he did.  But

1    I just didn't want to talk to them.  They just

2    woke me up in the morning, so I had -- so I just

3    thought of something.

4    Q.        I'm kind of having a hard time hearing

5    you.  I'm sorry.

6    A.        No.

7    Q.        And my ears ain't so good.  So speak

8    slower if you would, please.

9    A.        He never told me not to talk to

10   anybody.

11   Q.        You told the chief that he told you

12   that?

13   A.        Correct.

14   Q.        So you were lying when you told?

15   A.        No, I wasn't lying, I was panicking.

16   Q.        You were panicking.  Why were you

17   panicking?

18   A.        Because I knew they were going to try

19   come after me like they did.

20   Q.        When you say come after you, you're

21   talking about the OHLEG thing?

22   A.        Correct.

23   Q.        And you're still thinking that they

24   complained that you were the person involved in

1    disseminating the OHLEG thing, correct?

2    A.          Correct.

3    Q.          And so you made that up about

4    Mr. Brunner telling you don't talk to anybody?

5    A.          Correct.

6    Q.          Did he ever indicate to you that you

7    were limited in who you should talk to or --

8    A.          No.

9    Q.          -- you shouldn't talk to anybody?

10   A.          No, sir.

11   Q.          Did you ever tell the sheriff or any of

12   the other deputies there anything that wasn't

13   true?

14   A.          No, sir.

15   Q.          That's --

16   A.          Not that I know of.  I mean, no.  Not

17   in -- not in relation to this, no.

18   Q.          That's the only time when you told the

19   sheriff or any of the deputies anything about this

20   matter that was not true?

21   A.          Correct.

22   Q.          And when did you tell the sheriff that

23   Mr. Brunner had told you not to talk to anybody?

24   A.          I never told the sheriff.

1   Q.        Who did you tell that to?

2   A.        Chief.

3   Q.        The chief?

4   A.        When he called me that morning.

5   Q.        Chief who?

6   A.        Valkinburg.

7   Q.        Okay.  And when did he call you?

8   A.        About 6:59 in the morning I believe.

9   Q.        What morning?

10  A.        I don't recall the date.

11  Q.        How did you know it was 6:59?

12  A.        I just remember the time.  It was right

13  before I was to wake up.

14  Q.        Did you tape-record that conversation?

15  A.        No, sir.

16  Q.        Tell me what was discussed.

17  A.        That's when he wanted me to come in and

18  talk to Mr. Lambert.  I just woke up, so I told

19  him, yeah, I'd be in there.  And then after I

20  thought about, I called back and said I'm not

21  coming in because they just sent the -- McKnight

22  to my house and I was -- I didn't want to.

23  Q.        So your reason for not wanting to talk

24  to the County's lawyer about a lawsuit against the

1    County or claims against the County was that you

2    thought that the people in the Sheriff's Office

3    had made you the subject of a felony

4    investigation?

5    A.          Correct.

6    Q.          And have you ever learned whether or

7    not you are in fact the subject of a felony

8    investigation?

9    A.          I have not.  No, I've received nothing.

10   It's -- that's why I have an attorney up here with

11   me.

12   Q.          So that's really based on an assumption

13   you made based on what other folks have told you?

14   A.          Exactly.

15   Q.          Because you don't know if it's true?

16   A.          I -- I have my opinions.

17   Q.          But you don't know for a fact it's

18   true, correct?

19   A.          I -- I don't think they'd tell me if it

20   was.

21   Q.          You don't think who would tell you?

22   A.          I don't think they would tell me if it

23   was.

24   Q.          But you don't know for a fact that you

```
 1   are the subject of an investigation, do you?

 2   A.          Correct.

 3   Q.          I'm going to, sir, ask you just about

 4   some names of people.  And I've got, just so you

 5   know, about 10 or 12 of them.  I don't know if you

 6   know these folks or not, so don't make any

 7   assumptions on that.

 8   A.          Okay.

 9   Q.          The first one is Scott Blazer.  Do you

10   know Mr. Blazer?

11   A.          I've seen him around the office.

12   That's about it.  I don't know him.

13   Q.          All right.  Have you ever talked to

14   him?

15   A.          I've never talked to Scott Blazer.

16   Q.          Do you know what his role is in this

17   ongoing dispute between --

18   A.          I have --

19   Q.          Let me finish.

20   A.          Sorry.

21   Q.          Do you know what his role is, if any,

22   in this ongoing dispute between the County and

23   Dr. Cummin?

24   A.          I have no idea.
```

```
 1    Q.            By the way, would you agree that

 2    there's been ongoing disputes and dissension

 3    between coroner and the prosecutor, the coroner

 4    and the sheriff, the coroner and the deputies, the

 5    coroner and the commissioners?

 6    A.            I think that would be true.

 7    Q.            Tell me your understanding of what the

 8    dispute and dissension is all about?

 9    A.            Well, I asked Ed one time what he had

10    against the coroner.  And so from what he told me

11    is that he applied for Lancaster Police

12    Department, I believe it was, and the coroner had

13    wrote a letter or called up there and he didn't

14    get the job.  So I was setting so sick about

15    hearing the coroner this and that, and I asked Ed

16    was what his problem with the coroner, what's all

17    this about, and that's what he told me.  The rest

18    of it has to do with properly handling of scenes

19    I'd imagine when -- under the charges, it was him

20    not being available.  But it was on before that.

21    Q.            Well, was it your understanding that

22    the prosecutor and the Sheriff's Office and the

23    commissioners were unhappy with Dr. Cummin about

24    not appearing at scenes where people were dead?
```

146

1   A.          That's what the word was.

2   Q.          Okay.  Did you ever talk to Dr. Cummin

3   about it?

4   A.          Not really, no.

5   Q.          Is it your understanding that

6   Dr. Cummin was angry because he didn't get the

7   funding he wanted for people?

8   A.          That's just what I read in the paper

9   and heard, so --

10  Q.          Did Dr. Cummin ever talk to you about

11  that?

12  A.          Not really.  We never really -- no.

13  Q.          Are you aware of any situations where

14  it was alleged that Dr. Cummin was interfering

15  with a homicide investigations?

16  A.          There's -- just from the deposition

17  that I've listened to on the coroner's request

18  that's on YouTube.

19  Q.          So you've gone on YouTube and listen to

20  the coroner?

21  A.          Yeah, everybody's listened to that.

22  Q.          What else have you viewed concerning

23  this ongoing dispute?

24  A.          Just -- that's about it.  I mean I just

1    know they've been going back and forth and that's

2    why I asked Ed what the problem was with the

3    coroner.

4    Q.        How long have you known the coroner?

5    A.        He got elected the same time Lanny did.

6    Q.        Pardon?

7    A.        He got elected the same time Lanny did.

8    Q.        Okay.  How long has that been?

9    A.        2001.

10   Q.        He's your doctor?

11   A.        Yes.

12   Q.        How long has he been your doctor?

13   A.        Not very long.  Maybe five years at the

14   most.

