1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

David L. Cummin, M.D.,     :
et al.,
                          :
        Plaintiffs,
                          :
        vs.                 Case No. 2:15-cv-1043
                          : Judge Sargus
Lanny North, et al.,        Magistrate
                          : Kimberly A. Jolson
        Defendants.
                          :


- - - - -

VIDEOTAPED DEPOSITION OF DAVID L. CUMMIN, M.D.

- - - - -


Taken at Brunner Quinn
35 North Fourth Street, Ste. 200
Columbus, OH 43215
April 29, 2016, 10:20 a.m.


- - - - -


Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF PLAINTIFFS:
3
        Brunner Quinn
4       35 North Fourth Street, Ste. 200
        Columbus, OH 43215
5       By Rick L. Brunner, Esq.

6

    ON BEHALF OF DEFENDANTS:
7
        Lambert Law Office, LLC
8       215 South 4th Street
        Ironton, OH 45638
9       By Randall L. Lambert, Esq.

10

    ON BEHALF OF DEFENDANT DOWNS:
11
        Schroeder, Maundrell, Barbiere & Powers
12      5300 Socialville-Foster Road | Suite 200
        Mason, OH 45040
13      By Lawrence E. Barbiere, Esq.

14

    ON BEHALF OF DEFENDANT VALKENBURG:
15
        Isaac Wiles Burkholder & Teetor, LLC
16      2 Miranova Place, Ste. 700
        Columbus, OH 43215
17      By J. Stephen Teetor, Esq.
            Aaron M. Glasgow, Esq.
18

19  ALSO PRESENT:

20      Michael Lane - Videographer
        Lanny North
21      David Valkinburg
        Edwin Downs
22      Crystal Cummin

23

24

3

1                    Friday Morning Session

2                     April 29, 2016, 10:20 a.m.

3                         - - - - -

4              S T I P U L A T I O N S

5                         - - - - -

6          It is stipulated by counsel in attendance that

7      the deposition of David L. Cummin, M.D., a

8      Plaintiff herein, called by the Defendants for

9      cross-examination, may be taken at this time by

10     the notary pursuant to notice and subsequent

11     agreement of counsel that said deposition may be

12     reduced to writing in stenotypy by the notary,

13     whose notes may thereafter be transcribed out of

14     the presence of the witness; that proof of the

15     official character and qualification of the notary

16     is waived.

17                         - - - - -

18

19

20

21

22

23

24

4

1                    I N D E X

2    Examination By                           Page

3    Mr. Lambert - Cross                          6

4    David Cummin Exhibits                     Page

5    Exhibit 1 - Oath of Office                  16

6    Exhibit 2 - Complaint                       41

7    Exhibit 3 - Statutes                        21

8    Exhibit 4 - Commissioners minutes          127

9    Exhibit 5 - E-mail, 1-6-14                 134

10   Exhibit 6 - Letter to Commissioners from   140
             Cummin
11
     Exhibit 7 - ORC 305.03                     142
12
     Exhibit 8 - Letter 1-9-14                  142
13
     Exhibit 9 - Swaim Certificate of Death      58
14
     Exhibit 10 - Swaim Supplemental Medical     59
15              Certification
16
     Exhibit 11 - Letter to Cummin from Fetherolf,  69
17              1-5-12

18   Exhibit 12 - C19NC Downs Subpoena           69

19   Exhibit 13 - Letter to Fetherolf from Cummin,  70
             1-23-12
20
     Exhibit 14 - Letter to Cummin from Fetherolf  73
21
     Exhibit 15 - Letter to Fetherolf from Cummin,  77
22              2-27-12

23

24

5

1                    INDEX (CONT'D)

2   David Cummin Exhibits                            Page

3   Exhibit 16 - Motion for Order Requiring            84
                 Coroner to Provide Autopsy Photos
4                and Request for Assessment of
                 Attorney Fees
5
    Exhibit 17 - Affidavit of Chief Deputy            104
6                David Valkinburg

7   Exhibit 18 - Letter to North from Cummin,         118
                 3-5-12
8
    Exhibit 19 - Letter from Cummin, 8-27-12          101
9
    Exhibit 20 - Journal Entry and Order              121
10
    Exhibit 21 - Letter to Cummin from Fetherolf,     220
11               1-10-14

12  Exhibit 22 - Complaint for Writ of Mandamus       222

13  Exhibit 23 - Dismissal of Writ of Mandamus        222

14  Exhibit 25 - Letter to Commissioners from         176
                 Cummin
15
    Exhibit 25B - Letter to Cummin, 6-3-14            175
16
    Exhibit 26 - Invoice, 6-16-14                     178
17
    Exhibit 27B - Letter to Cummin from Warthman,     191
18                4-24-14

19  Exhibit 28 - E-mail, 6-20-14                      210

20  Exhibit 30 - Letter to Cummin from North,          15
                 7-17-14
21
    Exhibit 32 - Answers                              227
22
    Exhibit 33 - Cummin's CV                            9
23

24  (Original exhibits returned to Mr. Lambert.)

1          THE VIDEOGRAPHER:  We are on the record

2     at 10:20.  Would counsel please announce their

3     presence.

4                        - - - - -

5              DAVID L. CUMMIN, M.D.

6     being first duly sworn, testifies and says as

7     follows:

8                   CROSS-EXAMINATION

9     BY MR. LAMBERT:

10    Q.          Dr. Cummin, my name is Randall Lambert

11    and I represent three of the defendants that are

12    involved in this lawsuit that you have pending in

13    Federal Court.  We're here today to take you're

14    deposition.  I assume you've had your deposition

15    taken before as maybe in your medical practice?

16    A.          Not in my medical practice.

17    Q.          Have you had your deposition taken

18    before?

19    A.          Yes.

20    Q.          Okay.  You understand in general, then,

21    the procedure we follow in depositions.  It's --

22    even though we're informal, it's still under oath.

23    And you are being recorded here today; whatever we

24    say is being recorded, the exchange between us.

1    You understand that?

2    A.          I understand.

3    Q.          And we have to talk audibly so the

4    court reporter can record everything and so it can

5    be recorded.  We all have a tendency sometimes to

6    nod our heads or not answer verbally.  But I need

7    you to verbal -- answer verbally, okay?

8    A.          Okay.

9    Q.          If I give you question that you do not

10   understand, please tell me, or if it's a compound

11   question, which I have a habit of doing at times,

12   let me know and I'll try to rephrase it or restate

13   it so any answer you give is to a question that

14   you understand.  Fair?

15   A.          Fair.

16   Q.          Okay.  Give us your name and address

17   for the record.

18   A.          David Cummin, 11423 Helber Road,

19   H-E-L-B-E-R Road, Logan, Ohio, 43138.

20   Q.          And how long have you lived there?

21   A.          Two and a half years.

22   Q.          And where did you live before that?

23   A.          I lived on -- I'm trying to think of

24   what the road is.  I lived on Chieftain before

1   that, but I -- I briefly lived for a couple years

2   up on a road just down the road.

3   Q.          Okay.  Give us your educational

4   background.  Where did you graduate from high

5   school to start?

6   A.          I graduated from Upper Arlington High

7   School.  And then I went to Ohio State University

8   for five years.  And I have a Bachelor's of

9   Science in --

10  Q.          Do you have your CV with you?

11  A.          I do.

12  Q.          Okay.  Go ahead and --

13  A.          Bachelor's of Science in human

14  nutrition.  And then I went to Ohio State

15  University for medical school; I got my M.D.

16  there.  And then I went to Grant Medical Center

17  for my three-year residency in family practice.

18  Q.          I think I've got exhibits marked

19  through 32.  If we can just go ahead and mark your

20  CV -- CV, we'll have it and we don't have to go

21  ahead and do it as -- we'll mark it as Exhibit 33.

22               - - - - -

23          Thereupon, David Cummin Exhibit 33 is

24  marked for purposes of identification.

9

```
 1                   - - - - -

 2   Q.          Is this a copy I can have or do you --

 3   A.          It is.

 4               MR. BRUNNER:  What I'll do, at a break

 5   I'll have copies made for everybody.

 6   Q.          That's fine.  All right.  For the

 7   record we've marked it as Exhibit 33.  And that is

 8   the CV you brought with you today, your

 9   professional background; is that correct, Doctor?

10   A.          It is.

11   Q.          Okay.  Tell us a little bit about your

12   work history, where you've worked, where you've

13   practiced.

14   A.          Well, I practiced for almost 18 years

15   in Logan, Ohio, private practice.

16   Q.          Is that the only private practice

17   you've had?

18   A.          It is.

19   Q.          And you are the elected coroner.  When

20   were you first elected or when did you first take

21   office, what year?

22   A.          I was appointed in -- on July 1st,

23   1999.

24   Q.          And you have been the coroner since?
```

```
1    A.          I have.

2    Q.          Other than your private practice and

3    the coroner, have you held any other positions

4    during the last 18 years?

5    A.          Elected?

6    Q.          Elected or otherwise.

7    A.          I've had all kinds of positions, but

8    I'm not sure what positions you're asking for.

9    Q.          Well, employment positions.  Have you

10   done any other work in or out of the medical field

11   during that time?

12   A.          I've been the chief of staff at a

13   hospital.

14   Q.          Okay.

15   A.          About seven years.

16   Q.          Which hospital is that?

17   A.          Hocking Valley Community Hospital.

18   Q.          Are you currently that?

19   A.          No.

20   Q.          Okay.  When -- during what period were

21   you chief of staff there?

22   A.          From 2000 to 2002 and from 2010 to

23   2013.  So seven years.

24   Q.          And you have hospital privileges there?
```

1    A.        I do.

2    Q.        Do you have hospital privileges

3    anyplace else?

4    A.        No.

5    Q.        Have you ever had hospital privileges

6    anyplace else?

7    A.        Yes.

8    Q.        Where was that?

9    A.        I had hospital privileges at Grant

10   Medical Center when I was a resident.

11   Q.        Okay.

12   A.        I had hospital privileges at Marion

13   General when I was an ER physician there.  I had

14   hospital privileges at Licking Memorial Hospital

15   when I was an ER physician there.

16   Q.        Now was that before you started your

17   private practice as -- when you worked as an ER

18   physician?

19   A.        Yes.

20   Q.        Okay.  How many employees do you

21   currently have in your private office?

22   A.        Eight.

23   Q.        Is that the same number you've

24   maintained over the past let's say five years?

12

1    A.         Yes.

2    Q.         How many employees do you currently

3    have in the cor -- coroner's office excluding

4    yourself?

5    A.         Two.

6    Q.         What are their positions?

7    A.         One is a chief coroner investigator.

8    The other one is a coroner investigator.

9    Q.         And who holds those positions?

10   A.         Linn Warthman, L-I-N-N Warthman,

11   W-A-R-T-H-M-A-N, is the chief investigator.  And

12   Jamie Walsh is the coroner investigator.

13   Q.         How long have they held those

14   positions?

15   A.         Jamie was an investigator for I'm

16   guessing seven years before her resignation for

17   one year.  And then she was -- actually, a year

18   and a half.  And then she was repositioned July

19   1st of 2015.

20              Linn Warthman was appointed I believe

21   on July 5th of -- I'm sorry, June -- pardon me.

22   January 5th, 2015.

23   Q.         During that 18 months Jamie Walsh was

24   not an investigator, did she hold any other

13

```
 1    position with the coroner's office?
 2    A.          She was a subcontracted employee.
 3    Q.          And what did she do as a subcontracted
 4    employee?
 5    A.          All the paperwork, phone calls,
 6    gathering of information, office work.
 7    Q.          Prior to January 1st, 2014, did she do
 8    the paperwork and office work for the coroner as
 9    part of her job as investigator; was that a
10    combined position?
11    A.          She did some of it.  She did the -- I
12    mean, we did a lot of things together.  But at
13    that time because we had two employees, including
14    herself, but she would help mainly with the
15    invoices.
16    Q.          Uh-huh.
17    A.          And the bills.  That was her main thing
18    outside of that.  Now, she does a lot more death
19    certificates and things that I used to do.
20    Q.          When you say invoices and bills, that
21    would come into the coroner, you mean, for -- that
22    you would receive?
23    A.          Yes.
24    Q.          Was she the main person that did that
```

14

1    then prior to January 1st, 2014?

2    A.        I mean I did some of it, she did some

3    of it.

4    Q.        Okay.

5    A.        The other investigator did none of it.

6    Q.        All right.  Taking care of the

7    paperwork then and the bills and the phone, that

8    pretty well -- did that basically stay the same

9    then in 2014 as it had been in 2013 as far as

10   Jamie's -- the work that she did?

11   A.        No.  She -- she did -- I think the

12   paperwork has substantially increased.  And she

13   was exclusively doing paperwork for the

14   subcontracted $500 a month fee that she was

15   charging.

16   Q.        Okay.

17   A.        I mean, she didn't do anything beyond

18   that.  I handled all the families and all the

19   things that she used to do.  That was not her job

20   anymore.  Her job was really to just make sure

21   things got paid on time and -- and that we got

22   requests from the attorney general's office for

23   reviews of this case and reviews of that case,

24   submissions of data for data gatherers for the

1    government or private entities or whatever.

2    There's a lot of paperwork.

3    Q.         All of those things, though, she or you

4    did before January 1st --

5    A.         Yeah.

6    Q.         -- 2014?

7    A.         We did those together.  But when she

8    was subcontracted, she pretty much took that

9    paperwork over and I did all the other stuff.  So

10   we divided and conquered.

11   Q.         You and I run over each other sometimes

12   and it's both our faults.  I jump in before I let

13   you finish and you anticipate my question and

14   answer sometimes before I finish, so we'll try to

15   both slow down, okay?

16   A.         Okay.

17   Q.         Now, after July 1st, 2015 when she

18   became a coroner investigator again, did she

19   continue to do the same paperwork and phone work

20   that she had done January 1st, 2014 until July

21   1st, 2015?

22   A.         We went back to the system that we had.

23   Q.         Meaning you helping more?

24   A.         Yes.  Because she was helping take the

1    burden off of me on the other stuff.

2    Q.          The other side being the

3    investigations?

4    A.          Yes.  So she would go to scenes again

5    and handle families and all the things.  Her

6    duties changed significantly back to where they

7    were.

8    Q.          I believe you as the elect -- appointed

9    and then elected coroner, you take an oath of

10   office each year, is that correct, or is it every

11   four years?

12   A.          Every four years.

13   Q.          Okay.  I'll hand you what's marked as

14   -- and I put D.C. for David Cummin's Deposition.

15   It's Exhibit 1.  Is that the latest oath of office

16   that you took, Dr. Cummin?

17                    - - - - -

18          Thereupon, David Cummin Exhibit 1 is

19   marked for purposes of identification.

20                    - - - - -

21   Q.          Or it looks like that's a '12.  I

22   thought it was -- it looks like the one in

23   December of 2012, which would have run through

24   December 2016.  And you can see the timestamp up

1    here of December 31st, 2012.

2    A.          What is your question?

3    Q.          Is that the -- is that the oath of

4    office that you took December 31st, 2012?

5    A.          Yes.

6    Q.          And that oath of office includes the

7    statement that "I will discharge the duties of the

8    office of Hocking County Coroner with

9    fidelity...."  Correct?

10   A.          Yes.

11   Q.          You have been a part-time coroner the

12   entire time you've been coroner?

13   A.          I have been listed as a part-time

14   employee by the State of Ohio, yes.

15   Q.          And as a part-time, that means you're

16   able to maintain a private practice, correct?

17   A.          It -- no, it doesn't mean that at all.

18   That's not the definition of "part-time."

19   Q.          Well, I guess --

20   A.          Part-time is --

21   Q.          I didn't mean it as a def -- the

22   definition.

23   A.          I disagree with your statement.

24   Q.          Okay.  As a part-time coroner, you're

1     entitled to maintain a private office.  If you was

2     a full-time coroner, you could not; is that a

3     correct statement?

4     A.          That is false also.

5     Q.          All right.  Explain that to me then.

6     A.          Because you are listed -- you do not

7     have the opportunity to be a full-time salaried

8     coroner unless you have a population of greater

9     than 175,001 people in your county.

10    Q.          Okay.

11    A.          And you can as a full-time coroner with

12    a population of one million, like the Franklin

13    County Coroner, still have a medical practice and

14    show up to work three days -- three half days a

15    week as done by Dr. Adrienne and -- and others

16    after him.  Jan Gorniak was the first full-time

17    coroner of Franklin County that I had -- that I've

18    worked with.  I've worked with four coroners.

19    Q.          Okay.

20    A.          So that is -- your statement's

21    incorrect.

22    Q.          Okay.

23    A.          Part-time coroner is listed

24    automatically whether you have a private practice

```
1    or not in populations less than 175.

2    Q.          Okay.

3    A.          That's the definition by the State of

4    Ohio.

5    Q.          Okay.  So then you are a part-time

6    coroner and maintain a private office, which

7    you're entitled --

8    A.          I do.

9    Q.          -- to do under the statute?

10   A.          Yes.  I don't have to or I can.

11   Q.          I understand.  That --

12   A.          It's not listed under the statute that

13   I may or may not that I understand.

14   Q.          That's the reason I said you're

15   entitled to do.  You're permitted to do under the

16   statute.

17   A.          I can have three jobs if I want, yes.

18   Q.          How would you describe your duties and

19   responsibilities as coroner?

20   A.          My job is death investigation.  My job

21   is to evaluate whether a death is natural,

22   homicide, suicide, undetermined, accidental, could

23   not be determined, pending.  Those are my boxes I

24   get to check.
```

20

1                The coroner is the only person that can

2    sign an unnatural death on the death certificate.

3    So a -- an attending physician can check a box on

4    the death certificate and put a natural death, but

5    they cannot sign an unnatural death.  They can't

6    even sign a hip fracture if you die of hip

7    fracture complications.  That is an accidental

8    death dated back to the hip fracture.

9    Q.        Okay.

10   A.        So there is a box on the death

11   certificate in the middle of the death certificate

12   and it says certifying physician, check, or a

13   coroner, check.

14   Q.        All right.  And I've seen in several

15   things I've read that the determination of death

16   mean -- regarding the manner or mode and cause of

17   death.  Is that the area that you as the coroner

18   determines?

19   A.        It's an extensive -- however I want to

20   get to those is how the law is written.

21   Q.        I didn't understand that.

22   A.        However I want to get to mode, manner

23   and mean, cause, and manner of death is -- is not

24   restricted by Ohio Revised Code.

1    Q.          And it's not part of your duties to

2    determine who caused the death?

3    A.          It is not my determination to place

4    blame.

5    Q.          Okay.

6    A.          That is the correct terminology.  I can

7    determine who all I want, but I can't place blame.

8    Big difference.

9                        - - - - -

10          Thereupon, David Cummin Exhibit 3 is

11    marked for purposes of identification.

12                        - - - - -

13    Q.          I'll show you what's marked as

14    Exhibit 3, Doctor.  These are just some coroner

15    statutes that I'd like to look at with you

16    briefly.  Let me see the one you have and make

17    sure I gave you the right one.

18                Okay.  It would be -- it would appear

19    to me that under the first section, page 1 there,

20    313.04, if you are going to be temporarily absent

21    from the county, you may appoint a person with

22    necessary qualifications to act as coroner,

23    correct?

24    A.          Yes.  It says "may."

1    Q.        Okay.

2    A.        Not "shall."

3    Q.        I didn't ask you if it said shall.  I

4    said it says you "may," correct?

5    A.        It says "may."

6    Q.        Okay.  And page 2, 313.02 places the

7    eligibility for the office of coroner to be a

8    physician with at least two years of practice

9    preceding the appointment as coroner and in good

10   standing in the person's profession.  Is that your

11   understanding of the qualifications for someone

12   that you could appoint as coroner in your absence?

13   A.        It is.  It doesn't say -- okay.  That's

14   incorrect.  You -- you said I can appoint

15   somebody.  I can't -- I don't have that authority

16   to appoint.  That's up to the -- the party,

17   democrat or Republican Party.

18   Q.        I'm not talking about a vacancy in your

19   position.

20   A.        I heard you say --

21   Q.        You're correct -- you're correct --

22   A.        I heard you say appoint.

23   Q.        Well, it says -- let's go back to

24   313.04.  I don't mean -- none of this is to try to

```
1    trick you.  Go back to page 1.

2    A.          I understand.  But your statement if

3    you read it back was I have the ability to

4    appoint.  That's not how that works.

5    Q.          Well, let's look at the statute here.

6    "When the coroner is absent temporarily from the

7    county...." and some other situations here that

8    doesn't apply, down to the next-to-the-last

9    sentence, "...such coroner may appoint a person

10   with the necessary qualifications to act as

11   coroner during such absence...."  Do you see that?

12   You were not aware that you could do that?

13   A.          Oh, no, I can do that.

14   Q.          Okay.

15   A.          But I can't appoint a coroner.  I can

16   appoint somebody --

17   Q.          To act --

18   A.          -- to act as a coroner.

19   Q.          Yeah.  Yeah.  If I read that wrong, I'm

20   sorry.

21   A.          Okay.

22   Q.          But I thought I read that verbatim, but

23   I may have messed it up.

24   A.          Okay.
```

24

```
1    Q.          We just may have had a little
2    miscommunication.
3                All right.  Are we together now?
4    A.          Yes.
5    Q.          All right.  313.06, page 3, or the next
6    section there states "The coroner, his deputy, and
7    assistants shall be available at all times for the
8    performance of their duties...."  Correct?
9    A.          That's what it says, yes.
10   Q.          Then 313.09, part of the duties is to
11   keep a complete record of and file the cause of
12   death from the death certificate in all cases that
13   come under your jurisdiction.  That's something
14   that you do in all cases, correct?
15   A.          Correct.
16   Q.          Okay.  It says, "All records shall be
17   kept in the office of coroner...."  Where -- where
18   are your records kept, Doctor?
19   A.          They're in my office.
20   Q.          "Your office" meaning your private
21   office?
22   A.          Some are kept there.  Some are kept in
23   a storage place in the Hulls Building.  They kind
24   of shuffle between places.
```

25

```
 1    Q.          Okay.  You have an office or room in

 2    the Hulls Building where you keep files I

 3    understand.

 4    A.          We -- we have -- it's not secure.  We

 5    can't keep anything secure there.  People have

 6    gotten into our rooms, things have disappeared,

 7    there's foot marks all over my desk, people have

 8    to been -- I don't know what they doing in there.

 9    We have a padlock where we keep some of our

10    records and that's where I pretty much shuttle in

11    between the two places.  It's more of a storage

12    place, but I would not place anything valuable or

13    that I don't want to disappear in there.

14    Q.          Now, the statute goes on to say "if no

15    such office is maintained, then such records shall

16    be kept in the office of clerk of courts."  Do you

17    keep records at the clerk of courts or just in

18    your office and the coroner office --

19    A.          It says --

20    Q.          -- in the Hulls Building?

21    A.          -- if no such office is maintained.  An

22    office is maintained.

23    Q.          Okay.

24    A.          So that's not applicable.
```

26

1    Q.          Well, my question was:  Do you keep any

2    records in the clerk of courts?

3    A.          I believe there may be very old records

4    there but nothing since I've been coroner.

5    Q.          Okay.

6    A.          The problem is is records disappear

7    there and they never get returned.  It seems to be

8    a free-for-all.  There's no control of the

9    records.

10   Q.          Okay.  Next section is 313.15,

11   Determination of responsibility for death.  Now,

12   that statute provides that "All dead bodies in the

13   custody of the coroner shall be held until such

14   time as the coroner, after consultation with the"

15   prosecutor or the police department in a

16   municipality or otherwise the sheriff has decided

17   that it is no longer necessary to hold the body to

18   enable him to decide on a diagnosis giving a

19   reasonable and true cause of death.  Is that your

20   understanding that the bodies will be maintained

21   until there has been a consultation with the

22   prosecutor or either the chief of police or the

23   sheriff?

24   A.          I believe that's been substituted with

```
 1    the protocol.

 2    Q.          The protocol that we'll get in to here

 3    later, you believe?

 4    A.          It addresses that.

 5    Q.          Okay.

 6    A.          And this is a statute that was written

 7    in 1953.

 8    Q.          Uh-huh.

 9    A.          And since then, coroners' offices like

10    Franklin County will have a homicide victim; they

11    are required by statute to keep all records.  And

12    we don't -- when we're done with bodies, we don't

13    just stack them and wait to release them.  They're

14    automatically -- at least in Franklin County, they

15    don't call -- is it Mr. O'Brien?  I don't know who

16    the prosecutor is.  They don't call him and say

17    can we release a body.  It's automatic.  Because

18    by statute the coroner, the morgue duties somewhat

19    supersede this in that they are required to keep

20    this by five years and slides of this by that and

21    they're -- all the evidence is maintained.

22    There's no benefit of keeping a carcass, which is

23    the leftover after investigatory slides and photos

24    and DNA slides and all the things that are done.
```

1    So in general this is not something that is the

2    standard in Ohio.  Even though it's written in

3    1953, I think if you went through the morgue and

4    their requirements on homicide victims, that

5    somewhat supersedes this.  But we had to address

6    it, even though I think Hocking County would be

7    the only county I know of that would actually

8    consult after an autopsy whether you could release

9    the carcass or not.

10   Q.        Now, how is -- how has the protocol

11   expanded on this?

12   A.        It eased it.  So I had to notify one.

13   Q.        Pardon?

14   A.        It is said I had to notify one.  It

15   eased it.

16   Q.        Okay.

17   A.        And this is from Mr. Warren.  So the

18   burden is -- and it doesn't say I have to ask for

19   permission or consult.  It says I have to notify.

20   Q.        It says notify --

21   A.        That's what he says.

22   Q.        Notify either?

23   A.        That's what -- yes, that's what he

24   says.

 1    Q.         And that's what the protocol says?

 2    A.         That's what he says the protocol

 3    interprets it.

 4    Q.         Who's "he"?

 5    A.         Warren.  Dr. -- or Dave Warren.

 6    Q.         Okay.  And what do you mean "that's

 7    what he says"?  I believe --

 8    A.         It --

 9    Q.         Is he saying something different than

10    the protocol?

11    A.         He negotiated the contract for them and

12    he said that that's what it is.  And it's -- there

13    is a letter or something, an e-mail or something

14    like that which is referenced and it says I have

15    to notify one or the other.  And I think there is

16    an argument that goes on in whatever the discovery

17    documents are, and it's pretty much -- and I think

18    it was even in a deposition of what it means.

19    Q.         Okay.  So you're saying he explained

20    that as the interpretation of the protocol, that's

21    what's in the protocol means?

22    A.         That's -- that's how we have followed

23    it.

24    Q.         Okay.

1    A.          We have notified and we have notified

2    through an e-mail to Lanny North that the body has

3    been released.

4    Q.          That it has been or that it's going to

5    be?

6    A.          That it's going to be.

7    Q.          Okay.

8    A.          Or has.  I mean I don't know exactly.

9    When we send a body, the first thing they ask is

10   can we release it afterwards and we say yes.  And

11   then when the autopsy's over, I send the e-mail or

12   Jamie sends the e-mail.

13   Q.          Okay.  It appears the last sentence of

14   the statute provides that the consultation, or at

15   least the -- in this case notice, that before it's

16   to be released is to be sure that maintaining the

17   body is no longer necessary to assist any of the

18   other officials in their duties.

19   A.          That is --

20   Q.          What the old law --

21   A.          -- what I described about those statute

22   for the county morgues that keep homicide victims.

