240

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

David L. Cummin, M.D.,      :
et al.,
                            :

        Plaintiffs,
                            :
        vs.                     Case No. 2:15-cv-1043
                            : Judge Sargus
Lanny North, et al.,            Magistrate
                            : Kimberly A. Jolson

        Defendants.
                            :

- - - - -

DEPOSITION OF DAVID L. CUMMIN, M.D.

VOLUME 2

- - - - -

Taken at Brunner Quinn
35 North Fourth Street, Ste. 200
Columbus, OH 43215
June 10, 2016, 2:08 p.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

241

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFFS:
3
        Brunner Quinn
4       35 North Fourth Street, Ste. 200
        Columbus, OH 43215
5       By Rick L. Brunner, Esq.

6

   ON BEHALF OF DEFENDANTS:
7
        Lambert Law Office, LLC
8       215 South 4th Street
        Ironton, OH 45638
9       By Randall L. Lambert, Esq.

10

   ON BEHALF OF DEFENDANT DOWNS:
11
        Schroeder, Maundrell, Barbiere & Powers
12      5300 Socialville-Foster Road | Suite 200
        Mason, OH 45040
13      By Lawrence E. Barbiere, Esq.

14

   ON BEHALF OF DEFENDANT VALKINBURG:
15
        Isaac Wiles Burkholder & Teetor, LLC
16      2 Miranova Place, Ste. 700
        Columbus, OH 43215
17      By J. Stephen Teetor, Esq.
          Aaron M. Glasgow, Esq.
18

19
   ALSO PRESENT:
20
        Michael Lane – Videographer
21      Lanny North
        David Valkinburg
22      Edwin Downs
        Crystal Cummin
23

24

242

1                   Friday Morning Session

2                   June 10, 2016, 2:08 a.m.

3                        - - - - -

4              S T I P U L A T I O N S

5                        - - - - -

6         It is stipulated by counsel in attendance that

7     the deposition of David L. Cummin, a Plaintiff

8     herein, called by the Defendants for

9     cross-examination, may be taken at this time by

10    the notary pursuant to notice and subsequent

11    agreement of counsel that said deposition may be

12    reduced to writing in stenotypy by the notary,

13    whose notes may thereafter be transcribed out of

14    the presence of the witness; that proof of the

15    official character and qualification of the notary

16    is waived.

17                        - - - - -

18

19

20

21

22

23

24

243

I N D E X

| Examination By | Page |
|---|---|
| Mr. Barbiere - Cross | 244 |
| Mr. Teetor - Further Cross | 345 |
| Mr. Lambert - Recross | 412 |
| Mr. Barbiere - Further Cross | 427 |

| Exhibits | Page |
|---|---|
| Exhibit 34 - E-mail, 2-23-12 | 320 |
| Exhibit 35 - Hocking County Special Grand Jury 2012 (2nd Part) Term | 322 |
| Exhibit 36 - Plaintiff David L. Cummin's Responses to Defendants First Set Of Interrogatories, Request For Admissions and Request For Production of Documents | 327 |
| Exhibit 37 - Letter from Brunner, 1-27-16 | 342 |

| Exhibits referenced | Page |
|---|---|
| Exhibit 5 - E-mail, 1-6-14 | 258 |
| Exhibit 8 - E-mail, 1-9-14 | 254 |
| Exhibit 18 - Letter, 3-5-2012 | 282 |
| Exhibit 20 - Journal Entry and Order | 285 |
| Exhibit 21 - Letter, 1-10-14 | 302 |
| Exhibit 22 - Complaint Writ of Mandamus, 1-14-14 | 309 |
| Exhibit 25 - Letter | 310 |
| Exhibit 25B - Letter, 6-3-14 | 314 |
| Exhibit 30 - Letter, 7-17-14 | 319 |

(Original exhibits returend to Mr. Barbiere.)

244

1              THE VIDEOGRAPHER:  We are on the record

2    at 2:08.  Would counsel please announce their

3    presence.

4              MR. BARBIERE:  I'm Larry Barbiere for

5    Ed Downs.

6              MR. TEETOR:  Steve Teetor for Dave

7    Valkinburg.

8              MR. GLASGOW:  Aaron Glasgow for Dave

9    Valkinburg.

10             MR. LAMBERT:  Randall Lambert, attorney

11   for commissioners, sheriff and prosecutor.

12             MR. BRUNNER:  Excuse me.  Rick Brunner,

13   Brunner Quinn for the plaintiff.

14                      - - - - -

15             DAVID L. CUMMIN, M.D.

16   being first duly sworn, testifies and says as

17   follows:

18                  CROSS-EXAMINATION

19   BY MR. BARBIERE:

20   Q.        Dr. Cummin, my name is Larry Barbiere.

21   I represent Ed Downs.  I'm going to be asking you

22   some questions here today.  You're under oath.

23             If I ask you a question which you don't

24   understand, please stop me and ask me to repeat

245

1    myself.  I want to be certain you understand each

2    question before you answer.  Is that understood?

3    A.       It is.

4    Q.       Also so we can get a good record, it's

5    important that when you answer the questions, you

6    answer out loud because it's hard for the court

7    reporter to get it down if you say uh-huh or

8    huh-uh or shake your head or something of that

9    nature.  Fair enough?

10    A.       Fair enough.

11    Q.       Any time you want to take a break

12    during the course of the deposition, just please

13    answer the pending question and then you can go

14    ahead and take a break, okay?

15    A.       Okay.

16    Q.       What is your annual salary as the

17    Hocking County Coroner?

18    A.       $25,102.

19    Q.       And is that the same salary that you

20    had in 2014?

21    A.       Yes.

22    Q.       Was it the same in 2013?

23    A.       I believe so.

24    Q.       What are your job duties as the Hocking

246

1    County Coroner?

2    A.          I think there's listed I'm supposed to

3    be a death investigator and declare -- find the --

4    the manner and mode and cause of death.

5    Q.          As a death investigator, what do you

6    do?

7    A.          I look at all the information available

8    and then I make a ruling.

9    Q.          Okay.  Let's go to 2013.  I want to

10   just take your duties in 2013 for an example.  I

11   think I read that you told the commissioners in

12   the May 2014 meeting that there were approximately

13   300 deaths in 2013.  Does that sound right to you?

14   A.          Sounds accurate.

15   Q.          Those -- would those 300 deaths be

16   deaths that someone from your office would have

17   gone to the scene in order to try to determine the

18   cause of death?

19   A.          No.

20   Q.          Okay.  When is it that someone from

21   your office goes to the scene to try to determine

22   the cause of death?  And again I'm talking about

23   2013.

24   A.          When we feel that it is necessary or

247

```
 1    helpful.
 2    Q.          Is there any kind of statutory rule as
 3    to when someone from your office is supposed to go
 4    to the scene of a death?
 5    A.          No.
 6    Q.          Do you have any kind of office policy
 7    or protocol as to when someone from your office
 8    will go to the scene of a death?
 9    A.          No.
10    Q.          Do you know how many times in 2013 out
11    of the 300 people that died approximately someone
12    from your office went to the scene of the death?
13    A.          Do I have an idea?
14    Q.          Yes.
15    A.          I could give you a range.
16    Q.          Okay.  Give me a range.
17    A.          Maybe 30 to 50 times.
18    Q.          Now, of those 30 to 50 times that
19    someone from your office went to the scene of a
20    death in 2013, how many times did you go to the
21    scene of a death?
22    A.          Probably 80 percent.
23    Q.          If you didn't go to the scene of a
24    death, who else from your office would have gone?
```

248

1  A.          It would have been one of my

2  investigators.

3  Q.          And who were your investigators in

4  2013?

5  A.          Jamie Walsh and Mike Downhour.

6  Q.          When you went to a scene of a death in

7  2013, did you go by yourself ordinarily from your

8  office or did one of your investigators go with

9  you?

10  A.          It would depend on the circumstances,

11  the time, if we had gotten a lot of calls that

12  week.  It's -- it could be me alone, it could be

13  them alone, it could be three of us, it could be

14  two of us.

15  Q.          Okay.  So --

16  A.          We're on call 24 hours a day.  So if

17  somebody is at a family event, we -- and we don't

18  think we need to interrupt that, we try not to.

19  Q.          Do you get paid extra when you go to

20  the scene of a death?

21  A.          No.

22  Q.          So your $25,100 salary stays the same?

23  A.          That is correct.

24  Q.          In 2013, I assume you were out of

249

1    Hocking County from time to time?

2    A.          I assume I was.

3    Q.          When you were out of Hocking County in

4    2013, who covered for you in your duties as

5    coroner?

6    A.          Myself normally and then I would have

7    my investigators available.

8    Q.          And if someone had to go to the scene

9    of a death in 2013 when you were out of town, who

10   would have gone?

11   A.          It would have been Mike Downhour and

12   Mike Stephenson, as a subcontractor, and Jamie

13   Walsh would be the available people.

14   Q.          During 2013, was there ever a time when

15   anyone went to a scene of a death in Hocking

16   County other than someone from your office?

17   A.          Possibly.

18   Q.          Okay.

19   A.          I mean there could have been a

20   subcontractor too.

21   Q.          What I'm -- what I'm trying to get at

22   is did you have -- did you contract with anyone

23   else in 2013 to cover for you as coroner and go to

24   a scene of a death?

250

```
 1    A.          We might have had Seth Riddlebarger.  I

 2    mean he -- I don't know if he -- what his

 3    situation was at the time.

 4    Q.          He's another investigator, though,

 5    right?

 6    A.          He's not an investigator, but he's

 7    pretty capable.

 8    Q.          In --

 9    A.          He's not a full investigator.

10    Q.          In 2013, did your office contract with

11    any physicians to assist you in performing your

12    duties as a coroner?

13    A.          I don't know.

14    Q.          In 20 --

15    A.          Contract -- we wouldn't have had a

16    contract.  We would have had -- things have

17    changed.  If I'm out of town and somebody dies and

18    they need to be cremated, I have to have the

19    availability of a physician's signature right then

20    and there.  And so that's where we could have

21    potentially had a John Ireton or somebody cover

22    pretty much to sign the death certificate.  They

23    wouldn't have done any of the investigations they

24    would have done any of that, but I would have had
```

1     the physician's signature with the aid of my

2     investigators doing all the work.  Now --

3     Q.          Would your -- we're talking about 2013

4     then?

5     A.          Correct.  Now, I can sign one anywhere

6     in the world.

7     Q.          Let me -- okay.

8     A.          It's electronic.

9     Q.          That's --

10    A.          I don't need that.

11    Q.          Okay.  Let's go back to 2013.  If

12    Dr. Ireton or someone of that nature had signed a

13    death certificate, would your office have paid him

14    money to do that?

15    A.          Yes.

16    Q.          And how much would you have paid him to

17    do that?

18    A.          1/365th of my salary --

19    Q.          All right.

20    A.          -- of that year.  So one -- it would

21    have been -- $25,102 divided by 365 days.

22    Q.          Do you know in 2013 if any physician

23    received any money from your office for doing

24    services such as signing a death certificate or

252

1    any other service?

2    A.          I don't know.

3    Q.          So --

4    A.          Not sure.

5    Q.          -- is that something you would have had

6    a record of?

7    A.          No.  The auditor would.

8    Q.          All right.

9    A.          We would not keep a record of that.

10   Q.          Let's go back to 2012.  In 2012, do you

11   know approximately how many deaths there were?

12   A.          It would be similar to 2013.

13   Q.          So approximately 300 deaths in Hocking

14   County in 2012?

15   A.          That I would be called on, yes.

16   Q.          And do you know approximately how many

17   times someone from your office visited the --

18   A.          It would be the same.

19   Q.          Please wait until I'm finished with my

20   question.

21               Do you know approximately in 2012 how

22   many times someone from your office would have

23   responded to a death scene?

24   A.          Same answer as the previous -- or the

253

1    next year.

2    Q.          Which is?

3    A.          It's a pretty consistent 30 to 50

4    times.

5    Q.          All right.  And in 2012 do you know how

6    many times you would have gone to the death scene

7    yourself approximately?

8    A.          Probably more.  Probably 90 percent

9    plus.

10   Q.          Do you do any autopsies?

11   A.          Personally?

12   Q.          Yes.

13   A.          I haven't since I was 25.

14   Q.          All right.  In your capacity as a

15   coroner for Hocking County, have you ever

16   performed an autopsy?

17   A.          Not for Hocking County, no.

18   Q.          Have -- are all the Hocking County

19   autopsies performed from Franklin County?

20   A.          They are.

21   Q.          Have you gone to Franklin County and

22   witnessed an autopsy?

23   A.          Not as coroner.

24   Q.          I'd like to direct your attention to

254

```
 1    Defendant's Exhibit 8.  It will be in that stack

 2    of documents right there.

 3              Do you see Exhibit 8?

 4    A.        I do.

 5    Q.        And this is an e-mail it appears or a

 6    letter dated January 9th, 2014 addressed to to

 7    whom it may concern; is that correct?

 8    A.        Correct.

 9    Q.        Who was this -- first of all, was this

10    a letter or was this an e-mail?

11    A.        I believe it was sent to the

12    commissioners via e-mail, personal service, and

13    letter.  And it was -- might be the letter that I

14    took to the emergency agencies.

15              MR. GLASGOW:  Excuse me.

16              MR. TEETOR:  Excuse me.  Could you keep

17    your voice up a little.  I don't hear so good.

18    A.        I also believe it's also the same

19    letter that went to the emergency agencies, 9-1-1,

20    Sheriff's Office, police department, EMS, the

21    hospital.

22              MR. TEETOR:  Thank you.

23    Q.        Okay.  In this letter you say "I will

24    be out of town for medical educational conferences
```

255

1    Thursday, January 9th-Sunday January 12th, 2013"

2    first; is that right?

3    A.        Yes.

4    Q.        Okay.  Where did you go for that

5    medical conference?

6    A.        Dublin, Ohio.

7    Q.        And did you stay in Dublin the entire

8    time?

9    A.        I did.

10   Q.        The -- do you have responsibilities for

11   continuing education --

12   A.        I do.

13   Q.        -- as a doctor?

14             Was this seminar that you went to from

15   January 9th to January 12th something for

16   continuing education?

17   A.        It was.

18   Q.        How many hours is your obligation each

19   year for continuing medical education?

20   A.        50 hours.

21   Q.        Then further in that sentence it says

22   you're also going to be gone from January 23rd

23   through January 26th of 2013.

24   A.        Correct.

256

1    Q.          Where did you go that time?

2    A.          Same conference, same location.

3    Q.          All right.  So you were back in Dublin,

4    Ohio for those days?

5    A.          I am.

6    Q.          And did you stay in Dublin, Ohio the

7    entire time?

8    A.          I did.

9    Q.          So you were not in Hocking County from

10   January 9th through January 12th, 2013 or -- it's

11   actually 2014, right?  I'm sorry.  We have the

12   wrong -- I think that's a typo there.  Just so we

13   get this corrected for the record.

14   A.          I'm sorry.  It probably is a typo, yes.

15   Q.          Yeah.  Because you wrote the letter on

16   January 9th, 2014, right?

17   A.          It appears so.

18   Q.          Yes.  Okay.  Just so we make sure we

19   have this clear in the record.  You were in

20   Dublin, Ohio from Thursday, January 9th through

21   January 12th, 2014?  And you were in Dublin, Ohio

22   during that period of time?

23   A.          Yes, I was.

24   Q.          The same was true from Thursday,

257

```
 1    January 23rd through January 26th of 2014,

 2    correct?

 3    A.          Correct.

 4    Q.          In your last sentence you say "During

 5    my above times, please contact your Hocking County

 6    Commissioners, Mr. John Walker, Mr. Clark Sheets,

 7    and Mrs. Sandy Ogle for their coverage plans and

 8    any questions concerning coroner service."  Do you

 9    see that?

10    A.          I do.

11    Q.          Did I read that correctly?

12    A.          You did.

13    Q.          Did either of the commissioners or any

14    of the commissioners indicate to you that they had

15    some plans for coverage for your coroner duties

16    during those periods of time when you were going

17    to be out of town?

18    A.          They did not respond to any of my

19    letters or anything.  I didn't get a phone call,

20    an e-mail or any response to my e-mails, personal

21    service or letters.

22    Q.          So none of the commissioners indicated

23    to you that they had any plans for coverage; is

24    that true?
```

258

1    A.        None of them responded to my letters,

2    e-mail or personal service; that is correct.

3    Q.        Okay.  Did you expect people to contact

4    the commissioners?  Is that what your aim was in

5    sending this letter?

6    A.        I was trying to give them a contact

7    person that would be a responsible county official

8    that would be able to respond.

9    Q.        Did you arrange to have somebody cover

10   for you from January 9th to January 12th as

11   coroner for Hocking County?

12   A.        No.

13   Q.        Did you arrange for someone to cover

14   for you from January 23rd through January 26th,

15   2014 as coroner for Hocking County?

16   A.        No.

17   Q.        Let's take a look at Exhibit 5, please.

18   I know you put those underneath.  I'm sorry about

19   that.

20           Exhibit 5 appears to be an e-mail from

21   you to the commissioners; is that correct?  Or is

22   that a letter?

23   A.        It is a similar e-mail, personal

24   service, and U.S. Mail.

259

```
 1    Q.          If we look under --

 2    A.          It's a different version of the -- one

 3    of the three ways I attempted to contact them,

 4    yes.

 5    Q.          Okay.  It looks like this letter here

 6    was dated January 2nd at 5:22 p.m.  Do you see

 7    that?

 8    A.          Yes.

 9    Q.          Is that the first letter that you wrote

10    to the commissioners telling them that you were

11    going to be out of town on -- from January 9th

12    through 12th and January 23rd through January

13    26th?

14    A.          I -- I believe this is incorrect to

15    some degree, because when I called the

16    commissioners, somebody -- and I didn't have their

17    right e-mail address.  They claim they didn't get

18    it.  So I believe that is says it was sent January

19    6th because this is a second attempt to send it

20    via e-mail.  I believe it was sent properly by

21    e-mail on January 2nd, but I noticed that it says

22    January 6th.  So I believe this is a second

23    attempt to send it by e-mail.  It's just is

24    different than the January -- it's the same letter
```

260

1    reattempted to be e-mailed.

2    Q.          Okay.  Let's make sure we have this

3    clear in the record.  It's your belief that your

4    first effort to notify the commissioners that you

5    were going to be gone out of Hocking County those

6    two dates in January was dated January 2nd at 5:22

7    p.m.; is that true?

8    A.          I don't know what generated that.  But

9    I believe that this letter was written on January

10   2nd and I believe it was delivered via personal

11   service on January 2nd.  I don't know how five --

12   I didn't write 5:22 p.m.  I'm not sure how this is

13   generated.

14   Q.          Okay.

15   A.          It could be from the -- what it could

16   have been is it could have been an e-mail and then

17   I had to copy and paste it and then resend it.

18   Q.          Okay.

19   A.          That would be my guess.

20   Q.          Just to --

21   A.          So --

22   Q.          Just to make sure we're clear, that's

23   your first notification to the commissioners --

24   A.          Yes.

261

1   Q.       -- that you were going to be gone?

2   A.       That's because I didn't have employees

3   anymore as of January 1st.

4   Q.       When is the next time after January

5   23rd through January 26th that you were out of

6   Hocking -- Hocking County for more than a day in

7   2014?

8   A.       I don't know.

9   Q.       Can -- if you don't remember periods of

10   time in there, just tell me you don't know.  But I

11   want to know each time that you can remember that

12   you left Hocking County for some period of time.

13   A.       I don't know.

14   Q.       Okay.  Did you leave Hocking County in

15   June?

16   A.       Yes.

17   Q.       And where did you go in June?

18   A.       Of 2014 I believe I went to Aruba.

19   Q.       And how long did you stay in Aruba?

20   A.       Eight days.

21   Q.       When did you make those arrangements to

22   go to Aruba in June?

23   A.       Probably May.

24   Q.       Going back to when you left to go to

262

1    that medical conference in Dublin, Ohio in

2    January, when did you make the arrangements to go

3    to that medical -- those two medical conferences?

4    A.          Probably November of 2013.

5    Q.          When you went to Aruba for those eight

6    days in June of 2014, did you make arrangements

7    for anybody to cover your duties as coroner?

8    A.          I did.

9    Q.          And who covered your duties as coroner?

10   A.          Jan Gorniak, the Franklin County

11   coroner.

12   Q.          You also left Hocking County in July;

13   is that correct?

14   A.          I did.

15   Q.          And how many times did you leave

16   Hocking County in July 2014?

17   A.          Twice.

18   Q.          When's the first time in July 2014 that

19   you left Hocking County?

20   A.          July 3rd through the 6th.

21   Q.          And where did you go?

22   A.          Jamaica.

23              MR. TEETOR:  I'm sorry?

24   A.          Jamaica.

```
 1    Q.          Did you notify the commissioners that

 2    you were going to be going to Jamaica from July

 3    3rd through July 6th?

 4    A.          I don't know.  I --

 5    Q.          Did you notify the commissioners that

 6    you were going to be going to Aruba for eight days

 7    in June 2014?

 8    A.          No, because I had coverage then.

 9    Q.          Did you ever notify the commissioners

10    that Jan Gorniak was going to be covering for you

11    in June 2014?

12    A.          I went to a meeting and I presented in

13    late May, I think it was May 27th or so of 2014

14    that she -- I was trying to remedy the situation.

15    In January I didn't have enough time to find

16    anybody because I didn't know I was going to be

17    without employees.  So by June I had a -- had to

18    come up with a plan on how things were going to be

19    covered.  I felt kind of blindsided having my

20    employees of 14 years removed of my -- from

21    January 1st on to some degree, and so I didn't

22    really have time to go out and find a doctor or

23    new trained employees or any of that in January.

24    So -- and plus they could go to the -- that was a
```

264

1     weekend and they could go in the morgue for two

2     days until I got back.  It wasn't to me a big

3     problem.