15   Q.        Okay.

16   A.        My doctor I had before left, so I found

17   one closer.

18   Q.        Is he a doctor for anybody else in your

19   family?

20   A.        No.

21   Q.        Just you?

22   A.        Yes.

23   Q.        Not your spouse?

24   A.        No.

148

```
 1    Q.          Do you have kids?

 2    A.          Yes.

 3    Q.          Is he the doctor of your kids?

 4    A.          No, not the doctor of my kids.

 5    Q.          And I don't want to know any of your

 6    medical stuff.  But just on the average over the

 7    last five years, how often would you see him in

 8    the medical context?

 9    A.          I've probably only been out there three

10    times, four times.  I don't go very often to the

11    doctor.

12    Q.          One of those was the time where you

13    talked about this case?

14    A.          Yes, we talked about some of it.

15    Q.          How many times?

16    A.          I don't recall when that was, though,

17    so --

18    Q.          How many times did you visit him as a

19    patient where you and he talked about the case?

20    A.          Probably just the one time.

21    Q.          Tell me exactly what you remember about

22    that.

23    A.          I don't recall.  I really don't recall

24    what was it -- it was probably just I told him the
```

1  same thing, that I thought it was personal.  And

2  this was before they filed the charges I think.

3  Q.          What's your relationship with Captain

4  Alford?

5  A.          We work together, we're friends.

6  Q.          Are you friends outside of the office,

7  too?

8  A.          No.  I don't hang out with him outside

9  the office.  Every once in a while --

10  Q.          You've got to talk louder and slower.

11  A.          Like I said, every once in a while

12  we'll talk on the phone for a little bit, but

13  outside of the office, no.  I don't believe I've

14  ever hung out with him outside work.  That's it.

15  Q.          You and he have had conversations about

16  the issues that are involved in this lawsuit?

17  A.          We've talked about our personal

18  opinions on it, what we thought and felt.

19  Q.          Did his opinions seem to gel with

20  yours?

21  A.          They coincided somewhat, yeah.

22  Q.          Before going on, let me backtrack to

23  something.  The OHLEG report.

24  A.          Excuse me?

150

1    Q.          The OHLEG report?

2    A.          Right.

3    Q.          I think you testified that when you saw

4    that you thought it was illegal?

5    A.          Yes.

6    Q.          And why didn't you notify BCI?

7    A.          I don't know how to get a hold of them.

8    I'd have no training on that.

9    Q.          You couldn't get on the Internet and

10   look up BCI and let them know?

11   A.          And, secondly, just like my anonymous

12   reporting of it, now look where it got me.

13   Q.          Did you ever consider making any

14   efforts at all to notify BCI?

15   A.          I reported it to my supervisor and

16   administration.

17   Q.          That wasn't my question.  Let me ask it

18   again.

19               Did you ever make any efforts

20   whatsoever to try and notify BCI of this action

21   you thought was illegal?

22   A.          No.

23   Q.          Did you ever make any efforts to notify

24   the Attorney General's Office of this illegal

1    action?

2    A.        No.

3    Q.        Did you ever make any efforts to notify

4    anybody other than your supervisor?

5    A.        No.

6    Q.        Who was your supervisor?

7    A.        At the -- who I notified was Captain

8    Alford.

9    Q.        That wasn't my question.  Who was your

10   supervisor?

11   A.        That's Sergeant Downs.

12   Q.        Who?

13   A.        Sergeant Downs.

14   Q.        Did you tell him?

15   A.        No.

16   Q.        Did you go to his boss?

17   A.        No.

18   Q.        Who's his boss?

19   A.        It would be Chief Valkinburg.

20   Q.        And who's his boss?

21   A.        The sheriff.

22   Q.        Did you tell anybody in the chain of

23   command?

24   A.        Yeah.  I told Captain Alford.

1    Q.          Okay.  Well, what was his -- what was

2    his -- is he above you?

3    A.          Yes.

4    Q.          Is he a supervisor of you?

5    A.          Yes.

6    Q.          And how long was he your supervisor?

7    A.          He's in the administration, he's a

8    captain, so he's above me, so since he's been a

9    captain.

10   Q.          So you went to him and you showed him

11   the photos and you said this is illegal?

12   A.          I sent him the pictures and he agreed

13   with me that it was illegal.

14   Q.          And did you ask him to notify BCI?

15   A.          I told him that someone should notify

16   BCI.

17   Q.          Okay.  Did you ever follow up to see if

18   he did it?

19   A.          No.

20   Q.          Why not?

21   A.          It's out of my -- I reported it.

22   Q.          But you assumed that he'd done it?

23   A.          Yes.  Well, I guess he did or he

24   didn't.  I don't know.  I never heard.

1    Q.        You never went back and asked him?

2    A.        No.

3    Q.        And to this date do you have any

4    idea --

5    A.        I'm --

6    Q.        -- if he notified BCI?

7    A.        I would assume that he did not notify

8    BCI.

9    Q.        Why would you assume that?

10   A.        Because nothing was ever done.

11   Q.        Can't you --

12   A.        Nothing was ever done.

13   Q.        When nothing was ever done, did you

14   ever consider doing it yourself, notifying BCI?

15   A.        If I notified them, then they come

16   after me for notifying BCI.

17   Q.        Say that again.

18   A.        I was scared to notify BCI.

19   Q.        Because of why?

20   A.        Because they would tell them who told

21   them and they would come after me.

22   Q.        Well, you hadn't done anything wrong,

23   right?

24   A.        It doesn't matter.

154

1    Q.          Had you done anything wrong?

2    A.          No.

3    Q.          And you had the photographs?

4    A.          Correct.

5    Q.          Okay.  So why do you think BCI would

6    come after you?

7    A.          Not BCI, they would.

8    Q.          Well, I'm not asking you to notify

9    them.  I'm asking you why didn't you notify BCI?

10   A.          Because they would find out that I told

11   BCI and they would come after me.  Not BCI, but

12   the Sheriff's Office would.  It would be

13   retaliation for telling on them.

14   Q.          Well, if you were worried about

15   retaliation, why did you tell Alford?

16   A.          I was -- I had to tell a supervisor.  I

17   thought that was illegal and I didn't want it

18   coming back to me as I didn't report it to

19   somebody.

20   Q.          Well, you expected Alford to tell BCI,

21   correct?

22   A.          Right.

23   Q.          And you expected Alford to show the

24   photographs that you had sent to him, so BCI was

155

1    going to know about it anyhow, right?

2    A.          Right.

3    Q.          And they were going to know you were

4    involved?

5    A.          That's -- he's reporting.  He's a

6    supervisor.

7    Q.          Okay.  So why were you afraid to report

8    it directly if you weren't afraid to report it

9    indirectly?

10   A.          Because they would come back to me.

11   Q.          Well, wouldn't they come back to you no

12   matter how they found out about it?

13   A.          I tried to remain anonymous, but that's

14   not the case.

15   Q.          When did you find out you couldn't be

16   anonymous?