23   Q.          Okay.

24   A.          And maintain evidence on homicides.

1    Q.          But if -- if there's notice given that

2    it has been released or going to be released, the

3    -- if there was a request or a need that the body

4    be maintained, if they're not notified until after

5    -- until after it's released, then that wouldn't

6    be effective, would it?

7    A.          What is your question?

8    Q.          I'm saying that that last part of that

9    statute that gives the other law enforcement

10   authorities the ability to ask that it be

11   maintained if for some reason they believe it

12   would assist them in their investigation or their

13   prosecution, they would have the ability to do

14   that if they're not notified until after its

15   released?

16   A.          You'll have to simplify your question.

17   It seems -- what is your question exactly?

18   Q.          I'm not sure what you don't understand.

19              I'm just -- my point was that the last

20   part of that sentence appears to give the other --

21   these other law enforcement officials the

22   opportunity to ask that the body be maintained if

23   they believe there's a reason that -- that the

24   retaining of the body would assist them in their

1    duties.

2    A.         If they believe that they think it

3    should be retained to assist them, then they

4    should notify me and let me know to make sure it

5    doesn't get released.

6    Q.         Okay.

7    A.         Just as if I have Glenn Swaim, they

8    will only maintain his urine and blood for six

9    months unless I specifically ask them to maintain

10   it longer, which I did preemptively.  So there are

11   certain -- you know, we would have to work

12   together.  If there is something that they're

13   concerned about, they should notify me and, say,

14   hey, we have a questions; otherwise, in general

15   100 percent of bodies are released to the

16   families.  And once the death certificate is

17   signed, I have lost control of that body.  I don't

18   maintain jurisdiction over the body.  If -- if the

19   family cremates it, I don't have that ability as

20   to my understanding under law that I -- the only

21   thing when I sign a death certificate does it --

22   I've lost control of the body.

23   Q.         Is there -- now, is that a statute or a

24   regulation that tells you that or --

1    A.          We run into this with indigent deaths.

2    Q.          Uh-huh.

3    A.          In that once the trustees have done all

4    their paperwork and they've submitted it to a

5    funeral home and they're in charge of an indigent

6    burial, 100 percent of the time that I know of,

7    whether it's Hocking County or Franklin County,

8    they're cremated because of expense, and the

9    coroner does not have the ability to prevent that.

10   Because once the death certificate's signed, we

11   have lost control of the body.  That is what I was

12   told through I believe either our prosecutor or

13   Ohio State Coroner Association, but that's how

14   it's been practiced.  I can't tell the trustees

15   save it for a second autopsy.

16   Q.          Okay.

17   A.          I don't have that authority anymore.

18   I've lost it.

19   Q.          The next section deals with disposition

20   of firearms.  It provides that -- it would appear

21   to me that firearms that come into your control or

22   custody would be turned over -- are turned over to

23   law enforcement once they're no longer necessary

24   for you to retain them; is that correct?

```
 1    A.          That is correct.

 2    Q.          Is that something you always do?

 3    A.          Yes.  We try to.  There -- it's been

 4    refused for example in the past.  This past Sunday

 5    the .50 caliber handgun from a suicide was

 6    refused.

 7    Q.          Who was it refused by?

 8    A.          By Detective Shyree.  He said it was my

 9    gun and it was my -- he didn't want it.  That's

10    fine.  I mean I have no problem with that.  We

11    maintain a secure place for it.  It's not a big

12    deal.

13    Q.          Then the next section deals with the

14    ability to issue subpoenas.  These would basically

15    be often for inquest, right?  You hold inquests

16    from time to time to help determine the manner or

17    cause of death?  Is that correct?

18    A.          It's -- I don't think it's necessary

19    for --

20    Q.          I did not mean it was necessarily for

21    that.  Let me back up.  You can issue subpoenas --

22    A.          I can perform inquests and I can issue

23    subpoenas.  The -- there is a quasi juris -- you

24    know, there's a --
```

1    Q.          Quasi judicial?

2    A.          Yes.  Quasi judicial power that the

3    coroner has that other elected officials don't

4    have to issue subpoenas.  Yes, it can be a

5    subpoena duces tecum, it can be a subpoena to

6    appear to testify, it can be all kinds of -- you

7    know, we've utilized that.

8    Q.          And that's in order for you to inquire

9    how the deceased came to his death basically?

10   A.          Yes.  It is for that among whatever I

11   need to -- if I'm not getting the answers that I

12   need, then we would perhaps use a subpoena if

13   they're not willing to discuss how somebody came

14   to their death or there are concerns that they

15   won't come forward with or their inability to give

16   me information because somebody says they're not

17   allowed to, whatever.

18   Q.          But it's -- the purpose, ultimate

19   purpose there that the subpoena would be used for

20   would inquire how the deceased came to his death,

21   correct, there in the second line?

22   A.          I don't think it exclusively says for

23   only that purpose.  Do you see where it says only

24   for that purpose?

36

```
 1    Q.         No.

 2    A.         Me neither.

 3    Q.         It does not.

 4               But other than the -- helping you

 5    determine how someone came to their death, what do

 6    you believe the other purpose or ability to use a

 7    subpoena is -- is available to you?

 8    A.         I think I've already answered that

 9    previously.  You can read it back.

10    Q.         Well, it was my understanding what I

11    what you answered previously all went to the

12    ultimate determination of how someone came to

13    their death.

14    A.         You can ask the court reporter to read

15    back what my previous answer was.

16               MR. LAMBERT:  Okay.  Would you read it

17    back for us.

18               (The record is read as follows:  The

19    question is:  "And that's in order for you to

20    inquire how the deceased came to his death

21    basically?"  The answer is:  "Yes.  It is for that

22    among whatever I need to -- if I'm not getting the

23    answers that I need, then we would perhaps use a

24    subpoena if they're not willing to discuss how
```

1   somebody came to their death or there are concerns

2   that they won't come forward with or their

3   inability to give me information because somebody

4   says they're not allowed to, whatever.")

5   A.       I'll stick with that answer.

6   Q.       Well, there were a lot of -- there were

7   a lot of generalities that -- in that answer,

8   Doctor. What I'm trying to figure out is if you

9   believe the subpoena can be used for anything

10   other than to assist you in ultimately determining

11   how the deceased came to his death?

12   A.       I think I've answered that question.

13   We can read it again.

14   Q.       Okay.

15         MR. BARBIERE: That's not proper.

16   You're entitled to an answer to your question. I

17   agree with Randy. I don't think you've answered

18   that question. And I don't think you can tell him

19   that you're not going to answer unless your --

20         THE WITNESS: I've already answered it.

21         MR. BARBIERE: If your attorney

22   instructs you not to answer, that's one thing.

23         MR. BRUNNER: Objection. It's been

24   asked and answered.

38

```
 1     Q.          Let me state it a different way,

 2     Doctor.  I don't want to get into a battle with

 3     you.

 4                 MR. BRUNNER:  That's probably --

 5     Q.          I'm trying -- I'm just trying to get

 6     some information.

 7                 I interpret the answer that she just

 8     read back as being ways to help you determine how

 9     the deceased came to his death, and you've stated

10     that even in the answer.  Do you believe there's

11     any other purpose other than how the deceased came

12     to his death as you described in your previous

13     answer that the subpoena can be used for?

14     A.          Yes.  I think it can be not only how

15     they came to their death, but the circumstances

16     around it before and afterwards.  Perhaps if there

17     is improper collection of evidence and then I

18     can't find out what that improper evidence was,

19     then I could ask questions on how that was done

20     because it's -- they determine how I rule the

21     case.  But it's not just cause and manner of

22     death.  It may be the circumstances around it

23     which may influence whether it's an accident or a

24     suicide or things like that.
```

39

```
 1   Q.          You believe you have subpoena power

 2   after you have determined the cause and manner of

 3   death?

 4   A.          Absolutely.

 5   Q.          And what would the purpose of that be?

 6   A.          Because I can change it at my

 7   convenience if I find new evidence.  There is no

 8   statute that says that I stop investigating after

 9   I've signed a death certificate.  And I can

10   certainly change it without anybody's authority to

11   do so.

12   Q.          Okay.

13   A.          For years later if necessary.  And I've

14   done that.

15   Q.          Okay.  Doctor, 313.23 provides that the

16   coroner may allow an interested person, which has

17   been -- can be defined as a law enforcement

18   agency, to view an autopsy.  Do you agree with

19   that?

20   A.          What is your question?

21   Q.          The coroner may allow an interested

22   person to view an autopsy?

23   A.          "May" is the proper term, yes.

24   Q.          Yes.  Is there any reason why you would
```

40

1 think that permission should not be granted to a

2 law enforcement agency if they asked to view the

3 autopsy?

4 A.          I think if you are Detective Downs or

5 Detective Valkinburg and you're secretly recording

6 a pathologist and Jan Gorniak says you're never

7 allowed to come back in her office again, I think

8 that's her discretion.  I don't think that they

9 have any expertise medically to help be there at

10 an autopsy.

11 Q.          Other than personal reasons, as you

12 described --

13 A.          Personal interest, maybe.

14 Q.          Other than personal reasons as you

15 described, can you -- is there any reason why law

16 enforcement you believe should not be entitled to

17 view an autopsy if they ask to do so?

18 A.          It's not within their power.  It

19 says "may."

20 Q.          I understand.

21 A.          You asked entitled, right?

22 Q.          No.  I asked if they asked you to view

23 an autopsy or asked a coroner in general to view

24 an autopsy, can you think of a reason other than

```
 1     some personal background that you -- as you

 2     described that a law enforcement agency should not

 3     be permitted to view an autopsy?

 4     A.          I think I've described one instance, if

 5     they be kicked out because of their --

 6     Q.          I understand that.

 7     A.          -- behavior.

 8     Q.          I'm just -- other than some personal

 9     thing like that, is there any other reason why?

10     A.          I've not had a problem with other

11     people going there, but that's also not -- also --

12     there is another say that can be the pathologist

13     besides myself.  I can't go and twist the arm of

14     Jan Gorniak and say I really, really want somebody

15     to see it and tell her to go against her

16     principles.

17     Q.          Have you ever told the Franklin County

18     Coroner's Office you did not want a law

19     enforcement member or agency viewing an autopsy?

20     A.          I don't remember.

21     Q.          Okay.  I'll show you what's marked as

22     Exhibit 2.

23                       - - - - -

24               Thereupon, David Cummin Exhibit 2 is
```

 1    marked for purposes of identification.

 2                    - - - - -

 3    Q.        Basically that's a copy of the lawsuit

 4    that was filed on your behalf in the case that

 5    we're here in, Doctor.  Would you agree with that

 6    or do you need a minute to look at it?

 7               (A discussion is held off record.)

 8    Q.        Do you agree that's a copy of the --

 9    A.        No.

10    Q.        -- complaint that you --

11               Okay.  Can you tell me why you don't

12    agree then?  Did somebody copy it wrong or what?

13    A.        The last page says Notice to Withdraw

14    Counsel.

15    Q.        Well, somebody did copy it wrong.

16    Let's take a last page off of there.

17    A.        Then I agree it's correct.

18    Q.        That'll be -- we'll consider that an

19    Angel-ism.

20               MR. BRUNNER:  I object to that

21    statement.

22    Q.        And what we'll have to do at some

23    point, keep these -- keep the exhibits together.

24    But Exhibit 3 there we're going to be using from

43

1    time to time -- or Exhibit 2 I mean during the

2    day, so if you want to just keep the other ones

3    here -- here, yeah, we'll put them over here.

4    That one there, just keep it there because we'll

5    be referring to it.

6              Would you agree, Doctor, that over the

7    past few years there has been some conflict or

8    controversy at times between you and the sheriff's

9    office or employees of the sheriff's office?

10   A.        Define "conflict."

11   Q.        Well, disagreement or confrontation?

12   A.        Regarding what?

13   Q.        A variety of things I guess I would

14   say.  Just -- if you don't agree with that, then

15   we can move on.

16              Regarding some of those issues that I

17   was referring to in the past, do you remember in

18   2009, Doctor, the investigation of the death of

19   Sherri Davis on Bailor Road in Laurelville?  Does

20   that name ring a bell?

21   A.        You'll have to give me the file on it

22   to -- so I can understand what you're --

23   Q.        Well --

24   A.        If I remember or not.

44

1    Q.          Well, in that -- it's my understanding

2    as a result of that investigation, you held an

3    inquest and subpoenaed all the officers from

4    what -- where you appeared to be upset over the

5    way you were notified.  Does that help refresh

6    your memory?

7    A.          Yeah.  I believe I was notified eight

8    hours after the death.

9    Q.          Okay.

10   A.          BCI was already processing the scene.

11   Q.          And --

12   A.          And I got there and the scene was

13   already being processed, yes.

14   Q.          Okay.  And as a result you subpoenaed I

15   think seven or eight officers to an inquest and

16   had them read Section 313.12 of the Ohio Revised

17   Code out loud regarding the notification to the

18   Coroner?

19   A.          I don't remember.

20   Q.          Okay.

21   A.          But I do remember that I did not record

22   Lanny North when he told me he purposely didn't

23   call me for eight hours and it was his fault and I

24   let him go.

```
 1              MR. TEETOR:  Excuse me a minute.  Could
 2    I ask that -- if you wouldn't mind keeping your
 3    voice up.  I'm having trouble hearing you.  And
 4    the court reporter is leaning forward.  You're
 5    speaking very softly and we all need to hear.
 6    Thank you.
 7    Q.         Something we all have a tendency to do,
 8    you and I are conversing back and forth but we
 9    have a large room; we have a -- the fan going.  So
10    we'll probably both have to speak up, okay?
11              MR. BARBIERE:  As a matter of fact, I
12    didn't hear the last answer either.  Would you
13    mind reading it back?
14              MR. TEETOR:  I couldn't hear it either.
15              (The record is read as follows:  But I
16    do remember that I did not record Lanny North when
17    he told me he purposely didn't call me for eight
18    hours and it was his fault and I let him go.)
19    A.         That should really say I let it go.
20    Q.         Now, I believe you were out of town at
21    that time and Mike Downhour was the investigator
22    that appeared on that scene.  Do you recall that?
23    A.         No.  I don't recall that.
24              MR. TEETOR:  I'm sorry.  What did you
```

1    say?

2    A.          No.  I do not recall that.

3    Q.          Would you agree that having the

4    officers read Section 313.12 of the Ohio Revised

5    Code out loud did not have anything to do with you

6    determining the cause or manner of the death of

7    Ms. Davis?

8    A.          It did not.

9    Q.          And you'll recall in that -- in that

10   case the suspect was hospitalized and you went to

11   the hospital and interviewed the suspect?

12   A.          No.  I don't recall that.

13   Q.          Okay.  Do you recall there being times

14   when prior to this protocol being developed that

15   your investigators were wait -- asked to wait

16   before they go into the scene until BCI gets there

17   and a search warrant is obtained and there being

18   some controversy about that?

19   A.          There were three instances where we

20   were called to three death scenes, and at one we

21   -- I was not permitted to go in.  And I believe --

22   I can't remember which one, but Laney North I

23   think was screaming at me that he is the sheriff

24   and he is in charge of the scene.  Then there was

```
 1    another one where David Valkinburg said:  I am in
 2    charge of the scene and you can't go in.  And then
 3    the third one was when Seth Riddlebarger was out
 4    there and he couldn't go into the scene.  And then
 5    I had Mike Downhour and Mike Stephenson at one of
 6    those three scenes, and they were told if they
 7    went inside they would be arrested.  And that was
 8    what prompted the three denials in six weeks of
 9    going into a death scene, of which there was no
10    jurisdiction for the sheriff's department.  Two
11    were naturals death and one was an overdose.  They
12    had no jurisdiction on any of those three deaths.
13    None.  Yet they denied access by the coroner to
14    the scene to evaluate if it was even a suspicious
15    death.  And that's why that was started with the
16    protocol.  It was to be able to get us access
17    because the prosecutor in our town would not
18    follow the Ohio Revised Code and let the coroner
19    or his investigators in the scene to evaluate it.
20    That is what really happened.  Denied three times
21    in six weeks on two naturals and one overdose.  No
22    jurisdiction does the sheriff's department have
23    over any of those deaths or the scene itself.  It
24    was illegal.
```

48

```
1    Q.          When you say "the scene," it's my
2    understanding the coroner is in charge of the body
3    and the area directly around the body?
4    A.          Defined "directly around the body."
5    Because Anthony Celebreeze defined it if you want
6    to look up his opinion which followed the opinion
7    piece of an Ashtabula case.  It's as big as the
8    coroner wants it to be.  That's the AG's opinion.
9    You can look up Anthony Celebrezze for that
10   opinion.
11   Q.          Is that the 1988 opinion?
12   A.          It is.
13              MR. TEETOR:  Excuse me.  I cannot hear
14   you.  I'm sorry.  Would you mind keeping your
15   voice up?
16              MR. LAMBERT:  Can you hear me or --
17              MR. TEETOR:  Yeah.
18              MR. LAMBERT:  Okay.
19              MR. TEETOR:  I can't hear the witness's
20   answer.  Nobody down here can, but I understand.
21              MR. BRUNNER:  My guess is, too, is that
22   some of it, it goes up, so you do have to raise
23   your voice for down there.
24   Q.          Okay.  You mentioned Glenn Swaim.  I
```

```
 1    think Glenn -- Glenn Swaim has been a source of

 2    some conflict or disagreement between you and the

 3    Sheriff's Office, correct?

 4    A.          Correct.

 5    Q.          And I believe that occurred in June --

 6    June the 9th of 2011 was his death?

 7    A.          It did.

 8    Q.          And he lived on Shaw Road?

 9    A.          I don't know.

10    Q.          Okay.  Do you recall if the first

11    indication you give to the Sheriff's Office as to

12    your ruling or what you would likely rule in the

13    case was in September when you approached Captain

14    Alford at the county fair?

15    A.          What's the question?

16    Q.          It's my understanding -- I'll rephrase

17    it.

18                It's my understanding that the first

19    indication you give to the Sheriff's Office

20    regarding your ruling or probable ruling was you

21    told Captain Alford at the county fair that it was

22    probably going to be ruled a homicide -- a

23    homicide that was in September, does that sound

24    right?
```

1    A.            September 12th, I believe, 2011.

2    Q.            And the official ruling on the death

3    certificate was dated --

4    A.            Actually, it was September 14th.  I'm

5    sorry.  September 14th.

6    Q.            And the actual death certificate was

7    signed in December, I believe December 13th?

8    A.            Correct.  Would you like me to explain?

9    Q.            Sure.

10   A.            Okay.  Glenn Swaim was found in a drug

11   trailer in the woods.  He was brought into the

12   emergency room deceased or I think they may have

13   coded him on a Thursday morning or so.  That would

14   have been June 9th, 2011.  I was seeing patients.

15   I sent Jamie Walsh, my investigator, over to the

16   emergency room, and she took notes and then she

17   filled out the -- the sheet for an autopsy request

18   and then she came back to the office.  I never saw

19   Glenn Swaim.

20            I got called on September 12th by

21   Dr. Ugwu, and he said that it was a death as a

22   result of blunt force trauma, that he had a

23   lacerated liver and that he had -- I'm trying to

24   remember if it was 1,200 ccs of blood in his

1    belly; he bled to death and it probably took one

2    to three hours.  He had reviewed it with his

3    peers.  They have a weekly meeting where they

4    review certain cases.  The microscopic slides that

5    he saw showed early healing.  He estimated that he

6    lived one to three hours and that he wanted me to

7    know.

8              I -- the county fair was going on that

9    week.  I thought I might see Lanny North at the

10   fair.  I didn't see him, but I felt it was

11   important enough and I found an officer with rank,

12   Jerrod Alford, and I told him that it was a

13   concern that it was going to be ruled -- I did not

14   have the autopsy report yet.  It came maybe three

15   days later.  He said -- he -- he apparently

16   notified Lanny North that evening.  And then

17   September -- so that was September 14th.

18             On September 28th, Kaleb Mortiz, who

19   was originally on the case, was removed.

20   Detective Downs had taken over the case.  And he

21   showed up two weeks after notification that it was

22   a homicide to pick up the autopsy report on

23   September 28th.

24             December 15th, 2011, the family

52

1    notified me after I'd told them that he died of an

2    over -- that he died of a blunt force trauma that

3    the sheriff's department had told them that he

4    died of an overdose and that they had switched the

5    blood samples, the Franklin County Coroner's

6    Office, as a mistake.  There was no drugs in his

7    system.  He was clean for three weeks before his

8    death.

9            So they told me that the case was

10   closed, the sheriff's department was not returning

11   any of their calls and the prosecutor wasn't

12   returning any calls.  And on September 28th when I

13   saw Dr. -- Detective Downs, I told him that I

14   would not release the cause of death to give him

15   the time necessary to investigate it.  So when the

16   family called me and told me December 15th that

17   they had created a fictitious cause of death which

18   was inaccurate, then I told them I'd release it to

19   the newspaper.  So December 17th, I showed up on

20   the newspaper that I declared it a homicide.  And

21   then on the 19th it was signed.

22           On the 27th, David Valkinburg called me

23   and asked me if I had a copy of the autopsy

24   report, three months after I'd already given it to

1    Detective Downs.  David Valkinburg was the head of

2    the detective bureau of two detectives.  Why he

3    did not have that autopsy is beyond me.  So we

4    sent Mike Downhour with a second copy that day and

5    gave him a copy of that.  So apparently for three

6    months the head of the detective bureau didn't

7    know that the lead detective had the autopsy

8    report, after he told the family a complete lie.

9    That's --

10   Q.        Did you --

11   A.          -- why I took that long.

12   Q.        Did you talk to Detective Downs and ask

13   if he had told the family that?

14   A.          He refused to talk to me.

15   Q.        What --

16   A.          He refused to turn anything over to me.

17   I sent Mike Downhour on January 3rd, 2012 there to

18   get a copy of the report.  It was the same

19   four-sentence report that I got on the September

20   28th when Detective Downs brought the same report

21   to me.  I asked for the report, he refused to give

22   it to me, and now you can see where we got.  I got

23   a family being lied to --

24   Q.        Who --

1    A.          -- I got --

2    Q.          Who -- who refused to give it?

3    A.          Detective Downs.

4    Q.          You say Detective Downs --

5    A.          Absolutely.

6    Q.          -- refused to give you the report?

7    A.          No.  He gave me the same four-sentence

8    report that I got on September 28th.  I found out

9    two years later that Glenn Swaim was a

10   confidential informant.

11   Q.          How did you find that out?

12   A.          I had heard through law enforcement and

13   I asked who signed him a as confidential informant

14   and it was Culbertson.

15   Q.          With Logan?

16   A.          Yeah.

17   Q.          Logan PD?

18   A.          And he signed him -- he told me in a

19   90-minute interview with him that he had no idea

20   that he died -- he thought he died of an overdose.

21   He had no idea he died of blunt force trauma.  He

22   signed him and he told me that it was detective or

23   it was with -- I don't know if he's a detective or

24   what his rank is.  Cluely.  Cluely is also --

1    Q.          Can you spell that for the --

2    A.          C-L-U-L-E-Y.  He is also the lone

3    investigator for Laina Fetherolf, the prosecutor.

4    He's the prosecutor investigator.  He is

5    by-the-book, straight-as-an-arrow guy.  And if he

6    signed somebody as a confidential informant three

7    weeks -- three weeks before their death, there's

8    no way he wouldn't have told his boss.  And I

9    would think that if your confidential informant

10   was killed three weeks after you signed him and

11   you're the prosecutor, you would actually call the

12   coroner and say what happened to my CI?  That's

13   why I believe there's something wrong here.

14   Q.          But you're saying this is all --

15   A.          He didn't have any drugs in his system

16   because I'm sure that was in his agreement.  It

17   was also, if you look at Jamie Walsh's notes which

18   are in the other room, her original notes from

19   that day June 9th, 2011, that Megan Swaim said he

20   had been clean for three weeks.  He was the driver

21   in a burglary ring and he didn't want to go to

22   jail again, so he signed a confidential agreement

23   -- confidential informant agreement to give up the

24   two guys that he was doing it with.  And then

```
1     three weeks later he mysteriously gets killed and

2     it's covered up.  That's what the Swaim problem

3     is.  And when I have a prosecutor and a sheriff

4     who are in the same page together, I can't fix the

5     problem.

6     Q.          Did you go to the sheriff or

7     prosecutor, either one, and talk to them about

8     this?

9     A.          They already told that the case was

10    over.

11    Q.          Did you go to them and talk to -- to

12    them about the Swaim case?

13    A.          Yes.  I talked to Laina Fetherolf in

14    September -- in November.  Now, remember, I

15    declared it a homicide in September 14th.  Downs

16    picks up the autopsy, gives me the four-sentence

17    report September 28th.  And then I am guessing it

18    was around November 17th Laina Fetherolf was in my

19    office, and I can't violate HIPAA to say why she

20    was there, but she was there.  And I informed her

21    that Glenn Swaim was killed, not knowing that he

22    was a CI at the time.  And she had no idea

23    anything about it.  Almost two months after -- oh,

24    over two months after I declared it.  I believe
```

 1    Detective Downs may have even been on paternity

 2    leave for a couple months at that time, but I

 3    don't know that to be true.

 4    Q.        Now, when you say you had declared it,

 5    what did you tell Captain Alford back in

 6    September?

 7    A.        I said he was killed by blunt force

 8    trauma, it was a homicide, and that I was going to

 9    rule it a homicide, and that he needed to tell his

10    boss.  And he did so that evening.  He called him

11    at home I believe.

12    Q.        And who did you tell that you were

13    going to hold the death certificate for for them

14    to do the investigation?

15    A.        Detective Downs on September 28th,

16    which apparently he didn't tell anybody.

17    Q.        I'm sorry.  I didn't catch that.

18    A.        Apparently he didn't tell anybody.

19    Q.        Okay.

20    A.        His boss or the prosecutor or anybody.

21    And then the lie to the family about the overdose

22    which was completely false.

23              I did bring his file if you want to

24    review it.

1    Q.          Pardon?

2    A.          I brought his file if you'd like to

3    review what I say to be true.

4    Q.          Okay.  We can take a break and we

5    can -- we can re -- we can look at that.

6              Now, after you had ruled on the cause

7    and manner of death in December of 2011,

8    approximately six months after the death you then

9    held an inquest in January 2012?

10   A.          That is correct.

11   Q.          And why was that?

12   A.          Because Detective Downs and the

13   sheriff's department wouldn't turn any information

14   they had over, because apparently they must have

15   had additional evidence that I didn't have because

16   they kept telling everybody it was an overdose.

17   Q.          When you say "kept telling everybody"?

18   A.          The family.  They called my office

19   again in January and they wanted something done.

20   And I'm talking Krystal Jones and Dewayne Jones.

21   Q.          I have what's marked as Exhibit 9.

22                         - - - - -

23              Thereupon, David Cummin Exhibit 9 is

24   marked for purposes of identification.

1                  - - - - -

2    Q.          This would have been the -- I guess the

3    preliminary death certificate that says the cause

4    is "Pending"; is that correct?

5    A.          Yes, it is.  Would you like to know why

6    it says "Pending"?

7    Q.          I -- well, I assumed I knew but go

8    ahead and -- go ahead and explain.

9    A.          This is the burial certificate.  And if

10   I -- I have -- as long as I put pending, the

11   decedent can be buried or cremated or anything.

12   Q.          Okay.

13   A.          That's the purpose of the pending when

14   you see that.

15   Q.          Okay.  You had told us the -- the

16   investigation that I thought was pending, but

17   that's fine.  I understand that's a better --

18   that's an explanation.

19                  Exhibit 10 then is the final death

20   certificate as I understand?