4              But in June -- are you talking about

5     July -- oh.

6     Q.         I'm talking about June.

7     A.         May 27th or so, Jan Gorniak had told me

8     that she would cover me and I'd asked for a

9     contract -- I'm not sure if I asked for the

10    contract for any physician because I couldn't get

11    any physicians to cover me because there was bad

12    press and, you know, all kinds of difficulties,

13    not having employees, people having to go to

14    scenes themselves who weren't trained.  Doctors

15    don't feel comfortable doing that.  So they were

16    aware that I was attempting to fix the problem.  I

17    was trying to find a physician coverage since they

18    -- essentially I didn't have employees anymore,

19    and so that's what I did.  So, yes, I would say

20    they knew but I'm not sure if they really -- what

21    they knew.

22    Q.         When you --

23    A.         I asked them, but I don't know what

24    they said.

```
 1    Q.          When you lined up Jan Gorniak to cover

 2    for you in June when you went to Aruba, did you

 3    tell her how much she would be paid for doing

 4    that?

 5    A.          Absolutely.  She asked for $500 a day.

 6    Q.          Okay.

 7    A.          Yeah.

 8    Q.          Had the commissioners approved your

 9    office paying Jan Gorniak $500 per day to cover

10    for you?

11    A.          Well, they didn't say anything to me.

12    I presented the proposal, I proposed -- I wrote

13    the contract up, I wrote a place for their

14    signatures for a contract to have physician

15    coverage and they didn't do anything with it.  It

16    just sat there.

17    Q.          So --

18    A.          There was no response.

19    Q.          So they did not approve it?

20    A.          They did not respond to anything of a

21    personal appearance of my myself at their meeting;

22    that is correct.  They didn't approve or

23    disapprove.  But the money was in my budget, so I

24    figured as an as elected official I could spend
```

266

1    the money allocated to me.

2    Q.          So the $500 per day was money that she

3    would get whether she went to a death scene or not

4    just to cover for you?

5    A.          Correct.

6    Q.          Was she going to be paid any extra if

7    she went to a death scene?

8    A.          No, not by our agreement.  But that was

9    not my proposal.  My proposal, before that --

10   Q.          Well, let's -- let's just stick with

11   the question I'm asking.

12   A.          No.

13   Q.          Okay.  So your agreement with Jan

14   Gorniak for her --

15   A.          A verbal agreement with her, yes.

16   Q.          Okay.  Your agreement with Jan Gorniak

17   for her to cover for you during the eight days you

18   were in Aruba in June of 2014 was that your office

19   would pay her $500 per day?

20   A.          Yes.

21   Q.          And whether she went to a death scene

22   or not, it -- the price remained the same, $500

23   per day; is that correct?

24   A.          Yes.

267

1    Q.          Okay.  You said you were gone from July

2    3rd through 6th in 2014 when you went to Jamaica;

3    is that correct?

4    A.          Correct.

5    Q.          Did you arrange to have anyone cover

6    for you during that time?

7    A.          I couldn't get any coverage because

8    they didn't pay the June bill.

9    Q.          Did you tell the commissioners that you

10   were going to be out of town from July 3rd through

11   July 6th, 2015?

12   A.          I don't know what my attorney Will

13   Kernen told them.  But I know that he called -- he

14   called Laina Fetherolf on July 1st.  I asked him,

15   I said I don't have a bill paid, I can't keep

16   running up tabs without the commissioners paying a

17   bill that I have money for.  And I said could you

18   please call Laina Fetherolf and ask her what the

19   plan is.  And so Will Kernen called Laina

20   Fetherolf and he said she does not have the money

21   to pay -- he doesn't have coverage because he

22   doesn't have employees and they're not paying his

23   bill, and she said it's not her problem.

24   Q.          Did you --

1      A.          And he said, well, then you're not

2      going to have coverage from July 3rd to July 6th,

3      and she said it's not her problem again.  That was

4      the conversation they had.

5      Q.          And --

6      A.          And he called me and said:  You do not

7      have coverage.

8      Q.          Did you notify any of the commissioners

9      that you were going to be out of town from July

10     3rd through July 6th?

11     A.          I don't know who knew.  I knew Laina

12     Fetherolf knew.  I don't know who else knew.

13     Q.          Okay.

14     A.          I don't know if I sent any memo or not

15     or if I called.  I could have verbally called, I

16     don't remember.

17     Q.          Well, we have memos and letters that

18     you've sent, other memos and letters that were

19     produced by your attorney in discovery.  I haven't

20     seen any for July of 2014.  Can we assume --

21     A.          It could have been -- it could have

22     been a phone call.

23     Q.          All right.  But you don't remember

24     making any?

269

1    A.         I didn't write one, no.

2    Q.         Do you remember talking to any

3    commissioner and telling them you were going to be

4    out of town from July 3rd through 6th, 2014?

5    A.         I don't specifically remember that.  I

6    know that the prosecutor was notified by my

7    attorney and that there was a disagreement of how

8    it -- having coverage.

9    Q.         Did you leave again in July 2014 after

10   July 6th?

11   A.         I did.

12   Q.         And when was the next time you left?

13   A.         It was 11 days, late in July.

14   Q.         Can you tell me what 11 days?

15   A.         No.

16   Q.         Were you out of town July 19th?

17   A.         I believe so.

18   Q.         Were you out of town July 20th?

19   A.         Yes, I believe so.  I knew it was in

20   the later part, like the 20s.

21   Q.         All right.

22   A.         I had a wedding --

23   Q.         Okay.

24   A.         -- to go to.

270

```
 1   Q.          And where was the wedding?

 2   A.          New York.  It was my niece's wedding.

 3   Q.          When did you make the arrangements to

 4   go to New York?

 5   A.          There's no arrangements to be made.

 6               MR. TEETOR:  I'm sorry?

 7   A.          There's no arrangements to be made.

 8   Q.          Did you stay in a hotel?

 9   A.          No.

10   Q.          Okay.  So did you make -- when was it

11   that you made your plans to go to New York for the

12   wedding?

13   A.          Probably -- I mean there was no

14   arrangements to be made.  I have a house there.

15   Q.          Okay.  When is it that you made your

16   plans to go to the wedding?  I mean, you got an

17   invitation to the wedding, I assume, you said

18   you're going to come --

19   A.          I would say a month in advance.  I

20   don't know.

21   Q.          Did you RSVP to the wedding?

22   A.          Yes.

23   Q.          And you think you RSVP'd about a month

24   in advance?
```

271

1    A.        I don't know.  I mean she -- my wife

2    probably RSVP'd.  I don't know when it was RSVP'd.

3    Q.        Did you tell the county commissioners

4    that you were going to be leaving Hocking County

5    for that 11-day period of time during the latter

6    part of July 2014?

7    A.        I did.

8    Q.        And who did you tell?

9    A.        I told them at a public meeting.

10   Q.        What public meeting?

11   A.        A commissioners meeting.

12   Q.        Yes.  When?

13   A.        It was latter part of July.  It was I

14   believe two days before I left.  I think it might

15   have been July 17th if I had to remember the date.

16   Q.        So you told them you were going to be

17   leaving for 11 days?

18   A.        Yes.

19   Q.        Had you made arrangements to have

20   anybody cover for you when you left town for those

21   11 days?

22   A.        They didn't pay the last bill and I

23   went there to complain about them not paying the

24   last bill for my coverage.

272

1    Q.          Yeah.  My question is:  Did you make

2    arrangements for anyone to cover for you during

3    the 11 days you left Hocking County during the

4    latter part of July 2014?

5    A.          I attempted to get money from the

6    commissioners to make arrangements.  But, no, I

7    would have had the same arrangement with Jan

8    Gorniak had they paid the previous bill.

9    Q.          Okay.  But to make sure we have it

10   clear on the record, you made no arrangements to

11   have somebody cover for you during the 11 days

12   that you were in New York during the latter part

13   of July 2014; is that correct?

14   A.          I attempted but I was unsuccessful.

15   Q.          Thank you.

16              Let's take a look -- you're looking at

17   Exhibit 5, right?

18   A.          Yes.

19   Q.          Okay.  The last sentence on that page

20   says "I will be sending a letter to law

21   enforcement offices, EMS, 911 operators, funeral

22   directors, and the hospital to notify you for

23   their concerns as well as notifying the public for

24   the imminent problems ahead."  Do you see that?

273

```
1    A.          Yes, I see.

2    Q.          It did I read that correctly?

3    A.          Yes.

4    Q.          Is that letter that you're referring to

5    in this sentence that we just read the letter we

6    read before which is Exhibit 8, Defendant's

7    Exhibit 8?

8    A.          No.  It's not the same thing at all.

9    Q.          Okay.  That's not the letter you're

10   referring to?

11   A.          Well, this is not a letter to me.  This

12   is a letter.  This is a -- an -- a little note.

13   Q.          Okay.  You say in this sentence here, I

14   will be sending a letter to law enforcement

15   offices, et cetera?

16   A.          Okay.

17   Q.          Okay.

18   A.          Sure.

19   Q.          Now --

20   A.          I mean this is the letter then I guess.

21   Q.          Okay.  So we're -- is the letter that's

22   Defendant's Exhibit 8 the letter that you're

23   referring to in that sentence we just read from

24   Defendant's --
```

1    A.          It's a notification, that, yes.

2    Q.          Okay.  The sentence after that says "I

3    predict that your defunding of my employees will

4    be a costly mistake for the taxpayers of Hocking

5    County."

6    A.          Yes.

7    Q.          Do you see that?

8    A.          Yes.

9    Q.          And what were you referring to there?

10   A.          That it was going to be very expensive

11   to find coverage of physicians of five to one

12   thousand dollars a day.  I think my employees at

13   12,000 a year were much less expensive.  That is

14   correct.

15   Q.          So that was what you were referring to

16   in that sentence?

17   A.          Yeah.

18   Q.          You spoke in your first deposition

19   about an office that you have that was provided to

20   you by the county commissioners at the Hulls

21   Building; is that correct?

22   A.          No.  I think it was referenced as an

23   office and I said it -- it was a room.

24   Q.          Okay.

275

1   A.          That was unsecured and nonoperational

2   anything.

3   Q.          Okay.  When I -- I want to know what

4   you mean by "unsecured."  Are you saying it had no

5   lock on the door?

6   A.          I'm saying that people had been in and

7   out of it without my permission.  It was not

8   locked down and secure; that is correct.

9   Q.          Did your -- did the office or storage

10  place or whatever you want to call it in the Hulls

11  Building that was dedicated to the Coroner's

12  Office, did the door to that room have a lock on

13  it?

14  A.          It has a lock on it, yes.

15  Q.          All right.  And did you have the

16  ability to lock it?

17  A.          It is locked, but people still go in

18  and out of it.  I don't know how they get in there

19  but there's footprints all over the desk and

20  everything.

21  Q.          Do you know who else has a key to it?

22  A.          No.

23  Q.          All right.  You have a key to it, I

24  assume?

```
1    A.          I do.  But mine doesn't work anymore.

2    Q.          Now, during the year 2013, did you keep

3    any coroner records in the office or the storage

4    room in the Hulls Building that was dedicated to

5    the Coroner's Office?

6               MR. BRUNNER:  Objection.  He's already

7    said it's not an office.

8               MR. BARBIERE:  That wasn't -- I didn't

9    say it was an office.

10              Could you read back my question,

11   please.

12              (The record is read as follows:  Now,

13   during the year 2013, did you keep any coroner

14   records in the office or the storage room in the

15   Hulls Building that was dedicated to the Coroner's

16   Office?)

17   Q.          Please answer the question.

18              MR. BRUNNER:  Same objection.

19   A.          Well, I kept some records in an

20   offshoot of the area which is a storage area that

21   actually is owned, "owned" by the clerk of courts.

22   Q.          Was that in the Hulls Building?

23   A.          Yes.

24   Q.          So what records did you keep in 2013 --
```

277

```
 1    A.          Same records I keep now.

 2    Q.          -- in the Hulls Building?

 3    A.          There were older -- there were older

 4    and some newer cases but they were padlocked in a

 5    separate room from the "office" area that was

 6    really not functional.

 7    Q.          And you said --

 8    A.          Or secure.

 9    Q.          And you said those were under the

10    auspices of the clerk of courts?

11    A.          No.  They're under my auspices, but the

12    actual area is owned by the clerk of courts.

13    Q.          Was -- is the area where those records

14    were kept in 2013 part of the area that the

15    commissioners dedicated to you as coroner?

16    A.          I don't think so.  I believe at the

17    time Narcy Starr had -- was not using the space

18    and she was the clerk of courts and she had asked

19    me if I could use it and I said yes.  And there

20    had been records stored in there since the '50s.

21    Q.          Okay.

22    A.          So we continued to add records to that

23    space and it was padlocked.

24    Q.          Do you still have records that are
```

278

1    stored in that same place?

2    A.          Yes.

3    Q.          And tell me what records are stored

4    there in that padlocked room.

5    A.          Cases.   Cases.

6    Q.          Are these old cases, current cases, can

7    you --

8    A.          Yes.

9    Q.          Both?

10   A.          Yes, both.

11   Q.          Do you have coroner's records kept in

12   any other location other than under that padlock

13   in the Hulls Building?

14   A.          Yes.   Some are in my -- in my physician

15   office.

16   Q.          How do you determine whether the

17   records are going to be kept in your physician

18   office or in the padlocked -- under the padlock in

19   the Hulls Building?

20   A.          Well, there's no real determination.

21   If it's been active -- we get a lot of old

22   requests for files, and so it's a difficult thing

23   to drive there and go get the records and find

24   them and then bring them back.   So in general we

279

```
1    keep the last several years in my business office,

2    in my physician office.

3    Q.          So the more current coroner's records

4    for the most part are kept in your physicians

5    office?

6    A.          Correct.

7    Q.          And what is the address of your

8    physicians office?

9    A.          751 A State Route 664 North.

10   Q.          And then the other records are kept

11   under the padlock at the Hulls Building?

12   A.          Correct.  The inactive files.

13   Q.          Is there any other place that you keep

14   any coroner's records other than those two places?

15   A.          No.

16   Q.          In your first part of your deposition

17   you mentioned that Jan Gorniak said that neither

18   Detective Downs or Chief Valkinburg were permitted

19   to go to the Franklin County morgue to watch an

20   autopsy; is that true?

21   A.          That is correct.

22   Q.          When was it that you had that

23   conversation with Dr. Gorniak?

24   A.          I don't know.  But I know that she was
```

280

1    the one who told me they couldn't come.

2    Q.          Did she call you to give you that

3    information?

4    A.          She did.

5    Q.          You don't -- do you remember

6    approximately when it was?

7    A.          No.  But I know it -- it had to do with

8    -- there was difficult -- she thought BCI should

9    be the only ones doing the cases and she didn't

10   want them there.

11   Q.          She thought BCI should be the only ones

12   doing what cases?

13   A.          Working on whatever case was up there

14   when she called me.

15   Q.          Was this something that she said from

16   now on I don't ever want them to watch another

17   autopsy or was it --

18   A.          I think --

19   Q.          Well, let me finish.  Or was it

20   something related to a specific case?

21   A.          I think that she did not want them to

22   come there because she thought there was

23   difficulties, and then there was the issue of them

24   secretly recording and I think that's when she

281

1    said no more.

2    Q.        Do you remember --

3    A.        Of her -- Dr. Ugwu.

4    Q.        Do you remember what reason she gave

5    you when you spoke with her for not wanting either

6    Detective Downs or Chief Valkinburg to go to

7    Franklin County to watch an autopsy?

8    A.        I believe she said it was her

9    discretion.

10   Q.        Yeah.  I want to know if you were -- if

11   she gave you a reason.  I want to know what you

12   remember her saying.

13   A.        It was her discretion.  She was not

14   going to have them come.

15   Q.        Okay.

16   A.        That is correct.

17   Q.        Did you give you any other reason other

18   than in her discretion she did not want them to be

19   there?

20   A.        No.  You can subpoena her, though, and

21   ask her.

22   Q.        I know we can.  What I want to know is

23   what you can remember of that conversation.

24   A.        That's what I remember.

282

```
 1   Q.          And so --

 2   A.          She said it's my discretion and they're

 3   not coming.

 4   Q.          Okay.  And that's the only reason she

 5   gave you?

 6   A.          Yes.

 7   Q.          Okay.  I'd like to ask you to take a

 8   look at Defendant's Exhibit 18, please.

 9               Now, this is a letter that appears to

10   have -- it's a three-page letter dated March 5th,

11   2012 that appears to have been -- been written

12   from you to Sheriff Lanny North; is that correct?

13   A.          May I read it?

14   Q.          Yes.  Any time I refer you to an

15   exhibit, take your time and read it, okay?  I want

16   to make sure you know what we're talking about.

17               Have you had a chance to read

18   Exhibit 18?

19   A.          Yes.

20   Q.          All right.  I'm not concerned with the

21   last page of Exhibit 18.  But I want to ask you

22   first --

23   A.          Sure.

24   Q.          -- is Defendant's Exhibit 18 a true and
```

283

1    accurate copy of a letter that you sent to Sheriff

2    Lanny North on or about March 5th, 2012?

3    A.        It is.

4    Q.        Did you send this letter to anyone

5    else?

6    A.        No.

7    Q.        Have you ever forwarded this letter --

8    letter or a copy of this letter to anyone other

9    than Sheriff Lanny North?

10   A.        Never.

11   Q.        I'd like to talk about the third

12   paragraph on the first page.

13   A.        Yes.

14   Q.        You say you were notified of an

15   incident from 2-8-12 when Mr. Downs went to a

16   follow-up appointment for a doctor visit in

17   Lancaster.  Do you see that?

18   A.        Yes.

19   Q.        Who was that doctor?

20   A.        I don't know.

21   Q.        And started to spout off to a couple in

22   the waiting room?

23   A.        Yes.

24   Q.        Do you see that?  Who was that couple?

284

```
 1   A.          I don't know.

 2   Q.          How did you find out about that?

 3   A.          They came to my office and told me

 4   about it.

 5   Q.          Okay.

 6   A.          They're not my patients.

 7   Q.          Did you get their names?

 8   A.          No.

 9   Q.          So you have no idea what their names

10   are?

11   A.          No.

12   Q.          And you have no idea who the doctor was

13   that they were visiting at the time?

14   A.          No.

15   Q.          And you have no idea --

16   A.          I mean I don't know what he was there

17   for what reason -- I mean, that would narrow it

18   down, but I have no idea.

19   Q.          So all you remember about that -- what

20   those -- what that couple told you is that it was

21   a doctor's appointment in Lancaster?

22   A.          Yeah, they thought he was insane.

23   Q.          Did they tell you he was insane?

24   A.          No, they said he was bizarre and that
```

285

```
 1    he was erratic and acting strangely.  And they

 2    gave me the quotes, I wrote the quotes down, and I

 3    thought I would notify his sheriff.

 4    Q.         Okay.  But you didn't write their names

 5    doctor down?

 6    A.         No.

 7    Q.         You didn't write the name of the doctor

 8    down?

 9    A.         No.  I don't know what doctor he saw.

10               MR. GLASGOW:  Sorry.  Could you --

11    A.         I don't know what doctor it was.  I

12    have no idea.

13               MR. GLASGOW:  I apologize.  I just

14    didn't hear you.

15    Q.         Please take a look at Exhibit 20.  Now,

16    I think you identified Defendant's Exhibit 20 in

17    the first part of your deposition as being the

18    protocol that was arrived at with respect to the

19    Sheriff's Office and the Coroner's Office; is that

20    correct?

21    A.         Amongst others, yes.

22    Q.         Okay.  Please look at pages 4 and 5,

23    which are the signature pages.

24    A.         Yes.
```

286

1    Q.          Were you present when these were

2    signed?

3    A.          No.

4    Q.          Okay.  Your signature is on page 5; is

5    that correct?

6    A.          Yes.  Correct.

7    Q.          Is that in fact your signature?

8    A.          It is.

9    Q.          And this protocol was negotiated

10   between your lawyer and another Attorney Warren

11   and you signed it and the Judge signed it and

12   others signed it, as indicated here on this

13   exhibit; is that correct?

14   A.          Yes.  I can vouch for my signature,

15   yes.

16   Q.          And you know that it was negotiated

17   between your lawyers and the Prosecutor's Office

18   and the Sheriff's Office?

19   A.          It was negotiated through my attorney

20   and David Warren.

21   Q.          And you are reviewed it and you signed

22   it?

23   A.          Yes.

24   Q.          I'd like to look at 1A first.

1    A.         Sure.

2    Q.         It says "Any ambulance service,

3    emergency squad or law enforcement officer will

4    notify the Coroner of all non-Hospice related

5    deaths immediately upon arrival."

6    A.         Yes.

7    Q.         All right.  Do you consider yourself to

8    be a law enforcement officer?

9    A.         Yes.

10   Q.         Do you have the ability to run OHLEG

11   reports?

12   A.         No.

13   Q.         Okay.

14   A.         I'm not a peace officer.  I am law

15   enforcement -- I am law enforcement, but I am not

16   a peace officer.

17   Q.         So within the context of this protocol,

18   you do consider yourself a law enforcement

19   officer?

20   A.         Yes.

21   Q.         Well, you indicated that --

22   A.         I'm part of law enforcement, maybe not

23   an officer.  I'm not a peace officer, but I am

24   part of the law enforcement, yes.

288

1    Q.        Well, I guess what my question is:  Do

2    you consider yourself a law enforcement officer?

3    A.        No.

4    Q.        And so within the context of this

5    protocol, when they use the term "law enforcement

6    officer," do you believe that applies to you?

7    A.        No.

8    Q.        Okay.  You indicated that there were

9    approximately 300 deaths in 2013 in Hocking

10    County, true?

11    A.        Correct.

12    Q.        And when they say that your office is

13    going to get notified about all deaths that are

14    not hospice related, would that have been the same

15    as the notification procedure would have been in

16    2013?

17    A.        This is the Ohio Revised Code, yes.

18    Q.        How do you determine whether you or

19    someone else from your office is going to go to

20    the scene of a death after your office is

21    notified?