17   A.          Right now.

18   Q.          Right now?

19   A.          September.

20   Q.          Who told you that?

21   A.          I just knew I couldn't because

22   apparently they started investigations on who

23   told.

24   Q.          Do you know who Carolyn Harris is?

1    A.          No.

2    Q.          Do you know who Ann McDono is?

3    A.          No.

4    Q.          Mary Pavluck?

5    A.          She works at the prosecutor's office.

6    Q.          What's her job?

7    A.          As far as she's clerk or a secretary.

8    Q.          Nice lady?

9    A.          Yes.

10   Q.          Did you ever have any runs-in with her?

11   A.          No.

12   Q.          What about David Warren, do you know

13   him?

14   A.          Just heard of the name.  I think he's a

15   prosecutor or assistant prosecutor.  I don't know

16   him or -- I just heard people talk.  I don't know

17   him.

18   Q.          He was appointed special prosecutor,

19   correct?

20   A.          Right.  I don't -- that's all I've

21   heard, that he was a prosecutor in Athens County.

22   Q.          Well, you read about him in the

23   newspaper, didn't you?

24   A.          I just know he was an Athens County

```
 1    prosecutor.

 2    Q.        Do you know what role he played in this

 3    whole matter?

 4    A.        No.

 5    Q.        Who's James Stehle?

 6    A.        I don't know who James Stehle is.

 7    Q.        Now, as I understand it, you were

 8    looking for some kind of a -- what was it?

 9    A.        Headphones.

10    Q.        Like for a recording device?

11    A.        Headphones to listen to my computer.

12    Q.        Headphones.  And those headphones were

13    in a filing cabinet?

14    A.        He always kept him in his bottom left

15    drawer, yes.

16    Q.        Were they found in a filing cabinet?

17    A.        They -- yes, after I looked then I

18    found them in the filing cabinet.

19    Q.        And then when you looked, that's when

20    you claimed to have seen the OHLEG report on

21    Mr. Kernen?

22    A.        Correct.

23    Q.        Okay.  And so you pulled that out of

24    the drawer?
```

1    A.         Correct.

2    Q.         You took photographs of it?

3    A.         Correct.

4    Q.         And did you tell anybody that day?

5    A.         Jerrod Alford.

6    Q.         Okay.  Did you tell your supervisor?

7    A.         Which would be Ed Downs, no.

8    Q.         Did you tell your supervisor's

9    supervisor?

10   A.         No.

11   Q.         Did you tell the sheriff?

12   A.         No.

13   Q.         Why didn't you tell the sheriff?

14   A.         Because I reported stuff in the past

15   and nothing was ever done about it and I got

16   blamed for it.

17   Q.         And you got what for it?

18   A.         I got blamed for it.

19   Q.         All right.  Tell me what you reported

20   in the past that you got blamed for that wasn't

21   your fault.

22   A.         Well, there was one time that he --

23   when we got the new guns, he -- it was just me and

24   Ed in the office and he went back in the armory

```
 1    and took out two boxes of ammunition and gave them
 2    to me.  Told me one was for my duty MO and the
 3    other one I could just go shoot off at practice
 4    shooting on my own.  And I considered that theft.
 5    He told me not to tell anybody that he did it.  I
 6    reported it to Alford who was in charge of the
 7    ammunition room and he did a -- he checked it and
 8    found that there was boxes of ammo missing, and
 9    the chief -- apparently according to the chief,
10    the chief said he could do that.
11    Q.        So did you ever report that to the
12    sheriff directly?
13    A.        No, I reported it to a supervisor.
14    Q.        Did you report it to the sheriff?
15    A.        No.
16    Q.        Did the sheriff refuse to do anything
17    about it?
18    A.        As far as I know he -- you'll have to
19    ask Jerrod about that.  So he'll have to go to him
20    about it.
21    Q.        So you don't know if the sheriff did
22    anything or not?
23    A.        He told me that the sheriff gave him
24    permission.
```

1    Q.        Do you know if the chief did anything

2    or not?

3    A.        No.

4    Q.        What else did you report to the sheriff

5    that he refused to act upon?

6    A.        The -- when Mr. Downs told -- was

7    talking about Crystal Shozie who was a deputy and

8    was accusing her of having an affair or sleeping

9    with two -- two supervisors, which would be Bach

10    and Alford.  They filed a complaint.

11    Q.        Who filed a complaint?

12    A.        Alford did.  And I -- on the way back

13    from the range, I got a flat tire and the sheriff

14    picked me up, and that's when he actually talked

15    about it to me while I was in the car and he just

16    told me not to believe everything I heard.  And

17    then after that he got promoted to sergeant.

18    Q.        So do you know whether or not the

19    sheriff did anything?

20    A.        He promoted him to sergeant.

21    Q.        Do you know if he did anything else?

22    A.        No.

23    Q.        Did you ever ask him what else he did?

24    A.        No.  I was told to basically mind my

161

1    own business.

2    Q.        Who told you mind your own business?

3    A.        It was don't believe everything I say

4    [sic], so I interpreted that as mind my own

5    business.

6    Q.        Really?

7    A.        Yes.

8    Q.        You think those are the same?

9    A.        Yeah.

10   Q.        So when you found this OHLEG regarding

11   Mr. Kernen, did you know who he was?

12   A.        I knew he was the attorney for Cummin,

13   former judge.

14   Q.        Was he after elected as a judge, do you

15   know?

16   A.        I don't know that.

17   Q.        Was he appointed?

18   A.        I don't know.  Before my time.

19   Q.        Do you know if there have been any

20   allegations or reports to anybody from the

21   Sheriff's Office about any activities of

22   Mr. Kernen that would justify an OHLEG?

23   A.        No.

24   Q.        Did you ever ask anybody?

1    A.          No.

2    Q.          Why not?

3    A.          One time they were doing an

4    investigation on municipal court for Judge Wallace

5    and I overheard them talking.  And when I asked

6    outside the office -- or I wasn't outside, it was

7    Jerrod and -- if he had heard what was going on

8    upstairs in the investigation.  It got back to the

9    chief and I was told not to talk about anything.

10   And that happened back there and I went back on

11   the road.

12   Q.          The truth, Mr. Dye, is that you don't

13   know if there were any complaints made to the

14   Sheriff's Office about Mr. Kernen or not, you have

15   assumed that since he was Mr. -- Dr. Cummin's

16   lawyer that that's the reason they were running

17   the OHLEG; isn't that true?

18   A.          Yeah.  But I also assumed then that --

19   Q.          Isn't that an assumption?

20   A.          But I would also say that if he was

21   actually doing an investigation, he shouldn't be

22   doing it.  It should be outsourced for a conflict

23   of interest too.

24   Q.          Wasn't my question.  It's an assumption

1    that there's been no complaints.  You never found

2    out or asked anybody, true?

3    A.          Correct.

4    Q.          Did you ever talk to Mr. Kernen about

5    it?