21                  - - - - -

22                  Thereupon, David Cummin Exhibit 10 is

23   marked for purposes of identification.

24                  - - - - -

60

```
 1    A.         Yes.

 2    Q.         Which includes the blunt -- the cause

 3    of death and then the manner of death I guess as

 4    the blunt impact to the torso?

 5    A.         Correct.

 6    Q.         It says "Presumed physical

 7    altercation."  That, again, presume speaks for

 8    itself there.  There was no evidence of there

 9    actually being a physical altercation, so that's

10    the reason you put it presumed?

11    A.         Exactly.

12    Q.         Now, before you release -- signed the

13    death certificate and released it to the press,

14    did you notify the Sheriff's Office you was going

15    to do so?

16    A.         No.

17    Q.         Now at what point was the body

18    released?

19    A.         It was released the day after the

20    autopsy.

21    Q.         I don't know if you told us that.

22    Now --

23    A.         I don't -- I'd have to look at the date

24    of the autopsy.
```

```
 1    Q.          Now, you indicated the autopsy report
 2    was 7 -- was September 14.  Had the autopsy been
 3    performed a long time before that --
 4    A.          Yes.
 5    Q.          -- and then you just got the report?
 6    A.          Yes.  But autopsies are not necessarily
 7    done the same day.  They could be done three to
 8    four days later.  It depends on the workload,
 9    especially if it's on the weekend.  At the time I
10    believe they had two -- they had maybe one
11    pathologist, maybe two that would come in on the
12    weekends, and they might do three autopsies a
13    piece.  But if they had eight deaths the night
14    before, then two -- and they would always do
15    Columbus autopsies before out-of-county ones.  And
16    so it's not unusual for us to get an autopsy three
17    to four days later, which isn't a problem.  So
18    they -- we know we're on the back burner but
19    that's okay.
20    Q.          But he had -- the autopsy apparently
21    was within two or three days of June the 9th, I
22    assume?
23    A.          The -- if we look at the file, we could
24    tell.  I don't know what day it was done.
```

62

1    Q.        Okay.

2    A.            It could have been done same day he was

3    sent; it could have been done one or two days

4    later.  I dont' know.

5    Q.            You wouldn't expect it to be more than

6    two or three days later?

7    A.            I don't know.

8    Q.        Okay.

9    A.            I mean, it could -- it could be three,

10   four days later.  I don't know.

11   Q.        Okay.

12   A.            I'd have to look at the sheet.

13   Q.            Dr. Ugwu had called you September 12th

14   is what I'm trying to get at.

15   A.        Yes.

16   Q.            Was that an unusual amount of time

17   between the autopsy and communicating with you?

18   A.            Well, I don't know what he thought.  I

19   don't know what he was thinking at the time.  You

20   know, he had created a -- an -- he created a

21   report in which he mentioned CPR, and I think what

22   he did was he -- and I asked him this, I said did

23   you -- well, he volunteered it.  He told me

24   eventually he had sent me an autopsy report that

63

```
 1    was not accurate.  And I read it, and luckily I

 2    read the entire details of it.  It said that he

 3    had possible signs of CPR.  And I went, whoa,

 4    where did that come from?  So I called him up and

 5    I said that's not consistent with your -- you told

 6    me blunt force trauma and he lived one to three

 7    hours.  And he said, oh, my, gosh, I had dictated

 8    that right afterwards, and then when we went

 9    through the process and I changed my opinion, I

10    forgot to delete that.

11    Q.        So the report after he talked to you on

12    September 12th --

13    A.        So --

14    Q.        -- that was --

15    A.        -- I got it in the mail.

16    Q.        Okay.

17    A.        And I read it.  And I -- when I was

18    reading it, I went what is that?  So I called him.

19    And I said there's -- is this what you meant to

20    say?  Because that's not consistent with what you

21    told me on the phone.  And that's when he

22    apologized -- he apologized and said can -- can

23    you destroy that and I'll send you a new one in a

24    couple days.  You haven't sent that to anybody,
```

1    have you?  And I said no.  I didn't even tell my

2    staff about it.

3    Q.        Now --

4    A.        So I took it to the shredder.

5    Q.        When you say he indicated that that was

6    his initial impression that it could have been due

7    to CPR and then --

8    A.        I don't know what he was thinking.

9    Q.        You said that he --

10   A.        I know that --

11   Q.        Sorry.  Go ahead.

12   A.        I don't know what he was thinking.  But

13   I do know that after he reviewed it that he --

14   apparently everybody had said that's not correct.

15   And so he must have taken his original report that

16   he had not sent out yet, a preliminary, and he had

17   to change it to what he thought was proper.

18   Dr. Ugwu was released because he could not pass

19   his boards.  He was fired.

20   Q.        Now --

21   A.        So that's a big problem with the Glenn

22   Swaim case is that if you -- you have to pass your

23   boards within a certain period of time or you have

24   to start over.  And he -- he failed his last set

1    of boards, and so Jan Gorniak released him.  He

2    was fired.

3    Q.          Okay.  Now, is that an unusual amount

4    of time from the autopsy until calling you

5    September -- it'd be three months later, was that

6    --

7    A.          Back then I would always have him call

8    me.  He didn't call me.  We just assumed it was an

9    overdose.  I had no idea that there were liver

10   lacerations or blunt force trauma at all until I

11   got that call.  For three months I had no idea.

12   That was news to me.  We just assumed it was an

13   overdose.  He came in -- you know, there wasn't

14   any marks on him.  So, yes, that was unusual

15   because I would have expected any other

16   pathologist to have called me and said, hey, what

17   happened to this guy.  But he didn't.

18   Q.          Okay.  So the first word you got from

19   Franklin County then was September 12th?

20   A.          That is correct.  And then a couple

21   days later the report was wrong.

22   Q.          Let's take a short break.

23              MR. BRUNNER:  Sure.

24   Q.          And I meant to -- before we go off the

1    record, I meant to tell you, too, Doctor, any time

2    you want to take break or need a break --

3    A.        I appreciate it.

4    Q.        -- you just let me know and we will.

5    It's not an endurance thing.  Only thing I ask is

6    that you answer --

7              THE VIDEOGRAPHER:  We're off the

8    record.  The time is 11:34.

9              (A short recess is taken.)

10             THE VIDEOGRAPHER:  This marks the

11   beginning of disk No. 2.  We are back on the

12   record.  The time is 11:50.

13   Q.        Dr. Cummin, going back to one prior

14   question.  I'd asked if you had attempted to

15   contact Detective Downs to inquire of him as to

16   whether or not he had told the family what they

17   had relayed to you.  Did you -- did you make any

18   personal attempt to contact Detective Downs?

19   A.        Yes.

20   Q.        And what was that?  What attempt did

21   you make?

22   A.        I phone called him on December 15th.

23   Q.        Okay.  And --

24   A.        That's what I have marked down on my

```
1    meticulous notes.

2    Q.         In your what?

3    A.         My notes.

4    Q.         Okay.  And that you were not able to

5    reach him or what?  You did not talk to him?

6    A.         As far as I know, I talked to him.

7    Q.         You --

8    A.         Because I -- that's what I wrote down,

9    that I talked to him.

10   Q.         And the reports that you said that

11   you -- the subsequent report that you got, I

12   believe Downhour went to the Sheriff's Office to

13   get that report; is that correct?

14   A.         Again --

15   Q.         Yeah.

16   A.         -- on January 3rd is what I wrote down.

17   Q.         Okay.  Do you know how he had --

18   A.         2012.

19   Q.         Do you know how he obtained that,

20   whether he talked to --

21   A.         No, I --

22   Q.         -- Downs directly?

23   A.         No, I don't believe he talked to him.

24   Q.         Okay.
```

1   A.          I think he got it from the front office

2   or wherever.  I don't think he was available or

3   something.

4   Q.          Okay.  Do you know whether or not

5   Detective Downs had a subsequent report after that

6   one that he picked -- that Downhour picked up from

7   the dispatcher?  Did --

8   A.          Not to my knowledge.

9   Q.          Or did you get a subsequent report from

10  him?

11  A.          I got something eventually, but it

12  wasn't much of a report.  It included the

13  transcription of Dr. Ugwu's secretly taped

14  interview, which it was I think in February, so it

15  would have been after that period of time when I

16  got a subsequent report.

17  Q.          After the death certificate --

18  certificate was released, they had been

19  communication between you and the prosecutor

20  regarding the records on Glenn Swaim.  Do you

21  recall that?

22  A.          Possibly.

23  Q.          I'll show you what's marked as

24  Exhibit 11.

69

```
 1                       - - - - -

 2            Thereupon, David Cummin Exhibit 11 is

 3      marked for purposes of identification.

 4                       - - - - -

 5      Q.          Do you recall receiving that letter

 6      from the prosecutor requesting all information

 7      that you have concerning Glenn Swaim?

 8      A.          I do.

 9      Q.          Okay.  And it was your understanding

10      she had also made the same request of the

11      Sheriff's Office or did you know that?

12      A.          I don't know.

13      Q.          You didn't know that?

14      A.          It doesn't say that on here.

15      Q.          Okay.  Now, that was dated January the

16      5th.  At that point you had not decided to have an

17      inquest, is that correct, as of that date?

18      A.          I don't know when I decided.

19      Q.          Okay.  You then issued subpoenas to the

20      law enforcement officers dated January 12th to

21      have an inquest scheduled; is that -- I'll show

22      you what's marked as Cummins Exhibit 12.

23                       - - - - -

24            Thereupon, David Cummin Exhibit 12 is
```

1    marked for purposes of identification.

2                      - - - - -

3    Q.          That would be the subpoena to Ed Downs,

4    correct?

5    A.          Yes.

6    Q.          And I believe there were other

7    subpoenas issued to the -- all the other officers

8    that might have been involved in Swaim?

9    A.          Yes.  To the best of my recollection.

10                     - - - - -

11           Thereupon, David Cummin Exhibit 13 is

12   marked for purposes of identification.

13                     - - - - -

14   Q.          Now, your response to the prosecutor is

15   -- they're stuck together here -- would appear to

16   be Exhibit 13.  Look at that and -- I'd ask you if

17   that is your response?

18               Let me ask you, Doctor, is that a copy

19   of a letter that you forwarded to the prosecutor

20   dated January 23rd, 2012?

21   A.          It appears to be.

22   Q.          That's your signature there on page 3?

23   A.          It is.

24   Q.          Okay.  And at this time had you already

```
 1    received from her the motion to quash the

 2    subpoenas that you'd issued for the officers, do

 3    you recall?

 4    A.          By reading the letter, it says that she

 5    was trying to quash my subpoena.

 6    Q.          I believe the second paragraph says

 7    your failed attempt to quash my coroner's

 8    subpoenas a second time?

 9    A.          Yes.  Because she tried to quash it the

10    first time.

11    Q.          The Davis inquest?

12    A.          Yes.  She had chosen -- she keeps

13    choosing sides on civil matters instead of

14    appropriately getting outside counsel.  Correct.

15    Consistently choosing the other side, yes.

16    Q.          Okay.

17                MR. BARBIERE:  I'm sorry.  I didn't

18    hear that answer.

19    A.          Consistently chooses the other side,

20    yes.

21    Q.          Now, had -- before you issued the

22    subpoenas, was there attempts made to talk to the

23    prosecutor or the sheriff about meeting and

24    exchanging information without the need for the
```

1    subpoenas?

2    A.          After my subpoenas had been issued, she

3    had sent something -- a letter to me that said

4    something about getting together and trying not to

5    put them on the stand or whatever.

6    Q.          What --

7    A.          I think we were past that moment then.

8    Q.          Now, what do you mean "past that

9    moment," Doctor?

10   A.          The hostility of this -- the

11   defendants, I would say mainly Downs, towards me

12   on the matter and letters from Laina Fetherolf

13   which are not very positive towards myself I think

14   had determined that it had to be done in a manner

15   that didn't seem to be very favorable.  For

16   example, she chose their side and wanted to quash

17   my subpoenas.  Well, she's clearly not

18   independent.  So how is an independent meeting

19   going to take place if she is not going to be

20   independent.  She's already chosen her course.  So

21   that's why I proceeded because I -- she even

22   showed up to court still to defend them.  She was

23   not independent and she did not recuse herself.

24   She had a conflict of interest and she chose to

73

```
1    continue her conflict.

2    Q.         Had she expressed to you that she did

3    not want the testimony to occur because it could

4    affect -- adversely affect the criminal

5    prosecution if these questions are asked in -- in

6    open -- in an open public hearing --

7    A.         No.

8    Q.         -- with law enforcement?

9    A.         I don't remember her having that

10   conversation with me.

11   Q.         I'll show you what's been marked as

12   Exhibit 14.  I think you just referred to that,

13   said she sent you a letter indicating we should

14   all get together and exchange information and work

15   together I believe.

16                     - - - - -

17             Thereupon, David Cummin Exhibit 14 is

18   marked for purposes of identification.

19                     - - - - -

20   A.         Yes.  But she's already chosen their

21   side.

22   Q.         So you felt her filing to quash the

23   subpoenas as the prosecutor to avoid the public

24   hearing and testimony -- public testimony before
```

1    -- during the investigation was choosing sides?

2    A.        Yes.  She -- I did not have counsel to

3    counter her quash attempt.  She did not supply

4    with me counsel to be able to proceed with my

5    duties.  She left me out on a limb without

6    attorneys.  Absolutely she did.

7    Q.        She proposed a meeting on January 23rd

8    where the Sheriff's Office would bring all the

9    information that they have to turn over to you.

10   What was your response to that?

11   A.        I don't know the date of this letter

12   because it's undated.

13   Q.        Uh-huh.

14   A.        Exhibit 14 --

15   Q.        It refers -- it refers to a prior

16   entry, January 19th, and a meeting to be held on

17   January 23rd, which would lead us to believe it

18   would have been between those two dates.

19   A.        The coroner's subpoena is on January

20   20th.  It was already set, she had lost her quash,

21   we were able to prevent the quash with no legal

22   representation, and so we proceeded forward.

23   Perhaps a different outcome had I been supplied

24   with an attorney, but it wasn't done.

```
 1    Q.          What do you mean "perhaps a different
 2    outcome"?
 3    A.          If I had representation supplied, maybe
 4    there could have been some sort of mediation of
 5    some sort.
 6    Q.          But you --
 7    A.          Of how we were going to arrange things,
 8    but I had no representation.
 9    Q.          So without an attorney, you did not
10    want to meet with the prosecutor and discuss that
11    ongoing criminal investigation?
12    A.          I did not have an independent attorney
13    with me.
14    Q.          I --
15    A.          I was not going to discuss it.
16    Q.          I understand you.  But as coroner do
17    you need an independent attorney to meet with the
18    prosecutor regarding an ongoing criminal
19    investigation?
20    A.          If she has chosen sides and she's
21    quashing my subpoenas, absolutely.  I have no
22    representation in court.
23    Q.          The inquest that you held was open to
24    the public, correct?  It's not closed?
```

1   A.          No.

2   Q.          Media can be there?

3   A.          They could.

4   Q.          Defense counsel could be there for

5   possible suspects?

6   A.          They could.

7   Q.          Did you obtain any additional reports

8   or documents as a result of that inquest that you

9   did not already have?

10  A.          Not that I know of.  No, I did not.  I

11  do know that.

12  Q.          You --

13  A.          Because I remember saying at the

14  inquest you still supplied me with the same

15  four-sentence, three-page document that I got

16  twice before.

17  Q.          Did you obtain any additional

18  information that you did not have that was

19  beneficial to reviewing the manner and mode of

20  death?

21  A.          I'd have to review the tape.

22  Q.          You don't recall receiving any

23  additional?

24  A.          I can't speak one way or the other --

77

1   Q.          Okay.

2   A.              -- on what I remember gaining from

3   that.

4                        - - - - -

5               Thereupon, David Cummin Exhibit 15 is

6   marked for purposes of identification.

7                        - - - - -

8   Q.          I'll show you what's been marked as

9   Exhibit 15.  Is that a letter from you to the

10  prosecutor dated February 27th, 2012?

11  A.          Okay.  Yeah.

12  Q.          Okay.  Is that a response to the

13  January 5th letter requesting information from the

14  prosecutor?

15  A.          No.

16  Q.          Had you already supplied the

17  information that was requested in the January 5th

18  letter?

19  A.          Yes.  Where's January 5th -- okay, let

20  me look.

21  Q.          That's Exhibit 11.  I'll help you out

22  there.

23  A.          I'll retract that answer until I know.

24  Q.          All right.

1    A.          Yes.  I already supplied this

2    information on -- from Exhibit 11, yes.

3    Q.          Prior to February 27th, apparently

4    you'd received a subpoena, so you're indicating

5    the information you're supplying here of

6    February 27th is the same information you had sent

7    January 5th --

8    A.          I had supplied I believe four times the

9    same information.  Remember, there wasn't much of

10   a file.  There was some preliminary notes.  There

11   was an autopsy report.  I mean we didn't have any

12   scene photos, we didn't have anything.  I had --

13   there was no file of substance.

14   Q.          As I understand Ms. Walsh actually went

15   to the hospital and saw the --

16   A.          She did.

17   Q.          -- the deceased?

18   A.          And her notes are in the file.

19   Q.          Okay.

20   A.          Original notes.

21   Q.          Now, down at the bottom of Exhibit 15 I

22   just had a question.  You indicate that you'd told

23   Ms. -- or the prosecutor that you had given

24   permission to Dr. Gorniak to talk to the

1    prosecutor.  This permission cites specifically

2    the prosecutor so there's no miscommunication with

3    intermediaries.

4    A.          I was removing myself so that she could

5    get whatever information she wanted.

6    Q.          Okay.  I read that as being limited to

7    only the prosecutor --

8    A.          No.  She didn't --

9    Q.          -- to talk to Dr. Gorniak?

10   A.          And she never called her.

11   Q.          Okay.  But this did not limit it where

12   her investigator or someone from the Sheriff's

13   Office could not talk to her then?

14   A.          It doesn't mention -- I mean that's a

15   totally different branch of government.

16   Q.          Okay.  I -- I read it wrong there.  I

17   read this permission cites specifically the

18   prosecutor so there's no miscommunication --

19   A.          No.  I was trying to make it so they

20   could speak freely to each other.  I was being

21   placed in the middle.  I -- once again, I had a

22   subpoena duces tecum by the prosecutor, my

23   attorney --

24   Q.          Uh-huh.

1    A.          -- and had no representation to respond

2    to it; that is correct.

3    Q.          When you say your attorney -- but she's

4    acting as the prosecutor, she give you a subpoena

5    to obtain certified copies of the records of the

6    Glenn Swaim --

7    A.          She is my attorney.

8    Q.          -- investigation, correct?

9    A.          She's my attorney.

10   Q.          Okay.  You think every time you receive

11   a subpoena from the prosecutor, you need to have

12   an attorney appointed?

13   A.          I think if you supplied me a subpoena

14   duces tecum, I would take it to the prosecutor,

15   yes.

16   Q.          That wasn't my question.  My question

17   was:  Every time the prosecutor gives you a

18   subpoena to obtain certified records, you believe

19   you'd need to have an attorney appointed?

20   A.          I think I need to have one to look at

21   it to see if it's proper, especially on a murder.

22   I had nobody.  I was hung out on a limb by myself

23   again.

24   Q.          But -- but you're not a party, you're

1    -- you basically are a witness in a -- in a murder

2    investigation or a murder prosecution by the

3    prosecutor, correct?

4    A.        I'm not an attorney.  If you are going

5    to give me legal documents --

6    Q.        I'm sorry.

7    A.        -- I'm going to take them to my

8    attorney.

9    Q.        Okay.  So you think -- you believe if

10   the prosecutor gives you a subpoena, you can't go

11   to the prosecutor and talk to her about the

12   subpoena she give you?

13   A.        I don't understand the subpoena route

14   because I've already given her everything.  Then

15   she wasn't satisfied, so she subpoenaed me.

16   Sounds like there's more to it.  Sounds like I

17   need an attorney.  It's a legal process; I'm not

18   an attorney.

19   Q.        If you issue a subpoena to deputies to

20   appear, do you believe they could come to you and

21   talk to you about the subpoena before --

22   A.        Sure.

23   Q.        -- the proceeding?

24   A.        Sure they could.

1    Q.          Okay.  Was there ever a meeting in

2    response to the prosecutor's letter asking that

3    the parties get together and exchange information?

4    Was there ever a -- did that meeting ever occur?

5    A.          It did not.  But I had texted about

6    either doing it by phone or -- the meeting by

7    phone or whatever.  I cannot specifically say.

8    But I know that there was an accommodation to a

9    meeting, whether it was this one or whatever.  But

10   I assume it was this one because I don't know of

11   any other meetings.  There should have been a

12   texting communication that we can talk by phone or

13   whatever, speaker phone.  I don't recall.  But I

14   know that there was something done.  There was an

15   answer to that of some sort.

16   Q.          February 22nd there was a special

17   prosecutor appointed to conduct a grand jury into

18   the Swaim death, correct, David Warren?

19   A.          I don't know the exact date.

20   Q.          Okay.  Around -- around the time of

21   this communication, actually prior to your

22   February 27th letter, I don't know if you recall

23   it being that time, but at least in February of

24   that year or around that time?

```
 1    A.        Could be.

 2    Q.        Okay.  You know there was a special

 3    prosecutor appointed and a grand jury convened to

 4    invest -- to look into the death of Mr. Swaim?

 5    A.        I do.

 6    Q.        Okay.  And there was some

 7    communication, some meeting between you and the

 8    special prosecutor regarding your records and

 9    autopsy photographs?

10    A.        There was one arranged.  He did come on

11    a Saturday morning; that is correct.

12    Q.        And do you recall he at some --

13    A.        That was later.

14    Q.        I'm sorry?

15    A.        That was later I believe.

16    Q.        You recall at some point he filed a

17    motion with the court regarding the autopsy

18    requiring the autopsy photographs to be provided

19    and then that motion set forth details as to what

20    his belief was of the meetings between you and

21    him, correct?

22    A.        You'll have to break down your

23    question.  There's a lot in there.

24    Q.        I'll show you what's marked as
```

84

```
 1    Exhibit 16.

 2                     - - - - -

 3           Thereupon, David Cummin Exhibit 16 is

 4    marked for purposes of identification.

 5                     - - - - -

 6    Q.        Now, basically what I want to do is go

 7    over some of this and just get you to confirm

 8    whether or not you agree that this is the process

 9    of how things happened or what happened.  The

10    special prosecutor, second paragraph, indicates

11    that upon being appointed he --

12    A.        If I can read the first paragraph.

13    Q.        I'm sorry?

14    A.        May I read the first paragraph?

15    Q.        Oh, sure.  Sure.

16    A.        Just so I can get the context.

17    Q.        Sure.

18    A.        Thank you.

19    Q.        Okay.  Second paragraph now Mr. Warren

20    indicates after his appointment he served a letter

21    on all parties including the prosecutor and the

22    sheriff.  Do you recall receiving a letter from

23    him indicating he was the special prosecutor?

24    A.        Not specifically.
```

```
1    Q.            I understand.  Then it says May 22nd,
2    2012, you may not remember the exact dates, I just
3    asked if you recall he and his investigator
4    meeting you at your office in Logan?
5    A.            I don't remember that, but I'm sure it
6    happened.
7    Q.            Okay.
8    A.            It was in my notes that it occurred.
9    Q.            Okay.
10   A.            But I don't remember the meeting.
11   Q.            He indicates he had asked to see the
12   autopsy photographs; you had asked if they could
13   do it later.  I think you had wanted to pick up
14   your children.  He's indicated it's no problem,
15   he'd try to get them from Dr. Gorniak.  Does that
16   help refresh your memory or --
17   A.            I think most of this is highly
18   inaccurate, but I would be happy to address your
19   issues.
20   Q.            Well, I'm going to go -- I just want to
21   go through it step by step.
22   A.            Yes, I understand that.
23   Q.            Okay.  Okay.
24   A.            So what's your question?
```

1    Q.          Paragraph 3, you don't recall, then?

2    A.          We don't have autopsy photographs at

3    this point.

4    Q.          That I didn't ask.  We're going to get

5    into that.

6    A.          Okay.

7    Q.          I'm just asking you if paragraph 3 --

8    A.          Yes.  I'm answering your question.  You

9    said do I recall him saying that I would like to

10   see the autopsy photos but I have to leave and go

11   back to my sitter.  That's false.  We were not

12   given autopsy photos, period.

13   Q.          Okay.  So you didn't indicate --

14   A.          That's false.

15   Q.          -- can we do that later or --

16   A.          No.

17   Q.          -- get into that later?

18   A.          We don't have them.

19   Q.          Okay.

20   A.          We never -- we were not supplied a

21   standard protocol to have autopsy photos at that

22   time by Franklin County Coroner's Office.

23   Q.          Okay.

24   A.          They were -- they are now, we get them

1    now, but that might have started in 2014.

2              MR. TEETOR:  Excuse me a minute.  I

3    hate to interrupt, but this will be better if

4    you'll each let each other finish.  There's --

5    you're getting in a hurry, kind of interrupting

6    and it's marking it hard for the record.

7    Q.         All right.  I think both of us jump in

8    a little quick, Doctor, so if you --

9    A.         I apologize.

10   Q.         I do too.  We'll both slow down or try

11   to.

12   A.         It's false.

13             MR. LAMBERT:  Mr. Teetor, keep an eye

14   on us.

15   A.         He wanted autopsy photos; they were not

16   supplied as standard at that time.  It's false.

17   What he says he came there and I had notes photos,

18   it's false.  I did not have photos.

19   Q.         He didn't say you had.  He asked to see

20   photos and you indicated if you could talk at

21   later time because you wanted -- you needed to go.

22   It says do that.  I'm not sure what that means.

23   I'm --

24   A.         I think it's false because he clearly

1    implies that I had the photos and I wasn't giving

2    them to him at that time because I had to go back

3    to my sitter.

4    Q.        Do you --

5    A.        I'm saying that's false.  We did not

6    have photos of autopsies supplied at that time.

7    Q.        Okay.

8    A.        That's false.

9    Q.        You recall him indicating he would try

10   to get them from Dr. Gorniak?

11   A.        Yes.

12   Q.        Okay.  And he indicates that --

13   A.        Because I don't possess them.

14   Q.        The next paragraph, he indicates that

15   he met with Dr. Gorniak and that she indicated to

16   him that since she was under contract with the

17   Hocking County coroner, she would -- he would need

18   to go through you to get the photographs.

19   A.        Okay.

20   Q.        Was that your understanding that she

21   was not permitted to leave -- release photographs

22   to anyone and -- but they had to go through you?