22    A.        Typically it's based upon a

23    conversation of people on scene.  Typically, the

24    EMS because they're usually the most medically

289

```
 1    well-versed and experienced people on scene, not
 2    law enforcement.
 3    Q.          When you receive a notification -- let
 4    me back up.
 5               When your office receives a
 6    notification of a death, is there a particular
 7    person who normally will notify your office?
 8    A.          9-1-1.
 9    Q.          Okay.
10    A.          Because we had not been notified
11    previously and I wanted that specifically -- I
12    wanted the law to be followed --
13    Q.          So --
14    A.          -- and to have notification.  So I -- I
15    specified that it be 9-1-1 because then it would
16    be logged in and it wouldn't disappear or anything
17    like that.  It would be another agency that can
18    vouch that the notification did occur -- did
19    actually occur.
20    Q.          So under the protocol, your office was
21    going to be notified by 9-1-1, the dispatch?
22    A.          Correct.
23    Q.          Okay.  Prior to the protocol, who was
24    it that notified your office of a death?
```

290

1    A.        Usually 9-1-1.

2    Q.        All right.

3    A.        But there were -- there are aberrations

4    at times.

5    Q.        So the protocol was designed so that

6    9-1-1 would always notify your office of a death?

7    A.        Consistently be involved in

8    notification, correct.

9    Q.        Tell me how the process worked then

10   when your office would make a decision whether to

11   send somebody to the scene.

12   A.        Each scene is different.  Each death is

13   different.  We evaluate what's told to us on the

14   phone and then we decide if we're going to go.

15   Q.        Yeah, what I want to know is the

16   process.  In other words, your office is notified

17   by 9-1-1.

18   A.        Yes.

19   Q.        Does your office then call somebody or

20   what happens next in the process?

21   A.        Currently, we have a text message alert

22   that --

23   Q.        When did that start?

24   A.        Probably in 2015 maybe, early 2015.

291

```
 1    Q.            Let's go back to the time when the

 2    protocol was signed and journalized.  What would

 3    have been the process at that time?  Your office

 4    is first notified of the death by a 9-1-1

 5    operator.

 6    A.            We were a group -- we were grouped in

 7    as a text message.

 8    Q.            Grouped in as a text message from whom?

 9    A.            So in 2012, 2013, Mike Stephenson, the

10    subcontracted employee, Mike Downhour and Jamie

11    Walsh and I would receive the same text message.

12    Q.            And the text message would be from the

13    9-1-1?

14    A.            Correct.

15    Q.            Okay.  Then what did your office do in

16    response to receiving that text message?

17    A.            I called 9-1-1 and then I would get the

18    information and then I would try to call.  And if

19    I didn't respond within five minutes, 9-1-1 was

20    notified to call me and if I didn't respond, then

21    call anybody else on the team.  But in general it

22    was my job to respond, text messages could go back

23    and forth, is anybody handling this, whatever.

24    But typically -- and I will respond, I've got it,
```

292

1    it's natural, we don't need to go.

2    Q.          So you would personally receive --

3    A.          Absolutely.

4    Q.          Let me --

5    A.          Every one.

6    Q.          You've got to let me finish my

7    question.

8              You would personally receive a text

9    message from 9-1-1 indicating that there had been

10   a death?

11   A.          Correct.

12   Q.          And then you would text back to 9-1-1

13   ordinarily and let them know that you had received

14   your -- their text?

15   A.          98 percent of the time it was my

16   response.

17   Q.          What was the next step in the process

18   which would lead you toward making a decision as

19   to whether or not someone from your office needed

20   to go to the scene?

21   A.          I would get the contact number of the

22   scene and then I would call it and I would speak

23   to the person at the scene.

24   Q.          When you say the contact number of --

293

1    of the scene, are you talking about a person

2    related to the decedent?

3    A.        A home number of where the person was

4    deceased or a cell number of the EMS person or a

5    cell phone number of the Ohio Patrol or the

6    dispatcher of the Ohio Patrol or whatever.

7    Somebody who could tell me what was going on.

8    Q.        So you could -- you could call anyone

9    of a number of people then --

10   A.        Absolutely.

11   Q.        -- after you received that text?

12   A.        And I might.

13   Q.        So that -- and it could have been the

14   -- someone at the house, it could have been

15   someone from EMS, could have been someone from the

16   Sheriff's Office, somebody from Ohio State Patrol?

17   A.        Correct.

18   Q.        All right. And you'd talked to them

19   about the circumstances of the death?

20   A.        Yes.

21   Q.        What kind of information would you get

22   from them?

23   A.        How old were they, are they -- where

24   are they? Are they -- do they have medical

294

1    problems, does it appear natural, does it appear

2    unnatural.  I mean it's -- whatever information I

3    needed.  Whatever path I was being led down on the

4    conversation.

5    Q.        And what kinds of information would

6    lead you to make a decision that someone should go

7    to the scene?

8    A.        A violent death would be one; overdose

9    would be another, presumed overdose; things that

10   were not natural in general.

11   Q.        So in general terms --

12   A.        Car accidents, we always went to those.

13   Q.        So in general terms would it be fair to

14   say that any time you received information that

15   the death was not natural, someone from your

16   office would go to the scene?

17   A.        Not always.  But if we could, we would.

18   I mean if we thought it was -- if -- if the scene

19   itself was going to be helpful, yes.

20   Q.        Were there -- were there circumstances

21   that you would make a decision that even though

22   the death was unnatural, no one from your office

23   needed to go to the scene?

24   A.        Yes.

295

1    Q.          And what would lead you to make that

2    decision?

3    A.          Every decision is an individual

4    decision based upon what I'm listening to.

5    Q.          Well, why would -- why would there be

6    times when you would not have someone from your

7    office respond to the scene of an unnatural death?

8    A.          Because the scene may not be helpful.

9    The decedent may have been moved to the EMS and

10   died en route.  They may have died -- in the ER.

11   The car accident may have already been -- you

12   know, the person's already been moved and put on

13   the -- in a body bag or whatever.  Sometimes

14   people don't always take care of the scene like it

15   should be.  You know, it's -- everything's been

16   altered, so the point is what's the point of going

17   to the altered scene.

18   Q.          If you made a determination that

19   someone from your office should go to the scene,

20   would there be a process by which you would decide

21   whether it would be you that would go to the scene

22   or whether one of your investigators would go to

23   the scene?

24   A.          No.  I -- I think my two employees and

296

```
 1    even Mike Stephenson are extremely capable.  I

 2    don't -- the sign of a good boss is when you leave

 3    town, nobody misses you.

 4    Q.        Okay.

 5    A.        So I expect them to be able to do

 6    everything that I can do, minus the signature.

 7    Q.        So as far as you were concerned, if

 8    there was a unnatural death that required your

 9    office to attend to the scene, you and your two

10    investigators would have been interchangeable?

11    A.        Yes.

12    Q.        Do you -- is it part of your obligation

13    as coroner to pronounce the cause of death for

14    every unnatural death that occurs in Hocking

15    County?

16    A.        Every unnatural death has to be signed

17    by the coroner.

18    Q.        In order to do that, do you need to see

19    the body --

20    A.        No.

21    Q.        -- of every unnatural death?

22    A.        No.

23    Q.        And why is that?

24    A.        Because there's nowhere that says that
```

297

1    you have to see every body that -- it might delay

2    the -- it might delay the process.

3    Q.        How would you determine the cause of

4    death if you don't see the body?

5    A.        Because they're usually sent for

6    autopsy.

7              MR. TEETOR:  I'm sorry?

8    A.        They're sent for autopsy.  Glenn Swaim,

9    never saw him.  Jamie Walsh saw him, sent him for

10   autopsy.

11   Q.        So you can pronounce --

12   A.        It's an example.

13   Q.        -- the cause of death by reading the

14   autopsy report?

15   A.        I can come up with a ruling of the

16   cause of death when I put all the information that

17   is available to me and then I take it for what

18   it's worth.  The autopsy is just one piece of the

19   information given to me.  Do I always take the

20   autopsy report and say it's the cause of death,

21   no.

22   Q.        In what percentage of the cases do you

23   pronounce a cause of death without actually seeing

24   the body?

298

1    A.          Myself or my -- and my staff?

2    Q.          Yourself.

3    A.          Probably -- currently probably

4    50 percent.

5    Q.          And how many cause of death

6    pronouncements do you sign each year

7    approximately?

8    A.          30.

9    Q.          30 to 50?

10   A.          No.  Less than 50 because we can go to

11   a scene that could be natural and we could say

12   we're not taking this.

13   Q.          Okay.

14   A.          Then we wouldn't make it a public

15   record.  We would rather keep their medical issues

16   private.  So we don't take the case.

17   Q.          So approximately --

18   A.          30.

19   Q.          -- 30 per year, some of -- you would

20   sign off on the cause of death?

21   A.          Yes.

22   Q.          And about 50 percent of those times you

23   do not actually see the body?

24   A.          Correct.

299

1  Q.          Okay.  Let's look at the second page of

2  the protocol, which is Defendant's Exhibit 20.

3              It says "After obtaining a warrant...."

4  -- this is paragraph 1, I'm sorry.

5              "After obtaining a warrant and the

6  arrival of crime scene assistants, the Coroner or

7  his staff along with designated law enforcement

8  personnel will be permitted to enter the scene

9  with crime scene assistants and the coroner shall

10  take charge of the body and the area reasonably

11  within the control of the body as defined in

12  Opinion No. 88-035...." et cetera.  Did I read

13  that correctly?

14  A.          You did.

15  Q.          Tell me the circumstances under which 1

16  and 1A -- strike that.

17              Tell me the circumstances under which

18  paragraph 1 applies.

19  A.          I would say predominantly homicides.

20  Q.          Okay.  And is that something that --

21  you know, when we talk about obtaining a warrant

22  and the arrival of the crime scene assistants,

23  et cetera, is that something that happens after

24  someone from your office arrives at the scene or

```
 1    is it someone who's at the scene, thinks it's a

 2    homicide, they tell you that and then this is

 3    done?

 4    A.          No.  I think it pretty much says that

 5    the coroner or his investigators will look at the

 6    scene and with the lead officer and then decide if

 7    it's a crime scene and then we would wait.

 8    Q.          And then you get a warrant?

 9    A.          I don't get warrants, no.  The law

10    enforcement get warrants.

11    Q.          Okay.  And then after the warrant and

12    the arrival of the crime scene assistants, then

13    the coroner or his staff shall take charge of the

14    body?

15    A.          Well, I -- I think the evidence and

16    everything collected there is also has

17    jurisdiction with the coroner to some degree.

18    There's a death.

19    Q.          Right.

20    A.          The coroner has control of the scene of

21    a death, and so therefore the law enforcement does

22    not have any -- by Ohio Revised Code to my

23    knowledge any authority over the coroner at a

24    death scene.  And so the coroner would not -- we
```

301

```
1      wouldn't move the body or anything until BCI or

2      whoever has collected all the evidence.

3      Q.          What do you mean when you say the

4      coroner has the jurisdiction over the death scene?

5      A.          The coroner is in charge of a death

6      scene where there's a dead body.

7      Q.          When you say death scene, what do you

8      mean?  Do you mean the entire room?

9      A.          It's --

10     Q.          The entire area?

11     A.          Opinion No. 88.035 I believe it says as

12     large as the coroner says, is that -- isn't that

13     Anthony Celebrezze's opinion?

14     Q.          I'm asking you what you think when you

15     say that you have the control over the death

16     scene, what -- how you're using the term "death

17     scene."

18     A.          As big as I would like to make it is

19     what that opinion is.

20     Q.          So in your opinion you have control

21     over as large an area around a dead body as you

22     want?

23     A.          That is correct.

24                 MR. BARBIERE:  All right.  Why don't we
```

302

```
 1    take a five-minute break.

 2              MR. BRUNNER:  Sure.

 3              THE VIDEOGRAPHER:  We are off the

 4    record.  The time is 3:06.

 5              (A short recess is taken.)

 6              THE VIDEOGRAPHER:  We are back on the

 7    record.  The time is 3:20.

 8    Q.        Dr. Cummin, please take a look at

 9    Defendant's Exhibit 21.  And this is a letter to

10    you from Laina Fetherolf dated January 10th, 2014;

11    is that correct?

12    A.        It appears so.

13    Q.        Did you receive this letter?

14    A.        Let me read it, if --

15    Q.        All right.

16    A.        If I may.  Okay.

17    Q.        Have you had a chance to read

18    Defendant's Exhibit 21?

19    A.        I have.

20    Q.        This is a letter to you from Laina

21    Fetherolf dated January 10th, 2014; is that

22    correct?

23    A.        It is.

24    Q.        Did you receive this letter?
```

```
 1    A.         I did.

 2    Q.         Did you receive this letter on or about

 3    January 10th, 2014?

 4    A.         I don't know what day I received it.

 5    Q.         Did it come in the mail or was it an

 6    e-mail?

 7    A.         I don't know.  It could have been

 8    hand-delivered.  I don't know.

 9    Q.         All right.  Do you recall if you

10    responded in writing to this letter?

11    A.         I could have.

12    Q.         Do you recall if you did or not?  I

13    don't want you to guess.

14    A.         I don't recall.

15    Q.         In this letter she's referring to

16    correspondence that you had sent to the

17    commissioners on January 9th.  Do you see that?

18    A.         Yes.

19    Q.         And that we have talked about that

20    letter previously --

21    A.         Two --

22    Q.         -- in your deposition, correct?

23    A.         Two letters I believe.

24    Q.         Yes.
```

304

1               Those were Exhibit 5 and Exhibit 8 that

2     we discussed earlier?

3     A.          The second one was asking why I didn't

4     respond to the first letter, yes.

5     Q.          Yeah.  But those are Exhibits 5 and

6     Exhibit 8 that we talked about earlier?

7     A.          No.

8     Q.          That's Exhibit 8.

9     A.          It's not Exhibits 5 and 8, no.

10    Q.          Take a look at Exhibit 5 if you would.

11    A.          It is 5.  But it's not the second

12    letter; that's the first letter.

13    Q.          Fine.

14    A.          She's responding to two letters.

15    Q.          She's talking about two letters, and

16    one was Exhibit 5 and one was Exhibit 8, correct?

17    A.          No.  She's responding to this initial

18    letter, then there was a second letter, which I

19    believe -- I thought there was a second letter

20    before -- yes.  There's a second letter that she's

21    referencing but not 8.

22    Q.          Okay.

23    A.          I believe.

24    Q.          So would --

```
1    A.          This is a -- this is a --

2    Q.          Okay.  Let's leave those two out.

3    A.          Yes.

4    Q.          And so it's your belief that Laina

5    Fetherolf is referencing Defendant's Exhibit 5; is

6    that correct?

7    A.          Yes.

8    Q.          And she says at the beginning of the

9    third paragraph also recall that you signed a

10   protocol with law enforcement which was filed with

11   the Court on May 1, 2013 outlining how death

12   scenes were to be handled.  Your current course of

13   action violates this protocol as well as the Ohio

14   Revised Code.

15             Do you see that?

16   A.          I see it.

17   Q.          Did she ever express to you in what way

18   she believed your actions were violating the

19   protocol and the Ohio Revised Code?

20   A.          No.  Because there's nothing in the

21   protocol that says what she says.  The protocol

22   is --

23   Q.          That's not my question.

24   A.          -- behavior on the death scene, not how
```

1    do you notify or how you respond or any of that.

2    None of that's in there.

3    Q.          My question to you is:  Did Laina

4    Fetherolf ever explain to you why she believed or

5    how she believed your conduct was violating the

6    protocol or the Ohio Revised Code?

7    A.          No, not that I recall.

8    Q.          Did you realize when she wrote this

9    letter she was referring to the period of time

10   when you had just been out of town to go to the

11   medical conference in Dublin, Ohio?

12   A.          What's your question?

13   Q.          Did you realize when you received

14   Defendant's Exhibit 21 that Laina Fetherolf was

15   referring to the period of time that you had gone

16   to Dublin, Ohio and left Hocking County?

17   A.          I don't think she says that.  I think

18   she's talking about my letters and not that I left

19   town.

20   Q.          Okay.

21   A.          She doesn't mention that anywhere in

22   here I don't believe.

23   Q.          No, but your letter said you were

24   leaving town.  And what my question is is did you

1    realize when you read Defendant's Exhibit 21 that

2    she was referring to you to you leaving town?

3    A.        I did not take it that way.  I took it

4    that she was responding to my first two of three

5    letters to the commissioners not this, Exhibit 8.

6    Q.        Okay.  But you're not answering my

7    question.

8    A.        I think I did.  But, okay, I'll answer

9    it again.

10   Q.        I want to make sure that we're on the

11   same page.  You left town and were gone from

12   January 9th through 12th, right?

13   A.        Yes.

14   Q.        And she wrote you this letter, and I'm

15   asking you if you understood her to mean that you

16   were violating the protocol by leaving town?

17   A.        No.  I didn't take it that way at all.

18   Q.        You thought she meant you were

19   violating the protocol by writing the letter?

20   A.        No.  I didn't know what she was talking

21   about.

22   Q.        Okay.

23   A.        She -- I wrote a letter on the 2nd and

24   I believe the 9th.

308

```
 1    Q.          So my --

 2    A.          And my --

 3    Q.          Well --

 4    A.          And this is her response to my two

 5    letters.

 6    Q.          Okay.

 7    A.          That's how I took it.

 8    Q.          So -- okay.  So your answer to my

 9    question is is that you believed she was claiming

10    that you violated the protocol by writing the two

11    letters; is that what you're saying?

12    A.          I don't know what she's talking about

13    because the -- apparently she's answering --

14    instead of the commissioners calling me, they have

15    directed her to answer my two letters that I wrote

16    to them.

17    Q.          Okay.

18    A.          It says "I am in receipt of your two

19    letters."  Right?

20    Q.          Are you saying that you don't know what

21    she's referring to?

22    A.          I am telling you that I believe this is

23    a response to my first two letters to the

24    commissioners of not having funding to be able to
```

```
 1   cover the office; that is correct.
 2   Q.         And rather than being a response to you
 3   leaving town?
 4   A.         That -- that doesn't mention anything
 5   about leaving town here, no.  I don't think so.
 6   Q.         Let's take a look at Defendant's
 7   Exhibit 22.  And that is the complaint for the
 8   writ of mandamus dated January 14, 2014; is that
 9   correct?
10   A.         It is.
11   Q.         And that was discussed in your first
12   part of your deposition.  And what I wanted to do
13   is look at the Exhibits, A and Exhibit B, that are
14   at the end of that.
15              Okay.  Exhibit A -- you just had it in
16   front of you.
17   A.         Uh-huh.  Yes.
18   Q.         Exhibit A is a letter dated January
19   9th, 2014; is that correct?
20   A.         Yes.  This is the second letter.
21   Q.         Right.  And then look at Exhibit B.
22   A.         Yes.
23   Q.         And that's the letter, Exhibit B,
24   attached to the complaint for mandamus is the
```

310

1    Exhibit 8 from the -- that we discussed

2    previously, correct?

3    A.          It's part of Exhibit 8, yes.

4    Q.          All right.  And Exhibit A to the

5    complaint of writ of mandamus is Exhibit 5 --

6    no --

7    A.          It is not.  That's why I was trying to

8    explain to you that the --

9    Q.          Okay.

10   A.          It's not correct.  Your 5 and 8 was

11   incorrect.

12   Q.          Let's go to Defendant's Exhibit 25.

13   A.          Yes.

14   Q.          Okay.  Now, Defendant's Exhibit 25

15   appears to be a letter dated May 29, 2014 that you

16   wrote to the commissioners; is that correct?

17   A.          It is.

18   Q.          And was this, Exhibit 25, actually

19   delivered to the commissioners?

20   A.          It was in person.

21   Q.          You handed it to them?

22   A.          Yes.  Three copies for each one of

23   them.

24   Q.          And did you --

311

1    A.          With this agreement which I'd already

2    discussed.

3    Q.          Under --

4    A.          Correct?

5    Q.          Under what circumstances did you hand

6    this to them?

7    A.          At a public meeting.

8    Q.          Okay.  And did you then discuss with

9    them what this proposal was in addition to handing

10   them the letter?

11   A.          Yes.

12   Q.          Okay.  I want to make sure I understand

13   what your proposal means.  So let's look at the

14   second paragraph which is in the middle of the

15   letter which is Defendant's Exhibit 25.

16              You say, "The Hocking County

17   commissioner agreed to pay $500 per day to the

18   Covering Physician for coverage and $1,000 for any

19   call out to a suspicious or non-natural death,

20   including suicide, accident or homicide."  Did I

21   read that correctly?

22   A.          You did.

23   Q.          All right.  Is it your proposal that

24   when you're out of town the covering physician

1    would be paid $500 per day for each day you're out

2    of town and that they're covering for you?

3    A.         Yes.

4    Q.         In addition to that, are they to be

5    paid $1,000 for any time they have to go to the

6    scene of a suspicious or nonnatural death?

7    A.         Yes.

8    Q.         All right.

9    A.         Because they would leave their office.

10   Q.         Okay.

11   A.         And they would lose 2,500 to 3,000

12   bucks a day.

13   Q.         So for example to make sure we're

14   clear --

15   A.         It's expensive.  That's why I wanted to

16   keep my employees.

17   Q.         All right.  So to make sure I'm clear

18   on what your proposal was, if you left town for

19   five days and you retained a physician to cover

20   for you, just for covering you for those five

21   days, even if they were not called to the scene,

22   they would get $500 per day or $2,500; is that

23   fair?

24   A.         Yes.

313

1   Q.          If they had to get two callouts during

2   that period of time, they would get the $2,500

3   plus two additional $1,000?

4   A.          They would.

5   Q.          2,500 plus two additional --

6   A.          That's right.  You're asking them to be

7   on call 24 hours a day, take phone calls

8   throughout the night and then you want them to

9   leave their office, cancel 15 patients and not get

10  paid for it?  I mean let's -- that's -- you guys

11  get paid a lot more than that.

12  Q.          Okay.  I wanted to make sure I

13  understood what your proposal was.

14  A.          Yes.  It's very factual.

15  Q.          $500 per day regardless of whether

16  they're called out.  And if the covering physician

17  is called out, they get an additional $1,000 for

18  each callout?