6    A.          No.

7    Q.          Did you ever tell Mr. Kernen that you

8    disclosed to Dr. Cummin and to Dr. Cummin's lawyer

9    that there was an OHLEG run on him?

10   A.          Nope.

11   Q.          Why not?

12   A.          Because I was -- no, that's -- I

13   wouldn't go around telling that.

14   Q.          Pardon?

15   A.          No, I didn't.  Why not, because I just

16   didn't.

17   Q.          Okay.  Well, you let Dr. Cummin and

18   Mr. Brunner know.  Why wouldn't you give him the

19   courtesy of letting him know since it was about

20   him?

21   A.          Because Mr. Cummin was going to take it

22   to BCI.

23   Q.          Pardon?

24   A.          Mr. Cummin was going to take it to BCI?

1    Q.        Dr. Cummin?

2    A.        Dr. Cummin, right.

3    Q.        Was going to take it to BCI?

4    A.        Correct.

5    Q.        When did he tell you that?

6    A.        After I told him.  When he asked me if

7    it was personal and I said yes.  Because they're

8    investigating your attorney at the time.  How do

9    you know that?  I was like, because I found the

10   evidence.  I was like, as reported, I'm going to

11   go to BCI.  And that's when he said I can take it

12   to BCI, I know who's up there.

13   Q.        Do you know if he did it?

14   A.        He told me he did.

15   Q.        He told you he went to BCI?

16   A.        Yes.

17   Q.        Do you know if that was the source of

18   the investigation?

19   A.        I don't know.  Again, I don't know.

20   Q.        What exactly did Dr. Cummin report to

21   BCI, do you know?

22   A.        That's something you'll have to ask

23   Dr. Cummin.

24   Q.        Do you know when?

1    A.          Probably back in November of last year,

2    2014.

3    Q.          So all you really know about it is that

4    Dr. Cummin reported the dissemination of OHLEG

5    information concerning Mr. Kernen to BCI?

6    A.          I wouldn't call it dissemination of the

7    OHLEG information.  He reported the date it was

8    printed and who it was.

9    Q.          How did he know the date it was

10   printed?

11   A.          I told him the date it was printed.

12   Q.          Pardon?

13   A.          I told him the date it was printed.

14   Q.          Really?  What else did you tell him?

15   A.          The name.

16   Q.          What else?

17   A.          That was it.  He got the rest of it

18   from what he told me it was from BCI told him.

19   Q.          And when was it as close as you can

20   estimate that you told Dr. Cummin about this

21   OHLEG?

22   A.          It would have probably been November of

23   last year.

24   Q.          And when was it as specific as you

```
 1     could be that you told Mr. Brunner about this

 2     OHLEG?

 3     A.          Probably December.  I don't know, it

 4     was right around that time.

 5     Q.          Of 2014?

 6     A.          '14.  Right.

 7     Q.          Have you had any communications with

 8     BCI about any of these issues?

 9     A.          No.

10     Q.          Had any communications with the

11     Attorney General's Office about any of this?

12     A.          No.

13     Q.          How would you characterize your

14     relationship with Dr. Cummin?

15     A.          He's my doctor.

16     Q.          Pardon?

17     A.          He's my doctor.

18     Q.          Understood.  How would you characterize

19     your relationship with him?

20     A.          Just -- just a friend I guess.

21     Q.          You like him, get along with him?

22     A.          Right.  Yeah, I mean I like him.  He's

23     got a personality, though.

24     Q.          If I told you that I sensed some
```

```
 1    animosity --

 2               MR. GLEESON:  Can we go off the record

 3    for a minute?

 4               (A short recess is taken.)

 5    Q.        Back on the record.

 6               Mr. Dye, with respect to Dr. Cummin and

 7    his disputes with the county commissioners, do you

 8    know anything about those disputes other than what

 9    you read in the newspaper or what you read in the

10    complaint that Mr. Brunner sent you?

11    A.        No.

12    Q.        No knowledge whatsoever?

13    A.        No.  No.

14    Q.        Did Dr. Cummin ever complain to you

15    about the fact that he didn't think the

16    commissioners gave him enough funding?

17    A.        No.

18    Q.        Did you ever read anything in the paper

19    about that?

20    A.        Just what I read in the paper, stuff, I

21    -- just what I've read in the paper.

22    Q.        Which means it may or may not be true?

23    A.        I can't answer that.  I don't know.

24    Q.        What about Dr. Cummin and his disputes
```

168

```
1    with the prosecutor, what do you know about that?

2    A.          Again, that's what the commissioners --

3    or same as the commissioners, I don't know.

4    Q.          You don't know anything about it?

5    A.          No.  I know there's -- there's

6    obviously a dispute, but I don't know what they're

7    about or --

8    Q.          Do you know the prosecutor?

9    A.          Laina?  Yeah, I've dealt with Laina

10   before.

11   Q.          What's your relationship with her?

12   A.          I was always -- we were always friendly

13   to each other.

14   Q.          Is she a good prosecutor?

15   A.          In my eyes, yeah, I don't have any

16   complaints.

17   Q.          How would you characterize your

18   relationship with the sheriff?

19   A.          I -- I like the sheriff.  I can't say

20   that I didn't.  When -- I mean, I had high hopes

21   for him when he ran in 2001.  I liked him all

22   those years.  I'm still grateful for him giving me

23   a job at the Sheriff's Office and what I've

24   learned.  I just think in the past few years it's
```

1    just -- it went sour.

2    Q.          What caused it to go to sour?

3    A.          That would be speculation.  I just -- I

4    mean I don't -- I don't want...

5    Q.          Well, from your standpoint --

6    A.          Right.  I don't want to assume what

7    happened.  There was a great divide in that office

8    between people.

9    Q.          Really?  Describe that to me.

10   A.          I just think that -- and that was

11   actually brought up to me by Ed Downs when I first

12   got back into the -- the detective bureau.  He

13   said that there was factions or groups forming

14   apart and he even tried -- apparently tested me.

15   We went to Cleveland to see who's side I was on.

16   I didn't agree with it and I talked to him about

17   it and we actually got into an argument over it.

18   I just didn't agree.  Because when I got on there,

19   everybody got along and everybody was fine with

20   each other.

21   Q.          Well, you said there was a great divide

22   in the office.  Who was the divide between?

23   A.          I would assume what he's saying is him

24   and the sheriff and the chief and some other

1    people and then of course me, Jerrod, Derrick and

2    whoever else.  That's who I'm assuming.  Between

3    the chief and the captain.

4    Q.        Did you ever see any divide in the

5    office?

6    A.        I mean I -- people complained about

7    everybody.  But I could -- there was tension.

8    There's always been tension.  But to get back to

9    the sheriff, no, I never really had anything to

10   say about the sheriff.  I never really saw him and

11   he was always -- most of the time when I talked to

12   him he was nice.  I never --

13   Q.        Did you see any divide in the office?

14   A.        I saw -- yes, there was.

15   Q.        Based on what you saw, how did the

16   divide work?  Who was so one side, who was on the

17   other?