23   A.        No.

24   Q.        Okay.

```
 1    A.           I was not communicated this at all that

 2    I -- to my understanding.

 3    Q.           You had never communicated to her not

 4    to release photographs --

 5    A.           No.

 6    Q.           -- to any -- let me finish -- any

 7    investigative person?

 8    A.           No.

 9    Q.           Okay.  Did Dr. Gorniak ever send you

10    the photographs after she met with the special

11    prosecutor -- yeah, the special prosecutor?  Did

12    she send you --

13    A.           Yes.

14    Q.           -- the photographs?

15                 Okay.  You received a subpoena to

16    produce your complete file to the grand jury.  Do

17    you recall that?  And -- or did you appear at the

18    grand jury with your file?

19    A.           Yes.

20    Q.           Okay.  Did you have the autopsy

21    photographs with you at that time?

22    A.           No.

23    Q.           Do you recall indicating you'd left

24    them at the office?
```

```
 1    A.          No.  I think that's false.

 2    Q.          The --

 3    A.          I didn't have them.

 4    Q.          No.  This is over a month after he had

 5    met with Dr. Gorniak.  She still had not sent them

 6    to you?

 7    A.          She overnighted them to me at some

 8    point.

 9    Q.          Okay.

10    A.          They remained unopened in the file in

11    the other room.

12    Q.          Okay.

13    A.          I was given 72 hours by my attorney,

14    the prosecutor, to produce slides and autopsy

15    photos of which I did not possess.  I had no

16    representation to counter a threat of 72 hours or

17    being charged with something.  I called Jan

18    Gorniak at home and I said, I have a problem.  I

19    need these autopsy photos and slides that I don't

20    possess.  I would think that you would subpoena

21    the person who possesses them.  Now, your

22    paragraph 4 says that they're supposed to go

23    through me.  That was not informed -- I was not

24    informed of that duty.  So she said, don't worry
```

```
 1    about it, I will go into tomorrow morning and I
 2    will cut new slides and send them to you with the
 3    photos.  I had 72 hours to produce them.  At 48
 4    hours, I received it overnighted to me and I had
 5    Mike Downhour take it to her office to deliver it
 6    personally to her because I was under threat by my
 7    attorney with no representation.
 8    Q.         When you say --
 9    A.         She was not --
10    Q.         -- by --
11    A.         -- there.
12    Q.         When you say by your attorney, you're
13    talking about the prosecutor --
14    A.         Yes.
15    Q.         -- that had issued the subpoena for the
16    records?
17    A.         Yes.  She threatening me, yeah.
18    Q.         All right.
19    A.         With prosecution.
20    Q.         All right.
21    A.         If I didn't respond within 72 hours.
22    Sometimes this is an emergency after waiting how
23    many months.  So she was not there.  He left a
24    message that we had the photos and the slides and
```

1    that he was taking them back to my office.  I was

2    24 hours early from the deadline.  She called my

3    office a couple hours later, which I think she

4    refers in her testimony as an errand boy comment.

5    And what she really said was I'm not coming to

6    your effing office to pick up any effing slides on

7    my effing time and blah, blah, blah.  I could hold

8    the phone out to here while my office staff heard

9    it all.  And I said, okay, well, they're here in

10    the pickup box for you.  And then she hung up.

11    Q.         Why were they not left at her office?

12    A.         Because if somebody lost them or

13    misplaced them, it was my behind that was going to

14    be punished.  They were going to be specifically

15    handed to her because she was threatening me and I

16    had no legal representation to counter it.

17    Q.         You -- they couldn't be left with her

18    at her office with a receipt showing that they'd

19    been left?

20    A.         I wasn't taking any chances.

21    Q.         Okay.

22    A.         Call me crazy, but I'm not taking

23    chances.  So I put them in the pickup box --

24    Q.         Okay.

```
 1    A.           -- where unfortunately I didn't know

 2    they remained there for months, unopened to this

 3    day.  And so when Mr. Warren came to my office on

 4    a Saturday morning and I pulled the file to give

 5    to him, the photos weren't in there.  Do you know

 6    why?  Because none of my office staff was there

 7    and they didn't tell me they were still in the

 8    pickup box, that she apparently didn't feel the

 9    necessity to come send one of her deputies over to

10    get them, as she so conveniently would subpoena me

11    through that.

12    Q.         Now --

13    A.         They were available.  She refused to

14    pick them up.

15    Q.         Well, you did not have them with you

16    when -- when you went to the grand jury?

17    A.         No, because I didn't know that --

18    Q.         At --

19    A.         I don't know the dates.  I did not have

20    them in the file.  They were not delivered by

21    overnight at that time or they were in the pickup

22    box.  I don't know the dates.

23    Q.         You would recall the -- Mr. Warren then

24    agreeing to meet you the morning of August 18th or
```

1    the middle of August?

2    A.        I'd have to check the date, but I know

3    we met on a Saturday morning.

4    Q.        Okay.  Now, he indicates you told him

5    that due to budget problems you could not provide

6    copies and he would have to bring a laptop to view

7    the photographs.

8    A.        I don't remember saying that.  I mean

9    could be.

10   Q.        But you already had the copies you said

11   in a sealed envelope in the pickup box?

12   A.        I didn't know where -- I didn't know

13   that.  I don't know what the dates -- I don't have

14   a sequence of the timeline.  I'm telling you they

15   were either not delivered yet or they were in the

16   pickup box.

17   Q.        Well, I think you already indicated

18   they were actually delivered to you before the

19   grand --

20   A.        I don't know what the --

21   Q.        Let me finish.  Before the grand jury

22   because you got them 24 hours in advance?

23   A.        I don't know.  I don't see Laina

24   Fetherolf's 72-hour threatening letter in here to

1    check the date.

2    Q.          Let me -- let me back up.  You

3    indicated that you had received them within the 72

4    hours.  You knew he had --

5    A.          48 hours, yes.

6    Q.          Okay.

7    A.          We delivered them to her office for

8    her.

9    Q.          And -- and --

10   A.          That is correct.

11   Q.          And it appears from this letter that

12   the special grand jury proceeding was August the

13   3rd.

14   A.          Okay.

15   Q.          So if the grand jury -- if we assume

16   that's correct that the grand jury was August the

17   3rd, then this August 19th would be some 15 days

18   after the grand jury and thus 15 to 16 -- 16 days

19   after you had received the photographs.  Do you

20   see the -- do you understand the progression?

21   A.          I don't know what the photographs were

22   received.  But it's possible that I went to the

23   grand jury assuming they were still in the file

24   and when I opened the file up, just like when

96

```
 1      David Warren came to my office and they weren't in
 2      there, I didn't know where they were, maybe I said
 3      they must still be back at the office.  But they
 4      weren't -- depending on when they were delivered,
 5      they were either in the pickup box or they weren't
 6      delivered.  They were not in the file on the
 7      Saturday morning --
 8      Q.        Okay.
 9      A.             -- when I saw Dave Warren because they
10      were in the pickup box.  That's the only time I
11      knew exactly where they were, based upon a lack of
12      timeline in front of me on when they were mailed.
13      They're in the other room, you can check the date
14      and see when I received them and I can answer the
15      question better.
16      Q.        Okay.  You say that a -- can we --
17      let's take a short break.
18      A.        I'll bring the file in.
19                MR. BRUNNER:  Sure.
20      Q.        Yeah.  So we can look at the date.
21      A.        Absolutely.
22                MR. BRUNNER:  I have a room set up
23      where all the documents that we didn't produce
24      that you guys want to look at are set up to be
```

1    looked at.

2              THE VIDEOGRAPHER:  We are off the

3    record.  The time is 12:27.

4              (A short recess is taken.)

5              THE VIDEOGRAPHER:  We are back on the

6    record.  The time is 12:34.

7    Q.         Okay.  Doctor, you've obtained the file

8    for us.  And it looks like the photographs that

9    you were talking about after talking with Gorniak

10   were sent -- what was the date on that again?

11   August 29th, which I think helps give me a

12   timeline here.

13             The -- Mr. Warren indicates that as of

14   August the 18th -- well, let me back up.  It would

15   appear to me that still at this point in this

16   August -- July, August situation, you thought the

17   photographs were on the disk that was in the file;

18   is that correct?

19   A.         That is correct.

20   Q.         Now, Mr. Warren indicates that at the

21   August 18th meeting you became upset, things got

22   less than cordial.  Do you recall that being the

23   situation?

24   A.         Absolutely.

```
1    Q.         Okay.  You -- they indicated they

2    brought their laptop because you had told them to

3    do so they could view the -- could view the

4    photographs.  You called home to have the file

5    delivered to your office; is that -- do you recall

6    that?

7    A.         I think it was actually -- I don't know

8    if it was in my car or where it was, but I

9    purposely had it out of the office, meaning my

10   coroner's office, so that I would have it in my

11   business office.

12   Q.         Okay.

13   A.         For the meeting.

14   Q.         And you at that time reached in the

15   file, pulled out the disk and indicated there is

16   your effing pictures, take them, I'm done?

17   A.         No.

18   Q.         Do you recall that?

19   A.         That's not what really happened.

20   Q.         What happened?

21   A.         What happened was is Dave Warren came

22   into my office and he said -- he had Jeff Sholl

23   with him.  And I've known Jeff a long time.  And

24   he said that the whole problem with this case is
```

1    I'm just not getting along with everybody.  And I

2    said, no, the whole problem with this case is the

3    detective lied to the family on how their son

4    died.  I didn't know it was really their nephew,

5    but it was really their nephew, not their son, the

6    Enderlies.  And he goes, no, no, no, the problem

7    is you're not getting along with everybody.

8    Emphasis on that statement.

9    Q.          Uh-huh.

10   A.          And looking at me with big eyes.  And

11   that's when I looked at him and I said -- he

12   wanted me to change the death certificate.  And I

13   said I'm not lying for you, I'm not lying for

14   Laina Fetherolf, I'm not lying for the sheriff.

15   I'm not lying for any of you.  I'm not changing

16   the death certificate.  The autopsy's what the

17   autopsy says.  The forensic evidence is there.

18   There's no overdose.  I'm not changing it.  He

19   came there to strong-arm me.

20          And then he gave me a lecture, a

21   five-minute lecture, on how it really wasn't

22   illegal to lie to the public.  And after he was

23   done with the five-minute lecture of that to me, I

24   told him he could go do something anatomically

1    impossible to himself.  And then I escorted him

2    out of the office.  That's what happened.

3                (A discussion is held off record.)

4                MR. BARBIERE:  He keeps saying he.

5    Who's the "he" he's talking about?

6    A.          Dave Warren.

7    Q.          You're talking about Dave Warren?

8    A.          And then they sat in my parking lot for

9    about 15 minutes because I had left my family on a

10   Saturday morning to have a guy come in my office

11   and strong arm me and tell me that he wanted the

12   death certificate changed with his 6-foot-6

13   bodyguard.

14   Q.          You're talking about Mr. Sholl?

15   A.          Jeff Sholl.

16   Q.          Okay.

17   A.          And --

18   Q.          You --

19   A.          -- I went out to the parking lot

20   because I was pretty unhappy about what had just

21   gone on.  And I didn't record it, I didn't have

22   anything to prove it.  And they're just sitting in

23   my parking lot.  So I looked at them and they

24   rolled their window down and I said truth and

1    justice, gentlemen, truth and justice for all.

2    And that's the statement because they came there

3    to cover it up.  Dave Warren's dirty, man.

4    Q.        What do you mean?

5    A.        He came there to change everything.  He

6    wanted me to change the death certificate.

7    Q.        Okay.  Now, in the interim it appears

8    they had viewed the disk and realize -- found

9    there was no autopsy photographs --

10   A.        The two.

11   Q.        -- on it?

12   A.        Yes.

13   Q.        I think now we've got our time frame as

14   a result of that, is the three-daytime line you

15   were given to get the photographs.  Look at

16   Exhibit 19.

17                         - - - - -

18            Thereupon, David Cummin Exhibit 19 is

19   marked for purposes of identification.

20                         - - - - -

21   A.        Are we done with this document?

22   Q.        Yes, at this point.

23   A.        I find this highly inaccurate.

24   Q.        All right.

1           MR. BARBIERE:  What was the last thing?

2   Did you say I find that highly --

3   A.          Highly inaccurate.

4           MR. LAMBERT:  Give that to Aaron or

5   Steve.  I'm short one.  We'll look together and

6   then I'll --

7           MR. BARBIERE:  Okay.

8   Q.          Actually, are you looking at -- this

9   appears to be your response to receiving the --

10          MR. BRUNNER:  Just a second.  Let me

11  see what you've handed the witness because I don't

12  think you gave --

13          MR. LAMBERT:  Here it is.

14          MR. BRUNNER:  Oh, okay.

15          THE WITNESS:  I'm sorry.  That's yours.

16  I'll take this one.

17          MR. BRUNNER:  No, that's fine.  Take

18  this one.  Thank you.

19  Q.          It would appear to be a letter from you

20  to Dave Warren dated August 27 responding to

21  receiving the -- an order to provide the

22  photographs.

23  A.          It's actually to Judge Wallace.

24  Q.          Well, it says Judge Wallace see David

1    Warren, so apparently to both of them?

2    A.          It went to Hocking County Common Pleas

3    Court because I probably didn't have a way to

4    respond to Dave Warren because I don't think he

5    had a private practice at the time.

6    Q.          You indicate that on August 27th you

7    had called Franklin County Coroner's Office to

8    request the photographs, which is what you told us

9    earlier you did when you received a notice to --

10   A.          That is correct.

11   Q.          -- produce them in three days.  So

12   that's the timeline, which when we got down later

13   in the letter we found the disk didn't have the

14   photographs on them.  That makes sense, correct?

15   A.          Yes.

16   Q.          Okay.  Now, backing up just a bit.

17   That letter kind of spanned a long time frame.

18   Exhibit 17, would you look at and I'll purport to

19   you that that is a copy of the subpoenas that were

20   issued for the -- or, no, affidavits that were

21   filed in response to the subpoenas.  We're short a

22   couple on this one.  Did you get a copy?

23   A.          Yes.

24                MR. BRUNNER:  Yes.

1    Q.          Okay.  That's where my copy went.

2                    - - - - -

3              Thereupon, David Cummin Exhibit 17 is

4    marked for purposes of identification.

5                    - - - - -

6    Q.          Just maybe for time, saving time, if

7    you'll look at them in the light that these were

8    the affidavits that were submitted in response to

9    your subpoenas for your inquest.  Do you see

10   they're dated January 18th --

11   A.          These are the affidavits prepared by

12   Laina Fetherolf on behalf of David Valkinburg

13   since she wrote it and he signed it; that is

14   correct.

15   Q.          Okay.  So my statement that they're

16   affidavits that were submitted in response to the

17   subpoenas you had issued for the inquest is

18   correct?

19   A.          That is correct.

20   Q.          Okay.  Now, in his affidavit David

21   Valkinburg states that he had texted you on or

22   about December 27th, asking if you would be

23   willing to meet with the personnel at the

24   Sheriff's Office and the prosecutor regarding the

1   death of Glenn Swaim.  We've talked earlier, I

2   believe you indicate, yes, that request --

3   A.          There was a request.  I didn't know the

4   time.

5   Q.          Okay.

6   A.          When it was.

7   Q.          You responded you'd done -- you were

8   done with your part in the Swaim matter but would

9   be available for a phone conference?

10  A.          Okay.

11  Q.          Is that correct?

12  A.          Is that on here somewhere?

13  Q.          That's No. 4 there.  I'm looking at

14  Valkinburg's --

15  A.          That's his sworn affidavit.  I -- I

16  think that there is something consistent with

17  that, but I don't have it in front of me to

18  confirm that that's true.

19  Q.          Don't have what in front of you?

20  A.          The --

21  Q.          Do you have notes that would have that

22  on it?

23  A.          I think it was done by text message.

24  Q.          Okay.  Well, I think he -- No. 3, he

```
 1    indicates that there was a -- he did text it.  Do
 2    you have notes that would help confirm this or --
 3    A.          No, not on this.  I mean, no.
 4    Q.          Okay.  You said you didn't have it in
 5    front of you --
 6    A.          I mean I had a different phone at the
 7    time.
 8    Q.          Okay.
 9    A.          I don't have it.
10    Q.          But you said you didn't have it in
11    front of you --
12    A.          I just remember.
13    Q.          -- to confirm it and I wasn't sure what
14    you meant.
15    A.          I mean he's stating what the text said,
16    he's paraphrasing.  I'm taking him --
17    Q.          Okay.
18    A.          -- at his word that it's factual.
19    Q.          And at that point he says you had given
20    no indication of wanting any additional
21    information from him or anyone at the Sheriff's
22    Office.  Had there been a request for additional
23    information at the Sheriff's Office?
24    A.          Yes.
```

1    Q.          That had not been complied with?

2    A.          That would be -- remember, on this --

3    on the 27th of December -- what's this dated? --

4    of 2011.

5    Q.          Uh-huh.

6    A.          -- Mike Downhour went to deliver a

7    second autopsy three months after Detective Downs

8    already possessed it and was given the same

9    four-sentence report.  This one.  There's four

10   sentences as I recall.  That is the full report I

11   was given a second time.  And then January 3rd I

12   believe he went back to the office and got this.

13   Q.          The same report and --

14   A.          The same four-sentence --

15   Q.          And you believe he got -- received that

16   from the dispatcher then?

17   A.          I don't know where he got it from.

18   Q.          Okay.  There -- there was -- you're not

19   aware of any direct contact with Detective Downs

20   to see if that's the accurate report or not?

21   A.          The report says on the above date and

22   time I was dispatched to 32179 Shaw Road in

23   reference to a possible drug overdose.  One

24   sentence.

 1              MR. TEETOR:  You need to slow down a

 2    little.

 3              THE WITNESS:  I'm sorry.  Do I need to

 4    repeat that?

 5              MR. TEETOR:  No.  Just slow down.

 6    A.        Upon my arrival, Hocking County EMS

 7    personnel were escorting the listed victim in the

 8    squad.  Sentence No. 2.

 9              Next sentence, No. 3, The scene was

10    held until Detective Moritz arrived on scene.

11              The fourth sentence of the complete

12    report is:  A report was filed.  That's it.

13    That's what I've gotten twice.  That's -- that's

14    the exchange that I got from the Sheriff's Office.

15    It's not very helpful.

16    Q.        Now, if we look at Downs' affidavit,

17    which is the second page, it indicates on

18    September 29th he dropped off the Swaim report.

19    Is that the report you're referring to?

20    A.        I have documented September 28th --

21    Q.        Okay.

22    A.        -- in my meticulous notes, yes.

23    Q.        Now, when you say your notes, you have

24    notes that would --

1    A.          I have work product with my attorney.

2    Q.          Well, is it -- is it something that you

3    wrote down September 28th, 2011 that -- before

4    you --

5    A.          I don't know when I wrote it down.

6    Q.          Before you had your attorney?

7    A.          I don't know.

8    Q.          Because you said they're meticulous

9    notes.  If you made them three years later, I'm

10   not sure how meticulous they would be I guess was

11   my question.

12   A.          No, they were not made -- I don't know

13   when they were made.  They had been a sequence --

14   Q.          But they made -- were these notes

15   you're talking about that you say -- I assume this

16   is something you may later refer to to refresh

17   your memory as to when you did things?

18   A.          No.  That's a note.

19   Q.          Okay.  That's a meticulous note?

20   A.          That is documentation.  You can take

21   meticulous out if you want.

22   Q.          It says Laina --

23   A.          Notified.

24   Q.          -- notified 11-2-11.

110

1    A.        That's when I told her about the
2    homicide, yes.  And then they were condensed into
3    a --
4    Q.        Okay.  I'm just referring --
5    A.        -- work product.
6    Q.        Referring to the fact --
7              MR. BRUNNER:  Don't cut him off.
8    Q.        -- that you said on September -- it was
9    September 28th instead of September 29th because
10   you kept meticulous notes.
11   A.        Okay.
12   Q.        Were they notes that were kept at the
13   time the events occurred?
14   A.        They were written -- that -- he dropped
15   them off at that day, yes.
16   Q.        That wasn't what I asked.  The notes,
17   I'm talking about your personal notes that are
18   meticulously kept.  Are they kept as things -- as
19   events occur?
20   A.        I don't -- they were compiled as I did
21   things.
22   Q.        As you did things.  So around the time
23   of September 28th, then, you would have compiled
24   the note that said that's when you -- the Swaim

1    report was dropped off to you?

2    A.         Yes.

3    Q.         Okay.  Did you keep notes of all the

4    occurrences that were going on in September -- or

5    I mean in 2011, '12, '13 and '14?

6    A.         I -- I kept notes on what was going on,

7    yes.

8                 MR. LAMBERT:  Okay.  I would ask that

9    we be provided with a copy of those notes that

10   were -- anything that was prepared prior to

11   preparing anything for counsel.

12                MR. BRUNNER:  I -- we'll take a look.

13   If it's responsive, if you want to get me a new

14   request, I think if it's something different than

15   what you've asked for before, we'll take a look at

16   that too.

17                MR. TEETOR:  Well, we clearly asked for

18   that.  I would like to have it before we go on

19   with the deposition if I may.

20                MR. BRUNNER:  Well --

21                MR. TEETOR:  Shouldn't take long to

22   copy.

23                MR. BRUNNER:  I don't have anything

24   that I am aware of that I haven't turned over.

1           MR. TEETOR:  Well, he does.

2           MR. BRUNNER:  Again, it's not here.  I

3     don't have anything in this office that has not

4     been turned over, not been made available to you.

5           MR. TEETOR:  I --

6           MR. BRUNNER:  All right?

7           MR. TEETOR:  If that's the case, then

8     I'm willing to end up reserving time to rerequest

9     him once we're provided with the notes that

10    weren't given to us earlier.

11          MR. BRUNNER:  Well, if they're

12    responsive, you tell me what answer -- you don't

13    think I've answered, not responded to and I will

14    be glad to look at it.  I have a duty to do that

15    under the rules and I will be glad to.

16          MR. TEETOR:  Well, I won't argue with

17    you.  I'm just reserving my rights to question him

18    about notes that were not produced,

19    contemporaneous notes that were not produced.

20          MR. LAMBERT:  And I would reserve --

21    we'll reserve that also.

22    Q.        Just a couple questions on that,

23    Doctor, do you -- do you still possess these notes

24    then?

1    A.        I don't know.  Maybe.

2    Q.        Where would they be if you maybe have

3    them?

4    A.        I don't know.  I'd have to look.

5    Q.        You corrected me and said it was

6    September 28th instead of the 29th.  When was the

7    last time you looked at the notes that you would

8    recall it was September 28th instead of the 29th?

9    A.        I don't know.  I don't know how long

10   ago, but I just know 1-14-28.

11   Q.        Pardon?

12   A.        I knew it went 14 to 28.

13   Q.        I'm sorry.  What?

14   A.        The dates -- the date was September

15   14th and then date -- September 28th.

16   Q.        What was the 14th?

17   A.        Let's see.  28th was when he came.

18   Q.        "He" being?

19   A.        The 14th was when -- was when Captain

20   Alford was notified of the death.

21   Q.        Okay.  If -- if we say "he" and then we

22   go read this deposition --

23   A.        I tried not to --

24   Q.        -- later, we -- it's hard to refer to

1    who "he" is?

2    A.         I'm sorry.  Captain Alford was on

3    September 14th.

4    Q.         That's when you saw him the at the

5    fair?

6    A.         Right.

7    Q.         Okay.

8    A.         And then Downs had it September 28th.

9    Q.         Okay.  Now, are you going from

10   specifically memory or --

11   A.         Memory.

12   Q.         -- reviewing your notes?

13   A.         No, memory.

14   Q.         Did you review your notes before you

15   came to the deposition?

16   A.         I reviewed -- not my notes.  I don't --

17   I didn't review those, but I reviewed, you know,

18   what I had at home, you know, this stuff, the

19   letters or whatever.

20   Q.         The notes that you told me about, the

21   meticulous notes that you keep, did you review

22   them in the last few days in preparation for this

23   deposition?

24   A.         No.

1    Q.        Okay.  When was the last time you

2    recall reviewing them?

3    A.        I don't remember.

4    Q.        Now --

5             (A discussion is held off record.)

6    Q.        Do you have them with you -- with you?

7    A.        No.

8    Q.        Have you turned them over to

9    Mr. Brunner?

10   A.        I don't know what he has.

11   Q.        Okay.

12           MR. BRUNNER:  If we would have withheld

13   anything, you would have gotten a privilege log.

14          MR. LAMBERT:  Yeah.  I'm not accusing

15   you of withholding them.  I'm just trying to find

16   out where they're at or how we can determine if

17   they -- if they still exist I guess.

18          MR. TEETOR:  Rick, I'm sure your client

19   didn't spoliate contemporaneous notes.  Do you

20   know where they are?  Are you going to provide

21   them?

22          MR. BRUNNER:  I don't think that's what

23   he was talking about.  I think -- do you want to

24   take a counsel-only conference out in the hall and

1    I can give you an idea.

2                    MR. LAMBERT:  Okay.

3                    MR. TEETOR:  Let's do that if you don't

4    mind.

5                    THE VIDEOGRAPHER:  We are off the

6    record.  The time is 12:52.

7                    (A short recess is taken.)

8                    THE VIDEOGRAPHER:  We are back on the

9    record.  The time is 12:59.

10   A.          I apologize that I was hung up.  I did

11   not take contemporaneous notes.  That was the

12   extent.  Sorry.  I misinterpreted it.

13   Q.          Look at the prosecutor's affidavit,

14   which is the next page of your -- we'll try to

15   move on here.  She indicates that when she read

16   the report in the paper there was information in

17   there that was more than what was in the -- the

18   autopsy report.  Had you had any consultation with

19   the prosecutor or talked with her about the detail

20   -- any of the details of the -- of this death

21   investigation or homicide before releasing it to

22   the press?

23   A.          The last conversation I had was when

24   she was dropping the "F" bomb, three "F" bombs per

1    sentence.  And I don't understand this since she

2    was never subpoenaed --

3    Q.          Let me --

4    A.          -- by --

5    Q.          Let me back up.  I believe the -- the

6    release we're talking about was in December when

7    the death certificate was signed.  So I'm talking

8    about prior to giving the press release regarding

9    the Swaim matter, did you discuss that matter with

10   the prosecutor?

11   A.          Yes.  On the November -- 2nd.

12   Q.          That's when you delivered your --

13   A.          That's when I told her what was

14   happening.  She didn't have a clue what was going

15   on.

16   Q.          Okay.  Now, after the events we've just

17   talked about, there was a letter you sent to the

18   sheriff regarding disassociating -- the permanent

19   dissociation of the Coroner's Office with

20   Detective Downs, correct?

21   A.          I don't have a copy of that.

22   Q.          All right.  Now you do.

23   A.          Yes.

24   Q.          I'll show you what's marked as

1     Deposition Exhibit 18.

2                - - - - -

3        Thereupon, David Cummin Exhibit 18 is

4     marked for purposes of identification.

5                - - - - -

6     Q.       Now, I'm not going to ask you about the

7     whole letter, Doctor. I mainly first just want to

8     know is that a copy of the letter that's dated

9     March 5th, 2012 you addressed to Sheriff North

10    with your signature on page 3?

11    A.       I would like to read it if that's okay.

12    Q.       Okay.

13    A.       I don't have a copy of this. It

14    crashed -- my hard drive -- I couldn't get it. So

15    I would like to see what I wrote.

16    Q.       Do you want me to --

17    A.       Yes.

18    Q.       I'd asked you if that is a copy of a --

19    A.       It is a copy, yes.

20    Q.       -- March 5th, 2012 letter that you sent

21    to Sheriff North --

22    A.       Yes.

23    Q.       -- indicating a permanent dissociation

24    with Detective Downs?

119

```
 1    A.          Yes.

 2    Q.          And then Sheriff North's response is

 3    page 4 of that document you received, correct?

 4    A.          Yes.

 5    Q.          Now, after the Swaim matter, after the

 6    grand jury proceeding that lasted I think we've

 7    seen at least through August, at that point there

 8    was an order from Judge Ward for the parties to

 9    meet and attempt to come up with a protocol to

10    handle crime scene investigation -- death scene

11    investigations, correct?

12    A.          What's the question?

13    Q.          Judge Ward had indicated to the parties

14    that they need to get together and come up with a

15    death scene investigation protocol for the parties

16    to follow to attempt to work better together so to

17    speak?

18    A.          No.  That's not the case at all.

19    Q.          A protocol was developed?

20    A.          A protocol was developed.

21    Q.          All right.

22    A.          But not under those circumstance.

23    Q.          What were the circumstances?

24    A.          The circumstances were that I had a
```

1    writ of mandamus action I believe at that time.