19  A.          That is correct.

20  Q.          And you presented page 2 also to the

21  county commissioners at that meeting on May 29th,

22  2014?

23  A.          I did.

24  Q.          Did the commissioners say anything to

314

1    you on May 29th, 2014 regarding whether they were

2    going to accept or reject your proposal?

3    A.        No, I don't believe so.

4    Q.        Let's look at Exhibit 25B.

5    A.        Yes.

6    Q.        Did you receive Exhibit 25B?

7    A.        I did.

8    Q.        And that's a letter written to you

9    dated June 3rd, 2014 from the commissioners; is

10   that correct?

11   A.        Five days after the meeting, that is

12   correct.

13   Q.        And did you -- do you recall that you

14   received Exhibit 25B approximately five days after

15   the meeting?

16   A.        No.  I believe it was mailed.  It came

17   through U.S. Mail.  So I would say probably June

18   5th.

19   Q.        This letter --

20   A.        Logan -- Logan mail goes to Columbus

21   and then comes back to Logan.

22   Q.        Okay.

23   A.        It's two days.

24   Q.        So this letter is rejecting your

315

```
 1    proposal; is that correct?

 2    A.         Yes.

 3    Q.         So you knew that as of the time you

 4    received Defendant's Exhibit 25B that the county

 5    commissioners were rejecting your proposal for the

 6    covering physician?

 7    A.         Yes.

 8    Q.         All right.

 9    A.         Unless I could get a favor from

10    someone.  You know, cover me for free or whatever.

11    Do you see that?  Favor.  They wanted me to ask

12    for favors to cover for free.

13    Q.         Well, they also say "Have you contacted

14    a local physician for a call out basis?  These are

15    all alternatives we would like you to look into."

16    Did you then look into these other alternatives

17    they discussed in Exhibit 25B?

18    A.         I had prior when I presented them with

19    the prior proposal.

20    Q.         Okay.  After you received Exhibit 25B,

21    did you do anything further to try to follow-up

22    with any of the suggestions that were made in this

23    letter?

24    A.         Do you mean asking for favors from
```

316

1    other --

2    Q.        Any other suggestions?

3    A.        -- county coroners?  No, I did not do

4    that.

5    Q.        Okay.

6    A.        Did I --

7    Q.        Well --

8    A.        -- come up with Jan Gorniak's plan to

9    cover me for eight days at $500 a day which was a

10   lot more reasonable than that, yes, I did.

11   Q.        All right.  The only plan --

12   A.        They still didn't pay that either.

13   Q.        Okay.  Let me -- let me ask you this:

14   So the only plan that you addressed or that you

15   looked into after receiving this June 3rd, 2014

16   letter was the proposal that you made to Jan

17   Gorniak about covering you for eight days and $500

18   per day?

19   A.        No.

20   Q.        What other proposals did you make?

21   A.        We called Ed Breining.  I think I

22   already discussed this the first time around.  We

23   called Ed Breining who was the investigator -- one

24   of the investigators of Fairfield County, and he

317

```
 1    makes over 41,000 a year as an investigator.  And

 2    then I think there was a discussion of that's a

 3    much larger county in the first deposition and --

 4    Q.        But did you call to him --

 5    A.        Yes.

 6    Q.        -- after you received this Exhibit 25B?

 7    A.        I believe so.

 8    Q.        Okay.  So you called Ed Breining

 9    sometime after June 3rd, 2014?

10    A.        I believe so.

11    Q.        All right.  What other efforts did you

12    make after you received Exhibit 25B to try to get

13    some coverage?

14    A.        We -- I had talked to Jan Gorniak, I

15    had talked to people, other coroners and asked

16    them what they suggested and they all kind of

17    shrugged their shoulders, and then Jan Gorniak

18    said she'd do it for 500 bucks a day.

19    Q.        And so when you left --

20    A.        And if I ever needed help, that I could

21    call her and she was always there for me.

22    Q.        And when you left in June of 2014 and

23    you went to Aruba, you had John -- Jan Gorniak

24    cover for you; is that correct?
```

318

```
1    A.         I did.

2    Q.         And the arrangement was that you were

3    going to pay her $500 per day?

4    A.         Yes.

5    Q.         When you left the two times in July,

6    there was no physician covering for you; is that

7    correct?

8    A.         I didn't need coverage the second time

9    because I was in the United States and I was able

10   to --

11              MR. TEETOR:  I'm sorry.  I can't hear

12   you.

13   A.         I didn't need coverage in July, the

14   second half of July.  Aruba, I didn't have cell

15   phone coverage.  I needed coverage.

16   Q.         Okay.  Let me --

17   A.         In Jamaica, I did haven't cell phone

18   coverage.  I needed coverage.  When I was in

19   New York, I handled a homicide over the phone no

20   problem.

21   Q.         Let me ask you -- please answer my

22   question.  You were gone from July 3rd to July 6th

23   of 2014; is that correct?

24   A.         Yes.
```

319

```
 1    Q.         Did you have someone covering for you
 2    as coroner during that period of time?
 3    A.         Yes.  When is it?
 4    Q.         July 3rd through July 6th.
 5    A.         No.
 6    Q.         Okay.  When you were gone for 11 days
 7    later in July, did you have someone covering for
 8    you at that time?
 9    A.         I covered myself.
10    Q.         Okay.  No one else was covering for you
11    during that time?
12    A.         No.  I mean my -- no.  I didn't have
13    anybody covering.  It was just me.
14              MR. TEETOR:  Sorry.  I couldn't hear
15    you.
16    A.         It was just me.  I didn't have any
17    employees.
18    Q.         Please take a look at Defendant's
19    Exhibit 30.  Exhibit -- Defendant's Exhibit 30 is
20    a letter dated July 17th, 2014 written to you and
21    it's from Lanny North; is that correct?
22    A.         It is.
23    Q.         Did you receive this?
24    A.         I did.
```

320

1  Q.        Did you respond to this letter?

2  A.        No.

3  Q.        In no -- either orally nor in writing?

4  A.        No.

5  Q.        Did you tell Sheriff North whether you

6  were willing to agree to his proposal or his

7  potential solution?

8  A.        No.  He doesn't control how my office

9  operates.

10 Q.        Okay.

11 A.        No.

12 Q.        So you didn't respond to him one way or

13 the other?

14 A.        No.  I thought it was completely

15 incorrect based upon the laws and based upon how

16 Hocking County was run.

17                  - - - - -

18          Thereupon, Defendant's Exhibit 34 is

19 marked for purposes of identification.

20                  - - - - -

21 Q.        I'm going to hand you what's been

22 marked for identification as Defendant's

23 Exhibit 34.  And I'm going to ask you first to

24 please take a look at Defendant's Exhibit 34.

321

1   A.        Okay.

2   Q.        I'll represent to you that Exhibit 34

3   was produced to us by your attorney.  You can see

4   it's got the Bates stamp on the back -- on the

5   bottom.  Have you seen this e-mail before?

6   A.        No.

7   Q.        This is something you've never seen

8   before?

9   A.        Never seen it.

10   Q.        Okay.  It appears to be an e-mail from

11   Dewayne Jones dated February 22nd, 2012; is that

12   correct?

13   A.        Yes.

14   Q.        Did you ever speak with Dewayne --

15   A.        If it was more than a sentence or two,

16   I don't know when.

17   Q.        Okay.  Well, let's look at the first

18   page of this.  It says "This email is going to

19   reference some of the many comments that Dave

20   Cummins 'coroner of Hocking County' has made to me

21   Dewayne Jones (brother...of Glenn Swaim).  Dave on

22   more than one occasion has degraded the Hocking

23   County Sheriff's office stating that they are

24   incompetent and that if we needed answers to

322

1    questions to ask him, not to even bother with Ed

2    Downs."  Did you make that -- a statement of that

3    nature to Dewayne Jones?

4    A.        I don't ever remember speaking more

5    than one sentence to Dewayne Jones, so I would

6    call this completely false.

7    Q.        Okay.  So it's your testimony that

8    everything in Defendant's Exhibit 34 is completely

9    false?

10   A.        Yes.

11   Q.        And that Dewayne Jones is lying?

12   A.        Yes.

13   Q.        Okay.  I'm going to hand you what's

14   been marked as Defendant's Exhibit 35, which is

15   entitled a Motion For Assessment of Attorney Fees.

16   And I am going to ask you some questions about

17   this document.  If you want to take a look at it,

18   just let me know when you are ready to answer.

19                    - - - - -

20        Thereupon, Defendant's Exhibit 35 is

21   marked for purposes of identification.

22                    - - - - -

23   A.        Okay.

24   Q.        Have you seen this document before?

323

1    A.          I have.

2    Q.          I'm going to refer you to the

3    memorandum in support and beginning with on August

4    18th, 2012 Investigator -- Investigator Scholl and

5    I, which is David -- C. David Warren "met

6    Dr. Cummin at his office in Logan to view the

7    autopsy photos of Glenn Swaim."

8    A.          That was not the specific reason they

9    came.  But he can say that that's why he came.

10   Q.          Okay.

11   A.          My understanding was to meet to get

12   caught up on things.

13   Q.          He next says "Dr. Cummin began being,

14   let's say, less than cordial stating that he had

15   no idea why we were there.  I explained to him

16   that we had agreed upon this meeting to view the

17   autopsy photos and reminded him that he required

18   us to bring a laptop computer which we did.  He

19   then had to call his home to have his Swaim

20   investigation file delivered to his office."  Are

21   those statements accurate?

22   A.          No.

23   Q.          That -- that's not true?

24   A.          No.

1    Q.        Is he lying there?

2    A.        Yes.

3    Q.        The next sentence says "A few minutes

4    later after the file arrived he reached into the

5    file and pulled out an envelope containing a

6    compact disc saying 'There's the F---ing pictures,

7    take the file, I'm done.'"  Is that true?  Did

8    that happen?

9    A.        Not in that particular order.  I think

10    that was near the end when he was asking me to lie

11    to the public.

12    Q.        Okay.  So you say that C. David Warren

13    asked you to lie to the public?

14    A.        Yes.

15    Q.        While --

16    A.        He did.

17    Q.        "While explaining to Dr. Cummin that I

18    cannot have possession of the file for public

19    record reasons my investigator down loaded the CD

20    only to discover that the only information on the

21    disc were two pictures of the residence where

22    Swaim was found unconscious and no autopsy

23    photos."  Is that a true statement?

24    A.        Yes.

1   Q.          "Dr. Cummin then stated 'well I must

2   not have any autopsy photos'.  After some more

3   profane laced language about how he did not have

4   to cooperate with the Sheriff's office and that we

5   were wasting his time, Dr. Cummin got up and left,

6   shouting as he drove out of the parking lot at the

7   top of his lungs 'TRUTH AND JUSTICE GENTLEMEN,

8   TRUTH AND JUSTICE.'"  Is that true what he wrote

9   there?  What I just read to you?

10  A.          He seems to be quite confused on the

11  sequence of events.  I would say that is a

12  complete inaccurate sequence.  He seems to have

13  confused the first 30 minutes of niceties with the

14  last 10 minutes of problems.  I would say he is

15  confused.

16  Q.          All right.  So you're saying that --

17  A.          On his sequence of events.  And he

18  seems to put what happened 40 minutes into the

19  meeting into the fifth minute and the fifth minute

20  into the 20th minute.  He's not very chronological

21  with his statements.

22  Q.          Are you saying that he's lying or he's

23  just confused with respect to the statements that

24  I just read to you?

326

1    A.         That specific statement could be

2    confusion.  The -- some are lies, some are true.

3    Q.         Okay.  So reading through this stuff --

4    A.         Each sentence has to be evaluated for

5    its content because he's completely off base.

6    Q.         All right.  So with respect to this

7    Defendant's Exhibit 35, I want to try to break

8    this down.  It's your testimony that in

9    Defendant's Exhibit 35 C. David Warren is totally

10   off base.  I think is what you just said; is that

11   true?

12   A.         Yes.

13   Q.         And I think you said that some of the

14   statements that he made in this pleading are just

15   out-and-out lies; is that correct?

16   A.         Yes.  Uh-huh.  Right.

17   Q.         And some -- some of the statements that

18   he made in this pleading are inaccurate, but you

19   allow that they may just be a result of his

20   confusion?

21   A.         Of his chronological confusion, yes.

22   Q.         Okay.  I'd like to have you take a look

23   at Defendant's Exhibit 36.

24                  - - - - -

```
 1              Thereupon, Defendant's Exhibit 36 is

 2     marked for purposes of identification.

 3                    - - - - -

 4     Q.          Partial -- these are your Responses to

 5     Defendants First Set of Interrogatories, Request

 6     For Admissions and Request For Production of

 7     Documents.  And in the first part of your

 8     deposition a partial response was made an exhibit.

 9     This is the entire, the entirety.

10              I'm going to ask you just a couple of

11     questions, some specific questions.  If you want

12     to read the whole thing now, you can; otherwise,

13     we'll just go to the questions I have with it.

14              Please take a look at page 3, question

15     8 and the answer.  Tell me when you've had a

16     chance to read that, please.

17     A.          No. 8?

18     Q.          Yes.

19     A.          Okay.

20     Q.          The question is:  "Pursuant to Rule 34,

21     Federal Rules of Civil Procedure, please produce

22     any and all documentation of any type whatsoever

23     related to, concerning, or documenting anything

24     about Edwin Downs during the period of time
```

328

```
 1    extending from January 1, 2012 through the date of

 2    your response to this discovery request."

 3              Your answer is:  "See thumb drive of

 4    documents produced by Jeremy Dye in response to

 5    the subpoena issued to him, previously provided to

 6    all counsel.  No other documents have been clearly

 7    identified at this time and discovery is ongoing."

 8    Is that -- did I correctly read your answer?

 9    A.        You did.

10    Q.        Now, my point here is to make

11    absolutely sure that the thumb drive of documents

12    produced by Jeremy Dye that you're referring to

13    there are the only documents of any kind as

14    defined here in this pleading that you have

15    relating to Edwin Downs extending from January 1,

16    2012 through the date that you answered these

17    responses.

18    A.        It's true.  I don't -- I didn't have

19    the one letter that I wrote to Lanny North because

20    I didn't have that hard drive anymore.  So I did

21    not -- did not have that letter that you were

22    worried that I had sent other people that I never

23    had.  But --

24    Q.        Do you mean the letter that I referred
```

329

```
1    to as an exhibit --

2    A.          Yes.

3    Q.          -- or some other letter?

4    A.          Yes.

5    Q.          Okay.

6    A.          The one -- but those kind of things I

7    gave you what I had.

8    Q.          All right.  So --

9    A.          But I didn't have that letter on Ed

10   Downs anymore.

11   Q.          You have nothing else about Edwin Downs

12   other than what you've already responded to in

13   discovery?

14   A.          Correct.

15   Q.          Okay.  Please take a look on page 6 at

16   question 16.

17   A.          Yes.

18   Q.          Is -- now, No. 16 says "Pursuant to

19   Rule 34, Federal Rules of Civil Procedure, please

20   produce any and all documentation of any type

21   whatsoever related to or concerning any

22   communications by and between"...(i) "you

23   and"...(ii) "any employee or representative of the

24   City of Logan Police Department from January 1,
```

330

1    2012 through the date of your response to this

2    discovery request, which refers to or concerns in

3    any way any Plaintiff, or the Hocking County

4    Coroner's office and/or the Hocking County

5    Sheriff's Office and/or the Hocking County

6    Prosecuting Attorney."  And your answer was

7    "None."

8              As you sit here today, is that a true

9    and accurate answer up to today?

10   A.        I believe we've supplied everything

11   that I had.

12   Q.        Well you -- the answer you said here is

13   none.  And --

14   A.        No additional to whatever's been

15   supplied.  The letters or whatever we had we gave

16   to you.  There's nothing outstanding.

17   Q.        Right.  But I think what you said here

18   and this refers to communications with the City of

19   Logan Police Department.

20   A.        Right.  I don't have any communication

21   with them.

22   Q.        That's what I want to make sure we --

23   we're clear.

24   A.        None.

331

```
1    Q.          So you have no communications?

2    A.          None.  Zero.

3    Q.          Okay.  So the answer to 16 that's here

4    now is "None."  As you sit here today, that's

5    true?

6    A.          It is.

7    Q.          All right.  Let's look at 17.

8    "Pursuant to Rule 34, Federal Rules of Civil

9    Procedure, please produce any and all

10   documentation of any type whatsoever related to or

11   concerning any communications by and

12   between"...(i) "you and"...(ii) "any employee or

13   representative of the Hocking County"

14   Prosecutor's..."office from January 1, 2012

15   through the date of your response to this

16   discovery request, which refers to or concerns in

17   any way any Plaintiff, or the Hocking County

18   Coroner's office and/or the Hocking County

19   Sheriff's Office and/or the Hocking County

20   Prosecuting Attorney."  Your answer to that was

21   "None."  Is that still your answer as you sit here

22   today?

23   A.          It is.  If it's referencing

24   communication between what I've already supplied,
```

332

```
 1    there's no additional communication.

 2    Q.          Yeah.  But that's not what this answer

 3    says, that's why I want to make sure I understand.

 4    You're saying --

 5    A.          I'm not sure I totally understand the

 6    question.

 7    Q.          Okay.

 8    A.          I mean it wants -- it's kind of a long

 9    -- it wants to know if I have any communications.

10    Yes, I sent some text messages from David

11    Valkinburg.  I sent -- I don't think I had

12    anything from Ed Downs.  I don't think I had much

13    from Lanny North except for an e-mail of whatever

14    he sent about the murder, the -- they called it a

15    -- I can't remember what they called it, about

16    issuing the moneys to be guaranteed.  There's some

17    letters to the prosecutor that -- I mean, that's

18    all been supplied.  So my answer is none beyond

19    what I've already supplied.

20    Q.          All right.  So the answer is not none.

21    The answer that you would say as you sit here

22    today to No. 17 is --

23    A.          Already supplied.

24    Q.          -- none other than what I have already
```

333

1    supplied?

2    A.          Correct.

3    Q.          Okay.  Let's go to the next page.

4    Let's look at No. 19.  It says "Pursuant to Rule

5    34, Federal Rules of Civil Procedure, please

6    produce any and all documentation of any type

7    whatsoever related to, concerning, evidencing, or

8    constituting any recordings made of any Defendant

9    without his or her knowledge, including but not

10   limited to any audio recordings, any transcripts

11   of the same."  And your answer is "None."  Is that

12   still your answer as you sit here today?

13   A.          My answer is I don't have anything like

14   that.

15   Q.          Okay.

16   A.          If anybody else does, I don't have it.

17   Q.          The question is:  Do you have it?

18   A.          I don't have it.

19               MR. BRUNNER:  Objection.  Asked and

20   answered.

21   A.          I don't have any.

22   Q.          So as you sit here today, you're saying

23   that you have no recordings of any defendant

24   without his or her knowledge?

334

```
 1    A.         Correct.

 2    Q.         And you have no transcripts of any

 3    recordings?

 4    A.         No.

 5    Q.         Of any defendant?

 6    A.         No.

 7    Q.         Okay.  Does your attorney have any such

 8    recordings?

 9    A.         I don't know.  You'll have to ask him.

10    I mean he's -- apparently he's had things that I

11    didn't have.  I don't know --

12    Q.         I'm not asking --

13    A.         -- what he has.

14    Q.         If you don't know, you can just say I

15    don't know.

16    A.         I don't know.  I think I did say that.

17    Q.         Take a look at 20.  It says "Pursuant

18    to Rule 34, Federal Rules of Civil Procedure,

19    please produce any and all documentation of any

20    type whatsoever related to providing or sharing or

21    communicating any recording or transcript of any

22    recording made of any Defendant without his or her

23    knowledge to any person or organization

24    whatsoever."  Your answer is "None."  Is that
```

335

1    still your answer as you sit here today?

2    A.          Yes.

3    Q.          Let's take a look at 22.  It says "Do

4    you admit that prior to July 2014 on more than one

5    occasion you authorized an autopsy when there was

6    not sufficient monies in the lab and morgue

7    account to cover the cost of the autopsy?"  Your

8    answer on the next page is, "Yes in part."  What

9    do you mean "Yes in part"?  And if you want to

10   read 22(a), you can.  But I just want to make sure

11   I understand completely what you mean by "Yes in

12   part" with respect to 22.

13   A.          I believe actually 22(a) is a good

14   answer.  Yes, if we needed extra money, we went to

15   the commissioners.  But once they stopped paying

16   for employees and then they wouldn't pay for

17   coverage, then -- and then I had writ of mandamus

18   and I had -- you know, I had to do everything by

19   the book.  And by the book is if I don't have the

20   money, then we're going to have to wait until I

21   have the money so I don't get in trouble with the

22   law.

23   Q.          Is it your testimony that every time

24   prior to July 2014 that you authorized an autopsy

336

1     when there was not sufficient moneys in the lab

2     and morgue account to cover the cost that you went

3     ahead and authorized it?

4     A.          No.  What's your question?

5     Q.          Yeah.

6     A.          Did I authorize it without the money?

7     Q.          When --

8     A.          No.  We tried to get the money first.

9     Q.          When was -- when was the first time

10    that you ever did not authorize an autopsy because

11    there was not enough money in the account?

12    A.          I'm unaware of when -- if that's

13    occurred or not.

14    Q.          Okay.  Did that occur on July 19th of

15    2014?

16    A.          Did I authorize an autopsy without --

17    Q.          Did you refuse to authorize an autopsy

18    because you did not have enough money in your

19    account?

20    A.          No, I didn't refuse to authorize it.  I

21    delayed it until the money was in the account.

22    Q.          All right.

23    A.          I didn't refuse to do one.

24    Q.          Was there ever -- well -- you never do

337

1    autopsies, do you?

2    A.          No.

3    Q.          I'm asking you if you refused on July

4    19th, 2014 to authorize the autopsy that day?

5    A.          No.

6    Q.          You didn't refuse?

7    A.          No, I didn't refuse it.

8    Q.          Okay.  What's your position on that?

9    You're saying you just delayed it?

10   A.          Yeah.

11   Q.          So you refused the authorize it on that

12   day, though?