18   A.        The groups that I told you.  And I

19   didn't really feel like I was on either side

20   because I got along with --

21   Q.        Well, identify the first side for me.

22   A.        It would be Jerrod and, you know, his

23   group, I guess, on the road, road deputies, and

24   then the chief and the detectives.  That's what

1    I -- in opinion.

2    Q.        You viewed yourself as being in the

3    middle?

4    A.        I tried to be.  I mean I liked -- I

5    mean I had no problems with the sheriff.  I did

6    take -- with Ed, I do take a big bond with him.

7    Q.        You and Ed just did not get along?

8    A.        We got along with we were at work.  I

9    didn't agree with some of the thing he did and

10   some of the things he said.  Ed Downs was a good

11   detective, is a good detective.  I'm not going to

12   take away what it is that I thought he was a good

13   detective.  He just needs to focus on detective

14   work and not go after people he doesn't like.

15   Q.        And who are you claiming that Mr. Downs

16   went after unfairly other than Dr. Cummin?

17   A.        He went after Cummin.  Just he'd always

18   come in there and everybody was doing something

19   wrong, everybody.

20   Q.        Who?

21   A.        I can't give specifics.  I mean --

22   Q.        Can you give me the name of one other

23   person that you believe Mr. Downs want after

24   unfairly?

1    A.         He was investigating Mark Anthony for

2    about three years, two years. I mean, I don't

3    know what all that was about. I'm just saying

4    that was a topic of conversation nonstop from

5    there.

6    Q.         And why do you say that was unfair

7    investigation?

8    A.         I'm not saying that. I'm just saying

9    that it just doesn't seem like he liked him

10    personally.

11    Q.         Have you ever investigated somebody you

12    didn't like?

13    A.         I try not to let it interfere with my

14    job.

15    Q.         That wasn't my question. You

16    investigate a lot of --

17    A.         I'm not from Hocking County, sir, so

18    not very many people that I know, not -- I may not

19    like their actions, but --

20    Q.         So you're not claiming that he -- that

21    Detective Downs unfairly investigated Mark

22    Anthony. You're just saying --

23    A.         No. Right.

24    Q.         -- he investigated him for a long time?

1    A.         Like I said, I don't know the specifics

2    of it, so -- but I'm just saying it seemed like it

3    was more of a personal matter than --

4    Q.         Well, then I'll go back and ask it

5    again.  Can you identify one person that you think

6    Detective Downs unfairly investigated other than

7    Dr. Cummin?

8    A.         I think half the guys at the office, if

9    he had any investigations on that.

10   Q.         Pardon?

11   A.         I think Kevin, I don't know if he had

12   anything to do with that.  I think that would

13   be --

14   Q.         Who's Kevin?

15   A.         Kevin Groves.

16   Q.         Who investigated Kevin Groves?

17   A.         I just remember him talking about that.

18   Q.         About?

19   A.         Ed Downs talking about him stealing

20   stuff out of the investigate evidence room.

21   Q.         Why was that an unfair investigation?

22   A.         I think it was a conflict of interest.

23   Q.         Was it unfairly done?

24   A.         That, I don't know.  I don't know the

174

1    specifics of it.

2    Q.          Did you go to the sheriff or anybody

3    and say, hey, this is a conflict of interest?

4    A.          No.  That wasn't my concern.

5    Q.          So you thought it was a conflict of

6    interest but you didn't say anything to anybody?

7    A.          Right.

8    Q.          Anybody else?

9    A.          I can't think of offhand, no.

10   Q.          Do you recall any specific

11   conversations with the sheriff about Dr. Cummin?

12   A.          With the sheriff about Dr. Cummin?

13   Q.          Yeah.

14   A.          I cannot think of any offhand, no.

15   Q.          Did you had any conversations about

16   Dr. Cummin with Mr. Downs or Mr. Valkinburg other

17   than what you've told us about here today that you

18   can remember?

19   A.          Not that I can remember.

20   Q.          What has Dr. Cummin ever told you about

21   his disputes with the Sheriff's Office?

22   A.          Just -- I mean, nothing really.  I just

23   -- he said -- nothing that I know of.  He -- he

24   told me one time that Ed was one of his patients

1    at one time and I guess things went sour.

2    Q.          What did he say when you told him about

3    -- what did Dr. Cummin say when you told him about

4    the OHLEG?

5    A.          He said he had someone he would report

6    it to at BCI.

7    Q.          But that was it, nothing else?

8    A.          He agreed that it was probably illegal.

9    Q.          You and he both thought it was illegal?

10    A.          Yes.

11    Q.          What else did he tell you?

12    A.          That's all.  I mean there wasn't much

13    more about the problems between those two.

14    Q.          Did Dr. Cummin ever tell you anything

15    about the prosecutor?

16    A.          Not -- no, not that I can think of.

17    Q.          What do you know about the

18    investigation of Glenn Swaim's death?

19    A.          I don't know about it.

20    Q.          Do you know what, if anything, the

21    Sheriff's Office was complaining about concerning

22    Dr. Cummin and that investigation?

23    A.          No.

24    Q.          Pardon?

```
 1   A.          No.

 2   Q.          You never heard anything about it,

 3   never talked to anybody about it?

 4   A.          Just what's on YouTube, again, on the

 5   -- on the inquiry.

 6   Q.          What do you know, if anything, about

 7   the Franklin County coroner's involvement in this

 8   situation?

 9   A.          No.  I don't know about her

10   involvement.

11   Q.          How many times have you gone to a crime

12   scene where there was a death, suspected crime

13   scene?

14   A.          I've had a few.

15   Q.          Pardon?

16   A.          I've had a few.  Ballpark is what you

17   want?  Eight.  I mean that's --

18   Q.          Best estimate?

19   A.          Probably eight in the -- 10.  I mean I

20   really -- a few I guess.

21   Q.          Can you put them in any kind of time

22   frame, Mr. Dye?

23   A.          No, I couldn't remember now.  No, sir.

24   Q.          They were all while Dr. Cummin was the
```

```
 1    coroner?

 2    A.          Correct.

 3    Q.          Ever have you ever participated in one

 4    of Dr. Cummin's inquests?

 5    A.          No, sir.

 6    Q.          When did you first learn, if you can

 7    recall, that a special prosecutor was appointed to

 8    review the matter concerning Dr. Cummin?

 9    A.          There's been like a couple matters.

10    Just what I hear through the office and what you

11    read in the paper.

12    Q.          Do you remember when?

13    A.          No.

14    Q.          Did Dr. Cummin ever talk to you in any

15    regard about the criminal charges that were filed

16    against him?

17    A.          Not until afterwards.  I never talked

18    to him while this was going on.

19    Q.          Afterwards what did he tell you?

20    A.          He just said he knew he'd beat it

21    because he didn't do anything wrong.

22    Q.          Said what?

23    A.          He just said he knew he'd beat it.

24    Q.          Did he tell you anything else?
```

1    A.          That's about it.  Any substance would

2    be that he's going to beat the charge.