2    And I had to consult an attorney because my -- my

3    attorney was suing me and I wasn't given any --

4    I'm sorry.  I'm misspeaking.

5              I was having a judgment of $505 by Dave

6    Warren against me.  That's what it was.  Pardon my

7    confusion.  That's when he had come to my office

8    and then when he left he was going to charge me

9    $505 for wasting his time.  So he had placed that

10   in court for me to pay the $505.  And when I took

11   it to my attorney, because now I had to involve an

12   attorney since I was being I guess sued by a

13   special prosecutor, and my attorney said, well,

14   you've had problems with getting into crime

15   scenes, so you cannot file a separate complaint.

16   But we can file a cooperation agreement and attach

17   it to this.

18             The protocol was the idea of my

19   attorney, not Judge Ward.  And he went to Judge

20   Ward and filed that he would like to create a

21   protocol of cooperation.  And Judge Ward then

22   accepted it and then I believe over almost 18

23   months we negotiated this contract of sorts and

24   Judge Ward then signed it and -- and waived the

1    $505 and that was the end of it.

2    Q.        Okay.

3    A.          But this is attached to Dave Warren's

4    complaint against me but it was not initiated by

5    Judge Ward.

6    Q.        I think -- let me see that.  Let me

7    have that.  Let me see the last page.  That's

8    actually some notes from my office.  If you would

9    just tear the last page off.

10            MR. BRUNNER:  I'll take it off.  Don't

11   worry about it.

12            MR. LAMBERT:  Yeah.  Just throw it

13   away.  You can just get rid of it.

14   Q.        But this is a copy of the protocol that

15   was agreed upon, Exhibit 20?

16                      - - - - -

17            Thereupon, David Cummin Exhibit 20 is

18   marked for purposes of identification.

19                      - - - - -

20   A.        Yes.

21   Q.        Okay.  Let's look at Exhibit -- the

22   complaint, Exhibit 2.  I'll find my copy.  I don't

23   know what I did with it.  Oh, here it is.

24            Paragraph 20 of the complaint, if

1   you'll look at that, Exhibit 3 I think it is.

2   Actually, no, let me see it.  It should be

3   Exhibit 2.  Yes.  We're probably done with the

4   others if you want to kind of stack them up there

5   so we can keep them out of your way.  Yep.  Yeah.

6           MR. BRUNNER:  Yeah.  I need to get that

7   copied.

8   Q.        We'll organize them later.

9           Now, paragraph 20 is part of the

10  complaint in the case that the bulk of the time

11  you had served as coroner you had two coroner

12  investigators, correct?

13  A.        Correct.

14  Q.        And they were -- they were paid 4,150 a

15  year, plus they received healthcare and

16  retirement?

17  A.        They did.

18  Q.        Now, did you understand that they

19  received a percentage of a year retirement each

20  year, that at that time the minimum retirement

21  eligibility was 6,000 and they were receiving a

22  percentage of a year?

23  A.        No.  I was not under that

24  understanding.  I thought it was 4,000.

123

```
 1    Q.          Okay.  Okay.

 2    A.          Are you sure it's 6?

 3    Q.          I'm not sure.  I just going on what the

 4    auditor told me so --

 5    A.          Okay.  I don't know.  I -- my

 6    understanding is they got paid that much because

 7    4,000 was what they needed to get their benefit.

 8    Q.          Okay.  Now, part of all of this

 9    financial issue started because PERS changed their

10    minimum requirements for eligibility for PERS,

11    correct?

12    A.          My understanding was from 4,000 to

13    12,000, not 6,000 to 12,000.

14    Q.          Okay.  They changed to 12,000.  Did you

15    understand that that was on a percentage basis?

16    They would still would be eligible and would

17    receive credit but a percentage --

18    A.          No.

19    Q.          -- based upon the amount they received?

20    A.          My understanding was that it was still

21    full.

22    Q.          Okay.

23                MR. BARBIERE:  I think you guys are

24    talking over each other.
```

```
1   A.          My understanding was that it was full

2   benefit.

3   Q.          Meaning they had to make --

4   A.          You had to make $1,000 a month to

5   receive full benefit.

6   Q.          Okay.

7               MR. BARBIERE:  But --

8   A.          If it's not that, I'm -- I'm surprised.

9               MR. BARBIERE:  I thought you asked

10  about a partial benefit?

11  Q.          I was going to, yeah, follow up.

12              You did not understand that if they

13  made 4,000 of the 12, they would receive credit

14  for one-third of a year?

15  A.          Yes.

16  Q.          Okay.

17  A.          I did know that, but they would not

18  receive the benefit.

19  Q.          The full year credit?

20  A.          They would not get a year credit.  And

21  they also would not get the health benefit.

22  Q.          Okay.

23  A.          That is correct.

24  Q.          Okay.  Now, did you recall a meeting
```

1    with -- meeting with the commissioners back in

2    October of 2013 indicating to them that your two

3    investigators would be resigning?

4    A.          No.  I did not state that they would --

5    Q.          Or leaving?

6    A.          -- be resigning.  I did meet with them

7    because I -- one of my investigators, Mike

8    Downhour, told me that he was being told through

9    whoever he was talking to that the commissioners

10   were going to get rid of -- not pay for my

11   investigators.  I thought that was strange, so I

12   said I'll tell you what, I'll go to the meeting,

13   I'll ask them in an open meeting what the case is.

14   Q.          Were you aware that Mike Downhour had

15   gone to the auditor and initiated retirement based

16   upon the changes in the retirement system that

17   would be not beneficial to him to keep working as

18   -- how it would affect his retirement?

19   A.          Before that time?

20   Q.          Around -- before January of that year?

21   A.          Yeah.  I don't think he did it before

22   that time.

23   Q.          Okay.

24   A.          Not before October because he wouldn't

126

```
 1    have been concerned about his job.

 2    Q.          I'm not asking about concerned about

 3    his job.  I'm asking about concerned about the

 4    changes in the retirement system, where it would

 5    affect his -- adversely affect his benefits if he

 6    kept working after the first of the year?

 7    A.          What's your question?

 8    Q.          Are you aware that he had applied for

 9    retirement in order to beat the changes in the

10    retirement system as how it would affect him --

11    A.          No.

12    Q.          -- if he continued working?

13                Okay.  But you were --

14    A.          Because he came to me with a concern

15    about it, so I went to go discuss it with the

16    proper people.

17    Q.          You had indicated if you look at the --

18    I'll show you what's marked as Exhibit 4, it

19    indicates to you this is a copy of the

20    commissioners minutes for October 3rd, 2013.  And

21    at that time you informed the commissioners that

22    two of your employees would be leaving January

23    1st.

24                          - - - - -
```

1              Thereupon, David Cummin Exhibit 4 is

2    marked for purposes of identification.

3                    - - - - -

4    A.        What's the date of this?

5    Q.        December 3rd, 2013 at the top.  Look at

6    the bottom paragraph.

7    A.        It says October 3rd.

8              MR. BARBIERE:  October 3rd.

9    Q.        I guess it does say October 3rd.  I

10   don't know if I said, but if I said anything other

11   than October 3rd, I was not correct.  October 3rd,

12   2013.

13   A.        Okay.  That's a paraphrase.  I don't

14   think that's a direct quote.

15   Q.        This was the initial discussion then

16   with the commissioners about wanting to increase

17   the budget so you could hire someone that would

18   get full PERS benefits?

19   A.        Yes, including my two -- my two current

20   employees, yes.

21   Q.        But you told them at that time you

22   already knew that the -- two of the employees

23   would be leaving January 1st?

24   A.        I don't think -- I don't remember ever

1    saying anything like that.

2    Q.          Okay.

3    A.          You can get a recording I'm sure and

4    see what I really said.

5    Q.          Okay.

6    A.          But that's not my recollection of why I

7    went to that meeting.  I did not go there to tell

8    them to my recollection that I had people

9    resigning on October 3rd.

10   Q.          Is the only two people you had working

11   at that time Mr. Downhour and Ms. Walsh?

12   A.          Yes.  And, remember, I went there

13   because Mike Downhour raised a concern I thought

14   it was ludicrous.  Why would they get rid of

15   people I had for 14 years.

16   Q.          Now, wasn't this before the budget time

17   -- before the budget had been presented?

18   A.          Yes.

19   Q.          Okay.

20   A.          We have to submit our budgets August,

21   September-ish.  So this is after the proposals,

22   yes.

23   Q.          But it was before the commissioners had

24   issued any budgets or had set any budgets or

1    approved or disapproved?

2    A.        Yes.  I don't think it was approved

3    until late December.

4    Q.        So at this point you -- no one knew

5    that the commissioners were not going to approve

6    an increase in the investigator's budget?

7    A.        My understanding was I went there, I

8    raised a concern, they didn't act like it was a

9    real concern, and they didn't give me any reason

10   for concern that it wasn't going to be funded.

11   Clark Sheets, who was the least favorable to me,

12   just said good -- just go ahead and put it in your

13   budget and we'll take care of it or we'll look at

14   it or whatever.

15   Q.        Okay.

16   A.        But this is not a direct quote of what

17   went on in the meeting.

18   Q.        Okay.

19   A.        But -- so I went out of there and I

20   went straight to Mike Downhour and I said the

21   commissioners don't seem to have a problem as far

22   as I'm concerned of -- of adding -- I mean I fully

23   was led to believe leaving that meeting that

24   everything was positive and we were going to have

```
 1    our two investigators.  And because -- and they

 2    clearly understood the reason was was because of

 3    the benefit.  And that my employees didn't work

 4    for the money, they worked for the benefit.

 5    Q.          Now, you indicated also that you were

 6    looking at contracting with another person on the

 7    flat rate of $75.  I assume that's $75 any time

 8    they were called out?

 9    A.          Yes.

10    Q.          Okay.

11    A.          Yes.  But I don't know if -- I guess it

12    would be subcontracting.  We wouldn't sign a

13    contract, but apparently we're signing something

14    now through the auditor's office.  We didn't use

15    to.

16    Q.          Okay.

17    A.          We used to just submit a requisition --

18    Q.          Whether --

19    A.          -- and say so-and-so covered me, pay

20    him this much money and they got paid.

21    Q.          Okay.

22    A.          There was no receipt or --

23    Q.          But had -- at that point, had there

24    been someone you had talked to to pay a flat rate
```

1    for a con -- on a contract at $75?

2    A.          Not specifically, but we've had people

3    who were -- who we've called.  For example, when I

4    have a dead body, I would like three people.  And

5    for every additional dead person on the scene, I

6    would like an additional person so that we can

7    have one person per body with two people who are

8    not connected to a body so there's no confusion of

9    decedents which causes lots of bad lawsuits.

10   Q.          So did you have a third person

11   available at that time that you used?

12   A.          I had three -- I had two employees and

13   myself.

14   Q.          I understand.  You said --

15   A.          Do I have a third employee?

16   Q.          Yes.

17   A.          No.

18   Q.          Did you have one available that you

19   could use on a contract basis like you're saying

20   you like to have available --

21   A.          We -- we would call people and say can

22   you come out.  And if they're -- we've used

23   fireman before.  We've used EMS people before.

24   Once again, they're not the principal

```
 1    investigator.  We just need them to stay with the

 2    body so that nothing's lost, jewelry, no confusion

 3    on whose artifacts are whose.  That's a big

 4    concern of mine.  So if we have three bodies, I

 5    want five people on scene.

 6    Q.          Okay.  And you indicated you would like

 7    to hire two employees and contract with another on

 8    a flat rate of $75 --

 9    A.          Contracted additional --

10    Q.          Let me finish.

11                Contract another one on a flat rate of

12    $75 to cover him in his absence.

13    A.          I think that's a paraphrase --

14    Q.          Okay.

15    A.          -- and not a perfect representation of

16    what I said.

17    Q.          Okay.

18    A.          I wanted to be able to pay additional

19    people a $75 fee to show up to a scene and help us

20    if we need additional personnel.

21    Q.          Okay.

22    A.          That's how she wrote it.

23    Q.          Right.  She --

24    A.          That's not necessarily accurate.
```

1    Q.          And it is a paraphrase of her.  And she

2    indicates you had indicated you needed two people

3    instead of one.  You -- you had been asked by one

4    of the commissioners if you could keep the same

5    budget and hire one person, in other words, give

6    them all the money so to speak?

7    A.          Right.

8    Q.          And you indicated you wanted $12,000

9    per person which would -- Ms. Ogle indicated that

10   was an increase of 16,000, correct?

11   A.          Yes.  I mean, a little less than

12   16,000, but, yes.

13   Q.          Well --

14   A.          15,700, right.

15   Q.          Okay.  Now, this was before the issue

16   of the employees resigning because of the

17   commissioners not approving, correct?

18   A.          Yes.

19   Q.          So you knew in October that they were

20   going to be leaving January 1st regardless --

21   A.          No.

22   Q.          -- regardless of the budget?

23   A.          No.  No.  Remember, I went there --

24   you're saying Mike Downhour was going to retire.

1    I don't think he initiated contact with that until

2    -- to my knowledge, until after he wasn't going to

3    be approved any longer.  I mean I don't know

4    that --

5    Q.          Okay.

6    A.          -- he went any earlier.  I solely went

7    to this meeting to keep Mike's job.

8    Q.          Okay.

9    A.          That was my sole purpose.  So you're

10   asking me if I knew they were going to resign, no.

11   I went there to save their jobs.

12   Q.          Okay.

13   A.          It was a very friendly meeting.

14   Q.          Okay.

15   A.          I probably had not been to a meeting in

16   five and a half years.

17   Q.          So you think you indicating at that

18   point you already knew two employees would be

19   leaving January 1st is not accurate?  That's --

20   A.          That's not what I recall saying.

21   Q.          Okay.

22   A.          But I could be corrected.

23                         - - - - -

24          Thereupon, David Cummin Exhibit 5 is

```
 1    marked for purposes of identification.

 2                      - - - - -

 3    Q.          I'll show you what's marked as

 4    Exhibit 5.  And I will ask you to look at that and

 5    see if it's a copy of a January 2nd dated -- a

 6    letter dated January 2nd from yourself?

 7    A.          It seems to be half of one.

 8    Q.          Pardon?

 9    A.          It seems to be part of one.

10    Q.          I don't know why that's --

11                Well, it does appear to be -- it does

12    appear to be page 1 of a letter, doesn't it?

13    A.          Yes.

14    Q.          All right.  Do you recall if -- by

15    looking at the letter resending -- sending the

16    letter that at least this was the first page of

17    it?

18    A.          It -- it is possible.

19    Q.          Did you notify them January 2nd that

20    the resignation of your investigators due to lack

21    of funding?

22    A.          Yes.  And I had send this via e-mail

23    and personal service.

24    Q.          And page 2 of that would be the e-mail?
```

136

```
 1   A.          No.  No.  It should be --

 2   Q.          It's a separate --

 3   A.          I don't know what that is.

 4   Q.          It's a January 2nd, but it appears to

 5   be a separate e-mail.

 6               MR. BRUNNER:  Are you talking about

 7   page 2 of the exhibit?

 8   A.          I'm sorry.  Randy, there's -- this is

 9   the 6th.  This is the second letter I bet.

10   Q.          This is -- the first one was sent then

11   was dated January 2nd but it was sent by e-mail

12   then?

13   A.          And then this is January 9th, so I

14   think you're missing.

15   Q.          All right.

16   A.          I think you're missing -- there's three

17   letters.  I don't know which one's which based

18   upon that.

19   Q.          Well, let's do this then, around the

20   first of January you notified the commissioners

21   that your two employees were resigning because of

22   lack of funding?

23   A.          Correct.

24   Q.          And you indicate -- you call it
```

1    defunding, but actually they maintained funding

2    but they did not increase funding; is that a

3    correct terminology?

4    A.        I don't have the budget in front of me

5    to see the numbers, but --

6    Q.        Assuming they put --

7    A.        You're correct.

8    Q.        -- the same money in --

9    A.        You're correct in that they did not

10   completely get rid of the money.  They kept some

11   in there.

12   Q.        Now, as of January 2nd when you

13   realized the commissioners did not increase the

14   funding as you requested, you still had the $8,300

15   in the salaries account that had been used for

16   investigators the year before, correct?

17   A.        Correct.

18   Q.        And did you attempt to hire an

19   investigator -- one investigator for the 8,300 so

20   you would have someone to cover for you when you

21   were out of town?

22   A.        I didn't have anybody trained in the

23   county who could perform that duty.  These people

24   were trained for 14 and 8 years.

138

1    Q.          Okay.

2    A.          I can't slap a gun belt on -- Lanny

3    North cannot slap a gun belt on somebody and call

4    them a sheriff tomorrow when he's out of town.  I

5    can't do the same.

6    Q.          Did you --

7    A.          I'm responsible for that function.

8    Q.          You had contracted with -- with

9    Ms. Walsh to continue doing recordkeeping and

10   clerical work for $500 a month you indicated?

11   A.          I don't know when she accepted that.  I

12   don't think -- I'm not sure she accepted that in

13   January.  I'd have to look at the records.

14   Q.          My belief it was July 1st that that

15   started.  Does that sound correct?  Does that

16   sound right?

17   A.          I don't know.  Initially I was by

18   myself.  I had paperwork, I had some money --

19   Q.          Now, Ms. Walsh was still working in

20   your private office?

21   A.          Yes.  She's a nurse.

22   Q.          And she would not work for the 80 -- do

23   the investigator and continue -- continue doing

24   the same thing she was doing in 2013 for the

139

1    $8,300?

2    A.        No.

3    Q.        In January what did you do to attempt

4    to find someone to be an investigator or a deputy

5    coroner to provide coverage while you were not

6    present in the county, while you were out of

7    county?

8    A.        I was surprised, so I wrote the letters

9    to the commissioners stating that they had created

10   a problem we did not have previously; that they

11   had spent over $20,000 educating my two

12   investigators and then --

13   Q.        No.  I'm -- Doctor, I want to cut you

14   off because -- just because of time.  What did you

15   do to find someone to work as an investigator for

16   the $8,300 or to find someone --

17   A.        I didn't have --

18   Q.        -- to provide the right coverage?

19   A.        -- anybody trained as an investigator

20   in Hocking County to perform the duty.  I couldn't

21   find anybody.  There's nobody trained.  I asked

22   some physicians if they would cover and they said

23   absolutely not, especially after all the bad

24   publicity I got in the paper.

1    Q.          Now, I'll show you what's marked as

2    Exhibit 6.

3                      - - - - -

4          Thereupon, David Cummin Exhibit 6 is

5    marked for purposes of identification.

6                      - - - - -

7    Q.          I believe this is the full letter.

8    A.          Yes.

9    Q.          It's a letter dated January 13th that

10   you sent to the county commissioners?

11   A.          It is.

12   Q.          2014.  At that point you -- you're

13   accusing commissioners of operating under false

14   pretenses?

15   A.          I'm saying that the news article where

16   they magically found $16 million in various funds

17   claiming they couldn't pay for my two employees

18   for 12,000 a year seemed funny, especially since

19   Judge Moses was the one who brought it to their

20   attention.  Sandy Ogle had been there five and a

21   half years and had no idea they even existed, the

22   16 million, and she was the head of the two

23   commissioners at that -- head of the three total

24   commissioners at that time.  And she was writing

1    budgets and not knowing that she had $16 million

2    in reserve.

3    Q.        You indicate in the last paragraph as

4    the fourth commissioner?

5    A.        Yes.

6    Q.        That's how you referred to yourself?

7    A.        No, I'm just stating a fact.  ORC

8    305.03(d).

9    Q.        Well, that statute basically provides

10   that if one of the commissioners is absent due to

11   a health reason for more than 90 days I believe it

12   is?

13   A.        Two have to be absent.

14   Q.        If two of them are absent, yes.  If two

15   of them are absent and they file physician's

16   certificates stating that they will not be able to

17   return within the 90 days, then they can continue

18   to be absent.  And at that point if there are two

19   that are under physician certificate for more than

20   90 days, you would be the -- sit as the second

21   commissioner until one of them returns or the seat

22   is vacant?

23   A.        And I would be paid a commissioner's

24   salary, yeah.

1   Q.          Uh-huh.

2   A.          That is correct.

3   Q.          But that's -- that's the statute you're

4   referring to that you called yourself the fourth

5   commissioner, correct?

6   A.          That is what some people refer to the

7   coroner as, yes.

8   Q.          And the statute I have there is the

9   statute, the 305.03 that you're referring to?

10  A.          Yes.

11  Q.          Okay.

12                          - - - - -

13              Thereupon, David Cummin Exhibits 7 and 8

14  are marked for purposes of identification.

15                          - - - - -

16  Q.          I'll show you what's marked as

17  Exhibit 8.  Now, the first page of Exhibit 8 is a

18  notice you sent that it says "To Whom It May

19  Concern."  This went to the commissioners, and did

20  this also go to law enforcement --

21  A.          It --

22  Q.          -- which was --

23  A.          It went to all the EMS, 9-1-1 and the

24  Logan PD and the sheriff, yes, and I believe the

1    commissioners.

2    Q.          And it says you will be out of town

3    January 9th through the 12th and January 23rd

4    through the 26th, correct?

5    A.          Yes.

6    Q.          And you told law enforcement, EMS to

7    contact the commissioners since you were going to

8    be out of town?

9    A.          That's the best I could do, yes.

10   Q.          And according to statute, it is your

11   responsibility to be available or have someone

12   available as coroner, correct?

13   A.          If that's the statute, yes.

14   Q.          Okay.

15   A.          I would have to fund them though.

16   Q.          And by the -- before you sent this

17   January 9th, was there anything other than what

18   you've already told us that you had done to

19   attempt to find someone to be available on behalf

20   of the Coroner's Office?

21   A.          I had written three letters, none of

22   which were ever answered, not even with a phone

23   call to the commissioners.

24   Q.          I'm not talking about the

```
1    commissioners.  I'm -- funding another --

2    A.          I think that's --

3                MR. BRUNNER:  Objection.  He's

4    answering you with his answer.  You may not like

5    it, and you can follow it up.  Don't cut him off.

6    Q.          But, Doctor, I request that you answer

7    the question.

8    A.          I'm trying.

9    Q.          Okay.  Go ahead and give us your

10   statement.

11   A.          What was your question?

12   Q.          My question was:  Other than what

13   you've already told us, what, if anything, by

14   January 9th when you sent this notice had been

15   done to attempt to find someone to provide -- to

16   be available as a representative of the Coroner's

17   Office to provide coverage --

18   A.          I had --

19   Q.          -- while you were out of town?

20   A.          I had asked the commissioners in three

21   letters for funding so that we could have

22   competent trained people cover me while I was

23   gone.

24   Q.          Okay.  Other than continuing to request
```

1    the additional funds from the commissioners, what,

2    if anything, had you done?

3    A.         They could have paid these people or

4    they could have hired them back, whatever.

5    Q.         That wasn't what I asked you.  I asked

6    you what, if anything, you had done to --

7    A.         I had asked around and the physicians

8    -- no physician would cover me in Hocking County

9    that I had spoken to.

10   Q.         And Ms. Walsh, who continued to work

11   for you in your private office, would not provide

12   investigator services while you were gone to

13   provide --

14   A.         No.

15   Q.         -- coverage for the Coroner's Office?

16   A.         She had resigned.

17   Q.         Well, you contracted out with her later

18   on to do other services?

19   A.         To do paperwork.  But she was not going

20   to go to -- and do what she was doing before for

21   4,150 and no benefits.  That is correct.

22   Q.         Okay.  But you had --

23   A.         She made that very clear.

24   Q.         But you had $8,300 available in the

146

1    budget --

2    A.          She was not going to do it.  She

3    submitted her resignation.  I don't know how more

4    I can state it.

5    Q.          Okay.

6    A.          She was not interested.

7                MR. BARBIERE:  Rick, would this be a

8    good time for a lunch break you were talking

9    about?

10               MR. BRUNNER:  Whatever you're ready.

11               MR. BARBIERE:  Whenever it's a good

12   time for you.

13               MR. LAMBERT:  Is it 1:30?

14               MR. TEETOR:  Rick's buying lunch.

15               MR. LAMBERT:  Let me finish this doc --

16   let me finish this document.  Then we'll -- then

17   we'll do that, okay?

18               MR. BRUNNER:  Okay.  Sounds good.

19   Q.          What physicians -- do you recall the

20   physicians you asked, Doctor, that --

21   A.          Yes.  Dr. Ireton and he had covered me

22   previously.

23   Q.          Can you spell that?

24   A.          I-R-E-T-O-N.  He had covered me

1    previously.

2            Dr. Tornwall, T-O-R-N-W-A-L-L, he's a

3    surgeon.  I'm trying to think of if it was

4    Dr. Neff, N-E-F-F.  Those are the ones I saw in

5    that immediate time that I can for sure say.

6    Q.        And had you contacted any of the

7    neighboring coroners to see if you could work --

8    have some agreement with them, coverage by them or

9    a reciprocal agreement with them?

10   A.        I had not been -- I did not do that

11   because I did not have that ability to.  Before we

12   would in the past cover Perry County with Dr. Brad

13   Wilson.  And he was the only guy that we could --

14   that covered.  And typically -- we covered him,

15   but he didn't cover us.  Because we had

16   investigator, he didn't.  But at that time as far

17   as I know everybody had investigators.  Now, we

18   had no way to reciprocate.  Typically, the

19   investigators would handle going out of county and

20   handling death scenes.

21   Q.        Did you attempt to obtain investigators

22   from another county that would work on a per diem

23   basis?

24   A.        No.

```
1    Q.          They would have been qualified?

2    A.          They would have.  And I did contact

3    Fairfield and asked Ed Breining, who's a chief --

4    he's their chief coroner investigator, and he

5    makes over $41,000 a year as their investigator.

6    And he just couldn't -- I mean nobody could do it.

7    Nobody was interested.

8    Q.          So he was --

9    A.          We were getting bad publicity, too.  I

10   mean, you know --

11   Q.          He was not interested in providing

12   coverage?

13   A.          No.

14   Q.          He did not --

15   A.          His wife was ill and she eventually

16   died.

17   Q.          He didn't have any investigators that

18   would provide --

19   A.          I didn't know any of his investigators.

20   He had -- they have two deputy coroners and

21   there's another investigator.

22   Q.          It's a much larger county of course,

23   isn't it?

24   A.          It's -- I wouldn't call it a
```

149

1    metropolis.

2    Q.        It's much larger than Hocking?

3    A.        It's larger.

4    Q.        The -- page 2 of the e-mail there

5    January 9th e-mail was sent to -- do you know who

6    docded44 is?

7    A.        That's me.

8    Q.        Okay.  Sent -- it looks like you're

9    list -- listed twice there or --

10   A.        I probably sent it to myself to be able

11   to proofread it.

12   Q.        Okay.

13   A.        Maybe there's a glitch with the

14   computer and I couldn't get it to -- maybe it

15   jammed up.