13   A.          No.  I didn't refuse anything.  He --

14   when I -- even though I had the money, the body

15   was taken to the morgue.  Lanny North had zip-tied

16   the bag, preserved the evidence, the body was

17   taken to the morgue.  The following day I called

18   Ed Downs and David Valkinburg and I got the

19   information so they could send the decedent up to

20   Franklin County.  But it would have still been

21   done the same way.

22   Q.          So --

23   A.          So I don't --

24   Q.          So it's your testimony that on July

338

1  19th, 2014 you did not tell John Walker that you

2  were going to refuse to authorize the autopsy

3  unless you had sufficient money in your account?

4  A.        That is -- I did not say that to him,

5  period.

6  Q.        All right.

7  A.        That's false.

8  Q.        Was there ever a time prior to July

9  19th, 2014 that you refused to authorize an

10 autopsy because there was insufficient money in

11 the coroner's office?

12 A.        Not that I'm aware of.  I'm not aware

13 of not having enough money to do it.

14 Q.        Was there ever a time -- that's not my

15 question.

16          Was there ever a time prior to July

17 19th, 2014 when you refused to authorization an

18 autopsy on the basis that there wasn't enough

19 money in the account?

20 A.        No.

21 Q.        Let's take a look on page 20 at No. 63.

22 The question is:  "Set forth copies of any

23 documents the Plaintiff expects or intends to

24 introduce at hearing which have not already been

1    identified."  And the answer says "3 cases of

2    hindrance of duties...."  What do you mean by "3

3    cases of hindrance of duties"?

4    A.        There were three deaths in which we

5    were refused access to the scene by -- once by

6    Lanny North and once by David Valkinburg, and I

7    don't know who the third one was.  In which the

8    coroner or the coroner investigators went to the

9    death scene and the sheriff's department would not

10   let them in and my two investigators were actually

11   threatened with being placed in jail if they went

12   inside the house.

13   Q.        So --

14   A.        Two of these deaths were natural deaths

15   and one was an accidental overdose, none of which

16   the sheriff department has any jurisdiction

17   whatsoever and it happened three times in six

18   weeks and --

19   Q.        So -- so what were those three deaths

20   that you're referring to there?

21   A.        They are files that he has.  I don't

22   know specifically the names of the people off the

23   top of my head, but we have supplied them to my

24   attorney.

```
 1    Q.          So you're saying that documents that
 2    you're going to produce at trial include three
 3    cases of hindrance of duties and those are the
 4    three cases that you just described?
 5    A.          Correct.
 6    Q.          Now, you said it all happened within
 7    six weeks?
 8    A.          I believe so.
 9    Q.          During what six-week period did this
10    happen?
11    A.          It was the summer of -- I don't know
12    what year.  I don't know what year it was, but I
13    remember it was the summer because I remember my
14    employees sat outside for three hours without
15    access to the scene and it was very hot that day.
16    Q.          So you --
17    A.          So I told them to leave.
18    Q.          So you don't remember the names of any
19    of the three decendents?
20    A.          I believe he has the files.
21    Q.          I'm asking you do you remember the
22    names of any --
23    A.          I think one's Donahoe, the other two I
24    don't remember off the top of my head.
```

341

1    Q.          How do you spell Hoe?

2    A.          I think it's D-O-N-A-H-O-E.

3    Q.          Okay.  So you remember Donahoe as being

4    one of the decedents --

5    A.          Possibly.  I'm not guaranteeing --

6    Q.          Wait until I finish.  Wait until I

7    finish.

8                You remember Donahoe as being one of

9    the decedents you're referring to in the three

10   cases of hindrance of duties in response to

11   No. 63?

12   A.          I'm guessing the name.

13   Q.          Okay.  Do you know the names of any of

14   the other people, either of the other people that

15   you're claiming were cases of hindrance of duties?

16   A.          Not off the top of my head.

17   Q.          And you say that those three cases

18   occurred within a six- to eight-week period of

19   time sometime in the summer?

20   A.          Yes.

21   Q.          Do you know if that happened in 2014 --

22   A.          No.

23   Q.          -- 2013 or 2012?

24   A.          No.  I mean the file would tell you.

342

1    They're all the same year.

2    Q.          Okay.  My question was:  Do you

3    remember if it was the year 2012, the year 2013 or

4    the year 2014?

5    A.          No.

6               MR. BRUNNER:  Objection.  Asked and

7    answered.

8    A.          Not off the top of my head.

9               MR. BRUNNER:  Go ahead.

10              MR. BARBIERE:  Well, his answer was

11   "the file would tell you."

12              MR. BRUNNER:  He said no.

13   A.          Not off the top of my head, no.

14   Q.          Is that your entire answer to No. 63?

15   A.          "Set forth copies of any documents the

16   Plaintiff expects or intends to introduce at a

17   hearing...."  yes.

18   Q.          I'm going to hand you what's been

19   marked for purposes of identification as

20   Defendant's Exhibit 37.

21                        - - - - -

22          Thereupon, Defendant's Exhibit 37 is

23   marked for purposes of identification.

24                        - - - - -

1   Q.          And don't go to -- don't leave the

2   prior document yet.

3               On Exhibit 36 if you look at the very

4   last page, which is 22, there is no signature on

5   that page under oath verifying these responses.

6   Do you notice that?

7   A.          I do.

8   Q.          Do you recognize Exhibit 37 as being

9   the verification page where you signed saying that

10  those responses to discovery that we just

11  discussed are true and accurate to the best of

12  your knowledge?

13  A.          Yes.

14  Q.          Excuse me.

15              Did you have any input into the

16  termination of Dr. Ugwu?

17  A.          No.

18  Q.          Did you have any kind of conversation

19  with Dr. Gorniak regarding why Dr. Ugwu was

20  terminated?

21  A.          Yes.

22  Q.          And what was the conversation that you

23  had with her?  What did she tell you?

24  A.          She told me that he couldn't pass his

1    boards and that he had a certain period of time to

2    do that.

3                MR. LAMBERT:  Excuse me.

4    A.          He did not pass his boards, had taken

5    them multiple times, and therefore legally he

6    could not be certified and therefore not able to

7    perform autopsies as a forensic pathologist.  He

8    would have to retake his residency in fact, I

9    believe, and not just take the boards again.

10   Q.          Is that --

11   A.          So she had to dismiss him.

12   Q.          Is that the only reason that

13   Dr. Gorniak gave you that he was terminated?

14   A.          Yes.

15                MR. BARBIERE:  Anything else?  I think

16   those are all the questions I have at this time.

17   Thank you.  Do you want to take five minutes so we

18   can change places or are you okay?

19                MR. TEETOR:  I'm all right from here.

20                THE WITNESS:  I would like five

21   minutes.

22                MR. TEETOR:  You want a break?  Sure.

23                THE VIDEOGRAPHER:  We are off the

24   record.  The time is 4:07.

345

```
 1                    (A short recess is taken.)

 2                    THE VIDEOGRAPHER:  This marks the

 3        beginning of disk No. 2.  We are back on the

 4        record.  The time is 4:22.

 5                           -  -  -  -  -

 6                        CROSS-EXAMINATION

 7        BY MR. TEETOR:

 8        Q.          Sir, when the criminal charges were

 9        filed against you, were they served on you with a

10        summons?

11        A.          I don't know exactly what you mean by

12        that, but I know that I was charged when I was out

13        of town.

14        Q.          Okay.  Well, did the -- were the

15        documents that were served on you with respect to

16        these charges, did they require you to appear in

17        court?

18        A.          Yes.

19        Q.          And were you ever arrested?

20        A.          No.

21        Q.          Never handcuffed or taken to jail or

22        anything like that, correct?

23        A.          No.

24        Q.          Correct?
```

346

1    A.          No.  I was not handcuffed.

2    Q.          Okay.

3    A.          Or taken to jail.

4    Q.          And you were never taken into custody

5    by anyone at the Sheriff's Office, true?

6    A.          That is correct.  I was never taken

7    into custody.

8    Q.          And you were detained by anybody from

9    the Sheriff's Office, correct?

10   A.          Correct.

11   Q.          And when you went to court, you were

12   given a $1,500 recognizance bond at the

13   arraignment?

14   A.          I don't remember.  I didn't pay

15   anything.

16   Q.          Didn't have to pay any money?

17   A.          No.

18   Q.          They let -- you went to the arraignment

19   and they let you go home?

20   A.          Yes.

21   Q.          Is it your understanding that Special

22   Prosecutor Stanley was appointed to be the

23   prosecutor for those charges?

24   A.          Yes.

1   Q.          Have you ever read his deposition?

2   A.          Yes, a long time ago.

3   Q.          Do you know if Special Prosecutor

4   Stanley ever determined that probable cause

5   existed for those charges?

6   A.          I know he dismissed for four and he had

7   an e-mail to Laina Fetherolf on the fifth that

8   said that it probably wasn't going to fly if John

9   Walker took the stand.  So I would say he knew all

10  five were bogus.

11  Q.          Wasn't my question.

12  A.          That was --

13  Q.          In reading his deposition, did you ever

14  observe that he testified that he believed that

15  probable cause existed for those charges?

16  A.          I don't remember.  It's been a long

17  time since I've read it.

18  Q.          It was Special Prosecutor Stanley who

19  tried the criminal charges?

20  A.          Yes.

21  Q.          Prior to the filing of those criminal

22  charges, had you ever met or known of Special

23  Prosecutor Stanley?

24  A.          No.

348

1    Q.          Ever had any contact with him?

2    A.          No.

3    Q.          Have you ever claimed that Special

4    Prosecutor Stanley had a malicious reason or an

5    ulterior motive to prosecute you?

6    A.          No.

7    Q.          Did you or to your knowledge your

8    lawyer ever ask that he be removed as the special

9    prosecutor?

10   A.          No.

11   Q.          Who was your lawyer?

12   A.          Will Kernen.

13   Q.          And who paid Mr. Kernen's fees to

14   defend you?

15   A.          Me.

16   Q.          Out of your pocket?

17   A.          Yes.

18   Q.          And were you reimbursed by anybody?

19   A.          No.

20   Q.          How much did you pay him?

21   A.          About $10,000.

22   Q.          Did you pay it by check?

23   A.          Yes.

24   Q.          Can you estimate for me, sir, how many

1    times in 2014 you were either out of town or out

2    of the county and there was no one designated by

3    you to appear in the event a coroner appearance

4    would be needed?

5    A.        That's a multiple question, so I will

6    answer the first one no.  And your last part of

7    when is it required for a coroner to appear is --

8    I don't even understand what you're talking about.

9    Q.        All right.  Then let's break it down.

10   A.        Sure.

11   Q.        How many times can you estimate for me

12   that you left the county or the state for more

13   than one day in 2014?

14   A.        I can't estimate that.

15   Q.        More than five times?

16   A.        I can't estimate that.

17   Q.        More than once?

18   A.        I can't estimate that.

19   Q.        No idea?

20   A.        I have no idea.

21   Q.        Didn't you testify earlier that you

22   left Hocking County from January 9th, 2014 to

23   January 12th?

24   A.        Yes.

350

1    Q.        So you did leave at least once in 2014?

2    A.        At least four times.

3    Q.        Pardon?

4    A.        At least four times.

5    Q.        Okay.  Well, I just asked you how many

6    times you left the county, didn't I?

7    A.        No.  You asked me if I could estimate

8    and I said no.

9    Q.        I'm sorry.  I can't hear you.

10   A.        You asked me if I could estimate and I

11   said no.

12   Q.        Okay.  So you know you left four times

13   but you -- did you leave more than four times?

14   A.        Yes.

15   Q.        And when -- as I understand it, when

16   you left the county on January 9th, 2014, there

17   was nobody who you had designated during that

18   absence to appear as a coroner if necessary,

19   correct?

20   A.        I don't know what "appear as coroner if

21   necessary" even means.  That doesn't make any

22   sense to me.  There's nowhere that says a coroner

23   must appear if necessary.  I've never heard of

24   such a thing.

351

1    Q.        Did you --

2    A.        So I would say, no, I don't know what

3    you're talking about.

4    Q.        Okay.  Well, let's break that down.

5    A.        Sure.

6    Q.        When you left the county on January

7    9th, 2014, how long were you gone?

8    A.        Two days.

9    Q.        And where did you go?

10   A.        Dublin, Ohio.

11   Q.        Okay.  And --

12   A.        Three days I think.  I'd have to look

13   and see what the dates were.

14   Q.        Were you aware when you left that if

15   someone might die in Hocking County under

16   suspicious circumstances during your absence a

17   coroner might need to be involved?

18   A.        Yes.  You could take him to the morgue

19   too.

20   Q.        Did you arrange --

21   A.        Which is what they do everywhere else.

22   Q.        Did you arrange or designate anybody to

23   be involved during your absence?

24   A.        No.

352

1    Q.          And was it during the time that you

2    were gone that Russell Swackhammer died?

3    A.          I don't know who you're talking about.

4    Q.          Do you know who Ralph Swackhammer is?

5    A.          No.

6    Q.          Do you know if anybody died while you

7    were at Dublin in January of 2014?

8    A.          No coroner cases occurred when I was

9    gone.

10   Q.          No.  Do you know if somebody died

11   during the time you were in Dublin in January

12   2014?

13   A.          I believe I was charged with a crime of

14   dereliction of duty of a person who was not a

15   coroner case.  If you look at the death

16   certificate, it's clearly not a coroner case.  I

17   was charged twice for non coroner cases as two of

18   my five charges.

19   Q.          Are you done?

20   A.          So my answer is no coroner cases

21   occurred while I was gone.

22   Q.          I didn't ask you about that.

23   A.          Okay.

24   Q.          I asked you if you were aware if

353

1    anybody died while you were in Dublin in January

2    of 2014?

3    A.          I found out that people died when I was

4    gone, yes.

5    Q.          Okay.  And whether it was a coroner

6    case or not, was there anybody designated to cover

7    for you --

8    A.          No.

9    Q.          -- during January of 2014?

10   A.          During those dates specified --

11   Q.          Yes.

12   A.          -- in January, no.

13   Q.          And then again you were gone later in

14   January, I think January 23rd through the 26th?

15   A.          Yes.

16   Q.          Correct?

17               And you were aware that while you were

18   gone it was possible that somebody could die under

19   unnatural circumstances?

20   A.          It was possible but it didn't occur.

21   Q.          I didn't ask you if it occurred.  Were

22   you aware that that was a possibility.

23   A.          It was possible.

24   Q.          And had you arranged for anybody to

1    cover for you while you were gone?

2    A.         No.  There was a morgue to -- for the

3    three days to store the person until I got back.

4    Q.         I'm sorry.  You've got to talk louder.

5    A.         There was a refrigerated morgue in

6    which the deceased could be in place of while I

7    was gone and I would return and take care of it

8    when I got back.

9    Q.         That wasn't my question.  My question

10   was:  Did you arrange for anybody to cover for you

11   as coroner?

12   A.         No.  I've told you no.

13   Q.         And I believe you were gone from the

14   county July 3rd through the 6th of 2014?

15   A.         Correct.

16   Q.         And during that time when you were

17   gone, were you aware that someone might die in

18   Hocking County during your absence under

19   circumstances where a coroner would need to be

20   involved?

21   A.         Yes.

22   Q.         And did you arrange for anybody to

23   cover for you while you were gone?

24   A.         My attorney told the prosecutor to

1    stick them in the morgue if they died.  There was

2    no coverage because there was no funding for it.

3    Q.        That wasn't my question.  My question

4    was:  Did you arrange for anybody to cover for you

5    during July 3rd to July 6th, 2014?

6    A.        I attempted to.

7    Q.        And was there anybody appointed to

8    cover for you?

9    A.        No, because there was no payment from

10   the previous time.

11   Q.        Didn't ask you if they were paid.  I'm

12   not --

13   A.        That's my answer.

14           MR. BRUNNER:  He just said no.

15   A.        That's my answer.

16           MR. BRUNNER:  He said no even though --

17   he gave you an explanation, he said no.  And he

18   can give you an explanation if he wants in answer

19   to your question.

20           MR. TEETOR:  Are you done?

21           MR. BRUNNER:  Are you?

22           MR. BARBIERE:  No, I'm not done.

23   Q.        Was there anybody appointed for you

24   while you were out of the county from July 3rd to

356

```
 1    July 6th?

 2              MR. BRUNNER:  Objection.  Asked and

 3    answered.

 4    A.        No.

 5    Q.        The answer's no?

 6    A.        No.

 7    Q.        Do you know if anybody died while you

 8    were out of county July 3rd to July 6th?

 9    A.        I don't remember.

10    Q.        Do you recall that a --

11    A.        Oh, yes, there was a woman.

12    Q.        A body that was taken to the Hocking

13    Valley Community Hospital morgue?

14    A.        Right.

15    Q.        And do you know who eventually had to

16    sign off to release that body?

17    A.        Nobody had to sign off on the body.

18    Q.        Did you ever have to sign off?

19    A.        No.  Because somebody illegally

20    released my body.  The Athens County coroner did

21    because he thought it was decomposing because he

22    didn't know we had a refrigerated morgue.  He

23    apologized to me for releasing it.

24    Q.        Did you have to release the body?
```

1    A.        No.

2    Q.        Do you know who did?

3    A.        Yes.

4    Q.        Who?

5    A.        Athens County coroner at the time.

6    Q.        Thank you.

7              And you were absent from the county

8    July 19th through the 20th, 2014?

9    A.        Yes.

10   Q.        And do you know whether or not there

11   was a double shooting while you were absent from

12   the county?

13   A.        Yes.

14   Q.        Did one person die?

15   A.        Yes.

16   Q.        And who had you arranged to cover for

17   you while you were out of the county at that time?

18   A.        Myself.

19   Q.        And where were you?

20   A.        In New York.

21   Q.        Under those circumstances, would a

22   coroner be expected to investigate and sign the

23   death certificate?

24   A.        Yes, I did such.

358

1  Q.        You did that from New York?

2  A.        No.  I did it when I got back.

3  Q.        Okay.  When did you get back?

4  A.        In late July, 11 days after I left.  So

5  it would have been nine days after the death.  I

6  believe it's the 28th or 29th.

7  Q.        And when that double homicide occurred,

8  do you know if the shooter had yet been

9  apprehended when you were contacted?

10  A.        It was a -- it was a homicide-suicide,

11  not a double homicide.  Wasn't it?  Didn't he kill

12  himself, barricade or -- maybe he got shot by the

13  police.  It was down in the Wilmington area at a

14  -- I think at a motel or hotel.

15  Q.        And did you tell Commissioner Walker

16  during the time that you were out of town that you

17  wouldn't authorize transfer of the body of the

18  homicide victim for autopsy unless the

19  commissioners stated in writing that they would --

20  the funds would be transferred into your account?

21  A.        No.

22  Q.        What did you tell him?

23  A.        I did not.  I told him that we had a

24  problem, that I only had -- I didn't have enough

1    money in my budget for an autopsy and that I had a

2    homicide victim that was on scene.  It occurred

3    about 10:00 p.m.  And that I didn't know what I

4    was supposed to do since I couldn't send him

5    legally for autopsy until I had moneys to prove

6    that -- in the account.  I can't spend money that

7    wasn't allocated to me.  I did not refuse to

8    transport the body.  That's per Sandy Ogle.  I

9    think she made that up.  I did not say I wasn't

10   going to do an autopsy.  That is just false.  I

11   didn't ask for any resolution.  That is completely

12   false.  I asked him for his help.  He said I'll

13   see what I can do.

14          The resolution or whatever they came up

15   with is what they did.  That was not per my

16   request.  The victim was -- the scene was done at

17   5:00 a.m., the victim was -- I was in

18   communication throughout the night, including at

19   5:00 a.m.  Lanny North zip-tied the bag, the

20   evidence was preserved, he was taken to the

21   morgue.  And at noon the next day -- and I already

22   had whatever resolution they decided to illegally

23   pass against the Sunshine act, at a little after

24   midnight, he still went to the morgue.  And when I

360

```
 1    got all the information from Ed Downs and David

 2    Valkinburg at noon the following day and I could

 3    fill out the request form for an autopsy --

 4    because I could fill in all the blanks -- the body

 5    was released to the Franklin County coroner's

 6    office.  That is standard.  I don't care if it's

 7    homicide, suicide or natural death, that's how

 8    it's done.  There's no evidence loss.  It's

 9    perfectly protected.

10    Q.       Are you finished?

11    A.       I am.

12    Q.       All right.  You talked to Commissioner

13    Walker?

14    A.       I did.

15    Q.       Tell me what he asked you.  What did he

16    say?

17    A.       I didn't ask him a lot of questions.

18    Q.       What did he say?

19    A.       He told me that I could just do it and

20    -- and that he would authorize the money.  And I

21    said you do not have the authority as one of three

22    commissioners.  I need at least two.  And he said,

23    well, you're not going to take my word?  And I

24    said I can't; I need two.  I've -- two people.
```

361

1    You don't have the authorization as a single

2    person to do it.  I need a second person to say

3    it's okay and then I've covered my bases and I'm

4    protected.

5    Q.        All right.  So you needed two

6    commissioners to authorize you to do what?

7    A.        To authorize me to do nothing.  They

8    needed to authorize that there would be money

9    there to cover me so that my -- I'm not committing

10   any illegal act or something that I would be held

11   personally responsible for --

12   Q.        Was --

13   A.        -- money-wise.

14   Q.        Was this on a Friday night?

15   A.        Yes.

16   Q.        Pardon?

17   A.        I believe it was a Friday night.

18   Q.        Okay.  So you told him on a Friday

19   night that you needed authorization from two

20   commissioners?

21   A.        I needed something from two

22   commissioners that would say that they would cover

23   it.  That's all I needed.