3    Q.          And where were you when he told you

4    that?

5    A.          I don't recall.  I just -- or I just

6    remember the conversation, that it was about it.

7    He said he's not guilty of it.  I can't --

8    Q.          Well, were you in his doctor's office?

9    A.          I don't recall if that was in his

10   office or not.  It's been a while.

11   Q.          On the phone?

12   A.          It could have been.  I don't know.

13   Q.          In person?

14   A.          I doubt it was in person.  It would

15   probably be at his office or over the phone.  Like

16   I said, I don't recall.

17   Q.          So you remember him telling you that he

18   knew he'd beat it, but you don't know when, you

19   don't know if it was in person or by phone?

20   A.          Well, you're asking me what he said

21   about the charges and I -- he has said that he

22   will beat the charge.  I don't know when -- I know

23   he's always maintained that he was innocent of the

24   stuff, so --

179

```
1    Q.          You started at the Sheriff's Office,

2    was it 2001?

3    A.          1999 full-time.

4    Q.          '99.

5                Were you involved in the Hettinger case

6    at all?

7    A.          Who?

8    Q.          Does that name ring a bell, Hettinger?

9    A.          There's an attorney down there, isn't

10   there?

11   Q.          No.

12   A.          No.  Then, no, I don't think so.

13   Q.          What about Reeder?

14   A.          Doesn't ring a bell.

15   Q.          What about Spraggins?

16   A.          No, I don't think so.

17   Q.          Murray City?

18   A.          No.

19   Q.          Smith case?

20   A.          I -- I don't think so.  I never really

21   got involved in any of those homicides or -- I

22   never really got involved in the homicides.

23   Q.          Was there a reason for that?  Just

24   wasn't in your area or what?
```

180

1    A.          They would usually take care of the

2    homicides.

3    Q.          Did you know any of the coroner's

4    part-time investigators?

5    A.          Excuse me.

6    Q.          Did you know any of the coroner's

7    part-time investigators?

8    A.          Not personally, no.

9    Q.          Have you ever met them?

10   A.          At scenes they've been out there.  But

11   I -- I don't know.  I mean I know of them about as

12   much as I know of you, so --

13   Q.          Do you have any knowledge as to how

14   many times BCI attempted to contact you for

15   information?

16   A.          Regarding what?  Regarding what?

17   Q.          Regarding anything, any kind of

18   investigation?

19   A.          I don't think they've contacted me

20   once.

21   Q.          Do you know how many times they've

22   tried to?

23   A.          No.

24   Q.          You did find a card in the door?

1    A.          No.  Not from BCI, no.

2    Q.          Who was the card from?  I forget.

3    A.          That was from Tom McKnight, Athens

4    County Prosecutor.

5    Q.          And as far as you know, BCI never

6    attempted to contact you at all about any

7    investigation concerning OHLEG?

8    A.          Correct.

9    Q.          Did Mr. Brunner contact you before he

10   sent you the subpoena to tell you one was coming?

11   A.          I -- yeah, I talked -- talked to him.

12   And that was before the subpoena.

13   Q.          And what did he tell you other than I'm

14   going to send you a subpoena?

15   A.          That was about it.  Nothing else other

16   than the subpoena.  I don't even know if he told

17   me I was getting a subpoena.

18   Q.          Pardon?

19   A.          I don't know if -- he was asking me

20   where to send the subpoena to, my house or the

21   office, the Sheriff's Office.

22   Q.          And you told him your house?

23   A.          Yes.

24   Q.          Was it in that conversation that he

1    asked you if you'd bring the stuff up and meet

2    with him personally?

3    A.        No.

4    Q.        When was that?

5    A.        That was probably after I received the

6    subpoena that I --

7    Q.        Did you tell him on that first phone

8    call when he called you to say he was sending a

9    subpoena what -- what items you had or didn't

10   have?

11   A.        We went over the -- what I had, I

12   believe so.

13   Q.        Okay.  You told him all you had was the

14   photographs and some audio tapes?

15   A.        Yes.

16   Q.        Were you asked to go get anything else

17   from the Sheriff's Office?

18   A.        No.

19   Q.        Why did you want it sent to your home?

20   A.        Because I was scared of them, if they

21   think I'm cooperating with anybody.

22   Q.        How long have you been scared of them?

23   A.        A time.

24   Q.        Pardon?

1    A.          Quite some time.

2    Q.          How long?

3    A.          Probably before I was even a detective.

4    Q.          Pardon?

5    A.          Probably before I was a detective.

6    Q.          Well, when were you in Texas?

7    A.          You're putting a time frame.  I mean

8    it's probably since -- it's just -- I don't know.

9    It's been awhile.  I mean you've got the thing

10   with Kevin Groves.  That put everybody on the

11   edge.  And then before that it just -- they just

12   put you on edge.

13   Q.          Okay.  Can you estimate for me when you

14   were in Texas?

15   A.          Excuse me?

16   Q.          Can you estimate for me when you were

17   in Texas?  You said you were afraid of them since

18   you were in Texas.  When -- what's your best

19   estimate as to when you were in Texas?

20   A.          I can't recall being in Texas.  And I

21   don't think I said I was in Texas.

22   Q.          Okay.  Then I must have misunderstood.

23   A.          Okay.

24   Q.          Let's go back to the first question.

1    A.          Never been there, so.

2    Q.          You've been afraid of them for a long

3    time?

4    A.          Probably before I was a detective is

5    probably what I --

6    Q.          Detective?

7    A.          Yes.

8    Q.          Okay.  And when was that?

9    A.          That was in 2012.

10   Q.          So you've been afraid of them for at

11   least --

12   A.          I would say it was more like 2012 when

13   they started charging Kevin with stuff.

14   Q.          And who's Kevin?

15   A.          Kevin Groves, he was a former deputy

16   there at the Sheriff's Office.

17   Q.          Okay.  And what was he accused of?

18   A.          OHLEG.

19   Q.          Pardon?

20   A.          OHLEG violations.

21   Q.          And what do you know about that

22   situation?

23   A.          I don't know about that situation.

24   Only what's in the paper.

1    Q.          How do you know Kevin Groves?

2    A.          Only -- he was my supervisor, a

3    supervisor.

4    Q.          And did you know him outside the

5    office?

6    A.          No, I didn't care for Kevin.

7    Q.          Pardon?

8    A.          I didn't like Kevin.

9    Q.          Why not?

10   A.          Because I just thought he was a -- I

11   just didn't think he was a very good person.

12   Q.          You didn't think he was a --

13   A.          Good person.

14   Q.          Good person.  Must be a reason.  Why?

15   A.          Well, he's -- yeah, there's probably

16   multiple reasons.  I think he did stuff that

17   weren't -- weren't right on the job.

18   Q.          So you've been -- you said you were

19   afraid of them for about -- since 2012?

20   A.          Yeah.  I would say, if not before.

21   Q.          And did you express that fear to

22   anybody?