16   Q.        And then Crystal is?

17   A.        My wife.

18   Q.        Okay.

19   A.        Right there.

20   Q.        Then the third page it looks like is

21   just a copy of the same e-mail that was sent to

22   Ms. Ogle, Mr. Sheets and Mr. Walker?

23   A.        Yes.

24   Q.        That are e-mails.

```
 1              And then there was a separate letter

 2    sent the same day that's attached as the last page

 3    of that.

 4    A.         Yes.

 5    Q.         It says you've been waiting to hear

 6    from them for contingency plans?

 7    A.         Yes, the commissioners.

 8    Q.         Would the -- the commissioners not

 9    being physicians or coroners would not have any

10    ability to develop contingent plans, would they?

11    A.         They could fund my -- the coverage,

12    yes.

13    Q.         That's the contingent plans you were

14    looking for them to perform --

15    A.         I needed more funding, yes.  Nobody

16    works for free.  Yes.

17    Q.         Okay.  And I think you indicate there

18    in the last paragraph your priority lies with

19    aiding law enforcement, correct?

20    A.         Correct.

21    Q.         Okay.

22              MR. LAMBERT:  Okay.  Do we want to take

23    that -- do you want to take a break, Mr. Brunner?

24              MR. BRUNNER:  Yep.  Yep.
```

151

1          THE VIDEOGRAPHER:  We are off the

2     record.  The time is 1:40.

3               (A short recess is taken.)

4               THE VIDEOGRAPHER:  This marks the

5     beginning of disk No. 3.  We are back on the

6     record.  The time is 2:43.

7     BY MR. LAMBERT:

8     Q.          Just to follow-up briefly, Doctor, then

9     we'll try to move on to another area.  The three

10    doctors you gave us the names that you had

11    contacted, did you just do that in passing or did

12    -- did you send any written -- anything in writing

13    to anyone?

14    A.          Passing in the Doctor's lounge.

15    Q.          Okay.  At the hospital then I assume?

16    A.          Yes.

17    Q.          That's the only three you recall

18    contacting?

19    A.          For sure, yes.

20    Q.          And I think you said you'd contacted

21    Fairfield -- the Fairfield County coroner or chief

22    investigator?

23    A.          Ed Breining, B-R-E-I-N-I-N-G.  And his

24    wife was ill and she eventually died.

1    Q.        That was the only adjoining -- only

2    person in any adjoining counties you had contacted

3    about --

4    A.        Yes.  The other Athens County coroner

5    wasn't going to be in -- he didn't staying long.

6    He was retiring.  And he -- and he retired within

7    a year or two.  And he wasn't in office that long

8    either.

9    Q.        And what do you mean not in that long?

10   A.        He came in late and left early.  Like

11   he resigned and -- he retired is what he did.

12   Q.        Okay.

13   A.        I don't know if he had so many years in

14   another aspect of the government, but he retired.

15   Q.        At some point, Doctor, Sheriff North

16   had sent you a proposed possible resolution to the

17   coverage issue.  It's in a letter to you.  Do you

18   recall that?

19   A.        He sent me a letter at sometime, yes.

20   Q.        I'll show you what's marked as

21   Exhibit 30.

22                        - - - - -

23            Thereupon, David Cummin Exhibit 30 is

24   marked for purposes of identification.

153

1                          - - - - -

2    Q.        Is that the letter you received from

3    Sheriff North?  It says it's dated July 17th,

4    2014?

5    A.        Yes.

6    Q.        And he set forth some possible areas to

7    look into whether using an investigator from the

8    Sheriff's Office.  Did you consider that?

9    A.        No.

10   Q.        And why is that?

11   A.        Because the law as I understand it in

12   the state of Ohio is that if you have the same

13   employer -- employer of the county and you try to

14   possess two different jobs of similar duties, that

15   you could not possess both jobs because there was

16   concern about overtime.

17   Q.        Okay.

18   A.        This was an incident that occurred I

19   believe in Hocking County in which there was an

20   employee for the EMS who I believe worked

21   full-time, 40 hours, and then he was working at

22   9-1-1 for 20 hours and I think he wanted to sue

23   the County saying that since he had the same

24   paycheck from the same employer, Hocking County,

```
 1    that he should be given 20 hours' overtime.  And

 2    so the notification went out that you could not be

 3    an employee at 9-1-1 and EMS because of similar

 4    duties under the same employer.  Same with -- and

 5    that's as far as I know been the same forever and

 6    ever.  But I could employ a Logan police officer.

 7    Q.          Uh-huh.

 8    A.          Because they don't share the same.

 9    But --

10    Q.          Had you looked into that?

11    A.          We have not.  And the -- the problem

12    with that was Erin Miller had talked about union

13    issues and couldn't do any kind of schedule of --

14    in the future of coverage because of whatever

15    entity that was.  But there's a difficulty with

16    the police union FOP, I don't know, Buckeye

17    Sheriffs Association [sic] also with unionized

18    people getting a schedule ahead of time.  I don't

19    know the issues with it, but, no, we could not do

20    that.

21    Q.          You had -- Erin Miller is with the

22    Logan Police Department?

23    A.          He's retired.

24    Q.          And you had talked -- was he with the
```

155

1    police department back in '14?

2    A.          We had an issue where I wanted the

3    sheriff and the police department to have a team

4    member for child fatality deaths, and what I was

5    told was that that couldn't be done because of

6    issues with scheduling and they couldn't plan it

7    out beyond this much and that -- it was a similar

8    answer from Erin Miller and Lanny North on the

9    issue.

10   Q.          I'm sorry.  That last?

11   A.          There was a similar answer from Lanny

12   North and Erin Miller on that issue.  It was many

13   years ago.

14   Q.          Okay.  But there had never been any

15   discussion with him about using one or two

16   officers as investigators during the times you may

17   be out of town?

18   A.          For -- who are you talking about?

19   Q.          For an investigator -- for employing

20   him --

21   A.          Who are you speaking of?

22   Q.          -- as an investigator for the Coroner's

23   Office on a contract basis?

24   A.          Who are you speaking of?

156

1    Q.          Well, a -- someone with the Sheriff's

2    Office or someone with the police department?

3    A.          The issue is there is they're not

4    trained.  You know, they haven't had the $20,000

5    of training that the other investigators had.

6    Like I said, you can't give your neighbor a

7    briefcase and call them him an attorney.

8    Q.          What about the EMS, the paramedics?

9    A.          They're more qualified than a law

10   enforcement officer.

11   Q.          Did you consider that?

12   A.          We've -- we've used them in the past

13   and that was not considered similar duties because

14   they're trying to save lives and not doing

15   medical/legal death investigations.  So we had

16   employed one in the past.

17   Q.          When in the past had you?

18   A.          He -- he was a subcontractor.  He was

19   not specifically employed.

20   Q.          Okay.  And when was that?

21   A.          He was with us until about -- he worked

22   through 2013.

23   Q.          Through 2013?

24   A.          Yes.

```
 1    Q.         So he was a sub?

 2    A.         He was an extra.

 3    Q.         I'm sorry.

 4    A.         And he was highly qualified.  And he

 5    went to all the trainings and he went to the

 6    yearly 20 hours of medical/legal death

 7    investigation course and --

 8    Q.         What was his name?

 9    A.         Mike Stephenson.

10    Q.         And had you talked to him about

11    workings a contract --

12    A.         Yes.

13    Q.         -- employee?

14    A.         He works in Vinton County and he

15    doesn't have coverage for his cell phone.  We'd

16    still use him if we can get a hold of him.  He

17    would be one of your $75 guys.

18    Q.         He works for Vinton County EMS?

19    A.         He does.

20    Q.         He has no cell phone coverage at Vinton

21    County; is that what you're saying?

22    A.         In his house.  He's out in the rural

23    area of Hocking County.

24    Q.         And he doesn't have a house phone?
```

158

```
 1    A.          He does.  I tried both, but he hadn't
 2    -- I hadn't been able to get a hold of him except
 3    maybe once in the past year I would say from 2013
 4    to 2014.  So it was becoming difficult to even
 5    consider him because I could never get a hold of
 6    him.
 7    Q.          Anyone else -- any other EMTs you had
 8    used before?
 9    A.          Yes, Seth Riddlebarger.
10    Q.          Was he also a contract or extra?
11    A.          Yes.
12    Q.          And had you used him through '13?
13    A.          Yes.
14    Q.          And why -- why could you not use him in
15    '14?
16    A.          Because he had some issues at work of
17    harassment.  And I believe one of your defendants
18    was making his life difficult, so he moved his job
19    to -- above Columbus, north of Columbus.
20    Q.          That was before -- before '14?
21    A.          No.  That was done in the last -- I
22    don't know how long.  Within the last six months.
23    Q.          Okay.
24    A.          Six to eight months.
```

```
1    Q.          And I was asking what -- if you had

2    attempt to do use him in '14 --

3    A.          We have not used him.  But we have used

4    him in the past, so we would use him.  He works

5    about three jobs.  So, once again, contractors are

6    nice --

7    Q.          Uh-huh.

8    A.          -- but they don't -- they don't show up

9    when --

10   Q.          My --

11   A.          -- you need them.

12   Q.          What I was asking was had you attempted

13   to use him in '14 --

14   A.          Yes.

15   Q.          -- when you were not present?

16   A.          Yes, he had three jobs.

17   Q.          So he --

18   A.          He was not contactable.

19               MR. BARBIERE:  You can't talk at the

20   same time.  You've got to wait for him to finish

21   his question.

22   A.          I'm trying to finish my answer.

23   Q.          Okay.  So you had talked to him about

24   working in '14?
```

1    A.          I talked to him in 2014, yes.  But I

2    don't know if he showed up to any scenes.

3    Q.          Did you --

4    A.          Contractors are not obligated to show

5    up.  They show up at their convenience.  They

6    don't show up at 2:00 in the morning typically.

7    Employees do because they have an obligation.

8    Q.          Did you ever call him out in 2014?

9    A.          We have called him but he never came.

10   Q.          So starting in January when the first

11   problem occurred without having coverage, you had

12   attempted to call Seth Riddlebarger?

13   A.          Sure.  Yes.  We've called him multiple

14   times.

15   Q.          I'm -- and I understand that.  But I'm

16   trying to ask -- trying to get specifics.  In

17   January 2014, had you made arrangements with him

18   to be available as an investigator when you were

19   not present?

20   A.          We attempted to have multiple people

21   cover.  He had three jobs.  He was unable to

22   provide coverage.

23   Q.          Okay.  That's not -- that doesn't

24   answer my question, Doctor.

1      In 2014 after you learned that the

2  commissioners were not going to fully fund your

3  request for the investigators beginning January

4  1st, during the month of January did you have any

5  contact with Seth Riddlebarger about being an

6  investigator or an available investigator when you

7  were out of town?

8  A.      I would say yes we did.

9  Q.      Okay.  When you say "we" meaning?

10  A.      The office, which is me.

11  Q.      Okay.  And what was his response?

12  A.      He had three jobs.  He was unable to

13  commit to any time.  I think I've said that three

14  times now.

15  Q.      After January of 2014 during any time

16  of the year of 2014, was there attempts made to

17  make arrangements with Seth Riddlebarger to

18  provide coverage for the Coroner's Office?

19  A.      He had three jobs.  He told us he

20  couldn't commit.

21  Q.      Okay.  Any other paramedics or EMTs

22  that you had used in the past besides those two?

23  A.      We've used Tracy Nye.  He's a

24  firefighter.  But he's an extra, he's not trained,

162

1    but he's a good extra person to have on hand, but

2    he could not handle a scene by himself.

3    Q.          He would not be better than not having

4    anyone?

5    A.          You cannot slap a gun belt on somebody

6    and call them a sheriff.

7    Q.          I understand that, Doctor.

8    A.          You can't put an untrained person out

9    there and have me take responsibility for them.

10   No, it's not going to happen.

11   Q.          So you did not consider that was a

12   viable option?

13   A.          No.  He was untrained.

14   Q.          Anyone else that you had used in the

15   past as an investigator or an extra that you

16   contacted or did not contact to --

17   A.          We had used Tom Moorman.

18   Q.          Moorman?

19   A.          M-O-O-R-M-A-N.

20   Q.          Okay.

21   A.          He's another untrained but great guy to

22   have on scene with you, firefighter.  He's similar

23   with Tracy Nye's capabilities.

24   Q.          You did not feel he was someone you

163

1    could --

2    A.          No.

3    Q.          -- contract with to provide coverage?

4    A.          No.

5    Q.          Anyone else that you had used in the

6    past?  Any other investigators that you had used

7    in the past?

8    A.          Not that I can recall.

9    Q.          Did you make any -- obviously, there

10   were more investigators you'd used in the past

11   other than Downhour and Walsh who were there in

12   '14, correct?

13   A.          Right.  We had Stacey Gabriel who was

14   there for six years at the office, and that's who

15   Jamie took over for.

16   Q.          Okay.

17   A.          She left, became -- now she's a

18   director of nursing at the hospital.

19   Q.          Okay.  Did you make any contact with

20   her about --

21   A.          No.

22   Q.          -- seeing if she would provide

23   coverage?

24   A.          She had too many jobs.

1    Q.        And --

2    A.        She's a flight nurse.  She's a -- she

3    was the head of the ER at the time.  No.  And plus

4    she had basically quit.  She didn't want to do it

5    anymore.

6    Q.        Anyone else that you've used in -- as

7    an investigator?

8    A.        No.

9    Q.        Who were your investigators in 2012?

10    A.        Mike Downhour and Jamie Walsh.

11    Q.        Okay.  What about 2011?

12    A.        Same.

13    Q.        When did you first learn that there had

14    been an OHLEG run regarding Will Kernen and his

15    wife?

16    A.        I think I started to hear about it in

17    circles, rumors of such a thing in -- let me think

18    when that was -- in 2013, about the summer of

19    2013.  I'm not sure when I heard about it.  It

20    would be 2013, though.

21    Q.        And when you say rumors in circles,

22    explain that to me.  What type of circles?

23    A.        It's -- I would hear it from this

24    person maybe or that person that they -- have you

1    heard anything?  And I'd go, not really.  Have you

2    heard about it?  I mean I would call Officer

3    Smith, Chris Smith.  And he would say, yeah, I've

4    heard about them, but I don't really know any

5    specifics.  Nobody seemed to know anything

6    specifically about them except that there were

7    some sort of issues with an OHLEG and stuff like

8    that.

9    Q.        Now, who is Chris Smith?

10   A.        He is a Logan police officer.

11   Q.        Okay.  And he told --

12             MR. GLASGOW:  I'm sorry.  What did you

13   say?

14   A.        Logan police officer.

15   Q.        And in the summer of 2013, he told you

16   he had heard about it?

17   A.        I don't know when or what he told me.

18   You asked me who example -- what example, I can't

19   tell you specifically what he told me.  But he did

20   hear about racist recordings.  He heard about -- I

21   don't know what he heard.  I guess -- I think I

22   misspoke.  I think I heard about -- let me think

23   if I say that right.  I guess with Chris Smith he

24   heard more about some racist remarks.  I'm not

166

1    sure where I heard about the OHLEG issue.

2    Q.        What's your -- what's your --

3    A.        I'm sorry.  Let me correct that again.

4    I did not hear about the OHLEG issue.  I just

5    heard about the racist recordings in 2013.

6    Q.        Okay.

7    A.        That's what it is.  I'm sorry.  I --

8    Q.        All right.

9    A.        -- misspoke.

10   Q.        When did you first hear about the --

11   anything about the Kernen OHLEG?  Let me add to

12   that.  First indication you had that there may

13   have been an OHLEG run concerning Kernens?

14   A.        I think I heard about it in September

15   of 2014.

16   Q.        Okay.  And how -- how did you hear

17   about it?

18   A.        Jeremy Dye told me.

19   Q.        And regarding Mr. Dye or anyone else,

20   we don't want to know anything about their -- any

21   possible medical treatment, medical -- statements

22   concerning medical condition or anything else, but

23   was he at your -- physically at your office when

24   he told you?

```
 1    A.           Yes.  He was in the exam room.

 2    Q.           Okay.  And what did he tell you about

 3    the OHLEG?

 4    A.           The OHLEG was not a topic.  I think he

 5    was discussing something about -- somehow some

 6    racist recordings came up.  And I said, you know,

 7    I've been hearing about these for like a year.  Do

 8    you know anything about them?  I don't -- who --

 9    what's the story with them?  And he said, well,

10    they're out there.  And I said, well -- I mean,

11    like I keep hearing them, and I -- and that's

12    where I'd asked Officer Smith, because I figured

13    he would know.  And he said, they're definitely

14    there.  And I went, oh, and he -- and I don't know

15    how it came up but, somehow there was some sort of

16    issue of -- that I was going to meet with Steve

17    Schierholt soon, the head of BCI, and he --

18    Q.           You'd told Dye that?

19    A.           Yes.

20    Q.           You had told Dye that, that you were

21    going to meet with Schierholt?

22    A.           Yes.  And he said, well -- and I kind

23    of was like I don't know if these recordings

24    really exist, you same to say it, I keep hearing
```

1    about it from -- vaguely, maybe this, maybe not.

2    And he said, well, do you want -- do you want to

3    hear them?  And I said, sure, which I didn't

4    really believe they existed.  And so I think he

5    went over there to his house that evening.

6              And then after I started hearing

7    recordings of Dr. Douche from Mr. Downs and a

8    20-minute derogatory recording of Judge Wallace

9    and how they should get rid of him out of office.

10   And I think Lanny said that there was five years

11   remaining and how they're going to campaign

12   against him.  And then came the racist recordings.

13   And at the of it, I was probably -- I was pretty

14   shell shocked because I was shocked at what I was

15   listening to.  And then he --

16   Q.        You -- and you listened to the them all

17   the way through?

18   A.        Yes.

19   Q.        Okay.

20   A.        And I did not even realize that Jeremy

21   Dye had even recorded them.  I was so surprised.

22   And so he said I got -- I said -- he said are you

23   going to see Steve Schierholt?  And I said yes.

24   And he asked me who he really was.  And I said,

```
 1    well, as far as I know, he's the head of BCI.  And

 2    so he said, why don't you walk over there.  And so

 3    I walked into his kitchen.  And he has a desk in

 4    his kitchen.  So I walked over there; I didn't

 5    know what was going on.  And he had said you know

 6    there was an OHLEG run on your attorney.  And I go

 7    I don't know.  And then he said all you have to do

 8    is -- if you are seeing Steve Schierholt it's

 9    4-4-14 --

10    Q.        It's what?

11    A.        4-4-14, the date.

12    Q.        Oh, the date.

13    A.        9:20 a.m. I think is what it said, what

14    he said.  And then I never saw it.  I never

15    possessed it.  I -- I just went to Steve

16    Schierholt three days later or whenever it was and

17    I said just so you know -- he was asking about the

18    Glenn Swaim investigation.

19    Q.        Uh-huh.

20    A.        We watched the inquest together.  And I

21    said, oh, by the way, I just want you to know that

22    I heard some horrible recordings and there was

23    also some discussion out there that there may be

24    an OHLEG illegally run on my attorney and his
```

170

```
1    wife, but I don't know it to be true.  And he --
2    and he said, okay, and he -- and he goes what can
3    you tell me?  And I said I don't know; I've never
4    seen it and I never possessed it, but all I know
5    is 4-4-14, 9:20 a.m.
6    Q.         Now, at that time you had not seen the
7    OHLEG?
8    A.         I've never seen the OHLEG, no.
9    Q.         You've never seen it?
10   A.         No.
11   Q.         Have you seen on a jump drive?
12   A.         Can I ask my attorney a question?
13              MR. GLASGOW:  There's a question
14   pending.
15   Q.         Yeah.  I'd rather you answer my
16   question first.
17              MR. BRUNNER:  I'm not sure he can.  I
18   think that's what he's telling you.
19              MR. GLASGOW:  Well, there's --
20   A.         I can't answer the questions you
21   give you --
22              MR. BRUNNER:  You're not allowed to
23   discuss attorney/client --
24   A.         I can't answer due to attorney/client
```

171

1    privilege.

2    Q.        Well, I didn't ask you any

3    communication.  I just asked you if you'd seen

4    it --

5    A.        No.

6    Q.        -- off of a jump drive?

7    A.        The answer is no.

8    Q.        Have you seen it on a computer?

9    A.        No.

10   Q.        Have you seen it at all in any way,

11   manner or form seen a copy, picture or depiction

12   of the OHLEG regarding Kernens?

13   A.        I am unable to answer that last

14   question due to attorney/client privilege.

15   Q.        I'm not asking about any conversation

16   or anything that was said.  I'm just asking if

17   you've seen the document?

18             MR. BRUNNER:  But I think that answer

19   takes place in an attorney/client conversation.

20   So I don't think you can answer that question.

21   Q.        Let me ask this:  Other than seeing it

22   when you were with your attorney, have you seen it

23   in any other manner or form?

24   A.        No.

1  Q.        Did you have any other contact with

2  Jeremy Dye after that day that you -- that he told

3  you about the OHLEG?

4  A.        I'm unable to answer that due to --

5  Q.        I'll rephrase.

6  A.        -- doctor/patient relationship.

7  Q.        Have you had any other contact with

8  Jeremy Dye --

9  A.        No.

10  Q.        Let me finish.

11            -- other than this meeting with him or

12  discussion -- discussions with him concerning

13  medical issues since the day he told you about the

14  OHLEG?

15  A.        No.

16  Q.        Without getting into any medical issues

17  or questions, at any time during any time you

18  would have seen him in your office, did you have

19  any further discussions with him about the OHLEG

20  or the recordings?

21  A.        No.

22  Q.        Did you ever have any discussions with

23  Captain Alford about the OHLEG or the recordings?

24  A.        Never.

173

1    Q.          Did you have any discussions with

2    Officer Boch about the OHLEGs or the recordings?

3    A.          Never.

4    Q.          Any discussions with anyone else other

5    than your attorney about the OHLEGs or recordings?

6    A.          Not the OHLEGs.  But the recordings

7    after the newspaper came out.  People would say,

8    boy, that's pretty awful.  And I would say, you

9    haven't heard them, they're pretty awful.

10   Q.          Do you have any idea how the newspaper

11   received the recordings?

12   A.          Not from me.

13   Q.          Do you have any idea?

14   A.          I don't know how they got them.  You'll

15   have to ask them.

16              MR. GLASGOW:  You've got to speak up.

17   I can't hear you.

18   A.          I did not -- I did not give them to

19   them.  I don't know how they got them.

20   Q.          Did Dye indicate to you he had given

21   the OHLEG or a copy of the OHLEG or the OHLEG in

22   any form to anyone when he first met with you?

23   A.          No.

24   Q.          Or that he had shown it to anyone?

1    A.          No.

2    Q.          You later learned that he had given it

3    to your attorney?

4    A.          Umm -- yes.

5    Q.          Okay.  The time you went to Dye's house

6    is the only time you ever met with him?

7    A.          Yes.

8    Q.          Outside of --

9    A.          I don't know where he lives off the top

10   of my head, but, yes, I went -- I think I followed

11   him.  He lives in the city somewhere.

12   Q.          That's the only time you ever met with

13   him other than on Sheriff's Office business or

14   doctor/patient business?

15   A.          Yes.

16   Q.          There was an issue concerning

17   Dr. Gorniak and her providing coverage for you.

18   Initially you had submitted a proposal to the

19   commissioners asking them to approve a -- an

20   agreement with Dr. Gorniak to provide coverage for

21   50 -- $500 a day, plus $1,000 on any call out

22   basically as I understand; is that correct?

23   A.          No.

24   Q.          Okay.  What was the proposal?  And

1    while I'm looking to find it here.  What was your

2    proposal?

3    A.        She was proposed -- I'd have to look at

4    that, but I believe she was proposed at $500 a

5    day.  If the proposal says $1,000 per call out, it

6    didn't happen.  She did not charge that amount.

7    Q.        You recall the commissioners responded

8    that they felt it was -- that proposal was

9    unreasonable; they wanted you to look for other

10   alternatives?  Let me see here.  I'll show you

11   what's marked as Exhibit 25B.

12              - - - - -

13        Thereupon, David Cummin Exhibit 25B is

14   marked for purposes of identification.

15              - - - - -

16        MR. BRUNNER:  Thank you.

17   A.        Yeah, this is one of my favorite

18   letters.  I asked a physician, since they would

19   not cover an employee, who was competent to cover

20   me while I was absent per their request.  And when

21   I found somebody for $500 a day -- which, believe

22   me, that's pretty cheap for a doctor.  Apparently

23   they decided that wasn't good enough.  And I don't

24   know how much attorneys are paid, but I think $500

176

```
 1    for 24-hours coverage for a qualified forensic

 2    pathologist is a pretty good deal.

 3    Q.          Now, that was to be available by phone,

 4    right?  They did not have to go anywhere or do

 5    anything?

 6    A.          She was called four times on one Sunday

 7    that she covered me.

 8    Q.          Okay.

 9    A.          She covered -- so that's 125 bucks a

10    body right there.  And she did an autopsy on one

11    of the four.

12    Q.          Well, the --

13    A.          The -- it says --

14    Q.          I found that, but --

15    A.          -- asking for a favor.  I'm sorry, but

16    the county commissioners want to know if I could

17    get coverage by asking for favors right here.  Do

18    you see that?

19    Q.          Uh-huh.

20    A.          Pretty impressive.

21    Q.          I'll show you what's marked as

22    Exhibit 25.  I found the letter I was looking for

23    earlier.

24                        - - - - -
```

1           Thereupon, David Cummin Exhibit 25 is

2    marked for purposes of identification.

3                    - - - - -

4    Q.        Is that the letter you sent to the

5    commissioners May 29th?  Dated May 29th I'll say.

6    A.        Let me look at it.  Yes, this is --

7    what was your question?

8    Q.        That's a letter you sent to the

9    commissioners dated May --

10   A.        Correct.

11   Q.        And that's the reference I was making

12   earlier to the proposal of $500 a day to be

13   available and additional $1,000 for any actual

14   call outs?

15   A.        But not to Dr. Gorniak.

16   Q.        Pardon?

17   A.        You had mentioned Dr. Gorniak.

18   Q.        Yes.

19   A.        This was not her contract.

20   Q.        This was just a contract for anyone?

21   A.        This was one that I believe Dr. Ireton

22   said he would do it for that much and I can't

23   remember who else.  But I felt like that was

24   enough money where they would actually leave their

1    family or whatever they were doing that day, leave

2    their practice and go to a scene.

3    Q.        What did I do with my copy?

4    A.        I was trying to do what the

5    commissioners asked me to and the prosecutor asked

6    me to do.

7    Q.        So at this point it was not

8    specifically for Dr. Gorniak then?

9    A.        No.  This is before the Dr. Gorniak.

10   Q.        After that, the commissioners had asked

11   you to try to find a proposal that was not as

12   expensive.  Did you come up with any other

13   proposals?

14   A.        I could not find a physician for less

15   than this much money to cover me as a deputy

16   coroner.

17   Q.        Then you were gone in June and you had

18   Dr. Gorniak cover.  Gone for eight days, correct?

19   A.        Yes, I believe so.  I'd have to see the

20   dates.

21   Q.        Okay.

22                    - - - - -

23            Thereupon, David Cummin Exhibit 26 is

24   marked for purposes of identification.

179

1                          - - - - -

2    Q.          Exhibit 26, the front sheet says

3    invoice for coroner coverage services 6-5 to

4    6-12-14?

5    A.          Right.

6    Q.          Now, is this something you prepared and

7    submitted on behalf of Dr. Gorniak?

8    A.          Yes.

9    Q.          Okay.  And this basically is eight days

10   at the -- at $500 a day or $4,000, correct?

11   A.          Correct.

12   Q.          Didn't you say she had three phone

13   calls on one of those days?

14   A.          She had four deaths on Sunday.  She

15   took care of four deaths on Sunday and autopsied

16   one of the four.