24   Q.        And how would he be able to get that on

362

```
 1    a Friday night without contacting at least one of
 2    the other commissioners?
 3    A.          I don't know.  That's not my problem.
 4    My problem is I had $625.10 in my budget.
 5    Q.          Well --
 6    A.          And I had been there May 27th and I
 7    didn't get the money, or May 24th, I don't know
 8    which.  It's not my problem.  The means on how he
 9    did it was not a concern for me.  My concern is
10    there was a homicide victim that I'm trying to do
11    the best I can and that I don't have the money to
12    do my job.  And in order to do my job, I cannot
13    spend money that is not allocated to me --
14    Q.          Are you finished?
15    A.          -- by the commissioners.
16                I am.
17    Q.          You told him that you needed
18    authorization from two commissioners, not just
19    Walker, correct?
20    A.          I said that his single word was not
21    good enough to protect me; that is correct.
22    Q.          And it wasn't his problem --
23    A.          He said he would see what he could do
24    and that's where the conversation was left.  Next
```

1    thing I know is I got an e-mail with whatever they

2    did.

3    Q.          Okay.  So you said you have to get

4    another commissioner to sign off, correct?

5    A.          No, I didn't say sign off on anything.

6    I need permission from two commissioners, not one.

7    One commissioner does not have authority to issue

8    transfer of moneys.

9    Q.          So you were not going to take any

10   action until two commissioners gave you written

11   permission?

12   A.          The body was going to stay in the

13   morgue until I had the proper money to do the

14   autopsy; that's correct.

15   Q.          And so what did you expect the

16   commissioner to do to get authorization from

17   somebody else?

18   A.          I don't know --

19   Q.          It was his problem?

20   A.          -- what he was going to do.  Yeah, it

21   wasn't my problem.

22   Q.          So you expected him --

23   A.          I have my job.  He has his job.  Stay

24   in your own lanes; everybody does fine.

1   Q.         And how long were you willing to leave

2   that body there until you got the authorization

3   from two commissioners?

4   A.         Until I was assured there would be

5   money placed in the account.

6   Q.         And so is it your understanding that

7   Commissioner Walker went and got written

8   permission with another commissioner to do that?

9   A.         I don't know what he did.

10   Q.         Did he ever communicate to you that

11   there was authority to transfer the funds from two

12   commissioners?

13   A.         No, I got an e-mail from Lanny North.

14   Q.         Saying what?

15   A.         That some -- I don't know what it --

16   you have to show me the document in front of me.

17   But it was basically said that I had permission --

18   that they were going to put money in there on such

19   -- such and such a date or something like that.

20   That was good enough.

21   Q.         So the only person you talked to after

22   the conversation with Walker about authority from

23   two commissioners was Lanny North?

24   A.         I thanked Lanny for his e-mail when he

1     called me for about three minutes.  And I told him

2     to zip-tie the bag and we'd put him in the morgue.

3     The money was there apparently; it was promised,

4     which is fine.  That's all I need is a promise

5     that I can do my job properly.  Then he went to

6     the morgue and he was in the morgue until I got

7     the vital information from David Valkinburg and Ed

8     Downs.

9     Q.          Are you telling us you took Lanny

10    North's word but you wouldn't take Commissioner

11    Walker's word?

12    A.          No.  I got -- I got an e-mail from

13    Lanny North and I thanked him for the e-mail.  I

14    didn't say he had any authority over the

15    commissioners.

16    Q.          Did anybody give you any written

17    confirmation that two commissioners had approved

18    that?

19    A.          I got some sort of written confirmation

20    of some sort sent to my e-mail.  I mean it's a --

21    it's an exhibit somewhere.  I can't tell you

22    exactly off the top of my head what it says, but

23    it's an exhibit.

24    Q.          And you have sued the commissioners in

366

1    this case for getting that permission that you

2    wanted or the authorization that you wanted,

3    correct?

4    A.          I have -- I have a violation of -- a

5    Sunshine Law violation by a round-robin illegal

6    meeting; that is correct.

7    Q.          You have sued the commissioners for

8    violation of the Sunshine Law, correct?

9    A.          Correct.

10   Q.          And that claim relates to them getting

11   permission that you said you needed in order to

12   give authorization?

13   A.          I'm telling you --

14   Q.          True?

15   A.          -- that what they did -- how they did

16   it and their circumstances on how they did it

17   wasn't proper.

18   Q.          They did it --

19   A.          It's against the law.

20   Q.          -- because you told them you

21   wouldn't --

22   A.          It's called the Sunshine Law and they

23   violated the law.

24   Q.          You sued them for a Sunshine violation,

367

```
 1    correct?

 2    A.          I did.

 3    Q.          And because they got written

 4    authorization that you told them you needed?

 5    A.          No, I didn't say that I needed written

 6    authorization.  That's false.

 7    Q.          You told them you wouldn't be able to

 8    transfer until two commissioners approved --

 9    A.          That is not true.

10    Q.          Then what did you tell them?

11    A.          That he can sit in the morgue until I

12    was assured that there would be money.  I didn't

13    say I needed written, I didn't say I needed a

14    resolution, I didn't say any of that.  How they --

15    if they wanted to call each other and do illegal

16    things, that's their problem.

17    Q.          Did you tell them you needed approval

18    from two commissioners?

19    A.          I told John Walker I didn't -- I told

20    him that his word wasn't good enough.  I needed at

21    least two, that's what I --

22    Q.          You needed two commissioners?

23    A.          I just gave you my quote.

24    Q.          Is that right?
```

368

1    A.           I gave you my quote.

2    Q.           You told him he needed two

3    commissioners?

4    A.           I told him that his word wasn't good

5    enough, that I needed at least two.  That's what I

6    said.

7    Q.           And you --

8    A.           I did not say I need two commissioners.

9    I just gave you my quote at least three times.

10   Q.           And they got you two commissioners?

11   A.           Apparently.

12   Q.           And then you sued them for it?

13   A.           I sued them for having an illegal

14   meeting.  I didn't sue them for getting -- putting

15   money in my account.

16             MR. TEETOR:  He did say -- he already

17   told me that.

18             MR. GLASGOW:  That's fine.

19   Q.           Do you know if there was a

20   murder-suicide in March of 2014?

21   A.           Possibly.

22   Q.           Do you remember a murder-suicide that

23   was referred to as the Seeber case, S-E-E-B-E-R?

24   A.           I don't know when it was.  But there

369

1   was a -- I believe a woman who was shot through a

2   windshield with a high powered rifle a couple

3   times.

4   Q.          Were you out of town when that

5   occurred?

6   A.          No.

7   Q.          Did you go to the scene?

8   A.          If it's the one I'm thinking of, I was

9   there.  I don't know what year it was though.

10  Q.          Did you tell the commissioners in

11  May of 2014 "hamburger spoils in the fridge"?

12  A.          No.  I said even hamburger goes bad in

13  the fridge.  That was my quote.

14  Q.          "Even hamburger goes bad in the

15  fridge"?

16  A.          Yes.

17  Q.          And what was the context in which you

18  told them that?

19  A.          I went to the meeting and I asked for

20  funding, that I was leaving for 11 days, that

21  Laina Fetherolf set about six inches from me to my

22  right and I asked her what the resolution was to

23  our problem of not having any money in the

24  coroner's account, and she didn't answer.  And I

1    asked the commissioners.  I said we cannot have

2    people die while I'm gone and leave them in the

3    morgue for 11 days, that's not proper.  Their

4    answer was nothing.  They just sat there.  They --

5    they were going to think about it.  I don't know

6    what they were going to do, but they weren't going

7    to do anything.  They weren't going to allocate

8    money, they weren't going to give me employees,

9    and they weren't going to pay for coverage.  I

10   mean you've got to do one or the other.  You've

11   got to decide.  Pay for employees or pay for

12   coverage.  To do neither is not going to work.

13          So I said I have -- I'm going to be

14   gone.  I told them the dates I was going to be

15   gone.  I was going to be gone 11 days.  And they

16   acted -- they didn't say anything, they just sat

17   there.  And as I was walking out, I looked at them

18   and they weren't going to do -- I said are you not

19   going to do anything?  And they just looked at me,

20   and I said even hamburger goes bad in the fridge.

21   You cannot -- this isn't proper.  I left and then

22   Laina Fetherolf decided to create a fictitious

23   audio tape.  Because William Kaeppner, who was

24   there after I left -- she didn't say a thing when

```
 1    I was there.  When I left, William Kaeppner had
 2    already called my office and left a message to
 3    call him and I did.  And he said something is
 4    going on here that's really bad.  They are having
 5    a conversation like you are still in the room.
 6    That audio tape was fictitious.  I can't believe
 7    he called a -- a deceased person hamburger.  I was
 8    never there when any of that was discussed.  That
 9    was totally made up.  Then they spliced it
10    together like it was real.
11    Q.        And who all --
12    A.        And they released it on the Internet.
13    Q.        And who do you claim was involved in
14    creating a fictitious tape from your public
15    meeting?
16    A.        I don't know who spliced it together.
17    Q.        Who do you claim was involved?  Do you
18    have any idea who was involved in doing that?
19    A.        I know the voices on the tape are Laina
20    Fetherolf and that William Kaeppner said she was
21    doing it, that she was creating -- she was talking
22    like I was there when I clearly had already left.
23    Q.        So you're claiming that the prosecutor
24    created a fictitious tape?
```

372

1   A.           I am.  Yes, I am.

2   Q.           And do you know --

3   A.           I'm saying she participated by acting

4   like I was there when I clearly was not.  And

5   William Kaeppner will come to the trial and

6   testify to that fact.

7   Q.           And is it your testimony that everybody

8   -- every public official who was at that meeting

9   participated in allowing that fictitious tape to

10  be created?

11  A.           I don't know who participated, but I

12  would guess that if I was having a conversation

13  with a fictitious person that I would probably be

14  the one that was most participating.

15  Q.           Well --

16  A.           Now, where that recording went

17  afterwards and who participated afterwards, I

18  mean, things are released to the media.  I think

19  several of the defendants have participated in

20  news media releases and all kinds of things, you

21  know, you -- I don't know exactly who did what.

22  But I know that it was fictitious.  And I know it

23  was malicious.  I know it was false and it was

24  created in front of a witness who will testify at

373

1    the trial that it was done.

2    Q.        And your knowledge about this

3    fictitious tape is based solely on what this

4    William Kaeppner has told you?

5    A.        He told me it was happening and then I

6    heard it on the Internet on YouTube after that.

7    He was just telling me why it was being created.

8    I don't know how soon afterwards, a week or two

9    later, that it showed up on YouTube.

10   Q.        Do you know who put it on YouTube?

11   A.        No.  But it was an account that has

12   been inactive since then and it only had five

13   members.

14   Q.        And what were those numbers?  Whose

15   numbers were they?

16   A.        Members.

17   Q.        Five members?

18   A.        They're YouTube -- you join the YouTube

19   channel.  I don't know.  I'm just telling you I

20   don't know much about YouTube, but I can tell you

21   that that's what I've been told by my son who's

22   listened to it.  And said this was not created to

23   make money, this was created to be damaging to

24   you.

374

1    Q.          Did you go to Jamaica for four days in

2    July of 2014?

3    A.          Yes.

4    Q.          And had you arranged for anybody to

5    cover for you while you were out of the country?

6    A.          No.

7    Q.          And did you tell Captain Alford that if

8    a death occurred just transport the body to the

9    hospital morgue?

10   A.          Yes.

11   Q.          Was a special prosecutor appointed

12   regarding the Swaim death?

13   A.          Yes.

14   Q.          Who was it?

15   A.          C. David Warren.

16   Q.          Pardon?

17   A.          David Warren.

18   Q.          And how would you characterize your

19   relationship with Special Prosecutor Warren?

20   A.          Poor, based upon his derogatory

21   comments on his e-mails about me.

22   Q.          Would you say you had a hostile

23   relationship with him?

24   A.          Not in the beginning.

375

1    Q.        At some point?

2    A.        I would say that he was nice to my face

3    and he was malicious behind my back.  Yes.  He was

4    not up front and honest.

5    Q.        Fair to say you had a contentious

6    relationship with Dave Warren at some point in

7    time?

8    A.        He created a contentious relationship,

9    yes.

10   Q.        Did you have a contentious relationship

11   -- I didn't ask you who created it.

12   A.        I didn't trust him.

13   Q.        You called him dirty?

14   A.        He is dirty.  I stick with that

15   statement.  He's totally dirty.

16   Q.        Did Special Prosecutor Warren come to

17   your office to talk to you?

18   A.        Yes.

19   Q.        Did you at some point during that

20   conversation tell him to go fuck himself?

21   A.        I did.

22   Q.        And you saw him in the parking lot?

23   A.        Yes.  He was sitting out there for 15

24   minutes after he -- he was escorted out of my

376

1    office, that is correct.

2    Q.        When you say escorted, did you order

3    him to leave?

4    A.        Yes.

5    Q.        And then did you yell at him truth and

6    justice, gentlemen, truth and justice?

7    A.        I did.

8    Q.        How would you characterize your

9    relationship with Prosecutor Fetherolf?

10   A.        I don't have a relationship with her.

11   Q.        Is it hostile?

12   A.        No.  I don't have one with her at all.

13   I haven't talked to her in I don't know how many

14   years.

15   Q.        Is it contentious?

16   A.        The last time I talked to her was when

17   she wouldn't answer my question at the

18   commissioner meeting.

19   Q.        Would you say you had a collegial

20   relationship with her?

21   A.        I don't have any relationship with her,

22   I think I've answered that.

23   Q.        None at all?

24   A.        No, none.

377

1   Q.          How would you characterize your
2   relationship with Sheriff North?
3   A.          I don't have a relationship with
4   Sheriff North.
5   Q.          None at all?
6   A.          No.
7   Q.          Not friendly, not unfriendly, not
8   collegial, not hostile, just not a relationship?
9   A.          He doesn't talk to me; I don't talk to
10  him.  There's no relationship.
11  Q.          Do you talk to Laina Fetherolf?
12  A.          No.
13  Q.          How about Dave Valkinburg?
14  A.          I try not to.
15  Q.          Yeah.
16  A.          He likes to record me.
17  Q.          Do you have any relationship with him?
18  A.          No.
19  Q.          How about Ed Downs, do you have any
20  relationship with him?
21  A.          No.
22  Q.          What about the commissioners?  Sandy
23  Ogle, do you have a relationship with her?
24  A.          Yeah.

378

```
1    Q.          How would you characterize it?

2    A.          Neutral.

3    Q.          What about Clark Sheets?

4    A.          No, I don't have a good relationship at

5    all.

6    Q.          What about John Walker?

7    A.          Yes, I have a good relationship with

8    him.

9    Q.          Good relationship?

10   A.          Yes.

11   Q.          Are you claiming attorney's fees in

12   this case?

13   A.          Am I expecting to be reimbursed for

14   them?

15   Q.          Yeah.  Are you suing --

16   A.          Yes.

17   Q.          -- to get your attorney's fees for

18   Mr. Brunner?

19   A.          Absolutely.  Yes.

20   Q.          How much have you paid him so far?

21   A.          I have no idea.

22   Q.          Can you estimate it?

23   A.          No.

24   Q.          Been more than $10,000?
```

379

1    A.          Absolutely.

2    Q.          More than $50,000?

3    A.          Yes.

4    Q.          More than $100,000?

5    A.          I -- after that, I don't know how much

6    I paid him.

7    Q.          You don't know if it's more or less

8    than $100,000?

9    A.          I do not.

10   Q.          Did you pay him by check, credit card,

11   how are you paying it?

12   A.          I think check.

13   Q.          How many checks have you written him?

14   A.          I have no idea.  I write him one every

15   month.

16   Q.          Got copies of those checks?

17   A.          I have no idea.

18   Q.          What do you mean you have no idea?  You

19   don't get returned checks?

20   A.          No.  It's all electronic.  We don't get

21   returned checks, no.

22   Q.          But you write him a monthly check, it's

23   more than 50,000 and you don't know if it's more

24   than 100, correct?

380

```
 1    A.          Correct.

 2    Q.          What's your fee arrangement with him?

 3    A.          I don't know.  You'd have to ask him.

 4    Q.          Well, did you enter into a fee

 5    arrangement with Mr. Brunner?

 6    A.          There is a contract that we have

 7    signed, yes.

 8    Q.          Paying him hourly?

 9    A.          Yes.

10    Q.          How much an hour?

11    A.          I don't know.

12    Q.          Ballpark estimate?

13    A.          I don't know.

14    Q.          More than 50 bucks?

15    A.          It's more than 50, but I don't know how

16    much.

17    Q.          Is it more than 350?

18    A.          I don't know exactly how much I'm

19    paying him.

20    Q.          Do you have a copy of that contract?

21    A.          Not with me.  You can ask --

22    Q.          Some --

23    A.          -- my attorney for the contract.

24    Q.          Do you have one somewhere?
```

381

1    A.        If I do, I don't know where it's at.

2    Q.        Is any portion of your fee agreement

3    with Mr. Brunner based on a contingency?

4    A.        Yes.

5    Q.        What percentage?

6    A.        I don't know how much it is.  But I

7    have no idea.

8    Q.        So you're paying him hourly plus a

9    percentage of whatever you recover?

10   A.        Yes.

11   Q.        And is the contingency more than

12   5 percent?

13   A.        I don't know.

14   Q.        More than 10 percent?

15   A.        I don't know.

16   Q.        More than 50 percent?

17   A.        I don't know.

18   Q.        Could be, you just don't know?

19   A.        I don't know what it is.  You can keep

20   asking me percents, I'm still going to answer the

21   same answer.  I don't know.

22   Q.        When did you first hear that an OHLEG

23   was run on Will Kernen?

24   A.        I think it was September 2014.

382

1     Q.          And who's the first person that ever

2     mentioned that to you?

3     A.          Jeremy Dye.

4     Q.          Did anybody else ever mention that to

5     you?

6     A.          Not specifically.  There were rumors of

7     this or that, but I don't know exactly how much of

8     it was the racist recordings and how much of it

9     was the OHLEG.

10    Q.          Well, did you hear any rumors before

11    Jeremy Dye told you about it?

12    A.          Of what?

13    Q.          About an OHLEG being run on Will

14    Kernen?

15    A.          No.

16    Q.          So it first --

17    A.          But I did on the racist recordings.

18    Q.          I'm asking about the OHLEG.

19    A.          I'm answering your question too.

20    Q.          Stick with me.

21                Did anybody ever tell you anything

22    about suspicions about an OHLEG being run on Will

23    Kernen prior to Jeremy Dye?

24    A.          No.

383

1    Q.         And what did he tell you about that?

2    A.         Well, he told me in the office, in my

3    exam room that -- that -- do you know that there

4    was an OHLEG run on your attorney and his wife.

5    Q.         And have you ever seen that OHLEG?

6    A.         No.

7    Q.         Have you ever seen an image of that

8    OHLEG?

9    A.         I'm unable to answer that due to

10   attorney -- attorney/client privilege.

11   Q.         Did you ever tell anybody that you

12   personally visualized that OHLEG?

13   A.         Never.

14   Q.         Never?

15   A.         No.

16   Q.         Never put that in a writing or orally?

17   A.         No.  I -- I'd never saw or possessed

18   it; that is correct.  I went to Steve Schierholt

19   and hold him that there was a date and time that I

20   was told, but I never specifically saw it,

21   possessed it, or examined any kind of document

22   such as that.

23   Q.         So you never told the gentleman you

24   just mentioned that you personally visualized an

384

1    image of that OHLEG?

2    A.          That is correct.  I told him there was

3    a date.

4    Q.          Did anyone ever tell you a reason why

5    that OHLEG was run?

6    A.          No.

7    Q.          Did you ever ask anybody?

8    A.          I never knew the OHLEG was run until

9    Steve Schierholt told me in November.

10   Q.          That wasn't my question.

11               Did you ever ask anybody why that was

12   run?

13   A.          No.  I know it was run by Ed Downs

14   under Dave Valkinburg's ID and password.

15   Q.          Wasn't my question.

16               My question was:  Did you ever ask

17   anybody --

18   A.          It's four felonies I believe.

19   Q.          -- why it was run?  Did you?

20   A.          What?

21   Q.          Did you ever ask anybody why the OHLEG

22   was run?

23   A.          No.  I didn't know it was specifically

24   run when I talked to Steve Schierholt.  He's the

385

```
 1    only one that has ever confirmed it was run to me.

 2    Q.          At any time in your life did you ever

 3    ask anybody why that OHLEG was run on Will Kernen?

 4    A.          No.

 5    Q.          Mr. Barbiere asked you about

 6    tape-recordings and you indicated you didn't have

 7    any, correct?

 8    A.          Correct.

 9    Q.          Have you ever had any tape-recordings

10    that relate to any of the claims you've made in

11    this case?

12    A.          No.

13    Q.          Have you ever listened to any?

14    A.          Yeah.  Yes, I have.

15    Q.          Which ones?

16    A.          The ones that Jeremy Dye's where the

17    first one was Dr. Douche from Ed Downs, calling me

18    Dr. Douche on a phone call.  And then I had

19    another one of a 20-minute rant about how much

20    they hated Judge Wallace and how incompetent he

21    was, and that was mostly Ed Downs and Lanny chimed

22    in that they were going to have to put up with him

23    for another five years and they talked about

24    campaigning against him.  That's our Common Pleas
```

386

1    highest court judge.  And then I heard the racist

2    recordings where the only good N word is a dead N

3    word and all that, which I believe you have in

4    your possession.

5    Q.        Were all of those played for you by

6    Jeremy Dye?

7    A.        Yes.

8    Q.        And did you ask him to do anything with

9    those?

10   A.        No.

11   Q.        Do you know if he did do anything with

12   those?

13   A.        I don't know what he did with them.

14   Q.        Did you ask him to do anything with

15   them?

16   A.        No.

17   Q.        You don't know where -- whether he gave

18   them to anybody else or not?

19   A.        I don't know what he did with them.

20   That's -- you can ask him what he did with them.

21   Q.        Are those the only tape-recordings

22   you've ever heard related to this case?

23   A.        Yes.

24   Q.        Did you see a --

387

1    A.         Well, the -- there were -- whatever you

2    guys supplied.  I mean if you supplied me

3    recordings, I have listened to them.

4    Q.         Well, do you remember listening to any?

5    A.         Yeah.

6    Q.         Other than what you've told me?

7    A.         I listened to Alex Pavlick.  I think

8    there was one from Detective Mortiz where I said I

9    know you're recording me, and he said, no, I'm

10   not.  I go yeah, you are, and he goes no, I'm not.