23   A.          I think everybody -- yeah, I think so.

24   Not verbally.

186

```
1    Q.          Who did you tell?

2    A.          I didn't really tell.  I think

3    everybody was just kind of watching their back

4    about what was going on.

5    Q.          Well, when you say you were afraid of

6    them, who were -- who's "them"?

7    A.          Mostly Downs.

8    Q.          So you've been afraid of Downs for

9    three years?

10   A.          At least, yeah.

11   Q.          And -- and who specifically did you

12   tell I'm afraid of Downs?

13   A.          It was being afraid that they were

14   going to try to find something to charge you with.

15   Q.          And --

16   A.          And that could be anywhere from that I

17   told -- I mean I think that was everybody that you

18   -- you know, you know.  I mean I think I told, of

19   course, Alford, Bach, Pat, anybody else that would

20   listen.

21   Q.          So you told those three people you were

22   afraid of Downs?

23   A.          Yes.

24   Q.          How many times?
```

187

1   A.          I don't know.  You're putting on a

2   number on something.  I mean everybody knows

3   that --

4   Q.          Did you ever tell the sheriff you were

5   afraid of Downs?

6   A.          No.

7   Q.          Did you ever tell Downs you were afraid

8   of Downs?

9   A.          No.

10  Q.          And you were -- initially became afraid

11  because of --

12  A.          I was just seeing that he was going

13  after people that he doesn't like.

14  Q.          And you say Groves, right?

15  A.          Yeah.

16  Q.          He went after Groves?

17  A.          Matheny.

18  Q.          Hold on.  Did he go after Groves

19  unfairly?

20  A.          I don't know the specifics of it.  I

21  just know he was involved in it --

22  Q.          Okay.

23  A.          -- because he talked about it.

24  Q.          Who else did he go after?

188

1    A.          I just know he didn't like Matheny.

2    Q.          Did he go after them unfairly?

3    A.          I don't know if he went after them

4    unfairly or not.

5    Q.          Who else did he go after?

6    A.          Crystal Shozie.

7    Q.          Was that unfair?

8    A.          I don't believe that one was from what

9    I know.

10   Q.          Okay.  Well, can you tell me somebody

11   he went after unfairly?

12   A.          I'd have to -- it just seems everybody

13   that he talks bad about or talked bad about to me

14   that he ended up going after.

15   Q.          Can you tell me the name of anybody

16   that Mr. Downs went after unfairly?

17   A.          No.

18   Q.          I think that's all I'm going to ask.

19   Thank you for your patience.

20   A.          Not a problem, sir.

21                         - - - - -

22                  FURTHER CROSS-EXAMINATION

23   BY MR. LAMBERT:

24   Q.          I have just a few follow-ups based on

1    what your responses to Mr. Teetor was.

2              Regarding Kevin Groves, you indicated I

3    thought one of the reasons you were scared of --

4    that they may come after you is because after what

5    they did to Kevin Groves.  But yet you told us

6    Kevin did things improperly, stuff he didn't do

7    right.

8    A.        Well, it was just under my belief that

9    when he got in trouble for arresting somebody,

10   they actually wanted to keep him on at the

11   Sheriff's Office after he lied to them, which

12   anybody else that would be grounds for dismissal.

13   And they wanted to actually just to demote him and

14   keep him on and then put him in charge of the SIU

15   team until he left, quit, and then they went after

16   him to charge him with something because

17   apparently he wrote something in the paper or

18   something disparaging about the Sheriff's Office.

19   Q.        I thought you said you didn't like

20   Kevin because he did stuff that wasn't right?

21   A.        I didn't like Kevin.

22   Q.        And he did stuff that wasn't right?

23   A.        Right.

24   Q.        So the fact that they would pursue

1    something against him caused you to be worried

2    also?

3    A.          Yes.

4    Q.          Even though he did stuff that wasn't

5    right?

6    A.          Correct.

7    Q.          Now, as a detective, did you have

8    communications at times with BCI or contact BCI

9    regarding any of your investigations?

10   A.          Very few.

11   Q.          Did you?

12   A.          Yes, I talked with them.

13   Q.          And so you knew what the phone number

14   was and someone that you had talked to before up

15   there?

16   A.          Yes, I could call -- contact them.

17   Q.          So you could have called and said, hey,

18   who do I talk to up there about an OHLEG

19   violation?

20   A.          Yeah.  I just don't think that would be

21   the best course of action for me to do that

22   myself.

23   Q.          But you did have -- because you said

24   earlier you didn't know how to --

1    A.           I didn't know if there was a direct

2    line or anything.  Apparently I've learned

3    afterwards that there is a number that you can

4    call to report those anonymously.

5    Q.           Okay.  But when you told us earlier you

6    didn't know how to get a hold of BCI, that wasn't

7    accurate?

8    A.           I wouldn't say it wasn't accurate.  I

9    didn't know who to report the OHLEG violation to.

10   Q.           But you could have called your contact

11   or someone you knew up there --

12   A.           I didn't -- I didn't have a contact.

13   Q.           Who was -- well, you had a name and a

14   number of someone you talked to?

15   A.           Just a BCI number to BCI.

16   Q.           Well, when you dealt with them, did you

17   have investigators that you dealt with?

18   A.           Usually when you call BCI, I believe it

19   was -- dispatch would call them.  But I don't

20   recall calling them myself.

21   Q.           Well, did you have any follow-up

22   conversation with them regarding any of the cases

23   you were involved in as a detective?

24   A.           Not that I can recall.  I mean I may

1    have.  I don't recall.

2    Q.        So if they come in and did an

3    investigation of one of your cases, you wouldn't

4    follow up and have any contact with them?

5    A.        No.  Usually it would be coming back

6    through if a lab, sent something off to the lab it

7    would come back in the paperwork or something of

8    that matter.  I really didn't have too many

9    interactions with them.  I can think of a few.

10   Q.        Okay.  So --

11   A.        It would mostly -- I would be sending

12   something off to the lab -- or I can't think of

13   very many where they actually called them out to

14   the scene to assist me.

15   Q.        Now, when you say your computer blew

16   up, had you already put the photographs on the

17   disk --

18   A.        Yeah.

19   Q.        -- before then?

20   A.        Yeah, they were already on the disk.

21   Q.        Why had you already put them on a disk

22   if your computer was operating?

23   A.        All I did was I took them from my

24   hotmail and my e-mail account and put them on my

1   drive then I got rid of them completely off the

2   computer.

3   Q.         When you put them on your drive at that

4   point until you started giving the information to

5   anyone, had you put them on a disk?

6   A.         When you're saying -- we're talking two

7   separate -- if you are talking about a disk --

8   Q.         Well, I --

9   A.         It was a flash drive.

10  Q.         At one point I wrote down here disk.

11  A.         Yeah.  Disk, flash drive, it's a flash

12  drive.

13  Q.         But you would put it on a flash drive

14  before you sent them to Mr. Brunner, right?

15  A.         Yes.  They would have already been on

16  the flash drive the whole time.