17   Q.          Okay.

18   A.          That's a pretty good deal.

19   Q.          Now, this was not included in the

20   autopsy.  The autopsy would be --

21   A.          Correct.

22   Q.          -- separate?

23   A.          The autopsy was billed by her county to

24   our county.  She was available eight consecutive

180

1   24-hour days for that price for competent

2   coverage.

3   Q.          Now, as I understand, the commissioners

4   questioned the -- this as to whether or not it was

5   an actual invoice; is that correct?

6   A.          Which -- yes, which is strange because

7   when John Ireton covered me, I just filled out --

8   I didn't even give them this.  I just gave them a

9   requisition and I wrote John Ireton seven days.

10  And what I did with him at the time was I divided

11  365 by my salary and however many days he took.

12  That way he would be bonded and everything by the

13  County in my place and he would be protected.

14  Q.          What was --

15  A.          And he had my investigators at his

16  disposal.

17  Q.          When was --

18  A.          So when I left, he had investigators.

19  When Jan Gorniak covered, she had nothing.

20  Q.          When -- when was it you used Dr. Ireton

21  for that?

22  A.          I would say I've used him for probably

23  eight years.

24  Q.          Up until when?

```
 1    A.          Up until this incident because he

 2    didn't want to -- he was not even wanting to be

 3    mentioned in the contract because of all the bad

 4    publicity.  Nobody wanted to be mentioned.  They

 5    were willing to do it as long as they weren't --

 6    they didn't want to be on the front page, frankly.

 7    That's what they didn't want.

 8    Q.          So when you submitted that proposal in

 9    May, Dr. Ireton was going to do it for that, the

10    amount --

11    A.          Yes.

12    Q.          -- set forth therein?

13    A.          Yes.

14    Q.          Now, how much different is that --

15    A.          And I specifically mentioned his young

16    children, that he's willing to leave his young

17    children.  That's his children.

18    Q.          How much was it he received per day

19    whenever you paid him in the past when you divided

20    your salary?  How much was that?

21    A.          I don't know.  You'd have to calculate

22    it out.

23    Q.          Well, I'm asking.

24    A.          I think it was about $80.  I'd have to
```

182

1    look, but --

2    Q.          So he --

3    A.          He got paid $80 if he had to sign a

4    death certificate.  Once again, he had Mike

5    Downhour and Jamie Walsh to go to the scenes.  He

6    just had to sign the death certificate while I was

7    out of town; that was his real purpose.  If they

8    had a question, they could call him.  But he had

9    -- the investigators who could do all the work; he

10   just had to be able to sign a death certificate

11   somebody needed cremated.  So if you die and you

12   want to be cremated, you have to have the death

13   certificate signed now.  You can't wait eight days

14   and have it signed because you can't be cremated

15   until your burial permit, also known as your death

16   certificate, is done.

17   Q.          So in the past you had done it for $80

18   a day and --

19   A.          He had sat at home and answered

20   questions and came in and signed a death

21   certificate prepared by Jamie Walsh for $80 a day,

22   yes.

23   Q.          Okay.

24   A.          He did not go to scenes.  He never went

```
1    to a scene -- well, I don't think he went to a
2    scene.  Now he would be on his own, having to
3    investigate everything on his own and probably
4    spend all day out there, if you know John Ireton.
5    He's a very thorough guy.
6    Q.        It looks like page 2 of Exhibit 26 was
7    an e-mail where Jan Gorniak followed up with you a
8    second -- or an actual invoice from her, which
9    would appear to be -- as I understand page 3?
10   A.        Yeah, this is a copy of her e-mail --
11   Q.        Okay.
12   A.        -- to me.  I told her that the
13   commissioners said they won't pay you unless you
14   submit an invoice, even though there is no rule on
15   the books or law that said it had to be done that
16   way.  And we had not done it that way in the past.
17   There was a roadblock was to fill out an invoice
18   to be submitted on her letterhead.  And of course
19   her letterhead is her home address, so -- so she
20   jumped through the hoops, I resubmitted it now
21   with her invoice, and it still didn't get paid.
22   Q.        Well, page 3 still doesn't have her
23   name or address on it, does it?
24   A.        I don't know what that is.  That's not
```

184

1    my work product.

2    Q.          It was supplied to us actually from

3    your attorney who indicated it was from --

4    A.          Well --

5    Q.          He had received it from you.

6    A.          Well, I bet you her name is here.

7    Q.          Okay.

8    A.          Top left.  But it was colored green, I

9    think, if I remember correctly and it may not have

10   copied well.

11   Q.          Well it looks like the last document

12   December 9th right before it was actually paid,

13   you had submitted to them -- I'm -- to pay the

14   invoice previously submitted, I am resubmitting a

15   -- her bill with detailed description on her

16   letterhead for payment.  It looks like December

17   9th the letterhead with her name and address, so

18   it was submitted and then the bill was paid.  Is

19   that --

20   A.          Well, Clark Sheets had decided to not

21   vote and then it was approved by the two remaining

22   commissioners.

23   Q.          Yeah.  My question was --

24   A.          And John Walker had already resigned.

185

```
 1   Q.          My question -- my question was:  When
 2   it was submitted December 9th with the letterhead
 3   and address on it and then it was paid?
 4   A.          This one?
 5   Q.          Then it was paid?
 6   A.          I believe this is her letterhead and
 7   address.
 8   Q.          Okay.
 9   A.          I don't think it copied well.  This is
10   not my work product.  I would have to look and
11   recheck what's submitted to you.
12   Q.          Okay.
13   A.          But it's clear that she's got green --
14   I don't know, if she's got pink on there or what.
15   But it should have her -- I would guess it's up
16   here on the -- I'm not sure.
17   Q.          Yeah.  From what I got --
18   A.          And she does bill for services.  So she
19   would go to another county, do autopsies, and then
20   get paid per -- she would go to Cleveland and
21   do --
22   Q.          Okay.
23   A.          So she has her own way of doing
24   invoices.  This is her product, I'm guessing.
```

186

```
 1    Q.          Okay.

 2    A.          It's not mine.

 3    Q.          If you could check that and maybe you

 4    or Mr. Brunner could send that to us and see if

 5    there's an address that just didn't copy when he

 6    sent it or if there was a separate invoice sent

 7    December 9th that has the name and address on it.

 8    At some point one with a name and address was

 9    sent?

10    A.          Oh, yeah, there is one for sure.

11    Q.          Okay.

12    A.          Because I resubmitted it.  But I'm

13    guessing it's this.

14    Q.          But you understood that one of the

15    issues was the typed statement that they had

16    received.  They'd sent it to the auditor and the

17    auditor had a question as to whether or not it was

18    something that could be paid?

19    A.          I think it was the commissioners who

20    had to run it by to see if she could really bill

21    as an independent person.  I'm not sure it was an

22    auditor issue, but I don't know.

23    Q.          Okay.

24    A.          You're -- you're asking the wrong
```

1    person.  I did what they told me to.  I did

2    exactly what they told me to the second time,

3    resubmit it with an invoice on her letterhead.  I

4    did.  It still didn't get paid.

5    Q.          And you were going to be -- you were

6    gone July 3rd to the 5th of 2014, correct?

7    A.          Yes.

8    Q.          July 2nd you had a conversation with

9    Captain Alford?

10   A.          I don't know.

11   Q.          Do you recall calling him and telling

12   him you was going to Jamaica?

13   A.          No, I don't recall it was him.  But I

14   don't -- it could have happened.

15   Q.          And there was a death on the 3rd while

16   you were gone?

17   A.          Yes, as far as I know.

18   Q.          And the Athens County coroner

19   authorized the release of the body after being

20   called by the commissioners?

21   A.          He was called by Clark Sheets.

22   Q.          He's a commissioner?

23   A.          Yes.

24   Q.          Okay.

1    A.          He was.  And he was -- I called the --

2    the Athens County coroner and asked him why he

3    released the body that was in our morgue.  And he

4    said I was called by Commissioner Sheets and I was

5    told the body was decomposing.  And I said it was

6    in a refrigerated morgue.  And he said, oh, my

7    gosh, I didn't know you had a refrigerated morgue;

8    we don't have one in Athens County.  I would never

9    have released the body had I known you had a

10   refrigerated morgue.

11   Q.          Wasn't there some issue with the

12   funeral home indicating they had to have the body

13   within so many hours in order to --

14   A.          That's not per anything that I possess.

15   That might be something that Mr. Downs was coaxing

16   from somebody.  But I would be willing to put any

17   of my funeral home people on the stand to say that

18   you can embalm a body three to four days without

19   difficulty.  And when I told him that statement,

20   that a body can decompose in two to three days,

21   they thought that was ludicrous and that it was

22   probably made by an uncertified mortician who is

23   more of a manager and not a person certified.  I

24   would --

1    Q.          So that caused you to assume it was

2    Detective Downs?

3    A.          I read it in his stuff.

4    Q.          Pardon?

5    A.          I read it in his things.

6    Q.          Read what?

7    A.          In his submitted --

8    Q.          Read what?

9    A.          That he had gotten the statement from

10   some funeral home director that said that the body

11   was decomposing.

12   Q.          Okay.  Then you were at -- you were

13   going to be gone again in July -- looking at

14   Exhibit 2.  Now, you indicate that you on July

15   16th -- and I believe that was the day or two

16   before you left to be gone during the latter part

17   of July; is that correct?

18           MR. BARBIERE:  What paragraph are we

19   on?

20           MR. LAMBERT:  43.

21   Q.          Saturday -- I believe you were -- you

22   were gone the 18th or 19th for -- I don't remember

23   how many days.  Do you recall --

24   A.          Eleven.

190

1    Q.          -- being gone for 11 days?

2    A.          My niece's wedding, yes.

3    Q.          July -- July 16th you were aware that

4    your budget for lab and morgue expense had $610 in

5    it?

6    A.          Yes.

7    Q.          Now, you were at the commissioners

8    meeting on the 16th or 17th.  At that time did you

9    ask for additional moneys to be put into lab and

10   morgue account since you were going to be gone for

11   11 days?

12   A.          I asked for additional money to be

13   placed because we were out of money in May.  And I

14   asked that in order to complete the year I needed

15   $30,000.

16   Q.          I --

17   A.          That included lab and morgue.

18   Q.          I understand.  But did you ask for

19   specific lab and morgue money at that time?

20   A.          For a lesser amount for the lab and

21   morgue, no.  I asked for 30,000, which was going

22   to cover my lab and morgue, because we'd already

23   expended all of our lab and morgue by May.

24   Q.          Well, the commissioners always -- would

191

1    you agree they'd always put money in lab and

2    morgue any time you would ask for it?

3    A.        They had before.  But until that

4    meeting they didn't.

5    Q.        Until that meeting they didn't.  I'm

6    not sure what you mean.

7    A.        They did until that meeting.

8    Q.        Well --

9    A.        They didn't do anything.  They -- I was

10   at the meeting, I almost pleaded with them to put

11   money in there, and they did not.

12   Q.        Actually, you was out of money in your

13   lab and morgue by April, weren't you, of that

14   year.  Do you recall that?

15   A.        I don't know when I was out.

16   Q.        Should --

17   A.        I just know when I left town there was

18   $610.25.

19   Q.        I'll show you what's marked as

20   Exhibit 27B.  That was a letter to you indicating

21   that they had transferred $5,500 into your lab and

22   morgue account?

23                   - - - - -

24        Thereupon, David Cummin Exhibit 27B is

192

1    marked for purposes of identification.

2                    - - - - -

3    A.        Okay.

4    Q.        You had asked for additional moneys at

5    that time?

6    A.        Yes.

7    Q.        Had you made a similar request for

8    additional moneys in the lab and morgue account in

9    July 2016 before you left for 11 days?

10   A.        Did I write them another letter?

11   Q.        However you'd --

12   A.        I --

13   Q.        How do you normally ask for additional

14   moneys in your lab and morgue account?

15   A.        I can do a letter or I can show up to

16   the meeting and formally request it in person.  I

17   think formally requesting in person is a bigger

18   deal than writing a letter.

19   Q.        Well, when you showed up in person you

20   were asking for the additional $30,000, not

21   specifically money in the lab and morgue account,

22   correct?

23   A.        There are very few line items in the

24   budget.  I don't know where else I would have put

```
 1    it.  I can't put it in the first line item of my

 2    salary.  I can't put it in my second one, which is

 3    my PERS.  I mean, there's none in my supplies,

 4    so --

 5    Q.          What was it --

 6    A.          Where do you think I was going to put?

 7    Q.          Was part of it -- part of that 30,000

 8    was the increase in salaries for the employees,

 9    correct?

10    A.          I don't know if I specifically said

11    that or not.  I know that I was expecting to spend

12    $30,000 more for the -- for the remainder of the

13    year and most of it was going to be in lab and

14    morgue because I was out.

15    Q.          But you knew they would always add the

16    lab and morgue money.  I mean they had done it for

17    years, right?

18    A.          It was -- I didn't know they were going

19    to.  I had some hostile -- no, I would say no.

20    They've already -- they acted towards me in that

21    October 3rd meeting, if that's when the date was

22    of the previous year, that just submit the

23    salaries of $12,000 on your budget and we'll look

24    into it.  I did not come out of the meeting
```

1    feeling like they weren't going to do it.  So I

2    would say they misled me.  Why would you tell me

3    to put the money in there and then not do

4    anything?  That was suggested by them.  They

5    suggested --

6    Q.        Okay.

7    A.             -- that I put the 12,000 into the

8    budget.  I didn't say I want to put $12,000; they

9    suggested that to me.  And then when January 1st

10   came, it wasn't there.  So I would argue to you

11   that, no, they have not come through when they

12   promised to some degree because I had done

13   everything possible.  I jumped through every hoop

14   that they asked me to do.  I tried to find

15   coverage.  I tried to do everything.  There's

16   multiple attempts that you have brought to my

17   attention that I've tried to remedy the situation.

18   And even if I jumped through the hoops, they still

19   refused it.  So I would say, no, your answer is

20   no, they did not do what they said they were going

21   to do.

22   Q.        So you're saying if we get of the

23   transcript that October meeting there was a

24   promise to put the additional salaries in --

```
 1    A.          I am telling you --

 2    Q.          -- your budget?

 3    A.          -- that they suggested to me to put

 4    that in the budget.

 5    Q.          In your proposed budget?

 6    A.          Yes.

 7    Q.          Okay.  You didn't expect them to give

 8    you everything that you asked for in your proposed

 9    budget, did you?

10    A.          I didn't ask for anything else.

11    Q.          Okay.

12    A.          I only asked for one thing.

13    Q.          Now, had there ever been a time prior

14    to July 19th, 2000 -- or July -- the date of the

15    meeting, July 17th, 2014, that you had

16    specifically asked for an additional funding for

17    the lab and morgue account or for transportation

18    of decedents that it had not been paid by the

19    commissioners or added to your budget, that line

20    item, for payment?

21    A.          What is your question?

22    Q.          Had there ever been a time since you

23    have been commissioner -- or coroner that you

24    would ask for additional funds in your lab and
```

```
 1    morgue account or for the transportation of
 2    decendents that the money had not either been put
 3    in the account or it had been paid directly out of
 4    the general fund?
 5    A.        If I wrote a letter, it could be put in
 6    several days later.  It is possible.  But once
 7    again --
 8    Q.        Okay.
 9    A.        -- they were not following through with
10    their end of the bargain anymore.
11    Q.        And you're saying that October 13th
12    meeting was a bargain that they didn't follow
13    through on regarding the salaries?
14    A.        I am saying they suggested -- why would
15    you tell me to put money in there and then decline
16    it?  Just tell me you're not going to do it.
17    Q.        Well, one possible way, wouldn't it,
18    that they needed to look at the entire budget and
19    decide how much money they did have?
20    A.        I can't tell you what they were
21    thinking.
22    Q.        Okay.
23    A.        But -- I think I wouldn't tell somebody
24    to put money in the --
```

1    Q.          I'm not sure you answered my question.

2    My question is:  Do you recall any time prior to

3    July 17th, 2014 that you had asked for additional

4    moneys for lab and morgue or transportation of

5    decedents to supplement your budget that it had

6    not been granted or the bills paid directly by the

7    commissioners?

8    A.          Specifically when I asked for those in

9    writing, no.

10   Q.          Okay.

11   A.          For those line items individually.

12   Q.          And you knew before you left town that

13   you had $610.25 in the lab and morgue account?

14   A.          I did.

15   Q.          There was a death while you was gone?

16   A.          There was.

17   Q.          And you -- the Sheriff's Office got a

18   hold of you or talked to you -- was able to

19   contact you?

20   A.          Yes.

21   Q.          And you refused to authorize the body

22   to be sent at that time for autopsy?

23   A.          No.  I said that I couldn't send a body

24   for autopsy without having the amount of money in

1    that in the line item because that would be

2    illegal.

3    Q.        And you had --

4    A.        I would be held personally possible for

5    that amount of money.

6    Q.        And you had sent bodies before for

7    autopsies even though you did not have sufficient

8    moneys in that line item, correct?

9    A.        I don't know to that -- that to be true

10   at all.

11   Q.        Did you ever check before whenever

12   you've sent a body for an autopsy to see if there

13   was money in the line item before you sent it?

14   A.        We knew how much money was in there.

15   We knew -- we didn't submit bills without it.

16   Sometimes if it was getting low, John Walker or --

17   I don't know if there was another commissioner who

18   would come in and they would say, hey, I just want

19   you to know we put some extra money in here.  And

20   I believe that's what happened here.  I don't

21   think I -- I'm not sure I requested that.  I think

22   John Walker may have come by and said we noticed

23   you were getting low and put that in there.  I'm

24   just saying they didn't put money in there

1    necessarily because I asked for it.  They -- their

2    job is to monitor the budget and they may have

3    just said I noticed you're low.

4    Q.          From what I was able to learn through

5    the auditor, the auditor would get bills for the

6    lab and morgue account that would be over the

7    balance.  And then the Auditor's Office would have

8    the commissioners put money in so they could pay

9    the bills.

10   A.          I don't know the answer to that

11   question.

12   Q.          Were you ever contacted by the auditor

13   saying we got a bill for your lab and morgue

14   account and you don't have enough money?

15   A.          No.

16   Q.          So if that happened, then it would make

17   sense that they would contact the commissioners

18   and the commissioners would put money in there

19   then?

20   A.          I don't know what they're doing.

21   You're asking me --

22   Q.          Do you know whether or not that has

23   happened in the past?

24   A.          No.

1    Q.          Bills come in for the lab and morgue

2    account, not enough money, and the Auditor's

3    Office would contact the commissioners and have

4    them put money --

5    A.          I'm not aware of that happening.

6    Q.          Okay.  Are you aware that it happened

7    where bills would come in and there would not be

8    enough money in the lab and morgue account in the

9    past?

10   A.          No.

11   Q.          And I'm not sure if you specifically

12   answered this.  I don't mean to be -- to reask it.

13   Had there been times you had sent a body for

14   autopsy knowing there was not enough money in

15   there at that time for the autopsy but sent the

16   body anyhow because you knew the money would be

17   put in there?

18   A.          No.

19   Q.          So the times -- if the Auditor's Office

20   has times where bills for autopsies would be

21   received and there not be enough money there, that

22   would be a time you didn't know what the balance

23   was in the account?

24   A.          That would be a time that I was

1    unaware.  Our numbers didn't always match their

2    numbers.

3    Q.          So you was -- so you was unaware then

4    of the balance of the account when you sent the

5    body for the autopsy at that point if that

6    happened?

7    A.          I did not authorize autopsies to be

8    done if I did not -- if I knew there wasn't enough

9    money in there.  That is correct.

10   Q.          But if the Auditor's Office from time

11   to time received bills for that account that

12   exceeded the balance in there, you -- that would

13   have been a time you would not have known what the

14   balance was?

15   A.          That is correct.  I would not have

16   known that we were -- did not have enough money in

17   there.  But we tried to stay on top of it, and

18   that was part of Jamie's job too.  Jamie knew it

19   was 610.25 and I knew it was 610.25 when I left

20   tow.

21   Q.          But generally how low would the lab and

22   morgue account get before you would ask for

23   additional moneys to be put in?

24   A.          Usually 2,000 maybe.

```
 1    Q.           Okay.  But had -- at this point, there

 2    had not been any request for additional funds from

 3    the time the 5,000 was put in in April, correct?

 4    A.           It was busy season.

 5    Q.           Is that correct?

 6    A.           Yes.  We got five autopsies with

 7    $5,500, yes.  $1,100 a piece.

 8    Q.           So you -- who was it you first told

 9    that you would not authorize the body to be sent

10    without being assured additional moneys would be

11    put in the account?

12    A.           John Walker called me in New York -- I

13    had called John Walker.  I think I called him.

14    Yeah, I called John Walker and then he called me

15    back.

16    Q.           Okay.  And did he basically tell you

17    we've always put money in there, it will be put in

18    Tuesday?

19    A.           He didn't pay Jan Gorniak's bill.

20    Q.           I don't think -- that wasn't part of my

21    question at all, Doctor.

22                 My question was:  In that conversation

23    did he tell you we have always put money in that

24    account when you need it; we'll put money in there
```

1    Tuesday?

2    A.          No, I don't think he said that.

3    Q.          Well --

4    A.          I told him I didn't have enough money.

5    He said he could assure me that there would be

6    money put in there.  And I said, John, you can

7    only speak for one of the three commissioners.

8    You cannot -- I need at least two commissioners to

9    tell me that because I'm not going to be charged

10   with any more lawsuits.  We're going to do things

11   by the book and that's how it's going to be.  I

12   need some assurance that there will be money in

13   there so that I don't get -- so I'm not breaking

14   the law.

15   Q.          Well, you knew the commissioners could

16   not do that over the phone -- they could not pass

17   a resolution over the phone, didn't you?

18   A.          I didn't ask for any resolution to be

19   passed.

20   Q.          You did not?

21   A.          No.

22   Q.          Didn't ask for a resolution?

23   A.          No.  I did not ask for a resolution at

24   all.

204

```
 1    Q.          What did you ask for?

 2    A.          I told him -- I didn't ask for

 3    anything.  I just told him that I needed assurance

 4    that there would be money put in the account that

 5    would cover the autopsy.  I didn't ask for a

 6    certain amount.  And he said after he -- he was

 7    pretty unhappy.  He said I'm sick of all this.

 8    And when I calmed him down, I said, John, I cannot

 9    legally order -- I can't legally spend money that

10    I don't have in my line item; it's illegal.  And

11    he said I'll see what I can do.  That's where it

12    was left.

13    Q.          So you didn't ask for anything specific

14    other than --

15    A.          No.

16    Q.          -- that?

17    A.          No.

18    Q.          Just an assurance is all you asked for?

19    A.          Yes.  Correct.

20    Q.          Okay.  Now, at that time then it was

21    your understanding that you -- if you exceeded

22    that line item you could be personally responsible

23    or if you exceeded your budget?

24    A.          No, that line item.
```

205

1    Q.          Okay.

2    A.          I was under the impression, and my

3    attorney has also told me the same thing, that I

4    cannot spend money that's not in the line item.

5    Q.          But --

6    A.          It has to be transferred.

7    Q.          But you know once the money is put in

8    your budget you can transfer within your budget?

9    A.          I did not have enough money in that

10   line item.

11   Q.          That's not what I'm asking you, Doctor.

12   Did you know that you could transfer moneys from

13   other line items --

14   A.          Yes.

15   Q.          -- into that line item to cover --

16   A.          Yes.

17   Q.          -- that?

18              There was sufficient money in your

19   budget to have covered that autopsy in other line

20   items?

21   A.          Where?  I -- where?

22   Q.          You didn't have eleven or twelve

23   hundred dollars in -- left in your budget for that

24   year?

206

1    A.          You have to --

2    Q.          Doctor --

3    A.          -- specifically send a request.

4    Q.          Doctor, just answer my question.

5    A.          Okay.

6    Q.          Did you have $1,500 left in your entire

7    budget --

8    A.          I don't know.

9    Q.          -- at that -- you don't know?

10   A.          You're asking me -- show me a budget

11   and I'll tell if you there was enough in there.

12   Q.          Okay.  So you don't know if you had the

13   $1,500 in your budget --

14   A.          I did not have enough --

15   Q.          -- as of July?

16   A.          -- money in my line item for --

17   Q.          I know, Doctor.  I'm not on asking

18   about the line item.  I asked if there was other

19   accounts in your budget -- you knew you had 610 --

20   A.          That is correct.

21   Q.          -- in your lab and morgue?

22   A.          Right.

23   Q.          And the autopsy would have been how

24   much, a thousand, eleven hundred?

```
 1    A.          $1,100.

 2    Q.          So you needed five hundred and -- $500?

 3    A.          Yes.

 4    Q.          And you did not know at that point when

 5    you were talking to John Walker whether or not you

 6    had $500 in another line item that you could have

 7    transferred?

 8    A.          I did not have assurances that money

 9    would be transferred from one line item to another

10    or that additional money would be put in that line

11    item.

12    Q.          Well --

13    A.          You're asking me to commit an illegal

14    act of spending money that's not in that line item

15    and I'm not going to do and I didn't do it.

16    Q.          You knew you had the freedom to

17    transfer within line items within your own budget,

18    didn't you?

19    A.          I can, but that takes requests.  And I

20    -- you are asking me to spend the money and then

21    put the money back there later.  That's exactly

22    what you're asking.

23    Q.          Well --

24    A.          I'm not doing it.
```

1    Q.          I'm asking you if you knew you had the

2    money and you could transfer it so you knew it

3    would be covered if --

4    A.          I knew I did not have enough money.

5    Q.          Let me finish.  If they did not put the

6    money in the lab and morgue, you knew you had

7    enough money to transfer to cover it if for some

8    reason for the first time ever they didn't put

9    money in the lab and morgue, correct?

10   A.          What's your question?

11   Q.          You knew at that -- on July 19th that

12   you had sufficient money in your budget that you

13   could have transferred to cover that autopsy if

14   the commissioners for the first time failed to put

15   money in the lab and morgue account on Tuesday?

16              MR. BRUNNER:  Objection to form.

17   Q.          Is that --

18              MR. BRUNNER:  You can answer the

19   question.

20   Q.          Is that correct, Doctor?

21   A.          No.  I did not have enough money --

22   Q.          Okay.

23   A.          -- in the line item to --

24   Q.          See, Doctor, that wasn't my question.

1   A.          You are asking me to play a shell game

2   and put money in later after it's been spent and

3   I'm not going to do that.  It has to be done

4   before you spend the money.

5   Q.          But I did not ask you --

6   A.          That's the law.

7   Q.          -- whether or not you had money in the

8   line item.  I'm not asking you whether or not you

9   had money in the line item.

10  A.          You're asking me to commit an illegal

11  act.

12  Q.          Okay.

13  A.          You're asking me to say, hey, there's

14  money somewhere else, we'll charge it on this

15  credit card and replace it later, that's not how

16  the county budget works.

17  Q.          So what other discussions with anyone

18  did you have that night about what you were

19  expecting before you would transfer the body?

20  A.          The characterization that you are

21  saying is wrong.

22  Q.          Okay.

23  A.          At no time did I ever say that we would

24  not move the body, as I had seen on Ms. Ogle's

1    thing.  That is false.  The body was transferred

2    to the morgue.  I asked Lanny North to Zip Tie it.

3    And it was under lock and key in the morgue.  We

4    could not send the person because we didn't have

5    identification on him.  I do not send bodies to

6    Franklin County Morgue without the vital

7    information required.