11   And I go yes, you are.  But he was really

12   recording me because I got the recording.

13   Q.         And who played those two for you?

14   A.         I got them from you I believe.

15   Q.         Who played them for you?

16   A.         I believe I got them from my attorney.

17   I don't know where I got them from.

18   Q.         Did your attorney give you copies of

19   them?

20   A.         I don't know if I came here or if I

21   went to the -- I don't know for sure.

22   Q.         Did you see a newspaper article about

23   the tape-recordings with the racist comments?

24   A.         Yeah, I saw a bunch of them.

388

 1    Q.          Did you provide any of that information

 2    to the media?

 3    A.          No.

 4    Q.          Did you ask anybody to provide it to

 5    the media?

 6    A.          No.

 7    Q.          Do you have any idea or suspicions as

 8    to who did?

 9    A.          I can't speculate.

10    Q.          I'm not asking you to speculate.  Do

11    you have any idea who did?

12    A.          I'm not guessing for you who did it.

13    Q.          Do you have any idea --

14    A.          I don't know.

15    Q.          -- who did?

16    A.          I'll tell you I don't know.

17    Q.          Did you ever talk to anybody about who

18    provided those to the media?

19    A.          No.

20    Q.          And you have no idea as we sit here who

21    did that, correct, under oath?

22    A.          I assume that wherever -- whoever got

23    the recordings released them to whatever media.  I

24    don't -- I mean The Dispatch had them.

389

1   Q.          Did -- and you never talked to anybody

2   about --

3   A.          I did not talk to The Dispatch about

4   them, no.

5   Q.          Didn't ask you that.  Let me finish.

6               You never talked to anybody about who

7   provided those tapes to the media?

8   A.          No.

9   Q.          And as we sit here, you can say under

10  oath you have no idea who did that?

11  A.          I mean I can guess but I don't think

12  that's proper.  You don't want me to guess.  I'm

13  not -- don't plan on guessing.  I don't think -- I

14  don't want to place blame on people who are

15  innocent.

16  Q.          Have you talked to members of the media

17  about any issues in this case?

18  A.          I was called by the Huffington Post and

19  they weren't interested.

20  Q.          By who?

21  A.          The Huffington Post.  They wanted to

22  know what the background, if I had a copy of the

23  complaint.  They weren't -- I mean that's all they

24  wanted from me.  And then I -- I don't have a

390

1    clean copy of the complaint.

2    Q.        Did you ever talk to anybody else at

3    the media about any of the defendants or the

4    issues that you've alleged in this lawsuit?

5    A.        No.

6    Q.        Did you ever talk to Gretchen Gregory

7    about any of these issues?

8    A.        No.

9    Q.        Deb Tobin?

10   A.        No, not really.  I mean she read an

11   article about it, but it was kind of a vague

12   article.

13   Q.        None of these media or newspaper

14   reporters or radio folks ever called you to talk

15   about any of the defendants --

16   A.        No.

17   Q.        -- in this case?

18   A.        Surprisingly not.

19   Q.        And you never went in and talked to any

20   of them?

21   A.        Absolutely not.

22   Q.        Did you ever give any of them any

23   documents relating to any of the defendants or any

24   of the claims in this case?

391

```
 1   A.          A Huffington Post, I -- I asked my

 2   attorney to send a copy of the complaint, that's

 3   it.  It's public record.  I figured it was okay.

 4   Q.          Did you --

 5   A.          They asked for it.  I didn't have -- I

 6   had things attached to e-mails.  I didn't want to

 7   send anything from me.

 8   Q.          Now, I believe at your initial

 9   deposition you were asked about attempts to obtain

10   coverage for those times when you were out of

11   county and there was nobody designated to cover

12   for you.  Do you recall that?

13   A.          No.

14   Q.          You don't remember that?

15   A.          No.

16   Q.          Do you --

17   A.          Not specifically as you're stating it,

18   no.

19   Q.          Say it again.

20   A.          Not specifically as you are stating it.

21   Q.          Okay.  What do you recall about being

22   asked about coverage, anything?

23   A.          Well, I mean we talked a lot about it.

24   What do you want to talk about?
```

392

```
 1   Q.          Did you --

 2   A.          Ask me a question, I'll answer your

 3   question.

 4   Q.          All right.  Did you ever talk to

 5   Dr. Ireton about covering for you?

 6   A.          Yes.

 7   Q.          When?

 8   A.          That's where the 500 and $1,000

 9   contract came in.  Specifically mentions --

10   Q.          All I asked you was did you talk to

11   him.

12   A.          I'm -- I'm answering you.  I should be

13   allowed to explain my answer and I did.

14   Q.          Did you talk to him or not?

15   A.          Yes.

16   Q.          When?

17   A.          Around this -- the time of the problem.

18   I specifically gave you names of Dr. Neff and I

19   gave you names of Dr. Tornwall and I gave you a

20   name of Dr. Ireton.  Those three specifically I

21   know I gave you in the previous deposition.

22   Q.          Let's try it again.

23               When did you talk to Dr. Ireton?

24   A.          After -- whenever I came up with the
```

```
1    contract, the 5,000 -- I mean I have to look.  I
2    think that was done around May.
3    Q.          May of 2014?
4    A.          I believe -- I mean it was around that
5    time.
6    Q.          Okay.  I just want --
7    A.          Because he wouldn't do it and then when
8    I --
9    Q.          I just want your best recollection.
10   A.          He came back to me.
11   Q.          If you'll just answer the question, I
12   might be able to get done in the time that I have.
13               MR. BRUNNER:  Objection.  He has.
14   A.          I'm trying to answer your question.
15   You don't like my answer.
16   Q.          No.  I just asked you when you talked
17   to him.  Either you know or you don't?
18   A.          No, I don't know.
19   Q.          Where were you when the talked to him?
20   A.          In the doctors' lounge.
21   Q.          And how long was the conversation?
22   A.          Five, 10 minutes.
23   Q.          Five minutes?
24   A.          Or 10 minutes.  Five to 10 minutes.  It
```

394

1    was a good one.

2    Q.         And what did you say to him?

3    A.         I asked him if he would be interested,

4    and he said absolutely not, you're getting bad

5    publicity.  No one wants to be part of the

6    coroner's office now because there's -- you know,

7    they're saying bad things about you in the paper.

8    And I don't want to be raked across the coals if I

9    make a mistake.

10   Q.         Any other conversation with Dr. Ireton?

11   A.         I think I showed him the contract that

12   I drew up.

13   Q.         Was that the same contract like what

14   you'd proposed for Dr. Gorniak?

15   A.         No.  Dr. Gorniak we never really had a

16   contract.  We had a verbal agreement and then she

17   submitted an invoice, but there was no contract.

18   Q.         What were the terms you proposed to

19   Dr. Ireton?

20   A.         We've seen it in an exhibit today.  It

21   was the one I took to the commissioners in late

22   May, I believe it was May 27th or so, when the --

23   $500 a day and $1,000 if you are called out.

24   Q.         And you specifically gave that proposal

395

1    to Dr. Ireton?

2    A.         I did.

3    Q.         And he refused?

4    A.         Yes.

5    Q.         Okay.

6    A.         No.  No, he didn't refuse.  He said it

7    -- he would do it.

8    Q.         He said he'd do it?

9    A.         He would do it, yeah.  He just didn't

10   want his name mentioned.  He didn't want to be put

11   in the paper.

12   Q.         Okay.  Did you ever come back and tell

13   anybody that he'd do coverage for you?

14   A.         They refused the contract.  It says

15   Dr. Blank.  He didn't want his name in there.  He

16   did not want to be brought up on the front page

17   saying Dr. Ireton's now going to cover the

18   coroner's office.  He didn't want any publicity

19   whatsoever.  He is willing to do it if nobody was

20   giving any recognition in the newspaper about it.

21   He didn't want any notoriety.  He didn't want

22   anything to do with it.  He was willing to do it

23   as a favor to me, but other than that -- if

24   anybody else would have asked him to do it, he

1   wouldn't have done it.

2   Q.          So what you are telling me is

3   Dr. Ireton agreed as a favor to do it for $500 a

4   day and $1,000 per call?

5   A.          That is correct.

6   Q.          And then you went back and told the

7   commissioners he was willing to do it?

8   A.          I don't know -- yes.  Because the

9   contract was written mentioning his children

10  specifically, yes.

11  Q.          Okay.

12  A.          That is true.

13  Q.          And when did you tell the commissioners

14  that you had Dr. Ireton prepared to cover for you?

15  A.          I would not give him a name.

16  Q.          Pardon?

17  A.          Per his request, I would I not give him

18  his name up.  I told them I doctors that would --

19  that would cover at this and it was him.

20  Q.          Did you tell the commissioners that

21  Dr. Ireton would cover for those --

22  A.          No.

23  Q.          -- terms?

24              MR. BRUNNER:  Objection, asked and

397

1    answered.

2    A.          I told him doctors but not a specific

3    doctor.

4    Q.          And when did you approach Dr. Tornwall?

5    A.          Just in the hallway at the hospital.  I

6    see him two to three times a week in the hospital.

7    Q.          Roughly when?

8    A.          About the same time.

9    Q.          Okay.  Probably May of 2014?

10   A.          Could be.

11   Q.          And you saw him in a hallway?

12   A.          I did.

13   Q.          And what did you say to him?

14   A.          I asked him if he could cover the

15   coroner and he said no.

16   Q.          Did you tell him how much you'd pay --

17   how much he'd make?

18   A.          He wasn't interested no matter the

19   cost.  Nobody wanted to do it.  I was smeared.

20   They didn't want it.

21   Q.          Did Dr. Tornwall tell you why he didn't

22   want to do it?

23   A.          Yes.

24   Q.          What did he tell you?

1   A.        I don't want anything to do with that,

2   I don't care how much you pay me.

3   Q.        Did you or he say anything else during

4   that conversation?

5   A.        No.

6   Q.        How long was that conversation?

7   A.        12 seconds.

8   Q.        What about Dr. Neff, when did you talk

9   to him?

10   A.        I don't remember.

11   Q.        Roughly?

12   A.        Within 10 days of the other two.

13   Q.        Okay.  And where did you talk to him?

14   A.        I don't know.

15   Q.        Was it at the hospital?

16   A.        It could have been -- we're next-door

17   neighbors at the -- at the condo unit, so it could

18   have been walking across the parking lot.  I don't

19   know where.

20   Q.        Do you have a specific recollection of

21   talking to him --

22   A.        Yeah.

23   Q.        -- about this instance?

24   A.        I know we talked about it.  But it was

1    another thing in passing and he said no thanks.  I

2    didn't even give him the terms.

3    Q.        Do you have a specific recollection of

4    talking to him about it?

5    A.        Yes.

6    Q.        But you don't know where you were?

7    A.        No.

8    Q.        Do you know how long that conversation

9    was?

10   A.        It was brief.

11   Q.        How brief?  Estimate for me how long it

12   was.

13   A.        I would say less than -- on that topic

14   I would say less than 10 seconds.

15   Q.        Okay.  What did you tell him?

16   A.        I asked him if he could cover the

17   coroner's office and he said no thanks.

18   Q.        Is there any other conversation other

19   than what you just told us?

20   A.        With him?

21   Q.        Yes.

22   A.        No.

23   Q.        Did you talk to any other doctors?

24   A.        If I did, I don't remember.

400

```
 1    Q.          Okay.  Are there any other doctors you

 2    talked to that you recall?

 3    A.          That was per my attorney's request too.

 4    He said you should go get a list of doctors so

 5    that you can see if somebody will really cover

 6    you.  And he was sincere and wanting me to get

 7    coverage.

 8    Q.          Do you recall talking to any other

 9    doctors about coverage for --

10    A.          I don't recall.

11    Q.          Other than those -- let me finish,

12    please.

13                Do you recall talking to any other

14    doctors about covering for you other know that

15    those three we just mentioned?

16    A.          Not specifically.  But I believe I

17    mentioned a fourth in my previous deposition.  I

18    don't remember who it was.

19    Q.          You don't remember the name?

20    A.          No.

21    Q.          Don't remember who it was, when it was?

22    A.          No.

23    Q.          Do you remember where you were when you

24    talked to him?
```

1    A.          No.  Probably the doctors' lounge.

2    Q.          Did you ever tell any county officials

3    prior to suing them about the specific

4    conversations and doctors that you had

5    communicated with about covering for you?

6    A.          I didn't list the doctors to them.  I

7    gave them a contract that was for doctors that

8    would accept the agreement and it was mainly

9    Dr. Ireton but he did not want his name mentioned

10   specifically.  If I turned an invoice in for him,

11   it would say Dr. Ireton payable to this address.

12   Q.          Who at the county did you tell that you

13   had talked to Dr. Neff?

14   A.          Nobody.

15   Q.          Who at the county did you tell you'd

16   talked to Dr. Tornwall?

17   A.          Nobody.  What would be the point?

18   Q.          Are you claiming any mental or

19   psychological distress as a result of the criminal

20   charges?

21   A.          Yes.

22   Q.          At any time in the last three years

23   have you had any psychiatric or psychological

24   evaluation?

1    A.          No.

2    Q.          Have you had any counseling?

3    A.          No.

4    Q.          Do you remember a suicide by firearm in

5    roughly September of 2014?

6    A.          No.

7    Q.          Where you secured the firearm?

8    A.          No.

9    Q.          Have you ever -- do you recall an

10   incident where you secured a firearm and released

11   it to the victim's husband?

12   A.          That day, no.

13   Q.          Any time?

14   A.          Yes.

15   Q.          When did that happen?

16   A.          I don't know.  But I know we've had to

17   do it because the sheriff department doesn't want

18   our -- the weapons anymore.  They refused them on

19   scene.

20   Q.          Give me a specific instance where you

21   secured a firearm from a suicide scene and

22   released it to the victim's husband.

23   A.          Well, I just did one to the victim's

24   live-in girlfriend of 25 years.

1    Q.        Can't hear you.

2    A.        I did -- I just did one about two or

3    three weeks ago to a man's live-in girlfriend of

4    25 years.  It was her weapon.  That was about two

5    to three weeks ago.  I went to a scene, a guy had

6    leaned over his live-in girlfriend of 25 years and

7    shot himself in the head with a 50 caliber

8    American Eagle.  It was quite a mess.

9    Q.        And did you secure the firearm and then

10   release it?

11   A.        No.  No.  I -- it was being left there

12   and I asked the deputies if they would secure it

13   and they said they didn't want it.  Detective

14   Shirey did not want it.  They didn't stay to even

15   investigate the suicide at all.  They just wanted

16   the marijuana plant in the basement and then they

17   left.

18   Q.        That's different than what I asked.  I

19   asked if you recall any situation where you

20   secured a firearm and released it to --

21   A.        No.

22   Q.        Let me finish.

23   A.        I don't secure firearms.

24   Q.        Would you please let me finish.

1    A.        Go right ahead.

2    Q.        And then I'll let you finish.

3    A.        Sounds great.

4    Q.        Do you recall any situation where you

5    secured a firearm at a suicide and then released

6    it to the victim's husband?

7    A.        No.  I don't secure weapons, period.

8    I'm not an expert at weapons.

9              MR. TEETOR:  Let's take a five-minute

10   break while I find some stuff.

11             MR. GLASGOW:  Sure.

12             THE VIDEOGRAPHER:  We are off the

13   record.  The time is 5:14.

14             (A short recess is taken.)

15             THE VIDEOGRAPHER:  Back on the record.

16   The time is 5:24.

17   Q.        Sir, do you remember a case involving a

18   Betty Jo Castor?

19   A.        Yes.

20   Q.        And was there a firearm involved in

21   that case?

22   A.        Yes.

23   Q.        And what happened to it?

24   A.        The Lieutenant Walton -- I don't know,

1    if I guess he's -- is he a Lieutenant Walton,

2    Captain Walton.  I think he might have been a

3    lieutenant at the time.  He was from Logan Police

4    Department.  The -- he secured the weapon, put it

5    in a bag, and then I took possession of it.  It

6    sat in my office for several weeks and I

7    eventually released it back to --

8    Q.        Didn't hear the last part.

9    A.        Then I eventually released it back to

10   the husband.

11   Q.        Back to who?

12   A.        The husband.

13   Q.        To the husband of the victim?

14   A.        Yes, per his request.

15   Q.        Did you ever notify anybody at the

16   Sheriff's Office that you had that gun for two

17   weeks?

18   A.        Might have been longer than that.  No.

19   They didn't take it then; they left -- they left

20   the scene.

21   Q.        That wasn't my question.  Did you ever

22   tell anybody from the Sheriff's Office --

23   A.        No.

24   Q.        -- that you kept that gun?

1    A.          No.  They -- they refused to take it.

2    Q.          Did you tell anybody that you kept that

3    gun at the Sheriff's Office?

4    A.          No.  I -- I took it and all the

5    evidence at the scene with me.

6    Q.          And then did you tell anybody at the

7    Sheriff's Office when you were releasing it back

8    to the victim's husband?

9    A.          No, because they'd already given it up.

10   Q.          You --

11   A.          Why would I tell them they have an

12   opportunity to give it up again.

13   Q.          All I asked is if you told anybody at

14   the Sheriff's Office --

15   A.          No.

16            MR. BRUNNER:  And he answered your

17   question.

18            MR. TEETOR:  No, he didn't.

19            MR. BRUNNER:  Yes, he did.  Three times

20   -- he's given you more than what you wanted.

21            MR. TEETOR:  And I want him to just

22   answer the question.

23            MR. BRUNNER:  He did then he gave you

24   more.

1   Q.          Did you ever tell anybody at the

2   Sheriff's Office before you released that gun to

3   the victim's husband --

4               MR. BRUNNER:  Objection.

5   Q.          -- that you were going to release it to

6   the victim's husband?

7               MR. BRUNNER:  Asked --

8   A.          My fifth no.

9               MR. BRUNNER:  Objection asked and

10  answered.

11  Q.          Pardon?

12  A.          That's my sixth no now.

13  Q.          Do you remember a case involving Martin

14  Seelig?

15  A.          Not specifically.

16  Q.          Do you remember a case where your

17  investigator took possession of a .44 Magnum

18  pistol and put it in a safe for two months?

19  A.          Not specifically.

20  Q.          Doesn't ring any bells?

21  A.          No.

22  Q.          Okay.

23  A.          And we get a lot of weapons.  I don't

24  know which case you're talking of.

408

1    Q.        Well, when you take a weapon from a

2    scene, what's your understanding of what the

3    coroner's office is supposed to do with it?

4    A.        We would like to turn it over to the

5    Sheriff's Office, but they won't take them.  We

6    would like to give it to them at the scene, but

7    they refuse them.

8    Q.        Tell me an instance where somebody

9    refused it.

10    A.        I just gave you one with the American

11    Eagle.

12    Q.        Okay.

13    A.        Betty Jo Castor, they didn't take it

14    either.  They left.  They abandoned the scene.

15    Q.        Did they refuse to take it?

16    A.        Yes.

17    Q.        Who did you ask to take it?

18    A.        Shirey.  Detective Shirey absolutely

19    refused to take the .50 caliber American Eagle.

20    Q.        You asked Detective Shirey to take that

21    pistol?

22    A.        I did.

23    Q.        And what did he say?

24    A.        No.

1    Q.          And then -- so what did you do?

2    A.          I asked him if they could make it safe

3    and then put it in an evidence bag for me, and he

4    did or his deputy did.  And then they left it for

5    me.  They didn't want it.  I asked them several

6    times.  They don't want it.  I said, okay, I don't

7    have a problem with it, I'll take the weapon,

8    doesn't bother me at all.  I just don't touch

9    weapons on scene, period.

10   Q.          Why did you want the weapon?

11   A.          Because I couldn't leave it there.

12   They -- they left.

13   Q.          Okay.

14   A.          They abandoned the scene there too.  I

15   was -- Laurelville PD stayed and so did some

16   volunteer fireman to fix the scene.  They left.

17   They said we're out of here, we got our bag of pot

18   -- or our pot plant, and they left.

19   Q.          Are you talking about the Betty Jo

20   Castor case again or did you just switch cases?

21   A.          No.  No.  I'm talking about the

22   Laurelville case, the American Eagle case, the .50

23   caliber that I've already mentioned.

24   Q.          Well, when you took the weapon in the

410

```
1    Betty Jo Castor case, did you ask anybody at the
2    Sheriff's Office to take it?
3    A.          They left.  I couldn't -- the --
4    Detective Downs came in and he said what's going
5    on?  And I said I can't talk to you.  And he goes,
6    why not; we have a job to do.  And I said because
7    you have five criminal charges pending on me and
8    I'm not allowed to talk to you.  Most -- and there
9    were two or three deputies there.  And most people
10   who knew that they had a conflict at a criminal
11   scene with a criminal defendant would say, hmm,
12   shouldn't be here because I have a conflict, I
13   should walk away.  And I -- he kept asking me
14   questions.  And I was a defendant in a case that
15   he charged me with five charges and I said I
16   cannot talk to you.  I am not going to talk to
17   you.  I am a defendant from your five criminal
18   charges.  And he -- then they -- he went and got I
19   think Dave Valkinburg.  I said I cannot talk to
20   you, you have charged me with five crimes.  I'm
21   not allowed to talk to you.  And then they said,
22   fine, everybody get out of here and they left.
23   And Walton said he would stay with me and he did.
24   And he helped me process the scene.  And I'm sure
```

411

1    he would tell you the same.  And he told me:  I

2    will not leave you here by yourself; I will stay

3    until the job is done.  And he stayed.  Logan

4    Police Department, awesome.  Awesome, awesome

5    people.

6    Q.        Are you done?

7    A.        Yeah.

8    Q.        My question was:  Before you left the

9    Betty Jo Castor scene with the firearm, did you

10   specifically ask anybody at the Sheriff's Office

11   to take that gun?

12   A.        No, they left.  I think I've said that

13   several times.

14   Q.        You've said that a lot more.  But you

15   didn't ask them, correct?