17  Q.         So they were still on your computer

18  until it blew up but they were also on a flash

19  drive?

20  A.         No.  They weren't on my computer.  They

21  were on the flash drive.

22  Q.         Okay.  Well, did you have -- how many

23  flash drives did you have them on?

24  A.         I had them on one and then I took the

1   pictures off and got rid of the one there -- the

2   pictures on them.

3   Q.          So when you sent it to Mr. Brunner, you

4   sent one flash drive?

5   A.          Didn't send them to him, I dropped them

6   off here.

7   Q.          Now, as I understand, you came home,

8   found a card in your door of an investigator from

9   Athens County.  And the first thing you did was

10  call Dr. Brunner, the first person you contacted?

11  A.          I -- no.  First I called the number on

12  the card.

13  Q.          Okay.

14  A.          No answer.

15  Q.          Then you called Dr. Brunner -- I'm

16  sorry.  Dr. Cummin?

17  A.          No, I called Dr. Brunner --

18  Q.          Sorry.  Got them mixed up.

19              Dr. Cummin?

20  A.          I called Dr. Cummin and asked him if he

21  knew what it as about and he told me it was about

22  disseminating OHLEG.

23  Q.          If you got a letter from an

24  investigator from Athens County, why would you

195

1    assume Dr. Cummin would know anything about it?

2    A.       Because they stopped out at his place,

3    too, apparently.

4    Q.       Well, you didn't know until you called?

5    A.       I figured it had something to the with

6    the OHLEG, so I was pretty sure they would

7    probably get a hold of him.

8    Q.       So because you got a card from an

9    investigator from Athens County, you assumed it

10    had to do with the OHLEG?

11    A.       Right.  Then he said to let Mr. Brunner

12    know, so I contacted Mr. Brunner.

13    Q.       What I'm getting at is you saw the

14    card, called, didn't get any answer, and then you

15    called Dr. Cummin is the first person you called?

16    A.       Yes.

17    Q.       Now, as far as Athens County goes, the

18    only contact you had from them was the card that

19    was left and you called and didn't get an answer?

20    A.       Correct.

21    Q.       And have you been contacted by anyone

22    else concerning the OHLEG?

23    A.       Yes.

24    Q.       Who?

1    A.        That would have been Edgington.

2    Q.        And did you talk to him?

3    A.        Yes.

4    Q.        What did you tell him?

5    A.        Again, I asked what agency he was from.

6    Q.        Uh-huh.

7    A.        And he just said he was hired by

8    Hocking County to investigate an OHLEG violation.

9    Q.        Okay.

10   A.        Which would have been disseminating

11   and --

12            MR. BRUNNER:  Excuse me.  I don't know

13   why that did that.

14   A.        And again I asked him what agency he

15   was from, and he said Hocking County hired him.

16   And I said he could talk to my attorney.

17   Q.        Okay.  Anyone else contact you about

18   OHLEG?

19   A.        Let's see.  No.

20   Q.        Anyone else contact you about your

21   testimony in this case other than Mr. Brunner?

22   A.        About before, no.

23   Q.        And you talked to me on the phone --

24   A.        Briefly, yes.

1   Q.          And basically told me you weren't going

2   to --

3   A.          Right.  I was getting an attorney.

4   Q.          Didn't want to be -- you were getting

5   an attorney?

6   A.          Correct.

7   Q.          And no one else has -- what I'm getting

8   back at now is you indicated earlier you felt you

9   were being harassed?

10  A.          Well, I had the chief call me that

11  morning, wanting me to come in there and they've

12  already sent the investigator to my house, and so

13  that was -- then later the sheriff had texted me,

14  wanted me to stop in.  I don't know what it was in

15  regards to; I didn't reply to it.

16  Q.          Well, you had been asked to stop in

17  after you told the chief you were going to --

18  A.          Get an attorney.

19  Q.          Also after you told him that you were

20  going to pull your commission or you were going to

21  be resigning your commission?

22  A.          Yes.

23  Q.          So other than getting a card that you

24  didn't talk to anyone other than Dr. Cummin about,

```
1    you talked to Edgington and told him you're

2    getting an attorney, what did you believe was done

3    that amounted to harassing you as a witness?

4    A.         Because all that happened after I was

5    depositioned.

6    Q.         Pardon?

7    A.         All that happened after I was

8    depositioned.

9    Q.         After you was depositioned?

10   A.         Yes.  I was given the subpoena to give

11   a deposition.

12   Q.         Okay.

13   A.         And I had --

14   Q.         So that's why you felt it was

15   harassment, because it was after you had received

16   a subpoena for a deposition?

17   A.         Right.  And knowing that this was --

18   about OHLEG stuff, the chief had told me that I

19   was subpoenaed to produce documents and they

20   wanted to know the documents, so --

21   Q.         Pardon?  Now, the chief told you what?

22   A.         I was subpoenaed to give documents and

23   he wanted to know the documents.

24   Q.         Okay.  Did you tell him?
```

1    A.          No.

2    Q.          Did you think it was secretive or --

3    A.          I just didn't want to tell him.

4    Q.          Okay.  Now, you understand if there's a

5    question about an OHLEG report being given out by

6    someone in the Sheriff's Office that that has to

7    be investigated, don't you?

8    A.          I would think.

9    Q.          Okay.  So why did you feel it was

10   harassment?

11   A.          Because I don't think it was a

12   legitimate investigation.

13   Q.          Well, but obviously something has to

14   come out of the investigation?

15   A.          Right.  He wasn't from BCI.

16   Q.          Okay.  Other than what you've just --

17   you've just told be about harassment then, there's

18   been no other actions taken which you would

19   believe were harassment?

20   A.          Not since I had hired an attorney.

21   Q.          I have nothing further.

22               (Signature not waived.)

23                    - - - - -

24          Thereupon, the foregoing proceedings

200

1          concluded at 3:24 p.m.

2                  - - - - -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   State of Ohio       :       C E R T I F I C A T E
     County of Franklin: SS
 2
         I, Stacy M. Upp, a Notary Public in and for the
 3   State of Ohio, certify that Jeremy Dye was by me
     duly sworn to testify to the whole truth in the
 4   cause aforesaid; testimony then given was reduced
     to stenotype in the presence of said witness,
 5   afterwards transcribed by me; the foregoing is a
     true record of the testimony so given; and this
 6   deposition was taken at the time and place
     specified on the title page.
 7
         Pursuant to Rule 30(e) of the Federal Rules of
 8   Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
 9   transcript.

10       I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties hereto,
12   or financially interested in the action.

13       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Columbus, Ohio, on
14   January 4, 2016.

15

16

17

18

19

20   _____
     Stacy M. Upp, Notary Public - State of Ohio
21   My commission expires August 6, 2016.

22

23

24
```

202

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line          Correction or Change          Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Jeremy Dye, have read the entire transcript of
my deposition taken in this matter, or the same
has been read to me.  I request that the changes
noted on my errata sheet(s) be entered into the
record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU19848JD  S-SU P-DL