8              I called Detective Downs and David

9    Valkinburg the following day and I got the Social

10   Security number, the birth date, the person, the

11   address, next of kin, all that stuff.  And when I

12   had that, the body was then sent from our locked

13   morgue to Franklin County.  At no point -- now, if

14   I didn't get anything money-wise put into the

15   account or an assurance that it was going to

16   happen, then he would have stayed in the morgue

17   until I got back and talked to the commissioners.

18             There's no evidence that's going to be

19   lost.  He's locked down.  Lanny Zip Tied the bag.

20   Everything's perfectly fine.  He's refrigerated.

21   Q.        Let me show you what's been marked as

22   Exhibit 28.

23                      - - - - -

24             Thereupon, David Cummin Exhibit 28 is

1    marked for purposes of identification.

2                     - - - - -

3    Q.          Did I give you my copy?  There it is.

4    If first page is an e-mail from Lanny North to you

5    on the -- by now we're into the morning of the --

6    July 20th.  Correct?  Is that a --

7    A.          I didn't know there was a question.

8    Sorry.

9    Q.          Oh, the -- the first page is an e-mail

10   from you to -- from Lanny North to you.  It says

11   "Please review the attached document authorizing

12   an additional appropriation."  Correct?

13   A.          That's a question?

14   Q.          Is that --

15   A.          Yes.

16   Q.          Is that what that is?

17   A.          Yes, that's what this is.

18   Q.          You recall -- my last question is you

19   recall receiving this?

20   A.          I got this on my iPhone, yes.

21   Q.          Okay.  The attachment to that, then, do

22   you recall the handwritten document that's at

23   page 3 to this exhibit as being what was attached

24   by Lanny North?

212

```
 1    A.          This is what they created for whatever

 2    reason.

 3    Q.          Now, look at the last page of that

 4    exhibit, a statement signed by John Walker.  I

 5    mean, at this point John Walker was actually a

 6    patient of yours?

 7    A.          I'm unable to answer that under --

 8    Q.          Okay.

 9    A.          -- doctor/patient relationship.

10    Q.          Mr. Walker had indicated to me that he

11    had been a patient of yours.

12    A.          That's his choice.

13    Q.          Okay.  John states that you told him

14    his word was not sufficient.  I think you

15    indicated in -- in different words maybe you said

16    that, correct?

17    A.          Yes.  One out of three commissioners

18    was not enough to act upon three, yes.

19    Q.          That he wanted a resolution e-mailed to

20    him saying he could spend money out of a line item

21    without having sufficient funds in that line item?

22    A.          I never mentioned the word "resolution"

23    ever.

24    Q.          You never mentioned you wanted a
```

1    resolution e-mailed to you?

2    A.          Never.  That was what they chose to the

3    to do.  I didn't ask -- he told me he was going to

4    do what he could do.  I just told him I needed --

5    my word was reassurance.  That's different than

6    resolution.

7    Q.          Okay.  And he says again I told him

8    that it's standard protocol to put money in lab

9    and morgue and transport line items whenever these

10   funds are low.  Would you agree with that

11   statement?

12   A.          These are not his words I don't think.

13   They don't sound like John Walker to me, but --

14   Q.          Did he tell you that?

15   A.          Can I -- I don't think he said it like

16   that.  I think he said we put money in there

17   before.  Now, if you want to say that's what he

18   said, that's different.  But he never said it's

19   standard protocol.  That's false.

20   Q.          And --

21   A.          I don't think those are his words at

22   all.  He doesn't talk like that.

23   Q.          John's statement says "He," I --

24   referring to you -- "again said my word was not

1    sufficient and he wanted an e-mail saying he could

2    do this."  Do you recall that?

3              MR. BRUNNER:  Excuse me, can I hear

4    that question again?

5              (The record is read as follows:  John's

6    statement says "He," I -- referring to you --

7    "again said my word was not sufficient and he

8    wanted an e-mail saying he could do this."  Do you

9    recall that?)

10             MR. BRUNNER:  I'll object to that

11   because I don't see anywhere in that where it says

12   again.

13             MR. BARBIERE:  "He again said..."

14             MR. BRUNNER:  Where?

15             MR. GLASGOW:  Second -- second word in

16   the sentence.

17             MR. LAMBERT:  "He again..."

18             MR. BRUNNER:  What line in 22?

19             MR. LAMBERT:  Well, it's the next to

20   the last line, the first paragraph at the end of

21   the line on the right.

22             MR. BRUNNER:  Okay.  I thought you were

23   reading above.

24             MR. LAMBERT:  Okay.  I'll read it again

1   for clarification.  He said -- "He again said my

2   word was not sufficient and he wanted an e-mail

3   saying he could do this."

4   A.          Yes, I think that's accurate.  I don't

5   think those are his words, but I would say that's

6   accurate.  Yeah, I wanted something that I had to

7   fall back on in case I got arrested for spending

8   money that I didn't have illegally.

9   Q.          Doctor, what damages are you claiming

10  you have suffered as part of this lawsuit?

11  A.          I don't think specifically that they've

12  been listed by my attorney yet.

13  Q.          Well, can you tell us what damages you

14  have?

15  A.          Not until we have a consultation about

16  what those are going to be specifically.

17  Q.          Well, what --

18  A.          There's loss of income.  There's --

19  Q.          Are you claiming loss of income?

20  A.          Yes.  I don't know the amount.

21  Q.          And this is loss of income out of your

22  private practice?

23  A.          Yes.

24  Q.          This is something you've not calculated

216

1    yet?

2    A.          May I say something?  Is it proper for

3    a defendant to keep smiling at me?  Can we exclude

4    him if he's going to continue to mock me over

5    there?

6              MR. GLASGOW:  Don't acknowledge it,

7    just -- don't acknowledge it.

8              THE WITNESS:  Okay.  If it's okay.

9    Q.          The loss of income from your private

10   practice you've not yet determined?

11   A.          No.

12   Q.          And for what period of time you -- do

13   you claim you had a loss of income?

14   A.          That's going to be determined also.

15   Q.          When do you -- when do you believe that

16   this loss of income started, what period of time?

17   A.          We'll have to determine that at the

18   time.

19   Q.          Well, what -- if you haven't determined

20   it, what causes you to believe there was a loss of

21   income?

22   A.          Because you have my tax returns and you

23   have my loss of revenue sheets in front of you and

24   you can see there's dramatic decrease.  Loss of

1    patients, loss of income, media.

2    Q.          Do you know of any specific patients

3    you lost because of this?

4    A.          I'm unable to say due to patient --

5    Q.          Without giving me the name --

6    A.          -- confidentiality.

7    Q.          I didn't ask for the name.  I asked do

8    you know of any specific patients that you lost as

9    a result of this?

10   A.          Yes.

11   Q.          And how many patients do you claim you

12   lost as a result?

13   A.          We haven't specifically determined that

14   yet.  And I don't think that's determinable, if

15   that's a word.

16   Q.          How do you know you -- specifically

17   that you lost patients?

18   A.          Because I was told that people were

19   finding other doctors because they thought I was

20   going to jail or leaving the community.

21   Q.          And those people -- then the patients

22   themselves told you?

23   A.          Yes.

24   Q.          Besides loss of income, is there any

1    other area of damage that you believe you've

2    suffered?

3    A.         I think my attorney and I will have to

4    sit down and discuss what those specifics are,

5    yes.

6    Q.         Well, without getting into specifics,

7    we -- you can get with him and give us those

8    specifics, but I --

9    A.         We can in the future, yes, we can.

10             MR. BARBIERE:  What was that answer?

11   A.         We can in the future, yes, give you

12   those specifics.

13   Q.         Without -- I'm not asking for the

14   specifics at this time.  I'm just asking for the

15   area so we can know what to ask for in the future.

16   What are the areas -- other than loss of income,

17   what other type damages are you claiming?

18   A.         I'd have to talk to my attorney about

19   what specific damages that we are seeking.  I

20   think it specifically says to be determined by a

21   jury in the complaint, but I'm not an attorney and

22   I don't know the proper wording.  And I don't --

23   I'm not going to exclude based upon my testimony

24   what is and is not going to be limited to this or

1    that.  I don't know enough information to answer

2    your question.  I can tell you legal fees will be

3    in there, obviously.

4    Q.        Legal fees.  Did you have legal fees in

5    the criminal case?

6    A.        Yes, and this one.

7    Q.        How -- how much were the legal fees in

8    the criminal case?

9    A.        I think that's been supplied to you.

10   Q.        I asked you how much your legal fees --

11   A.        About $10,000 for the -- Will Kernen.

12             MR. GLASGOW:  Again, the air

13   conditioning has kicked on, so I can't hear you.

14   A.        About $10,000 for Will Kernen.

15   Q.        And have you paid legal fees to

16   Mr. Brunner --

17   A.        Yes.

18   Q.        -- at this point?

19             And how much have you paid him at this

20   point?

21   A.        I have no idea.  I pay him on a monthly

22   basis.  I could not give you within $10,000 of how

23   much I paid him.

24             MR. LAMBERT:  Okay.  Let's take a short

220

1    break.

2                    MR. BRUNNER:  Okay.  How much time do

3    you --

4                    MR. LAMBERT:  Restroom and --

5                    THE VIDEOGRAPHER:  We are off the

6    record.  The time is 3:55.

7                    (A short recess is taken.)

8                    THE VIDEOGRAPHER:  This marks the

9    beginning of disk No. 4.  We are back on the

10   record.  The time is 4:12.

11   Q.          Doctor, backing up a little bit to

12   January.  After you had sent the January 9th

13   letter to the commissioners -- I think we found

14   that in -- huh.  I don't seem to find it.  Let me

15   show you this and I will let you look at it and I

16   will see if I can find it.  That's Exhibit 21,

17   which would appear to be a letter to you from the

18   prosecutor responding to a January 9th letter you

19   had sent in the commissioners.  I ask you to look

20   at that and I'm going to ask you if you recall

21   receiving that letter?

22                    - - - - -

23                    Thereupon, David Cummin Exhibit 21 is

24   marked for purposes of identification.

```
 1                      - - - - -
 2    Q.        Do you recall receiving that letter
 3    from the prosecutor?
 4    A.        Yes.
 5    Q.        And after that letter the prosecutor
 6    had filed a complaint for a writ of mandamus
 7    regarding the question about the coverage or
 8    coroner coverage while you were out of -- out of
 9    the county?
10    A.        I'm not sure I understand this letter
11    anyway.
12    Q.        Well, I just asked -- yeah, you
13    received this letter?
14    A.        I received it.
15    Q.        Okay.
16    A.        But it didn't make any sense because it
17    says I violated protocol.  I don't know anywhere
18    in that protocol that it's violated.
19    Q.        The -- there was a writ of mandamus
20    filed in the Court of Appeals seeking a mandamus
21    for you to provide -- be available to provide
22    coverage -- oh, that's -- you keep this.
23              I'll show you what's marked as
24    Exhibit 22 and we'll represent to you that that is
```

1    a copy of the writ of mandamus complaint.

2                       - - - - -

3              Thereupon, David Cummin Exhibits 22 and 23

4    are marked for purposes of identification.

5                       - - - - -

6    Q.         Do you recall receiving that, Doctor?

7    That being filed?

8    A.         I got it through my attorney I believe.

9    Q.         Okay.  The --

10   A.         Actually, I may have received this and

11   sent it to my attorney.

12   Q.         Okay.  Paragraph 7 says that "On

13   January 10th, 2014, employees of the Hocking

14   County Sheriff's Office attempted to contact the

15   coroner with regard" -- with regard "to a deceased

16   individual located in Hocking County.  He did not

17   personally respond, nor did he send other staff."

18   Was that correct?

19   A.         I don't -- I'm unaware of a coroner

20   case on January 10th, 2014.

21   Q.         Okay.

22   A.         Do you have a death certificate?

23   Q.         You were -- you were gone -- were you

24   gone the 9th through the -- I don't remember --

1    did you go out of town on the 9th, I believe?

2    A.          I went out of town on the weekend, but

3    I'm unaware of a coroner case that weekend.  Do

4    you have a death certificate to show me?

5    Q.          No, I do not.

6                I think you indicated you were going to

7    be gone the 9th to the 12th, correct?  Your prior

8    exhibit we had, the last page of that which is an

9    exhibit to that --

10   A.          Yes.  But I'm unaware of a coroner case

11   on January 10th, 2014.

12   Q.          The writ of mandamus was voluntarily

13   dismissed by the prosecutor at a later time,

14   correct?  Was that your understanding?

15   A.          It -- it was because of a remedy, which

16   I'm unaware of what the remedy was.  Yeah.  That

17   has action to --

18   Q.          Here's a copy of the --

19   A.          To remedy the situation.  I don't know

20   what the remedy was.  Nothing was changed.

21               MR. BARBIERE:  What was the last thing

22   you said?

23   A.          There was not -- she says that I have

24   taken action to remedy this situation.  And the

224

1    answer is I don't know what remedy was done.

2    Q.         This was --

3    A.         Nothing changed that I knew of.

4    Q.         This was --

5    A.         Except that I got an attorney.

6    Q.         This was filed a few days after Jan

7    Gorniak covered for you June 16th while you were

8    out of town I believe.  This was filed the 23rd.

9    She had provided coverage for you the weekend

10   before this was dismissed.

11   A.         Okay.  But she never got paid until the

12   next commissioners, yes.

13   Q.         Well, she may not have, but you did

14   have someone --

15   A.         I did not --

16   Q.         -- provide --

17   A.         -- know that that was the remedy.

18   Okay?

19   Q.         Now, I've got copies of part of the

20   responses to discovery.  I've got the whole

21   document with you and I only made copies of the

22   parts that I was going to -- going to ask

23   questions about.

24             MR. LAMBERT:  Mr. Brunner, I've got the

1    whole document here if you want to see it --

2              MR. BRUNNER:   That's fine.

3              MR. LAMBERT:   -- if there's any

4    question about it.

5    Q.        We've been killing enough trees in this

6    case, if I can just copy what I'm going to ask

7    about.  No. 25 and 25A, I think we've already

8    covered that.

9              Now, are you aware that Mr. Dye said

10   that he told you about the OHLEG while he was in

11   your office, did not mention to us about meeting

12   you at his house?  Are you aware of that in his

13   deposition?

14   A.        I -- maybe.  I mean that's what

15   happened, but -- and I told you that, too, that I

16   went to his house because he told me in the

17   office, yeah.

18   Q.        No.  He told you about the OHLEG --

19   A.        Oh.

20   Q.        -- in your office --

21   A.        Oh, I don't know if that's -- I mean I

22   don't remember -- you're right.  I'm not sure I

23   remember it that way, but it's -- I mean --

24   Q.        You've seen where he said that, though,

226

1    that he told you in the office?

2    A.          I don't remember.

3    Q.          Okay.

4    A.          It's possible.  I mean I don't remember

5    it.

6    Q.          And I know you said today the first

7    time you heard about it was at the house.  Could

8    it have been at the office and then -- or was it

9    at the house in the kitchen like you was telling

10   us about?

11   A.          I mean, he has a -- he has a way that

12   he thinks it happened.  And I have a way I thought

13   it happened.  I don't know which one of us is

14   right.

15   Q.          Okay.

16   A.          I'm not sure it's that different --

17   Q.          Fair enough.

18   A.          -- except for location.  It's all same

19   day.

20   Q.          I had asked in the discovery the

21   efforts you had made in December of '13 and

22   January of '14 to employ an investigator or deputy

23   coroner.  I think you provide additional answers

24   today to that one.

1   A.          I did.

2   Q.          Now, your response to No. 28 would

3   indicate you committed $500 a month to Ms. Walsh a

4   total of 6,000.  So did -- did you pay her $500 a

5   month as a subcontractor for the entire year then?

6   A.          She was paid monthly.

7   Q.          I understand.  But 6,000 committed

8   would be $500 month.

9   A.          Yes.

10  Q.          Which would be 6,000.

11  A.          And I don't know if she took this -- I

12  don't know when that was effective, but, yes.

13  Q.          Well, if it was 6,000, would have been

14  the whole year, correct?

15  A.          Would have been January, correct.

16  Q.          No. 5 there it says talk to several

17  people and nobody interested.  I know you've given

18  us some names today.  Is there anyone else that

19  you're referring here that you talked to other

20  than who you told us about --

21  A.          No.

22  Q.          -- earlier today?

23              Number 35 on page 12, the presentation

24  you're talking about -- and I did not bring that

```
1    with me.  I saw a presentation where you had

2    indicated where the entire -- it would -- you

3    needed ninety-some thousand as a total budget; you

4    only got sixty-some thousand.  That's where the

5    $30,000 shortfall was in the budget you had

6    requested.  Is that the presentation you're

7    talking about?  Does that --

8    A.          I don't know.

9    Q.          Okay.  I did not bring it with me

10   today.  Number 38 -- most of these we've gone over

11   today, so I am just skipping over the ones I had

12   notes to actually ask questions on.

13              Number 38, on page 13 I think we've

14   identified it as Exhibit 32, but I'm not sure we

15   did.  So Exhibit 32 says they refused any

16   supplies, equipment and zero in line item.  Are

17   you -- are you saying there was ever any time you

18   had requested specifically moneys for supplies or

19   equipment that they had refused or just that there

20   had been a zero in the line item in the budget?

21                        - - - - -

22              Thereupon, David Cummin Exhibit 32 is

23   marked for purposes of identification.

24                        - - - - -
```

```
 1    A.           What's the question again, sir?

 2    Q.           Yeah.  You indicate they refused any

 3    supplies, and I'm trying to --

 4    A.           Yes.  I have a line item of supplies

 5    and it has zero dollars.  And my question was to

 6    them:  Why would you just not delete the line item

 7    if you are going to have a line item that says

 8    zero?  Doesn't make sense on a budget --

 9    Q.           But --

10    A.           -- to have a list something and you

11    give nothing to it.  You just delete the line

12    item --

13    Q.           Were there times --

14    A.           -- if you're not going to pay for it.

15    Q.           Were there times where you had bills

16    for supplies you submitted and bills for supplies

17    that they paid?

18    A.           Yeah.

19    Q.           Okay.

20    A.           Body bags.

21    Q.           But any time you would ask for bills

22    for supplies, even if there was zero in the line

23    item to be paid, they would -- those would be paid

24    by the --
```

1    A.        I don't know that we've ever had zero

2    in that line item before.

3    Q.        Oh, when was this?

4    A.        I had zero in the budget.

5    Q.        Had it been -- had it been the whole

6    year that -- your budget had zero in that line

7    item?

8    A.        Yes.  I was allocated zero dollars for

9    supplies that year.

10   Q.        Okay.  During the year did you ask for

11   any supplies to be paid or submit bills for

12   supplies to be paid?

13   A.        No, because I didn't have any money in

14   there.  Just like I can't ask for an autopsy for

15   $610.25 either.

16   Q.        So basically the basis of your response

17   is there that the line item had zero in it and not

18   that they actually refused bills for equipment or

19   supplies that you'd asked for; is that right?

20   A.        No.  38 says paragraph 55.  And it

21   says:  Because of past experiences with county

22   commissioners, including prior refusal to pay for

23   the unbudgeted invoice, Franklin County Coroner,

24   and because of a single commissioner does not have

1    the authority under Ohio law to bind the entire

2    board, Dr. Cummin declined to act based upon

3    Defendant Dr. Walker's oral representation.

4              I didn't fail to act based upon them

5    not putting any supplies in my line item of zero.

6    I did it --

7    Q.        All right.

8    A.        -- because they weren't paying bills

9    when I submitted after I did everything they

10   wanted me to.

11   Q.        But that's your answer, Doctor, you

12   said that -- but is that then not correct?  I

13   guess you just said that's not why --

14   A.        I would say that they had broken their

15   previous way of doing things when they refused to

16   pay a bill that I had the money in the budget to

17   pay it.  As far as I knew, I had the money to be

18   able to pay her and they wouldn't let it happen.

19   Therefore I couldn't transfer money, therefore I

20   couldn't be assured that I was going to have

21   enough money -- you had alluded to that I had

22   enough money in my budget to pay an eleven hundred

23   bill, right?

24   Q.        Uh-huh.

232

```
1    A.            But yet I had enough money to pay her

2    bill but they didn't let me transfer the money,

3    right?  So that's why I couldn't do the autopsy

4    because you're saying you got the money somewhere

5    else, you can move it later.  Well, I had the

6    money to pay Jan Gorniak, but they didn't let me

7    move that.

8    Q.            Well, now, there was never any refusal

9    to move money to pay that bill, was there?  They

10   were dealing with it, paying it directly

11   themselves, not out of your budget?

12   A.            Oh, no.  No.  No.  We -- no.  I think

13   we wanted to pay that out of our budget.  In fact,

14   it eventually came out of our budget.  We had the

15   $8,000 in the budget to pay it -- I mean the

16   $4,000 in the budget to pay it.

17   Q.            But there was never any request to

18   transfer moneys in line items regarding the

19   Gorniak bill, was there?

20   A.            I'd have to see the budget for the

21   amount of money in there.  But we had enough

22   money.  And the reason that -- if you look at

23   Ms. Ogle's comment, the reason they approved it

24   two to zero was because the money was in the
```

233

1    budget, the $4,000 was there.  Did we move things

2    around in line items, yes.  You were asking me

3    earlier why I didn't authorize the autopsy when I

4    did not have enough money in the line item, and my

5    answer to you is because I had enough money in my

6    budget to pay Jan Gorniak, but they didn't let me

7    move the money around that time either.  And that

8    was before the autopsy, correct?

9    Q.        Did you ask for a transfer of money at

10   the time for Gorniak that was denied or just asked

11   for the bill to be paid?

12   A.        I asked the bill to be paid.  And I

13   would have to look at my budget to see where the

14   money was.  But the money was in there and we

15   could have moved it.

16   Q.        Okay.

17   A.        But it was denied.

18   Q.        But you're right, it was never denied

19   because didn't have the money in the budget?

20   A.        It was approved because eventually

21   Ms. Ogle said he's got the money in his budget why

22   don't we pay the bill.  And it was paid in

23   December, not by -- it was paid by a new

24   commissioner, Ms. Ogle, and then abstained by the

1    outgoing commissioner.

2    Q.        But you never understood them denying

3    it in the past because there was not money in a

4    particular line item, right?

5    A.        Tell me if I'm wrong, but I think that

6    the Jan Gorniak bill was before the autopsy.  Am I

7    wrong on that?

8    Q.        Yes.  I'm saying they never denied the

9    Gorniak bill or never did not pay it because of a

10   question of whether or not there was money in a

11   particular line item.  That was never an issue

12   regarding Gorniak, was it?

13   A.        I'm not sure whether I'm following

14   you --

15   Q.        Well --

16   A.        Your logic is they would have moved

17   money this time, but they didn't move money before

18   that.

19   Q.        No, sir.  I'm not saying that at all.

20   All I'm saying is they never did refuse to pay

21   Gorniak or not pay Gorniak because of a question

22   about whether or not there was money in the line

23   item.  It was --

24   A.        You're right.

```
 1   Q.          -- purely about the what type of bill

 2   it was.

 3   A.          You're right.  But as the elected

 4   official, I am given a budget and it's up to me on

 5   how I spend my budget.

 6   Q.          And you moved --

 7   A.          But they micromanaged me.

 8   Q.          Uh-huh.

 9   A.          They decided what I could and couldn't

10   pay for.  That money was allocated to me, the

11   elected official, to spend how I see fit.  That's

12   how the budget in counties are supposed to work.

13   Q.          When you said they micromanaged and

14   decided what you could pay for and what you

15   couldn't --

16   A.          Yes.

17   Q.          -- what -- in what regard?  What --

18   give us an --

19   A.          They didn't want to pay Jan Gorniak

20   even though I have money in there.

21   Q.          Well, we just talked about the fact

22   that --

23   A.          They didn't authorize payment out of my

24   budget, how's that.
```

1   Q.          Okay.  Okay.  But we had talked about

2   the fact that they did not authorize it because of

3   the manner that the bill was submitted?

4   A.          They didn't like the bill.  They said

5   it was too high.  If I have the money and I'm the

6   elected official of the county office, they give

7   me a budget, I spend my budget how I see fit.

8   Q.          Now, was it -- is there any document

9   anywhere that commissioner said her bill was too

10  high?

11  A.          There was a letter that said it was

12  unreasonable.

13  Q.          Well, your proposal -- your proposal to

14  have a contract available was unreasonable.

15  A.          I don't know why they denied it.  They

16  just declined it.  I don't think it ever went

17  anywhere.  It just sat on their desk and they let

18  it just kind of sit there.

19  Q.          We talked before about the reason it

20  was denied is the way it was submitted, it was not

21  actually submitted on a bill?

22  A.          But it was two weeks later.

23  Q.          Well --

24  A.          And then it still wasn't paid.

1    Q.         I think the --

2    A.         For five more months.

3    Q.         The e-mail to you where she submitted

4    it on the letterhead was actually end of

5    September, which was --

6    A.         Okay.  It wasn't paid for three months.

7    We had paid John Ireton and everybody else without

8    invoices.  And when I went to the meeting and I

9    asked them why they weren't paying it and they

10   said, well, it wasn't on an invoice.  I said,

11   well, is that a rule because -- are you telling me

12   you don't ever pay bills?  And she said, Ms. Ogle

13   said, well, I'd like it to be that way.

14            Okay.  So what did I do?  I did exactly

15   what she asked and it still didn't get paid.  I

16   made every attempt to accommodate all of your

17   defendants.  I have made so much effort all by

18   myself with no employees to do everything I can to

19   accommodate them, but nothing satisfies them.

20   I've done everything.  There isn't anything that

21   they've requested that I didn't do.  Nothing.  You

22   can find nothing that I haven't done to

23   accommodate them.  I -- I challenge you to find

24   it.

238

1          MR. LAMBERT:  I'd mentioned to you

2     earlier, Mr. Brunner, about us leaving at 4:30

3     since it would be rather late for us to finish up.

4     And I know -- I think I'm about done and the other

5     counsel yet.  So I would like to --

6          MR. BRUNNER:  Well, as you know it's my

7     preference that we finish today; it's my client's

8     preference.  I can't keep you here.  We'll have to

9     work out when and how we resume.

10          MR. LAMBERT:  Okay.

11          THE VIDEOGRAPHER:  This adjourns the

12     deposition.  We are off the record.  The time is

13     4:35.

14               (Signature not waived.)

15                    - - - - -

16          Thereupon, the foregoing proceedings

17               concluded at 4:35 p.m.

18                    - - - - -

19

20

21

22

23

24

```
 1   State of Ohio      :         C E R T I F I C A T E
     County of Franklin: SS
 2
         I, Stacy M. Upp, a Notary Public in and for the
 3   State of Ohio, certify that David L. Cummin, was by
     me duly sworn to testify to the whole truth in the
 4   cause aforesaid; testimony then given was reduced
     to stenotype in the presence of said witness,
 5   afterwards transcribed by me; the foregoing is a
     true record of the testimony so given; and this
 6   deposition was taken at the time and place
     specified on the title page.
 7
         Pursuant to Rule 30(e) of the Federal Rules of
 8   Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
 9   transcript.

10       I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties hereto,
12   or financially interested in the action.

13       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Columbus, Ohio, on
14   May 12, 2016.

15

16

17

18

19

20   _____
     Stacy M. Upp, Notary Public - State of Ohio
21   My commission expires August 6, 2016.

22

23

24
```

240

```
              Witness Errata and Signature Sheet
               Correction or Change Reason Code
         1-Misspelling  2-Word Omitted  3-Wrong Word
           4-Clarification  5-Other (Please explain)


Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____
```

I, David L. Cummin, M.D., have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU21344DC   S-SU P-^