16   A.        No, they left.

17   Q.        Did you ask them before they left?

18   A.        No, because the scene wasn't done yet.

19   The scene wasn't processed.

20             MR. TEETOR:  That's all the questions I

21   have.  Thanks.

22             THE WITNESS:  Thank you.

23             MR. BRUNNER:  Okay.

24             - - - - -

412

                    RECROSS-EXAMINATION

1

2    BY MR. LAMBERT:

3    Q.          Just a few as follow-up --

4                THE VIDEOGRAPHER:  Can you grab that

5    microphone for me?

6                MR. LAMBERT:  Oh, right.  Yeah.

7    Q.          I'll talk loud and stay here.  If you

8    can't hear me, let me know.

9                Define "coroner case."  You've used

10   that term today several times.  Define that.

11   A.          A coroner case is when I have decided

12   to take charge of the decedent and I will sign the

13   death certificate.  And recall that on death

14   certificates in the middle of a death certificate

15   it says the person signing is -- one check is

16   certifying physician, and the second check is

17   coroner.  The certifying physician can only sign

18   natural deaths, so I have to take all unnatural

19   deaths as coroner.  Two of my cases -- two of my

20   charges by your defendants were actually not even

21   coroner cases.  They charged me with a crime that

22   wasn't even a coroner case.  If you've got the

23   death certificates of Mr. -- Ms. Dilly and

24   Mr. Swackhammer, you would find out they weren't

413

1    even coroner cases.  They charged me with two out

2    of five crimes that weren't even coroner case.

3    How does that make -- I had to go to the Bureau of

4    Vital Statistics to find out who they were.

5    That's a coroner case, when I take it upon myself

6    to sign it.

7    Q.       From what you said, I gather it's when

8    there's a unnatural death is a coroner case?

9    A.       No.  I can take a natural death as a --

10    as a coroner case.  Suppose that I have an

11    indigent person, hasn't seen a doctor in 50 years

12    and they die, who's going to sign their death

13    certificate?  Do I have to see the body, no.  Do I

14    have to do an autopsy, no.  But I can still sign

15    the death certificate based upon the knowledge

16    that I have.

17    Q.       Could you also define it then as an

18    unnatural death or a natural death where there's

19    not a physician available to sign the death

20    certificate?

21    A.       I have done that before.  And I have

22    done that before.  We try to find the physician, a

23    physician that's known them because they would

24    have more knowledge than me as coroner.

414

1    Q.       Okay.  Now, we've talked about the --

2    during the summer the times you were gone, one to

3    Aruba and one to Jamaica, where there was no cell

4    service and discussions about needing coverage

5    then.  But you indicated in New York since you --

6    the end of July since you had a cell phone, there

7    was no need for coverage because you was available

8    -- had cell service, correct?

9    A.       Correct.  Well, that's because, yes, I

10    had -- I had cell service, yes.

11    Q.       But you didn't feel you needed someone

12    to provide coverage?

13    A.       No.

14    Q.       Okay.  In January in Dublin, the two

15    times you had cell service, correct?

16    A.       I -- yes.

17    Q.       Okay.  Did you receive calls from law

18    enforcement during either of those two times in

19    January when you were in Dublin?

20    A.       My phone was turned off for my

21    meetings.  My meetings went until after 10:00.

22    Q.       I'm sorry?

23    A.       My meetings went until after 10:00.  We

24    weren't allowed to have cell phones in there.

1    Q.         So you did not have cell service

2    available then in Dublin because you had your --

3    had to have your phone turned off?

4    A.         Yes.

5    Q.         So then that would have been a time

6    like Jamaica and Aruba when you needed coverage

7    being out of town, correct?

8    A.         Correct.

9    Q.         And in January what did you do to

10   attempt to provide coverage before you went out of

11   town?

12   A.         I didn't have much time.  I thought I

13   had employees --

14   Q.         Doctor --

15   A.         -- until January 1st.

16   Q.         Doctor, does that mean you did nothing?

17   A.         I didn't know what to do.  I asked --

18   Q.         I'm not asking for why?

19   A.         Okay.  What did I do?

20   Q.         Please stop.

21   A.         I wrote two letters.

22   Q.         If you would answer my question --

23   A.         I'm trying.

24   Q.         Then -- then if you want a chance to

416

```
1    explain, I'll give you that chance.

2    A.          I'm trying to answer your question.

3    You asked me what I did --

4    Q.          But you're explaining --

5    A.          -- and I said I wrote the -- your

6    commissioners --

7    Q.          You're --

8    A.          -- two letters they never even call me

9    with a response.

10   Q.          Okay.  You're explaining before you

11   answer the question.

12   A.          No.  You asked me what I did.  I'm

13   telling you I wrote two letters to the

14   commissioners --

15   Q.          Okay.

16   A.          -- asking for temporary funding until I

17   could get --

18   Q.          Okay.

19   A.          -- something done.

20   Q.          Other than the two letters to the

21   commissioners regarding funding, what, if

22   anything, did you do in January before you went

23   out of town to provide coverage?

24   A.          I asked -- I don't know what I did.  I
```

417

1    can't recall.

2    Q.        You don't recall anything other than --

3    A.        I don't recall what I did.

4              THE REPORTER:  Excuse --

5    A.        I don't recall what I did.

6    Q.        I'm sorry.  We've been doing that a

7    lot.

8              Any contacts you had with these other

9    physicians that you've told us about was regarding

10   the time -- was regarding -- strike that.

11             Any conversations you had with any of

12   these other physician -- physicians was after

13   January, correct?

14   A.        Yes.

15   Q.        The contact with Dr. Gorniak was after

16   January?

17   A.        Yes.

18   Q.        Mike Stephenson, we've talked to him

19   briefly and he -- in the deposition.  I just want

20   to follow up there.

21             As I understand, he was available to do

22   contract work in 2013 and had provided some

23   contract work?

24   A.        Is that --

418

1    Q.          Yes.

2    A.          -- a question?

3    Q.          Yes.

4    A.          He had multiple jobs and he --

5    Q.          That wasn't what I asked.  I asked --

6    A.          What's your question?

7    Q.          Did he -- did he provide contract

8    services for you in 2013?

9    A.          I don't know.

10   Q.          Okay.  You indicated you had tried to

11   call him twice on his home phone for coverage in

12   2014 and did not reach him, correct?

13   A.          Oh, we called multiple times.  He -- he

14   was rarely contactable.

15   Q.          I'm talking about in 2014.  I believe

16   in the deposition you indicated --

17   A.          Yes.

18   Q.          -- that you had called a couple times

19   and wasn't able to reach him?

20   A.          I would say well more -- I would say 20

21   to 30 times that year, yes.

22   Q.          In 2014?

23   A.          Oh, yeah.

24   Q.          Now, is that his cell or his home phone

419

1    you called?

2    A.        Yes.

3    Q.        Both?

4    A.        Yes.

5    Q.        Did you leave a message on his cell

6    phone?

7    A.        No.  Because he could see who calls.

8    He knows my number.  Yes -- actually, yes, I would

9    change my answer.  Yes, I would leave him a

10   message.

11   Q.        And --

12   A.        And I would text him.  I would say are

13   you available.

14   Q.        Did he ever respond in 2014?

15   A.        Respond to my messages?

16   Q.        Yes, messages for --

17   A.        Sometimes a day or two later.

18   Q.        Did you have a conversation with him at

19   that time when he responded as to your need for

20   coverage in 2014?

21   A.        Yes.

22   Q.        And what was his response to your

23   inquiries in 2014?

24   A.        Yes, I would be happy to do it if you

```
 1    could get a hold of me.  But he works 24-hour
 2    shifts in Vinton County with no cell phone
 3    service.  He lives out in the very rural part and
 4    his cell phone doesn't work there.  And sometimes
 5    he answers his phone and sometimes he doesn't.
 6    Q.        Okay.
 7    A.        He used to work in Hocking County.  So
 8    if you want me to clarify that.
 9    Q.        Uh-huh.
10    A.        He used to work for Hocking County EMS
11    and he was always contactable.  But when he moved
12    to Vinton County, I couldn't contact him anymore.
13    He became difficult to contact.
14    Q.        Regarding the Donahoe death, you
15    indicated you were refused access to the scene; is
16    that correct?
17    A.        If that's who it was.  I don't know.
18    There were three files that I've supplied for
19    discovery.  You'd have to check the names.  I -- I
20    would hate to give you the wrong name and then --
21    I know that there was a person by that name.
22    Whether she's one of the three, I can't remember.
23    Q.        Well --
24    A.        If I would have known that was going to
```

421

1   be a question, I would have prepared for it.

2   About 5,000 deaths I've been involved in.  I --

3   it's hard for me to pinpoint certain ones.

4   Q.          If John Walker would state that you

5   told him you had to have something in writing from

6   the two commissioners before you would authorize

7   the moving of the body, would he be lying?

8   A.          No, I don't think so.  That could be

9   his interpretation.  You know, whether it's a text

10  message or an e-mail or whatever, I just need

11  something.  I'm not asking for any kind of --

12  whatever proposal thing they did.  I just --

13  Q.          If John --

14  A.          -- needed something.

15  Q.          I'm sorry.  I never know when you are

16  done, so --

17  A.          I could have gotten a text message from

18  Sandy Ogle and John Walker saying everything's

19  okay.  That would have been good enough for me.

20  Q.          Just everything's okay would have been

21  good enough?

22  A.          Yeah.  If they said that they would

23  cover it, sure.

24  Q.          If John Walker says that you indicated

422

1    to him you needed a written resolution from at

2    least two commissioners, would that be a lie?

3    A.          I wouldn't call it a lie.  I call it

4    a -- a misinterpretation of what I was wanting.

5    Did I specifically ask for a resolution, no.

6    Whether he took it that way, upon himself, I would

7    assume that he came up with that means of doing it

8    through the prosecutor.

9    Q.          You would assume what?

10   A.          I assume that there was some sort of

11   meeting, especially if the prosecutor -- she

12   probably came up with the idea of a -- what was

13   it, a resolution that was -- I can't remember what

14   the term was.

15   Q.          Why do you assume she came up with that

16   idea?

17   A.          I would assume she did it because there

18   was -- looked like -- they wrote I, the, these

19   three people.  I don't think that those three

20   commissioners would have written something like

21   that.  I'm just guessing.

22   Q.          You assume she come up with?

23   A.          Maybe she didn't do it.  I don't know

24   who did it.

1   Q.       You assume that she came up with the

2   idea to send the resolution or the idea that he

3   asked for a resolution?  I'm not sure I --

4   A.       No, to send a resolution.  The res --

5   the word "resolution" never camp up with us.  We

6   -- that's not a term that John and I discussed on

7   the phone.

8   Q.       So from what you're --

9   A.       I didn't even know it was called a

10   resolution.

11   Q.       So from what you're telling us the

12   conversation was John Walker come up with the

13   fact, him or the prosecutor, that he needed a

14   written resolution then; is that what you're

15   saying?

16   A.       I would say we did not specifically

17   state together that I needed a written resolution;

18   that is correct.  I asked for reassurance, that's

19   all I asked for.  However they chose to do it was

20   up to them.

21   Q.       I guess I'm not clear as to why you

22   believe the prosecutor come up with that.  Could

23   you --

24   A.       Well, it said I and then it put the

424

1    three commissioners names and then it was signed

2    by somebody, I don't know who signed it.  It

3    looked like a female's handwriting.  Didn't look

4    like a male's handwriting.

5    Q.        The -- the resolution --

6    A.        Could have been -- I don't know.  Is it

7    -- I don't know who it was.  I'll retract my

8    statement.  How's that?  I don't know who did it.

9    Q.        Let's talks briefly about this

10   fictitious recording I think what's you -- the way

11   you described it.  Who do you claim made these

12   recordings that were spliced together?

13   A.        I think I already said I don't know.  I

14   do know that Laina Fetherolf was accused by

15   William Kaeppner, K-E -- K-A-E-P-P-N-E-R, that

16   when I left the room that there was a gathering

17   and there was an -- of Laina Fetherolf is all I

18   know, and that she was acting like I was still in

19   the room with a conversation.  And he thought it

20   was unfair, whatever was going on, so he called my

21   office to tell me about it.

22   Q.        And when you say --

23   A.        And then I --

24   Q.        I'm sorry.  Again, I never know when

425

```
1    you're done, but I'll wait until --

2    A.          I'm done.

3    Q.          Okay.  What do you mean by a gathering?

4    A.          I don't know.  He said that people got

5    together afterwards and she acted like she was

6    still talking to me.  I don't know.  Ask him.  He

7    was there.

8    Q.          Okay.  Who do you claim spliced these

9    tapes together or did the actual act of creating

10   the fictitious tape?

11   A.          I don't know.

12   Q.          Do you have any knowledge or

13   information as to who created the fictitious tape

14   or participated in the creation of the fictitious

15   tape?

16   A.          No.

17   Q.          You believe someone actually spliced

18   two different pieces of tape together, though?

19   A.          Yes.  Because I'm on there, and when

20   I'm asked questions, there's no response from me

21   because I wasn't there in the second part.

22   Q.          I didn't -- I didn't understand that.

23   A.          There was a conversation where I say

24   even hamburger goes bad in the fridge, and then
```

1    the next part of the conversation is Laina

2    Fetherolf saying I can't believe you just

3    referred to deceased people as hamburger.  The

4    problem is is I wasn't there at the time it was

5    being said.  So there was a time gap, but the

6    spliced tape makes it looks like she's talking to

7    me.  It's fictitious.  It's not real.  It didn't

8    happen.  And William Kaeppner will testify to

9    that.

10   Q.         Have you had any mental health

11   treatment or evaluations since July 1st, 2014?

12   A.         No.

13   Q.         Have you had any mental health or

14   medical provider recommend that you have mental

15   health treatment or evaluation since July 1st,

16   2014?

17   A.         No.

18   Q.         Have you told any mental health

19   provider or medical provider about having

20   emotional or mental health problems since July

21   1st, 2014?

22   A.         No.

23   Q.         Okay.  I don't have anything further.

24                    - - - - -

|       |                                                       |
|-------|-------------------------------------------------------|
| 1     | RECROSS-EXAMINATION                                    |
| 2     | BY MR. BARBIERE:                                       |
| 3     | Q.          I just have a couple more.                 |
| 4     |             Is William Kaeppner a patient of yours?    |
| 5     | A.          Yes.                                       |
| 6     | Q.          Have you read the first part of your       |
| 7     | deposition, the transcription?                         |
| 8     | A.          Yes.                                       |
| 9     | Q.          There is something in that I'm confused    |
| 10    | about I want to ask you about.                         |
| 11    | A.          Okay.                                      |
| 12    | Q.          You referred in the first part of your     |
| 13    | deposition to some meticulous notes that you have      |
| 14    | taken at some point.  At one point you said they       |
| 15    | were contemporaneous with the events and then          |
| 16    | later you said something different.  I want to         |
| 17    | first have you identify what are the meticulous        |
| 18    | notes that you're referring to?  Are these             |
| 19    | something that you handwrote or are they typed up?     |
| 20    |             MR. BRUNNER:  I'm going to instruct him    |
| 21    | not to answer because I went out in the hall and I     |
| 22    | answered this question before.  Anything that          |
| 23    | we're talking about here is attorney/client            |
| 24    | privileged.                                            |

428

1          MR. BARBIERE:  Okay.  Well, I

2     haven't --

3          MR. BRUNNER:  And I explained that in

4     the hallway.

5          MR. BARBIERE:  I haven't --

6          MR. BRUNNER:  I very clearly explained

7     that in the hallway off the record.

8          MR. BARBIERE:  I haven't gotten to

9     anything that's attorney/client privileged yet.  I

10    just asked him if he handwrote them or if they're

11    typed.

12    A.        There's no notes.

13         MR. BRUNNER:  It's attorney/client

14    privilege and we're not going to talk about the

15    documents.

16         MR. BARBIERE:  So you're -- okay.

17    Well, let me keep asking questions and you can

18    keep instructing him not to answer.

19         MR. BRUNNER:  No.  What time are we at

20    now?

21         THE WITNESS:  This tape, 1 hour 13

22    minutes.

23         MR. BRUNNER:  Total.

24         THE VIDEOGRAPHER:  First tape was 1

429

1  hour 44 minutes.

2          MR. TEETOR:  So ask the questions.

3          MR. BARBIERE:  So we're at about 3

4  hours.

5          MR. BRUNNER:  No.  Total, both days

6  we're over 7 hours.  I'm not -- he's not answering

7  any questions.  I went out in the hallway and I

8  explained it to you.  If that explanation is not

9  good enough for you, we're not answering any

10  questions.

11          MR. TEETOR:  Well, Rick, he has to made

12  make a record, which means he can ask the

13  questions and you can instruct him not to answer.

14          MR. BRUNNER:  No.  We're past the time.

15  We're over seven hours.  I'm not going to do that.

16          MR. TEETOR:  We agreed we would do four

17  hours today.

18          MR. BRUNNER:  I am over seven hours.

19  I'm going to bring him back so you can ask him

20  about damages.  I'm not going to get into this

21  attorney/client privilege.  If my word is not good

22  enough for you in the hallway --

23          MR. BARBIERE:  I didn't say your word

24  wasn't good enough.

430

1          MR. BRUNNER:  If my word is not good

2    enough for you in the hallway --

3          MR. BARBIERE:  I'm not --

4          MR. BRUNNER:  -- then we're not going

5    there today.  We're not staying around for this.

6          MR. BARBIERE:  I'm not saying that your

7    word isn't good enough.  I have to make a record.

8    I'm just going to ask --

9          MR. BRUNNER:  No, you don't.

10          MR. BARBIERE:  -- him a couple

11   questions.

12          MR. BRUNNER:  He's not answering any

13   questions about what I told you about in the

14   hallway.

15          MR. BARBIERE:  Okay.  And I'm not going

16   to ask him about that.

17          MR. BRUNNER:  It's attorney/client

18   privilege.

19          MR. TEETOR:  There's nothing

20   attorney/client privilege about asking him if it's

21   handwritten or not.

22          MR. BRUNNER:  I'm telling you I've told

23   you what the document was.  And I told you it was

24   an attorney/client privilege and we're not getting

431

1    into it.

2                MR. TEETOR:  Then let him make his

3    record.

4                MR. BRUNNER:  Why?  We're --

5                MR. TEETOR:  Because he has a right to

6    make a record.

7                MR. BRUNNER:  -- past our seven hours.

8    I'm going to bring him back for damages.  I'm not

9    sticking around here for this.

10                MR. TEETOR:  You --

11                MR. BARBIERE:  You agreed --

12                MR. TEETOR:  -- agreed we'd do four

13    hours.

14                MR. BRUNNER:  And I am not going to get

15    into the issues that are attorney/client

16    privilege.  I'm telling you that's --

17                MR. BARBIERE:  I'm not going to ask him

18    any questions that are protected by the

19    attorney/client privilege.

20                MR. BRUNNER:  I'm not going to tell you

21    about him -- what he -- what he prepared for

22    counsel.  Now, if that -- if my explanation to you

23    in the hallway is not good enough, then there's

24    nothing I can do about that.

1           MR. LAMBERT: Since I don't believe I

2    was present, are we -- are you claiming these

3    notes that he's referred to in the deposition

4    previously were actually prepared after he

5    contacted counsel and were not contemporaneous?

6           MR. BRUNNER: They were prepared after

7    discussion with counsel, yes.

8           MR. LAMBERT: Okay. Okay. Because

9    that was my understanding they're -- that he had

10    indicated there were -- there were notes that were

11    contemporaneous.

12           MR. BRUNNER: Well, contemporaneous

13    with some things. But after -- after counsel had

14    been retained.

15           MR. LAMBERT: But --

16           MR. BARBIERE: You're talking about

17    after you were retained?

18           MR. BRUNNER: Yes.

19           MR. LAMBERT: He could ask about the

20    ones -- any notes prior to that; would you agree,

21    Rick.

22           MR. BRUNNER: As long as they weren't

23    prepared by Mr. -- for Mr. Kernen, but, yes.

24           MR. BARBIERE: And that's what I want

433

1    to make sure.

2              MR. BRUNNER:  Yeah.  Okay.

3    Q.          What I want to make sure is are there

4    any notes that you took regarding any of these

5    events that are subject -- relevant to your

6    complaint that occurred before you met with

7    Mr. Brunner?

8    A.          No.

9              MR. BARBIERE:  Okay.

10             MR. LAMBERT:  That was simple enough.

11             MR. BRUNNER:  Your discrepancy I

12   explained it in the hallway.

13             MR. BARBIERE:  You did.  But I needed

14   to know that answer.

15             MR. BRUNNER:  Yeah.  All right.

16             MR. BARBIERE:  Thank you.  That's all I

17   have.

18             MR. BRUNNER:  Thank you.  All right.

19   We'll read.

20             THE VIDEOGRAPHER:  We're off the

21   record.  The time is 5:49.

22             (Signature not waived.)

23                    - - - - -

24             Thereupon, the foregoing proceedings

434

1          concluded at 5:49 p.m.

2                   - - - - -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  State of Ohio      :       C E R T I F I C A T E
   County of Franklin: SS

2

3      I, Stacy M. Upp, a Notary Public in and for the
   State of Ohio, certify that David L. Cummin was by
   me duly sworn to testify to the whole truth in the

4  cause aforesaid; testimony then given was reduced
   to stenotype in the presence of said witness,

5  afterwards transcribed by me; the foregoing is a
   true record of the testimony so given; and this

6  deposition was taken at the time and place
   specified on the title page.

7

8      Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure, the witness and/or the parties
   have not waived review of the deposition

9  transcript.

10     I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,

11 and further I am not a relative or employee of any
   attorney or counsel employed by the parties hereto,

12 or financially interested in the action.

13     IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Columbus, Ohio, on

14 June 23, 2016.

15

16

17

18

19 *[signature: Stacy M. Upp]*

20 _____
   Stacy M. Upp, Notary Public - State of Ohio

21 My commission expires August 6, 2016.

22

23

24

Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC

436

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, David L. Cummin, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU21550DC  S-SU P-DL